

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:<br><br>**G-I HOLDINGS, INC. f/k/a GAF CORPORATION, et al.**<br><br>**Debtors.** | Case Nos.: 01-30135 (RG) and<br>01-38790(RG)<br>(Jointly Administered)<br><br>**OPINION** |

<u>**APPEARANCES:**</u>

**Riker, Danzig, Scherer, Hyland & Perretti, LLP**
BY:   Dennis J. O'Grady, Esq.
        Mark E. Hall, Esq.
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
*Co-Counsel for the Debtor, G-I Holdings, Inc.*

**Weil, Gotshal & Manges, LLP**
BY:   Martin J. Bienenstock, Esq.
        Kathryn L. Turner Esq.
        Philip M. Abelson, Esq.
767 Fifth Avenue
New York, New York 10153
*Co-Counsel for the Debtor, G-I Holdings, Inc.*

**Weil, Gotshal & Manges, LLP**
BY:   Debra L. Goldstein, Esq.
        Robert R. Summerhays, Esq.
        Erin D. Eckols, Esq.
        Matthew P. Harper, Esq.
200 Crescent Court
Suite 300
Dallas, Texas 75201
*Co-Counsel for the Debtor, G-I Holdings, Inc.*

**Office of the United States Trustee**
By:     Mitchell B. Hausman, Esq.
One Newark Center
Newark, New Jersey 07102
*Counsel for the United States Trustee*

**Lowenstein Sandler, P.C.**
BY:     Jeffrey D. Prol, Esq.
        Scott Cargill, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068-1791
*Co-Counsel for the Official Committee of Asbestos Claimants*

**Caplin & Drysdale, Chartered**
BY:     Trevor W. Swett, III, Esq.
        Leslie M. Kelleher, Esq.
One Thomas Circle, NW
Washington, D.C. 20005
*Co-Counsel for the Official Committee of Asbestos Claimants*

**Saiber, Schlesinger, Satz & Goldstein, L.L.C.**
BY:     David R. Gross, Esq.
        Nancy A. Washington, Esq.
One Gateway Center, 13th Floor
Newark, New Jersey 07102-5311
*Co-Counsel for C. Judson Hamlin, the Legal Representative of Present and
  Future Holders of Asbestos-Related Demands*

**Keating, Muething & Klekamp, P.L.L.**
BY:     Kevin E. Irwin, Esq.
        Michael L. Scheier, Esq.
One East Fourth Street
Suite 1400
Cincinnati, Ohio 45202
*Co-Counsel for C. Judson Hamlin, the Legal Representative of Present and
  Future Holders of Asbestos-Related Demands*

**Duane Morris, LLP**

2

BY:    Michael F. Hahn, Esq.
744 Broad Street
Newark, New Jersey 07102
*Counsel for the Bank of New York*


**United States Department of Justice**
Tax Division
BY:    Richard G. Jacobus, Esq.
P.O. Box 227, Ben Franklin Station
Washington, D.C. 20044
*Counsel for the Internal Revenue Service*

**Pitney Hardin LLP**
BY:    Richard M. Meth, Esq.
200 Campus Drive
Florham Park, New Jersey
Morristown, New Jersey 07962-1945
*Co-Counsel for Certain Noteholder Defendants in Adv. Pro. 04-2192(RG)*

## ROSEMARY GAMBARDELLA, BANKRUPTCY JUDGE

Presently before the Court are proposals submitted by adverse parties regarding the estimation methodology and related discovery and scheduling order this Court should approve for the purpose of estimating in the aggregate the asbestos-related personal injury claims pending against debtors, G-I-Holdings, Inc., pursuant to 11 U.S.C. §502(c). On May 20, 2005 G-I Holdings, Inc. ("Debtors"), the Official Committee of Asbestos claimants (the "Committee") and the Legal Representative of Present and Future Holders of Asbestos-Related Demands (the"Legal Representative") filed separate pleadings stating their respective positions on estimation methodology and discovery. Debtors filed a "Motion to Establish Aggregate Estimation Protocol and for Entry of Scheduling Order" ("G-I Mot.") and a brief in support thereof ("G-I Br.") (respectively, Docket Nos. 4884, 4885); the Legal Representative filed "The Legal Representative's Memorandum in support of [Proposed] Estimation Discovery Plan and Order" ("LR

3

Memo.")(Docket No. 4886); and the Committee filed the "Position Paper of the Official Committee of

Asbestos Claimants with Respect to Estimation of the Debtor's Aggregate Asbestos Liability and Related

Discovery and Scheduling Matters" ("Comm. Position Paper")(Docket No. 4887). Responses to the initial

pleadings were filed by each party on June 15, 2005 (referred to respectively as "G-I  Resp.", "Comm.

Op.",  "LR Op."). Replies were filed by each party on July 1, 2005 (referred to respectively as the "G-I'

Reply", the "Comm. Reply" and the "LR Reply").[1]  A hearing on the matter was conducted on July 14,

2005 at which time the Court reserved its decision. Thereafter, additional papers and exhibits were

submitted to the Court.[2]

---

[1]        On July 1, 2005, the United States, through counsel for the Tax Division of the Department of
Justice, filed a letter addressing the estimation-related briefs that had been submitted by counsel for
Debtors, the Committee and the Legal Representative ("U.S. Letter") .  The letter supplements the
United States' Opposition to Debtors' Motion for a Sixth Extension of the Exclusive Periods for Filing
a Plan of Reorganization and Soliciting Acceptances Thereof which was filed on May 10, 2005.  In the
letter, counsel states that while "[t]he proposals of the Committee and the Legal Representative view
estimation in realistic terms", the Debtor's estimation proposal and discovery sample "will delay plan
confirmation for years and inflict needlessly heavy fiscal burdens on the estate."  (U.S. Letter at 2).  It is
also noted in the letter that "the United States takes no position regarding the merits of any individual
asbestos claim or category of asbestos claims, nor what the eventual outcome of claims estimation in
this matter ought to be."  (U.S. Letter at n.2).

[2]        Prior to the hearing, Debtors supplemented their Reply with a letter brief filed on July
12, 2005 ("G-I 7/12/05 Letter Brief") to which they attached a copy of the June 30, 2005 opinion of
Judge Janis Graham Jack of the U.S. District Court for the Southern District of Texas in the Silica
MDL. (Order 29: Addressing Subject-Matter Jurisdiction, Expert Testimony and Sanctions, June 30,
2005, In re Silica Prod. Liab. Litig., MD Docket No. 1553 (S.D. Tex.)).
Subsequent to the hearing, on July 29, 2005, the Committee and Legal Representative filed separate
responses to Debtors' 7/12/05 Letter Brief ("Comm. 7/29/05 Response")("LR 7/29/05 Response").
Debtors filed a reply to the 7/29/05 responses on August 19, 2005 ("G-I 8/19/05 Reply").
        On August 26, 2005, the Committee filed a letter brief ("Comm. 8/26/05 Letter Brief") in
which it enclosed the August 19, 2005 estimation opinion of Judge Joseph H. Rodriguez, U.S. District
Judge for the District of Delaware in In re Federal Mogul Global, Inc., Civ. No. 05-59 (JHR).  The
Legal Representative also submitted a letter brief addressing Federal Mogul on August 31, 2005 ("LR
8/31/05 Letter Brief").  Debtors filed a responding letter brief on September 12, 2005 ("G-I 9/12/05

The following constitutes this Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.   This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B) (2006).  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 (2006 ) and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984.   Venue is proper pursuant to 28 U.S.C. § 1409(a)(2006).

## I.    Parties, Facts And Procedural History[3]

On January 5, 2001, G-I Holdings filed a voluntary petition under Chapter 11 of the Bankruptcy

---

Letter Brief").    The Committee filed a reply to Debtors' 9/12/05 Letter Brief on October 4, 2005 ("Comm. 10/4/05 Letter Brief")

On October 31, 2005, Debtors filed a "Notice of New Authorities and Supplemental Memorandum in Support of (1) Debtors' Motion to Establish Aggregate Estimation Protocol and for Entry of Scheduling Order; and (2) Debtors' Proposed Estimation Discovery Plan and Order" ("G-I - New Authorities - 10/31/05").  The Legal Representative filed a response to Debtors' New Authorities on November 22, 2005 ("LR 11/22/05 Response").  The Committee filed a response to Debtors' New Authorities on November 23, 2005 ("Comm. 11/23/05 Response").

On March 28, 2006, Debtors filed additional papers styled "Notice of New Authorities and Supplemental Memorandum in Support of (1) Debtors' Motion to Establish Aggregate Estimation Protocol and for Entry of Scheduling Order; and (2) Debtors' Proposed Estimation Discovery Plan and Order" ("G-I - New Authorities - 3/28/06").  The Legal Representative filed a response to Debtors' New Authorities on April 20, 2006 ("LR 4/20/06 Response").  The Committee filed a response to Debtors' New Authorities on April 21, 2006 ("Comm. 4/21/06 Response").  On May 24, 2006, Debtors filed a "Reply Brief Regarding Notice of New Authorities and Supplemental Memorandum in Support of (1) Debtors' Motion to Establish Aggregate Estimation Protocol and for Entry of Scheduling Order; and (2) Debtors' Proposed Estimation Discovery Plan and Order" ("G-I 5/24/06 Reply Brief). On June 26, 2006, the Committee and Legal Representative filed a "Joint Sur-reply to Debtors' 'Reply Brief Regarding Notice of New Authorities and Supplemental Memorandum Filed May 24, 2006'" ("6/26/06 Joint Sur-reply"). On July 31, 2006, Debtors filed "Debtors Response to 'Joint Sur-reply' filed June 26, 2006 Regarding Estimation Discovery" ("G-I 7/31/06 Response to the Joint Sur-reply"). On August 1, 2006, the Committee submitted a letter, which the Legal Representative joined, addressing Debtors' 7/31/06 Response to Joint Sur-reply ("8/1/06 Joint Letter")and asking that the Court disregard Debtors' 7/31/06 Response to Joint Sur-reply.

[3]This section contains excerpts from In re G-I Holdings, Inc. f/k/a GAF Corporation, et. al. 323 B.R. 583, 587-88 (Bankr. D.N.J. 2005).

Code. On August 3, 2001, ACI, Inc., a subsidiary of G-I Holdings, filed a voluntary Chapter 11 petition.

On October 10, 2001, this Court entered an Order directing the joint administration of the G-I Holdings

and ACI, Inc. bankruptcy cases.   Since the filing of its bankruptcy petition, G-I Holdings has been

operating its business as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

See 11 U.S.C. § 1107(a) (2006); see also 11 U.S.C. § 1108 (2006). G-I Holdings is the successor-in-

interest to GAF Corporation (hereinafter "GAF"), an entity named in approximately 500,000 asbestos

actions.   The Committee submits that, as successor-in-interest to GAF, G-I Holdings remains liable for

approximately 150,000 asbestos lawsuits filed, but unresolved, as of the petition date and for unknown

numbers of asbestos claims that will be filed in the future.    See In re G-I Holdings, Inc. f/k/a GAF

Corporation, et. al., 323 B.R. 583, 588 (Bankr. D.N.J. 2005).

Building Materials Corporation of America (hereinafter "BMCA"), a leading manufacturer of

roofing and building products, is an indirect subsidiary of G-I Holdings, and is also the primary operating

subsidiary and principal asset of G-I Holdings.[4]   BMCA, which was established in 1994, received

substantially all the assets of GAF's roofing products business and expressly assumed $204 million of

asbestos liability, with G-I Holdings indemnifying BMCA against any additional asbestos liability. In re G-I

Holdings, Inc., 313 B.R. 612, 621 (Bankr.D.N.J.2004).[5]

The Official Committee of Asbestos Claimants (hereinafter the "Committee") is an official

---

[4]BMCA is not a debtor in this bankruptcy case.

[5]Although BMCA claims to have never manufactured any products containing asbestos, the
Company has been named as an additional defendant in more than one thousand asbestos bodily injury
lawsuits against GAF since September of 2000. In re G-I Holdings, Inc., 313 B.R. at 621.

committee of creditors which was appointed on January 22, 2001 by the United States Trustee pursuant to § 1102(a) of the Bankruptcy Code to represent those individuals who allegedly suffered injuries related to the exposure to asbestos from products manufactured by the predecessors of G-I Holdings. See 11 U.S.C. § 1102(a) ( 2006 ).[6]  This Court appointed C. Judson Hamlin as the Legal Representative of Present and Future Holders of Asbestos-Related Demands (hereinafter the  "Legal Representative") on October 10, 2001.  The Legal Representative is a fiduciary who represents persons who hold present and future asbestos-related claims against G-I Holdings.                  On June 19, 2002, prior to the estimation-related pleadings currently before this Court, G-I Holdings filed a motion which it described as an application for an order "pursuant to 11 U.S.C. § 502 (c) establishing method to liquidate asbestos claims," (hereinafter the "Estimation Motion"). On June 25, 2002, G-I Holdings filed a companion motion to "fix a final date for filing proofs of claim," which the parties referred to as the "Bar Date Motion."[7]  Both the Committee and the Legal Representative filed objections to G-I Holdings' Estimation Motion.

On May 23, 2002, before G-I's Estimation Motion was filed, the Committee moved to withdraw the reference for all proceedings relating to claims estimation in the G-I Holdings bankruptcy case.  On August 13, 2002, the Legal Representative also moved to withdraw the reference with respect to G-I Holdings's Estimation Motion as well as its Bar Date Motion.  The United States District Court for the

---

[6]Section 1102(a)(1) of the Bankruptcy Code provides in relevant part as follows: "[a]s soon as practicable after the order for relief under [C]hapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate." 11 U.S.C. § 1102(a) (2006).

[7]  The parties have suspended the Bar Date Motion indefinitely.  See In re G-I Holdings, Inc. f/k/a GAF Corporation, et. al.,  323 B.R. 583, 589 (Bankr. D.N.J. 2005).

District of New Jersey denied the motions to withdraw the reference on May 13, 2003 in a reported

decision, Official Committee of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.), 295

B.R. 211 (D.N.J.2003).

## II.      The Estimation Opinion

On February 1, 2005, this court issued its opinion on the Estimation Motion captioned  In re G-I

Holdings, Inc. f/k/a GAF Corporation, et al. 323 B.R. 583 (Bankr. D.N.J. 2005)( "Estimation One").[8]

In Estimation One this Court discussed the estimation of claims pursuant to 11 U.S.C. § 502(c) and set

forth the parameters governing claims estimation as follows:

> While the Bankruptcy Code certainly envisions an estimation proceeding, the Code is
> "silent as to the manner in which contingent or unliquidated claims are to be estimated."
> Bittner v. Borne Chem. Co., 691 F.2d 134, 135 (3d Cir.1982). In general, a bankruptcy
> court has discretion to determine the appropriate method of estimation in light of the
> particular circumstances of the bankruptcy case before it. In re Trident Shipworks, Inc.,
> 247 B.R. 513, 514 (Bankr.M.D.Fla.2000); see also In re Thomson McKinnon Sec., Inc.,
> 143 B.R. 612, 619 (Bankr.S.D.N.Y.1992) ("In estimating [a] claim, the bankruptcy court
> should use whatever method is best suited for the circumstances") (citation omitted). As
> articulated by the Third Circuit Court of Appeals, the principal consideration in selecting

---

[8]

On July 14, 2005, the Court entered an order consistent with the February 1, 2005
Opinion, denying G-I Holdings Inc.'s  application for an order pursuant to 11 U.S.C. §
502 (c) establishing a method to liquidate individual asbestos claims and establishing
method to estimate present asbestos liabilities (the "July 14, 2005 Order"). G-I
Holdings, Inc. appealed the July 14, 2005 Order.  The Committee and the Legal
Representative moved to dismiss the appeal on the basis that the July 14, 2005 Order
was not final.  By Order dated December 7, 2005 and filed December 9, 2005,  the
District Court for the District of New Jersey granted the motion of the Committee and
Legal Representative and dismissed Debtors' appeal on the basis that the July 14, 2005
Order was not final.  The district court refused to grant leave for Debtors to appeal the
interlocutory order.  See In re G-I Holdings Inc., No. 05-4630 (WGB) (D. N.J.
December 9, 2005) (Bassler, U.S.D.J., Order and Opinion granting motion of Legal
Representative and Committee to dismiss Debtors' appeal).

an estimation procedure "must be an accommodation to the underlying purposes of the Code." Bittner, 691 F.2d at 135. Thus, to the greatest extent possible, a selected estimation procedure should not run counter to the efficient and expeditious administration of the bankruptcy estate. Id. at 135-36. In estimating claims pursuant to § 502(c), a bankruptcy court "is bound by the legal rules which may govern the ultimate value of the claim. For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law." Id. at 135. However, "there are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the Code." Id. at 136.

Section 502(c) of the Bankruptcy Code is drafted in mandatory terms. That is, any contingent or unliquidated claim "shall" be estimated so long as the "liquidation" of the particular claim would "unduly delay the administration of the case." 11 U.S.C. § 502(c) (West 2004). Consequently, before a court orders an estimation proceeding, an initial determination must be made that liquidating the claim or claims would unduly delay the bankruptcy case. Id. See also O'Neill v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.), 981 F.2d 1450, 1461 (5th Cir.1993) ("In order for the estimation process of § 502(c) to apply, a claim must be contingent or unliquidated and fixing the claim must entail undue delay in the administration of justice"); Apex Oil Co. v. Stinnes Interoil, Inc. (In re Apex Oil Co.), 107 B.R. 189, 193 (Bankr.E.D.Mo.1989) ("[T]he duty to estimate is not mandatory until the court determines that liquidation of the claim outside of the bankruptcy court would unduly delay the bankruptcy proceeding").

At present, G-I Holdings has more than 150,000 asbestos claims pending against it, with the prospect of several hundred thousand more asbestos-related personal injury claims being filed in the future. As G-I Holdings itself submits, if it "were required to litigate each and every asbestos personal injury claim asserted against it, it would take years, actually lifetimes, before these claims would be liquidated." ( G-I Br., pg. 3). The Committee agrees with this observation. Given this very real assessment of the enormity of litigation facing G-I Holdings, requiring the Company to first liquidate each and every asbestos-related personal injury claim outside of the bankruptcy context would undoubtedly cause undue delay in the administration of the bankruptcy case and could possibly be the death knell for the successful reorganization of this debtor. Therefore, some form of estimation proceeding is required.

Having reached this conclusion, however, the Court is next faced with the critical task of selecting an appropriate estimation process or methodology that also comports with the requirements of Bittner; namely, one that adheres to the legal rules that govern the ultimate value of the claim and that also promotes the efficient and expedient administration of the G-I Holdings's bankruptcy estate. Significantly, the parties agree that neither a debtor nor its personal injury claimants have a right to jury trial in an estimation proceeding conducted

under § 502(c) of the Bankruptcy Code. See, e.g., In re Standard Insulations, Inc., 138
B.R. 947, 951 (Bankr.W.D.Mo.1992) ("The court concludes from the statutory language
[of 28 U.S.C. § 157(b)(2)(B), 28 U.S.C. § 157(b)(5), and 28 U.S.C. § 1411(a) ] that
jury trials are not required for personal injury claims at the claims allowance stage"). While
the parties agree on this nuanced point, the most contentious issue between the parties is
whether the individual asbestos-related personal injury claimants, taken collectively, have
any jury trial rights within the context of the bankruptcy proceeding.

In re G-I Holdings, Inc, 323 B.R. 583, 599-600. However, as this Court concluded later in Estimation

One "asbestos claimants do in fact possess jury trial rights under the Seventh Amendment to the United

States Constitution for purposes of *liquidating* their respective claims against the G-I Holdings bankruptcy

estate." Id. at 607. The Court further held that:

> Nevertheless, bankruptcy court jurisdiction over the claims allowance process is distinct
> from liquidation for purposes of distribution. In re Standard Insulations, Inc., 138 B.R.
> 947, 953 (Bankr.W.D.Mo.1992). The allowance or disallowance of a claim is not
> identical to the liquidation of a claim for purposes of distribution. Id. at 954. A jury trial is
> not required for an action at law "if it is closely intertwined with claims allowance
> proceedings unique to bankruptcy law." Id. at 952. In other words, while creditors of a
> bankruptcy estate cannot be divested of their jury trial right for determining the ultimate
> extent and value of their personal injuries for purposes of distribution, creditors are not
> entitled to a jury trial in an estimation proceeding under § 502(c) when the purpose of the
> proceeding is to determine the allowance or disallowance of claims against the bankruptcy
> estate.
> Id.

## III.    The Estimation Protocol and Discovery Plan Submissions

The parties have submitted voluminous papers and even more extensive exhibits in support of their

respective estimation protocol and discovery proposals. At the root of the conflict between Debtors on

one side and the Committee and Legal Representative on the other is the parties' differing views on the

Debtors' solvency. However, as this Court stated in Estimation One, "the estimation proceeding envisioned

by the Court ... will not be to simply 'test' the solvency of G-I Holdings. G-I Holdings should be afforded

10

an opportunity to review the claims against the estate and object to those claims that it believes are

illegitimate or dispensable as a matter of law." In re G-I Holdings, Inc. 323 B.R. 583, 622-623 (Bankr.

D.N.J. 2005).  Therefore, in the matter sub judice, the crux of the dispute involves the scope of discovery

each of the parties should be allowed in order to prepare their cases for the estimation hearings to follow.


Debtors believe that most of the claims filed against them are illegitimate when properly analyzed.

In order to support this contention, Debtors seek discovery from a random sample of approximately 2000

to 2500 individual asbestos claimants on topics such as work history and product exposure, among other

things, and seek claimant production of medical records including original x-rays.  Debtors believe that

their historical claims data is merely the beginning point for estimation analysis and that they require the

discovery through claimant sampling to address information gaps in the historical database.  Debtors also

want the estimation to take into account changes in the asbestos litigation landscape such as new state tort

legislation in key states, unavailability of punitive damages and higher scrutiny of evidence produced by

mass screening companies.

 In contrast, the Committee and Legal Representative maintain that there is enough data in Debtors'

"unusually rich" pre-petition claims resolution database to allow an estimation of claims in the aggregate

without individual claimant discovery.  The Committee and Legal Representative believe that individual

claimant discovery through sampling will drain estate resources, result in delay and will not yield new

information useful for an aggregate estimation of Debtors' liability.   The Committee and Legal

Representative also argue that individual claimant discovery triggers claimants' due process rights.

Furthermore, the Committee contends that claimant discovery is burdensome on claimants and their counsel

11

who have not worked up their clients' files since the automatic stay began with the bankruptcy filing and

is burdensome for claimants who entered settlements pre-petition.    The Committee and Legal

Representative adamantly object to the use of summary judgment proceedings to exclude claims.

The parties further dispute whether the future claims should be estimated

contemporaneously with pending claims or after the conclusion of the estimation hearings on

pending malignant and nonmalignant claims as described by the Court in Estimation One.    The

Legal Representative. and the Committee request that the Court alter its prior ruling to allow future

claims to be estimated with pending claims.

The following is a more extensive summary of the parties' positions.

A.    **The position of Debtors**

Debtors believe that  "... properly analyzed, many (if not  most) of the asbestos-related claims

against Debtors' estate are  illegitimate." (G-I Mot. at 2).   Therefore, Debtors assert they must be able

to "challenge the  validity of categories of claims through discovery, expert review and analysis (including

the use of court-approved expert panels), evidentiary motions, and motions for summary judgment." (G-I

Mot. at 3).    In order to accomplish this, Debtors have proposed discovery from a sample of claimants:

> In lieu of a bar date, G-I proposes a representative analysis of a random,  representative,
> and unbiased sample of claims, including but not limited to information regarding work
> history, product exposure and medical diagnoses. Data from the representative sample will
> allow the Court and the parties' valuation experts to determine what adjustments to G-I's
> past history are necessary to arrive at an accurate valuation. The data will allow the Debtors
> to challenge categories of illegitimate claims and will also provide the Court with the
> foundation to address substantive issues regarding the legal validity of categories of asbestos
> personal injury claims asserted against G-I.

(G-I Mot. at 4).  Debtors state that they will construct a sample that is truly random and

12

"that the universe from which the sample will be drawn be restricted (i) to exclude claims

filed against G-I prior to 1997 (to correspond with Dr. Mark Peterson's [the Committee's

estimation expert's] assumed calibration period); and (ii) to include only claims for which

both a doctor and lawyer name appear so that medical records will more likely exist." (G-I

Br. at 23).   Debtors further propose that the discovery, including original x-rays, be placed

in a central repository the location of which will be agreed upon by the parties.  (G-I Br. at

24-25).   Thereafter, Debtors state that "[ a] meaningful analysis of the material collected

from the sampling program will be conducted to determine the appropriate adjustments to

G-I's historical claims experience and the results extrapolated to the universe of G-I's

claims." (G-I Mot. at  6).

Debtors contend, citing Estimation One,  that the purpose of estimation is not purely

to test Debtors solvency "but to afford Debtors the 'opportunity to review the claims against

the estate and object to those claims that [Debtors believe] are illegitimate or dispensable

as a matter of law." (G-I Br. at 1).   Debtors assert that they do not intend to object to

individual claims for estimation purposes, although Debtors maintain they are entitled to do

so under the Estimation Opinion.  (G-I Mot. at 8, n.4).   Instead, Debtors plan to "object

to categories of claims on a consolidated basis during the estimation process and defer

determination of individual claim validity for the distribution phase." (G-I Mot. at 8, n.4).

**Debtors believe many claims filed against them are not legitimate**

Debtors look to a series of studies, other cases and recent state legislation, namely the Gitlin/Johns

Hopkins   Study[9],   an   audit   of   the   Johns-Manville   Personal   Injury   Trust[10],   the

---

[9]      According to Debtors, in the Gitlin/Johns Hopkins study, "the plaintiffs' readers had interpreted 96% of the chest x-rays deemed readable by the Johns Hopkins panel as consistent with asbestosis, [whereas] the Johns Hopkins researchers found only 4.5% of the same set of cases positive ..." (G-I Br. at 8-9; App. Ex. E (Joseph N. Gitlin, et al., Comparison of "B" Readers Interpretations of Chest Radiographs For Asbestos Related Changes, 11 J. Acad. Radiol. 843 (2004) (the "Gitlin /Johns Hopkins Study")).   Since  "the Johns Hopkins Study determined that there was a probability of less than 1 in 10,000 'that the differences noted between initial and consultant readers are due to chance alone'", Debtors suggest that the readings by B-readers retained by plaintiffs' counsel may be driven by financial gain and should be subjected to scrutiny. (G-I Br. at 9).   Debtors further claim that this study is "directly applicable to this proceeding' because about 63% of the claimants in the Gitlin/Johns Hopkins Study are also claimants against G-I." (G-I Br. at 9-10)("There are fifteen doctors (including Dr. Ray A. Harron) responsible for the initial diagnoses in both the Gitlin/Johns Hopkins Study and this proceeding. Two of those doctors, one of whom is Dr. Ray A. Harron, account for over 8,000 (20%) of all the pending nonmalignant claims against G-I." (G-I  Br. at 10).
    The Committee contends that the Gitlin/Johns Hopkins Study was "commissioned and funded by attorneys for asbestos defendants"  and that the study showed only "what was already well known: equally qualified and certified B-readers can, and often do, disagree as to the proper interpretation of x-rays." (Comm. Op. at 14).   The Committee has also submitted letters submitted to the Journal of Academic Radiology from doctors critical of the study.  (See Comm. Opp. at 15-16; Ex. 5).

    The Legal Representative states that the Gitlin/Johns Hopkins Study merely showed what had already been "well known in the world of asbestos disease for dozens of years and is attributable more to human nature than any conspiratorial fraud as G-I suggests."   (LR Op. at 15-17; Ex. 1 ( Sargent, E. Nicholas, M.D. "The ILO 1980 Classification System (Facts and Fallacies)" Thirteenth Annual Symposium on Chest Disease (New York May 27-29, 1983)).

[10]Debtors assert that with respect to the Johns Manville Trust, "[i]n 1998, audits conducted by the Trust concluded that for ten doctors retained by plaintiffs, 59% of the readings showing abnormalities were inaccurate."  (G-I Mot. at 12) (citing In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d 297, 309 (E.D.N.Y. 2002)). Furthermore, Debtors set forth that "[t]he audit also revealed that 11% of plaintiffs claiming cancer related to asbestos exposure did not have any evidence of cancer or any other disease." (G-I Mot. at 12; App.Ex. F (Letter from R. Falise to E. Inselbuch, dated April 24, 1998, (the "Manville Audit Results") at 2).  Debtors further assert that after new trust distribution procedures were set up following the audit with "appropriate medical criteria" - claims dropped nearly 80%. (G-I Mot. at 12; App. Ex. G. (Letter from Robert A. Falise, Chairman and Trustee of the Manville Personal Injury Settlement Trust,  to Judge Jack B. Weinstein and Judge Burton R. Lifland, dated July 30, 2004) at 1).
    The Committee argues that the results of the Manville Trust have been mis-characterized by Debtors.  The Committee contends that the audit results show only inter-reader variability and do not

14

proceedings related to the Silica MDL[11], other criticism of the use of mass screenings as the basis for

---

support a need for a sample of claimant medical records. (Comm. Opp. at 18-20; App. Ex.. 10  (A.R. Localio et al., Biostatitistcs Section, Dept of Health Evaluation Services, Penn. State Univ.College of Medicine & Center for Clinical Epidemiology and Biostatistics, The Manville Personal Injury Settlement Trust X-Ray Audit: An Assessment of the Identification of the Underlying Disease Process Implications for Medical Review by Certified B-Readers (1998)) at 14).  The Committee further states that trustees of the Manville Trust "never actually used the audit as a basis for denying a single claim." (Comm. Opp. at 19; App. Ex. 11 (Owens Corning, 1/19/05pm Tr. At 110-12 -Dr. Dunbar's testimony as expert witness for the Bank Group)).    In addition, the Committee contends that the Manville Trust distribution procedures were amended not because the audit found illegitimate claims, as posited by Debtors, but rather to remedy a concern that the compensation payment ration "had become  skewed in favor of the less serious injuries." (Comm. Opp. at 19) (citing In re Joint E.& S. Dists. Asbestos Litig., 237 F. Supp. 2d 297, 319 (E. & S.D.N.Y. 2002)).   Therefore, the Committee argues that the experience of the Manville Trust does not support Debtors' requested discovery sample.

The Legal Representative asserts, among other things, that the Manville Audit did not produce a " dramatic revelation" and that it  is "an irrelevant issue for estimation and need not even be considered in the process."  (LR Op. at 17).

[11] Debtors point out that in the Silica MDL hearings which involved claims related to silicosis, Judge Janis Jack stated that the testimony of Dr. Harron, who was one of the doctors involved in the mass screenings, raised  "great red flags of fraud. . .." (G-I Br. at 3; App. Ex. M  (Daubert Hearing Transcript, dated Feb. 17, 2005) at 23-24).  Debtors further assert that "Dr. Harron alone is responsible for the diagnoses of nearly 5,000 (12.5%) of the pending nonmalignant claims at issue in this proceeding."  (G-I Mot. at  12).

Debtors further address the Silica MDL proceedings and in particular, Judge Jack's June 30, 2005 opinion in the matter, in their July 12, 2005 letter to the Court. (See G-I  7/12/05 Letter Brief Ex. B (Order No. 29: Addressing Subject Matter Jurisdiction, Expert Testimony and Sanctions Dated June 30, 2005 - In re Silica Prod. Liab. Litig., MDL Docket No. 1553 (S.D. Tex))).  Debtors note that Judge Jack did not retain jurisdiction over the majority of the cases.  However, Debtors claim Judge Jack's Opinion, which also scrutinized and criticized certain of the silica plaintiffs' doctors, lawyers and screening companies for manufacturing diagnoses, further supports their proposed discovery because of the similarity of diagnosing silicosis and asbestosis and that "many of the same mass screening companies, experts and doctors involved in the Silica MDL are also responsible for a large number of claims against G-I." (G-I 7/12/05 Letter Brief at 1).   Furthermore, Debtors assert that the Judge Jack Opinion highlights their need for the discovery sample because it was extensive pretrial discovery with access to medical records that brought the abuses to light.  (G-I 7/12/05 Letter Brief at 3).

In contrast, the Committee asserts that the Silica MDL has no bearing on the estimation of Debtors' asbestos liabilities and does not support Debtors' requested discovery.  (See Comm. Op. at

claims[12], and newly proposed and/or enacted state legislation in Ohio, Georgia, Florida and Texas[13], as

---

23-25).  The Committee argues that the Silica MDL was in a very different procedural posture which makes it inapplicable to the current matter since the Silica MDL "involved consolidated pre-trial proceedings, with a view to the adjudication of individual claims" whereas the Court here is "not presiding over the trial of any individual asbestos claim."  (Comm. 7/29/05 Response at 3-4).  The Committee states that the evidence should be scrutinized at the point of distribution, not estimation. (Comm. 7/29/05 Response at 4).  The Committee also notes the court's refusal in the Federal Mogul estimation proceedings to grant a request by the property damage committee to re-open discovery in light of the Silica MDL ruling.   (Comm. 7/29/05 Response at 2, 4; Ex. 1 (Opinion of Judge Joseph H. Rodriguez, U.S.D.J., In re Federal Mogul Global, et. al., No. 05-00059 (JHR) (D. Del.), Tr. July 14, 2005)).

The Legal Representative asserts that the Silica MDL court's findings regarding Dr. Ray Harron and others were already known to G-I and G-I's pre-petition claims processing agency the CCR and thus the Silica MDL court's findings do not support the claimant discovery sample requested by Debtors.  (LR  7/29/05 Response at 3).

[12]Debtors cite other cases in which the reliability of mass screenings has been questioned namely  Raymark Indus., Inc. v. Stemple, No. 88-1014-K, 1990 WL 72588, at *7-*8 (D. Kan. May 30, 1990) in which debtors contend that "physicians' diagnoses did not "pass muster" with the court because, inter alia, the physicians had placed much weight on mass screening x-rays" (G-I Mot. At 12-13);  In re Asbestos Prod. Liab. Litig. (No. VI), MDL 875, Admin. Order No. 8, at 1-2 (E.D. Pa. Jan. 14, 2002), in which debtors contend that Judge Charles R. Weiner (U.S.D.J.) administratively dismissed without prejudice "all non-malignant, asbestos- related, personal injury cases 'which were initiated through a mass screening'") (G-I Mot. At 13; App. Ex. H); and Owens-Corning, Memorandum and Order, in which debtors contend that "Judge Fullam found that '[c]ertain pro-plaintiff B-readers were so biased that their readings were simply unreliable." (G-I Mot. at  12 -14; App. Ex. D at 6).

The Committee and Legal Representative disagree with Debtors' use of the above matters, among others, as a basis for Debtors to make a sweeping vilification of all mass screening companies and the evidence derived therefrom or as support for Debtors' proposed discovery.  The Committee argues that Debtors have grossly  mis-characterized Judge Fullam's decision in Owens Corning, which decision the Committee claims contradicts Debtors' request for claimant discovery rather than supports such discovery. The Committee also contends that "the interpretation of x-rays for purposes of diagnosing non-malignant asbestos diseases is a subjective process" and thus differing interpretations do not necessarily infer fraud.  (Comm. Op. at 12-13).  As support for this contention, the Committee cites In re Joint E & S Dists. Asbestos Litig., 237 F.Supp. 2d 297, 309 (E. & S.D.N.Y. 2002); Comm. Op. App. Ex. 2 (Owens Corning, Dr. Gary Friedman Depo. Tr.) at 249-50; and Comm. Op. App. Ex. 3 (Owens Corning, Dr. Joseph N. Gitlin Depo. Tr.) at 65-66.  The Committee further suggests that Debtors have had ample opportunity to uncover questionable claims during their "long history of vigorously defending and settling asbestos claims, with the assistance of well-funded and aggressive

compelling evidence in support of Debtors' assertion that many of the asbestos personal injury claims

against the estate when properly analyzed will prove to be illegitimate.  (G-I Mot. at 11-13).   The

supplemental pleadings filed by Debtors after the hearing date purport to demonstrate the growing evidence

of illegitimate asbestos personal injury claims.

> **Debtors believe their discovery plan will remove illegitimate claims and provide a
> more accurate estimation**.

Debtors have proposed the following discovery plan which they believe will weed out illegitimate

claims:

> First, G-I proposes a narrowly tailored discovery plan that will allow for collection of
> medical records and product exposure data from a statistically significant and random
> sample of G-I's claimants. This set of data will provide a solid foundation of
> representative information to address the "substantive issues regarding the validity of

_____

counsel."  (Comm. Op. at 13,n.12).

[13]Debtors note that in Ohio, Georgia, Florida and Texas, legislation has either been adopted or proposed which requires that asbestos personal injury claimants "either present   prima facie evidence, based on certain medical criteria, that physical impairment is a result of a medical condition where exposure to asbestos is a substantial contributing factor, or file a report verifying the same" in order to maintain an action in tort.  (G-I Br. at  14).   According to Debtors, "[t]hese four states account for over 42% of claims pending against G-I."  (G-I Br. at  14).   Therefore, Debtors assert that "[w]ith changes already occurring in four of the states from which a large number of the G-I claims originate, sample data to adjust for that legislation is essential .... Specifically, G-I's ability to analyze such data requires discovery of the medical evidence and exposure history alleged by the claimants." (G-I Br. at 15-16).

The Committee and Legal Representative argue that the state legislatures of Florida Ohio and Texas have specifically provided that the legislation does not affect the rights of a party in bankruptcy or the rights of claimants with respect to a trust.  (Comm. Op. at 39) (citing Fl. H.B. 1019 § 9(2)(a), 2005 Reg. Sess. (Fla.); Ohio Rev. Code. Ann. § 2307.95 (2004); Tex. Civ. Prac. & Rem. § 90.011, S.B. 15, 79th Reg. Sess. (Tex. 2005)).  The Debtor, however, contends, among other things, that the provisions referenced by the Committee, to the extent they attempt to affect bankruptcy matters, are void due to preemption and the Supremacy Clause.  (G-I Reply at 24).

claims" and is the best means of achieving the most accurate and efficient estimation possible. Estimation Opinion at 48.

Second, the medical data collected in the discovery phase will be analyzed by a neutral panel of medical experts. Experts will also perform a causation analysis on the information collected regarding product exposure. Results of both analyses will be incorporated into the reports of the parties' valuation experts. After submission of initial and rebuttal expert reports, expert discovery shall commence.

Third, the parties can file Daubert motions to exclude unreliable expert testimony.

Fourth, G-I can object to the substantive validity of categories of claims on a consolidated basis by filing motions for summary judgment.

Fifth, the Court will hold phased estimation hearings in accord with the Estimation Opinion to value G-I's aggregate asbestos personal injury liabilities.

Sixth, the Debtors will propose a chapter 11 plan in accord with the Court's estimation of its liabilities that includes procedures for processing asbestos personal injury claims for distribution purposes.

(G-I Mot. at 15).

Debtors recognize that their historical claims resolution data "provides the foundation for" and is a "major component of the Debtors' aggregate estimation methodology." (G-I Mot. at 15-16). Debtors assert that while they believe the historical data is the starting point of their estimation methodology, the methodology advocated by the Committee and Legal Representative, in contrast, "begins and ends at G-I's historical claims database." (G-I Mot. at 16).

**Debtors contend additional discovery is necessary because the historical database is insufficient.**

Debtors maintain that they need the requested discovery because the raw data in their claims database is "incomplete, unreliable, or does not account for changed circumstances." As an example of the insufficiency of the historical database, Debtors point out the deficiencies of the claims resolution data that resulted from Debtors' participation in the Center for Claims Resolution ("CCR"):

18

For example, from 1988 until 2000, G-I was a member of the CCR, a consortium of asbestos defendants that sought to lower litigation transaction costs by having each member named in a lawsuit pay a settlement share regardless of whether the plaintiff had produced any evidence of exposure to that member's products. Under the CCR regime, if the plaintiff produced evidence of product exposure from any one member defendant, then all defendants named in the lawsuit paid into the settlement. Thus, during the CCR years, significant information regarding claimants' exposure to G-I products is simply missing. Understandably, membership in the CCR resulted in G-I paying settlements to thousands of asbestos claimants that never produced any evidence of exposure to G-I's products and could not provide any such evidence because they never were exposed to those products. Accordingly, G-I needs to expand upon the historical information regarding claimants' alleged exposure so that the Court includes in its estimation only those actually injured by the Debtors' products.

(G-I Mot. at 16-17).   Furthermore, Debtors claim that after their "abrupt expulsion from the CCR in 2000" debtors were not prepared "to conduct a defense" and were "hastily settling only trial-listed cases, not surprisingly at inflated prices." (G-I Mot. at 17). Thus, Debtors argue that the claims resolution history during the post-CCR, pre-petition time period is not representative of "either the value or validity of those cases and cannot form the basis of an accurate estimation without adjustments to account for and correct this anomalous situation." (G-I Mot. at 17).

In addition, Debtors claim that there are still claims which do not specify an asbestos-related disease.  Debtors argue that discovery is needed in this area because  "[d]etermining with accuracy the disease alleged is particularly important for projecting both the number and value of claims that are or will be asserted against G-I because one of the primary factors in establishing claims value is the disease alleged." (G-I Mot. at 17).

Debtors assert that despite cross-referencing to other asbestos trust databases, medical information is still deficient:

For example, G-I needs access to the pathology reports underlying the cancer diagnoses for a sample of claimants because the audit by the Johns Manville Trust revealed that 11%

19

of those claiming cancer related to asbestos exposure did not have any evidence of cancer or any other disease. See App. Ex. F (Manville Audit Results), at 2. G-I also must estimate the percentage of the pending lung cancer claims in which the tumors metastasized from another location to determine the proportion of claimed lung cancers that actually resulted from asbestos exposure. Gathering this information from the sample will be useful in projecting the number of valid lung cancer claims in the future. A determination of the percentage of lung cancer claims with underlying asbestosis is also important because that disease combination is generally compensated at higher levels than either disease individually.

(G-I Mot. at p 17-18).

Debtors further claim that they require original radiographs from a sample of claimants to assess the validity of non-malignant claims. Debtors argue original radiographs are necessary because of the disparity found in the Johns Hopkins Study between neutral B-readers and B-readers retained by plaintiffs wherein plaintiffs' B-readers were much more likely to find compensable injury. (G-I Mot. at 18).

Debtors argue that their proposed sampling method is the "only practical method of evaluating the thousands of claims asserted against G-I." (G-I Mot. at 18). Debtors describe their sampling proposal as a "random, representative, and unbiased sample of approximately 2000-2500 claims" that will be "generated by professionals whose business it is to create such sampling programs." (G-I Mot. at 19). Debtors further assert that the discovery topics requested of the sample claimants are "narrowly tailored to address the issue of missing and/or incomplete claims data, including but not limited to documents concerning a claimants work history, exposure to a G-I product and medical records such as x-rays and PFT tests." (G-I Mot. at 19).[14]

---

[14] Debtors have submitted G-I's [Proposed] Estimation Discovery Plan and Order as an attachment to their Motion to Establish Aggregate Estimation Protocol and for Entry of a Scheduling Order. (See G-I Mot. at 19; App. Ex. I). The Order contains a long list of specific fact and expert discovery desired by Debtors in addition to fact and expert discovery Debtors will provide the

Debtors further argue that the discovery which they seek from claimants is not burdensome because: first, the discovery is narrowly tailored "to target only those areas it feels are necessary to meaningfully evaluate its claims history"; second, the requested discovery will be directed at claimants' counsel of record and "the reality is that ... the work of collecting the data will be done by the claimants' law firms, and more probably, by a legal assistant in the plaintiff's law firms"; third, processing the request is "a fairly simple routine"; fourth, Debtors request "that the third parties who are collecting the information conduct the exercise once" and thereafter "the sample will be sorted by [the] law firm so that each law firm only receives one list of claimants for which they must collect information"; fifth, Debtors propose "that the responding law firms prioritize their responses in accord with the phased estimation proceeding ordered by the Court"; and sixth, claimants selected for the sample "will not be required to submit additional information at the distribution phase" however they are not "prohibited from submitting additional information at the distribution phase if they so desire." (G-I Mot. at 20-21).

Debtors acknowledge however that the timing and efficiency of their discovery plan depends at least in part upon the cooperation of the Committee and third parties who possess relevant evidence.

---

Committee and the Legal Representative.    In general, Debtors seek discovery of claimant medical records, work history, smoking history, product identification, exposure and causation information, and complaints, claims, causes of action and proofs of claims for silicosis and for asbestos-related disease. Debtors further seek information regarding: the practices of plaintiffs' attorneys in "obtaining, processing, settling or trying asbestos personal injury cases" subject to a non-waiver regarding attorney-client and work product privileges, which is to be negotiated; fee arrangements between individuals or companies involved in claimant asbestos-related diagnosis and attorneys representing such claimants; the Baron Budd Action; and third-party discovery, such as depositions of B-readers. (See G-I Mot. App. Ex. I at 2-3).

21

Therefore the amount of time necessary for the fact discovery envisioned by Debtors is, in their words, "unpredictable". (G-I Br. at 1, n 2).[15]

**Debtors request that a neutral panel review the medical evidence**.

Debtors' estimation protocol envisions first that medical records will be produced through fact discovery directed at a random sample of claimants and second that those medical records will be analyzed by a neutral panel of experts who "can assist the Court with respect to diagnostic issues, such as the Internal Labor Office ("ILO") scoring of films and analysis of Pulmonary Function Test ("PFT") results." (G-I Mot. at 22). Debtors assert that there is precedent for the use of medical experts in both asbestos and breast implant litigation. (G-I Mot at 22).[16] Debtors further assert that "[w]ith respect to the analysis of x-ray films from non-malignant claimants or those claiming lung cancer with underlying asbestosis, the

---

[15] Debtors specifically state that "[c]ooperation from the Committee in obtaining discovery from a random sample of claims (including the production of original x-rays to a centralized repository) without the need for contested Rule 45 subpoenas will significantly expedite discovery and the remainder of the estimation schedule. However, because the records G-I seeks are possibly in the hands of claimants, their law firms, testing facilities, and/or medical providers, none of whom the Committee and Legal Representative can bind to cooperate, the time it will take to collect this discovery is unpredictable." (G-I Br. at n. 2).

[16] Debtors refer to the following authorities to support their proposal that an expert panel review claimant medical records: "Carl B. Rubin and Laura Ringenbach, The Use of Court Experts in Asbestos Litig., 137 F.R.D. 35, 38-39 (1991) (appointing a panel of experts to review medical evidence regarding diagnosis of asbestos related disease); Order 31, In re Silicon Gel Breast Implant Prods. Liab. Litig. (N.D. Ala. 1996), available at 4 MEALEY'S LITIG. REP.: BREAST IMPLANTS F-1 (June 23, 1996) (appointing panel of medical experts to provide independent opinion medical evidence supporting general causation); Renaud v. Martin Marietta Corp., 749 F. Supp. 1545, 1552-53 (D. Colo. 1990) (appointing independent expert to assess testing methods used by plaintiff's expert to support opinion on PCB contamination), aff'd, 972 F.2d 304 (10th Cir. 1992); Hall v Baxter Healthcare Corp., 947 F. Supp. 1387, 1404-05 (D. Or. 1996) (appointing and looking to panel of independent experts to provide opinion on medical evidence supporting causation)." Debtors Motion at 22.

use of neutral medical experts is particularly important because of the recent acknowledgment that '[c]ertain

pro-plaintiff B-readers were so biased that their readings were simply unreliable.'" (G-I Mot. at 23; App.

Ex. D ( <u>Owens-Corning v. Credit Suisse First Boston</u>, 322 B.R. 719 (D.Del. 2005)) at 6).

**Debtors envision further analysis from causation and valuation experts**.

Debtors next assert that "[e]xperts must conduct a causation analysis to determine the number and

value of claims in which the claimant was actually injured by a G-I asbestos containing product." (G-I Mot.

at 23).  Debtors argue that this type of analysis in which experts will review product exposure and work

history of claimants in the sampling program will address "the information gap created by G-I's membership

in the CCR and the results can be projected across the universe of claims for estimation purposes."  (G-I

Mot. at 23).

Debtors set forth that after the analysis of medical records by the neutral panel and after the

causation analysis is complete, the results "will be incorporated into the analysis of the parties' valuation

experts."  (G-I Mot. at 23-24).   Debtors assert that the valuation analysis must adjust G-I's historical

claims numbers and value " to account for factors that are unlikely to be replicated in future asbestos

litigation, including but not limited to, venue shopping, mass asbestos litigation screenings, erroneous x-ray

interpretations by B-readers so biased as to be unreliable, over payment to unimpaired claimants, bundling

of a small number of malignant claims with a mass of non-malignant claims, and the impact of punitive

damages on verdicts and settlements." (G-I Mot. at 24; App. Ex. D (<u>Owens Corning v. Credit Suisse First</u>

<u>Boston</u>, 322 BR 719 (D.Del. 2005)) at 6-8).  (citing); G-I Mot..  Debtors point out that at least one

changed circumstance, namely the unavailability of punitive damages, has been acknowledged by counsel

for the Legal Representative.  (G-I Mot. at 24, n. 16).   Debtors add that recent state legislation regarding

asbestos personal injury claims evidences the changing nature of asbestos litigation that must be accounted

for in the estimation.  (G-I Mot. at  24).  Following the analysis, Debtors state that the experts will submit

a report pursuant to Fed.RCiv.P. 26 and rebuttal reports will be permitted and further expert discovery

pursuant to the Federal Rules of Civil Procedure and other Court orders.   (G-I Mot. at 25).

**Debtors may use summary motion practice to address claims on a class-wide basis**.

Debtors intend to use Daubert motions to exclude "unreliable and irrelevant expert testimony." (G-

I Mot. at  25) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-592)(1993);   In re Paoli

R.R. Yard PCB Litig., 35 F.3d 717, 742-43 (3d Cir. 1994)).  Debtors assert that they  " may seek to

challenge the validity of claims on a class-wide basis if they are supported by expert evidence that does not

satisfy the Daubert standard."  (G-I Mot. at  25).  For example, Debtors assert that "global" Daubert

motions have been filed in the Silica MDL to exclude claims based on a single B-reading of an x-ray

harvested during a mass litigation screening."  (G-I Mot. at 25).

Debtors further intend to use summary judgment motions to object to claims on a claims-wide basis:

> Because there are many common issues of law and fact among the asbestos personal injury
> claims asserted against G-I, allowing the Debtors to object to the validity of categories of
> claims or to particular categories of evidence allows the Court to address these substantive
> issues efficiently. Therefore, pursuant to the Court's Estimation Opinion, G-I will use the
> data collected from its random, representative, and unbiased sample to "move for summary
> judgment on certain issues on a claims-wide consolidated basis pursuant to Federal Rule
> of Bankruptcy Procedure 7042."

(G-I Mot. at  26).

**Debtors agree  with the phased estimation approach ordered by the Court in Estimation
One.**

Debtors agree with the phased estimation hearings envisioned by the Court in Estimation One in which pending mesothelioma and lung cancer claims will be estimated first, the remainder of pending claims will be estimated second and a subsequent hearing will address future demands. (G-I Mot. at 26).

Debtors maintain :

> [t]he division that the Court has ordered for the estimation hearing is the most practical means of conducting an estimation in the aggregate. ... Because the claims are pending, the parties and the Court know exact claim counts and do not have to engage in the speculation that necessarily accompanies estimating future claims. In addition, the pending claims do not implicate epidemiological issues that must be considered in forecasting future claims.

(G-I Mot. at 26-27).

Debtors assert that at the end of the second estimation hearing they will propose a chapter 11 plan through which assets will be set aside and distributed accordingly. Debtors state that "[c]ategories of claims that the Court has ruled are substantively valid as a matter of law, and therefore allowable, will be entitled to vote in the plan confirmation process." (G-I Mot. at 27). Debtors' proposed scheduling order envisions proceedings in the following order: A) Fact Discovery; B) Expert Reports (including Rebuttal reports); C) Expert Discovery; D) Daubert Motions; E) Summary Judgment Motions; F) Pre-hearing Briefs; G) Pre-trial Conference; H) First Estimation Hearing - Phase One; I) First Estimation Hearing -Phase Two; J) Post-hearing Briefs and K) Second Estimation Hearing (for future claims). (G-I Mot. at 27-28).[17]

**Martin Certification**

_____

[17] The specific discovery schedule dates listed by Debtors in their pleadings are no longer applicable.

Debtors have submitted the Declaration of Dr. Denise Neumann Martin ("Martin Declaration"),

a Senior Vice President of NERA Economic Consulting in support of their request for a statistical sampling

of individual claimants.[18]   (G-I Reply, Ex. C).   According to Dr. Martin:

> certain data fields are missing from GAF's historical claims database which, if populated,
> would lead to a more precise estimation of claims.  These data gaps include claims with no
> known disease (that is, the disease field is not populated), claims lacking important
> subcategories within each disease (such as lung cancer claims with underlying asbestosis
> or impaired versus unimpaired non-malignant claims) and claims with no indication of
> exposure to GAF asbestos containing products.

Martin Declaration at ¶ 4.  Dr. Martin further proffers that a random sample will allow for a more precise

estimation of liability:

> A statistically random sample of 2,500 claim files would fill in critical missing information
> in GAF's historical claims database on disease and impairment.  This sample would also
> allow us to further verify the product identification analysis performed to date on more than
> 15,000 asbestos-related depositions, estimating the proportion of claimants who would
> testify of exposure to a GAF asbestos-containing product.  Use of this additional
> information on both disease and exposure will allow a more precise estimate of GAF's
> aggregate liability.

Martin Declaration at ¶ 5.

**Debtors believe that the Committee has improperly withheld relevant evidence from Debtors**

In their Reply brief, Debtors contend that the Committee has supported its position it its opposition

brief with discovery from a separate action to which Debtors do not have access.  Specifically, the Debtors

assert that the Committee's Opposition contains references to discovery exchanged in G-I Holdings, Inc.

_____

[18] The Martin Declaration was attached as Appendix Exhibit C to Debtors' Reply [See Docket
No. 4992].   The parties have criticized the declaration of Dr. Martin for being inappropriately
submitted with Debtors' Reply.  See LR 11/22/05 Response at n. 12. The Court is satisfied that any
objections to the timing of submission of the Martin Declaration  have been cured by the significant
amount of time that has passed and by the numerous supplemental briefs that have been submitted.

<u>v. Baron & Budd</u>, No. 01-CIV-0216 (RWS) (S.D.N.Y.) ( the "Baron & Budd Action"). (G-I Reply at

5). Debtors note that "[a]lthough G-I is a party to the Baron & Budd Action, G-I is represented by

different counsel in that case and is party to the protective order entered in that case which prohibits it from

using discovery received in the Baron & Budd Action in any other case." (G-I Reply at n.3). Debtors

claim that despite repeated requests by counsel, the Committee has refused Debtors access to the Baron

& Budd Action discovery due to the protective order in that case. Debtors argue that the Committee

should not be permitted to use the discovery against Debtors and not provide Debtors access to it. (G-I

Reply at 6). Therefore, Debtors request that "as part of the discovery in this proceeding, the Court order

the Committee to produce the discovery in its possession from the Baron & Budd Action to which it has

access." (G-I Reply at 6).

**B.      The Committee's Position**

The Committee's position can be divided into three main areas. The Committee has given the

Court a general view of its intended estimation methodology and the discovery it feels is necessary to

support its methodology. The Committee has also presented its opposition to Debtors' intended estimation

methodology and the discovery Debtors have requested in support thereof. In addition, the Committee

has requested that the Court alter its decision in Estimation One with respect to the phasing of the estimation

hearing and future claims and with respect to summary dispositions.

**1.      The Committee's Proposed Estimation Methodology and Discovery**

The Committee's proposed estimation methodology takes substantial guidance from decisions

rendered in the Owens Corning bankruptcy case and in particular, the decision of Judge John P. Fullam,

U.S.D.J. in <u>Owens Corning v. Credit Suisse First Boston</u>, 322 B.R. 719 (D.Del. 2005). The Committee

27

emphasizes the similarities between the debtors and the issues in both matters: "[t]he rulings rendered over

the course of the estimation proceeding in Owens Corning's bankruptcy bear close attention in view of the

similarity of the two bankruptcies and of the arguments advanced there and here." (Comm. Position Paper

at 7).  The Committee highlights several decisions reached in the Owens Corning case which it suggests

are relevant here.  For example, the Committee refers to: 1) the August 19, 2004 decision to base

estimation on "the data now available - the Debtor's claim history, the experience in other cases, etc. -

viewed in light of the expert testimony at the scheduled hearing"[19]; 2) the November 22, 2004 ruling

denying a motion brought by Credit Suisse to postpone the estimation hearing and establish procedures for

discovery of a sample of claimant medical records; and 3) the March 31, 2005 Memorandum and Order

"estimating Owens Corning's liability for present and future asbestos claims at $7 billion dollars." (Comm.

Position Paper at 8; Ex. 1, 2 and 3).[20]

---

[19] The Owens Corning court also stated that "[i]f by the end of the January [Claims Estimation] hearing, the Court determines that additional information is needed, this order will be reconsidered." (See Comm. Position Paper ex. 1 (Order, dated August 19, 2004, In re Owens Corning , Case No. 00-3837 to 3854 (JKF)) at ¶ 4).

[20]      Debtors argue that the decision to deny discovery through sampling in Owens Corning is inapplicable in this matter because Owens Corning was not a member of the Center for Claims Resolution and thus, the parties in the Owens Corning case had access to a different set of claims data:

> Judge Fullam's decision on discovery in Owens-Corning was guided by the fact that the debtor had access to a different universe of data for estimation that is not present in this case.  For example, unlike G-I, Owens-Corning was not a member of the CCR and therefore had data regarding causation and claimants' exposure to its products.  Owens-Corning also had the benefit of studies it had commissioned regarding the medical validity of claims asserted against it, such as the study conducted by Dr. [Gary] Friedman.  G-I's experience as a member of the CCR yields no such data.

(G-I Reply at 8-9).

In essence, the Committee argues that since the Owens Corning Court was able to reach an estimate of the debtor's asbestos liability based on the debtor's claims history, litigation experience and expert testimony, without additional claimant discovery, so too should this Court be able to reach an estimate of G-I's asbestos liability based on its claims resolution and litigation history and expert testimony, without additional claimant discovery.

Citing the <u>Owens Corning</u> estimation decision, the Committee raises two principals that it believes describe the controlling parameters of estimation in the aggregate: 1) the Committee states that the claims which are to be valued arise under state law and therefore state law controls their validity and value and 2) claims are to be valued at the petition date. (Comm. Position Paper at 11) (citing <u>Owens Corning</u>, 322 B.R. at 721).[21]

The Committee characterizes its approach to estimation methodology as being driven by claims settlement values because the Committee believes the settlement values represent "the determined efforts of G-I's well-informed management to minimize G-I's liability at every juncture." (Comm. Position Paper at 19). Thus, the Committee references G-I's 30 year history of asbestos litigation during which it resolved some 300,000 claims. (Comm. Position Paper at 19, 25). However, the Committee specifically looks to

--------

[21]    The Owens Corning court found that "[t]his necessarily means that the claims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy." <u>Owens Corning</u>, 322 B.R. at 722. The court further stated:

> [w]e are not, at this time, deciding how much each claimant will actually be entitled to receive, but the total amount which the claimants, as a group, could legitimately have claimed as compensation, as of the petition date. The values of future claims should be estimated on the same basis-i.e., what their claims would have been worth in the tort system as it existed on the petition date. But the estimate of the number of such future claims should take into account changes likely to ensue as a result of the reorganization."

<u>Id.</u>

29

the average claim resolution costs during a time period preceding the bankruptcy petition date but close

in time to that date as the best indicator of the value of pending claims. (Comm. Position Paper at 27)

("[T]he appropriate metric is the average claim-resolution costs as they existed before bankruptcy, but at

a time reasonably close to the petition date." ) The Committee contends that the average claims resolution

costs factor in the so-called "zero-pay" cases in which G-I disposed of the claim without payment; the

Committee estimates that in the four years preceding bankruptcy, G-I dismissed 28% of claims without

payment. (Comm. Position Paper at 28).

The Committee argues that any changes in the tort system after the bankruptcy date can and should

be addressed through expert analysis and testimony. But the Committee urges the Court to avoid inclusion

of speculative factors in reaching an aggregate estimation.( Comm. Position Paper at 31).

**Discovery Requested by the Committee**.

The Committee seeks discovery related to Debtors' pre-petition asbestos personal injury litigation

experience and results. The Committee has divided its discovery request into eight sub-categories. 1) The

Committee requests G-I's claims data, which includes production of data compilations possessed by

Debtors, updates to claims data already in the Committee's possession, production of "settlements made

by the CCR but rejected by G-I, and documents related to settlement enforcement litigation" and

explanations of data gathering, entry and maintenance practices followed by Debtors "or others on its

behalf, both before and after termination of G-I's membership in the CCR." 2) The Committee seeks

discovery regarding Debtors "pre-petition knowledge and expectations with regard to asbestos litigation"

which the Committee believes will be "illuminated" through production of documents possessed by G-I but

which pertain to other prominent asbestos defendants. 3) The Committee requests discovery regarding

30

Debtors' verdict history.   4) The Committee seeks "guidelines, criteria, and practices that G-I followed in settling cases or taking them to trial" such as "settlement agreements encompassing substantial numbers of claims, as well as its so-called processing agreements or other arrangements for the disposition of future claims" and discovery of "the substantive criteria and information requests that claimants were required to meet under those agreements." The Committee also wishes to depose witnesses "who actually applied G-I's guidelines, criteria and practices such as G-I's senior executives, G-I's outside litigation counsel and CCR policy makers and personnel who dealt directly with claims administration and adjustment.  5) The Committee requests information on "products, plants, facilities, work sites, and customers" related to the use and dissemination of asbestos containing products.  In particular, the Committee "will pursue the identification of plants and  facilities where G-I's asbestos containing products were processed, made, stored, or sold, work sites where G-I's asbestos-containing products have been located or used, and major customers to which such products were shipped."  6) The Committee intends to seek discovery relating to the federal Multi-District Litigation regarding asbestos claims in the Eastern District of Pennsylvania and Debtors assertions related thereto.  7) The Committee requests discovery of "the source documents, data, and computations considered or generated by Navigant Consulting" including "information compiled or considered by Navigant Consulting and Letitia Chambers" related to Debtors prior claims estimation submissions.   8) The Committee seeks discovery of "electronic data compiled by NERA in its computerized review of deposition transcripts". (See Comm. Position Paper at 46-48).[22] The Committee

---

[22]  It appears that Debtors do not object to much of the discovery sought by the Committee regarding Debtors' asbestos litigation experience, as described above, since Debtors' [Proposed] Estimation Discovery Plan and Order provides  that  similar discovery should be available to the Committee and Legal Representative.  (See G-I Mot. App. Ex. I at 3-4).

has proposed a six month period for discovery.  (Comm. Position Paper at 53).

**2.      The Committee's  opposition to Debtors' estimation methodology and proposed discovery.**

Generally, the Committee makes the following points, among others, in opposition to Debtors

proposed individual claimant sampling.  First the Committee argues that "the Manville audit has no bearing

on mesothelioma or lung cancer claims against this debtor ..." (Comm. Op. at 8).  Secondly the Committee

believes "there is no good reason to allow debtor to conduct an unprecedented 'sample' of 2,500 individual

claims."  (Comm. Op. at 11).  Next, the Committee asserts that "G-I's proposal violates claimants' rights

under the Constitution and the Bankruptcy Code." (Comm. Op. at 30).   In addition, the Committee

contends that "the Debtor's proposed 'estimation discovery plan and order' is procedurally out of order

and its particulars are highly objectionable."  (Comm. Op. at 42) [23].

**3.      The Committee asks for a partial reconsideration of the February 1, 2005 estimation opinion (Estimation One).**

**The Phases of Estimation**

The Committee opposes the so called "trifurcation" of estimation mandated by the Court's decision

in Estimation One.[24]  Estimation One provided that only pending mesothelioma and lung cancer claims are

---

[23] The Committee's objections regarding Debtors' use of the Manville Audit as well as the
Gitlin/Johns Hopkins Study, the Silica MDL, criticism of mass screening companies, and recent state
tort law changes are referenced *supra* notes 9-13.  The Committee's opposition to Debtors' proposal
for an expert medical panel is discussed *infra* p. 45.

[24] In Estimation One, the Court held the following:
[T]he estimation hearing with respect to all present claimants will proceed in at least two phases.  The
first phase of the estimation proceeding will estimate in the aggregate all of G-I Holdings's asbestos
liability solely with respect to claimants suffering from mesothelioma and lung cancer. G-I Holdings will
be afforded the opportunity to object to claims. After this first phase, the estimation hearing will
proceed to the second phase which would estimate all remaining present claimants in the aggregate.

to be estimated in phase one.   If the company is still solvent after phase one, pending non-malignant claims will be estimated in phase two.  Future claims are to be estimated thereafter.   The Committee, however, asserts that it wants  future demands estimated at the same time as pending demands:

> it is not, and has never been, the Committee's contention that mesothelioma and lung cancer claims exceed the shareholder's equity of G-I if *only* pending claims are considered. Rather, the Committee expects that the sum of the pending and future claims for such malignancies renders the Debtor deeply insolvent. 'In such a solvency proceeding,' the Committee has offered to 'present expert testimony valuing the pending claims for those malignant conditions *and forecasting and valuing future claims of the same kind*.'

(Comm. Position Paper at 3) (citing Supplemental Submission of the Official Committee of Asbestos Claimants in Opposition to the Debtor's Bar Date and Estimation Motions at 21).   The Committee therefore requests that the Court reconsider its decision in estimation One and "proceed instead in a bifurcated fashion, first estimating the Debtors' liability for pending and future mesothelioma and lung cancer claims and then, if necessary, going on to estimate the liability for nonmalignant claims."  (Comm. Position Paper at n. 2).

Dispositive Motions.

In Estimation One, the Court specifically provided that "G-I Holdings will be permitted to move for summary judgment on certain issues on a claims-wide consolidated basis pursuant to Federal Rule of Bankruptcy Procedure 7042."[25]  In re G-I Holdings, Inc., 323 B.R. at 626.   The Committee, however,

---

After this second phase, the Court would order a subsequent hearing to estimate in the aggregate holders of future demands.

In re G-I Holdings ,Inc. 323 B.R. at 625 (footnote omitted).

[25] As stated in In re G-I Holding, Inc.: "Federal Rule of Bankruptcy Procedure 7042 incorporates Rule 42 of the Federal Rules of Civil Procedure which provides in relevant part as follows: "[w]hen actions involving a common question of law or fact are pending before the court, it may order a

opposes the use of summary judgment motions by Debtors in the estimation process.  The thrust of the

Committee's objection is that asbestos personal injury claims often involve disputed facts and thus do not

lend themselves to summary disposition.   For example, the Committee contends that if Debtors attempt

to exclude claims produced from mass screenings such an attempt would be unsuccessful because

"[m]esothelioma that is detected through mass screening is not on that account any less of an injury than

one discovered in a visit to a treating physician, and the same is equally true of nonmalignancy claims." The

Committee also argues that  "[t]he methods by which lawyers identify potential new cases are irrelevant

to the question of whether the claims have value." (Comm. Op. at 35).   Similarly, the Committee argues

that the absence of a pulmonary function test ("PFT") showing impairment would not be a basis for

summary dismissal of a claim because pulmonary function tests are not necessarily reliable and  asbestos

can cause harm without signs of impairment by PFT results.  (Comm. Op. at 37-38 (citing <u>Owens Corning</u>

322 B.R. at 724); Comm. Op. Ex. 7(American Thoracic Society Statement) at 700)).    Furthermore, the

Committee asserts that if Debtors attempt to obtain summary judgment as to the invalidity of any claim or

class of claims, then the procedural safeguards of the individual claimants would be triggered which would

result in additional litigation and extensive delay.   (Comm. Position Paper at 37).

     Thus, the Committee has proposed that prior to allowing Debtors to proceed with any motion for

---

joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions
consolidated; and it may make such orders concerning proceedings therein as may tend to avoid
unnecessary costs or delay."
323 B.R. at n. 44 (citing Fed.R.Civ.P. 42(a) (West 2004)).

summary disposition the Court hold a hearing to determine the feasibility of such a motion:

> At a minimum, the Court should require the Debtor to identify early in the estimation proceeding any issue going to the validity or value of claims that it considers potentially appropriate for summary disposition, and no such motion should be allowed without a pre-motion conference. The purpose of such a conference would be to assess informally whether any proposed summary judgment motion has a realistic potential to resolve efficiently on purely legal grounds any issue bearing on the Debtors aggregate liability. The Debtor should be called upon to explain what issues are targeted by the proposed motion, how the targeted issues relate to estimation of its aggregate liability, what nonbankruptcy law it believes is applicable, and why it regards the targeted issues as sufficiently "common" to large number of claims and sufficiently free from "factual disputes to stand as matters appropriate for consolidated summary judgment proceedings under Rule 7042. The Committee and the Legal Representative should then be afforded an opportunity to explain why any attempt at summary judgment would be a waste of the Court's time and the estate's resources.

(Comm. Position Paper at 42-43).[26]

## C.    The Legal Representative's Position

The Legal Representative has submitted a proposed Estimation Discovery Plan and Order ("LR Proposed Order") which provides for fact discovery and expert discovery and sets forth an estimation discovery schedule. In particular, the Legal Representative would allow the parties the following fact discovery to be completed within 90 days of entry of the order:

> 1. [T]he Debtors' may seek fact discovery relating to the Official Committee of Asbestos Claimant's (the "Committee") and Legal Representative's (collectively, the "Asbestos Constituency"), contentions regarding asbestos claims estimation subject to the Asbestos

---

[26] The Committee further asserts:

> Challenges to the validity or value of individual claims or categories of claims on grounds that implicate the facts cannot properly go forward in the context of an estimation of aggregate liability, but must await a subsequent stage of the Chapter 11 case or, more likely, post-confirmation claims processing by a settlement trust.
> (Comm. Position Paper at 43).

Constituency's right to object to specific requests and the timing of such requests;
2. [T]he Asbestos Constituency may seek fact discovery relating to affirmative defenses
G-I intends to assert, as well as its contentions regarding asbestos claims estimation subject
to the Debtors' right to object to specific requests and the timing of such requests.

(LR Proposed Order at 2).

The Legal Representative would permit the following expert discovery:

1. Source documents, data, and computations relied upon or generated by the parties'
experts in connection with the parties' prior submissions to the Court regarding claims
estimation;
2. The source documents, data, and computations relied upon or generated by the parties'
experts in forming their opinions as well as any exhibits to be used as a summary or
support for their opinions, the qualifications of the expert, including a list of all publications
authored by the expert within the preceding ten years, the compensation to be paid for the
expert's study and testimony, and a listing of any other cases in which the expert has
testified as an expert at trial or by deposition within the preceding four years. These
materials shall be produced within five business days following the submission of expert
reports.

(LR Proposed Order at 2).  The Legal Representative would have expert discovery adhere to the following

schedule: 1) affirmative expert reports would be submitted 30 days after the close of fact discovery; 2)

rebuttal expert reports would be submitted 60 days after the exchange of affirmative reports; and 3) expert

discovery would be completed 30 days after the exchange of rebuttal reports.  (LR Proposed Order at 3).

Expert discovery-related drafts, mark-ups, work papers, notes and correspondence would not be

discoverable.  (LR Proposed Order at 3).   The Legal Representative's proposed Order would prohibit

the filing of dispositive motions.  (LR Proposed Order at 3).

In support of his proposed estimation discovery plan and order, the Legal Representative asserts

three main points in his May 20, 2005 submission.  First, the Legal Representative argues that "discovery

related to G-I's litigation history is the only discovery necessary to estimate G-I's asbestos liabilities." (LR

Memo. at 3).   Secondly, the Legal Representative requests that the court  modify the malignancy only

estimation phase to include estimation of  future demands.   (LR Memo. at 6). Thirdly, the Legal

Representative argues that estimation of claims and demands should be placed in the context of plan

confirmation. (LR Memo. at 7).

The following is a brief summary of the Legal Representative's position with respect to his

estimation protocol and discovery plan proposal and his opposition to Debtor's proposal.

**The Legal Representative argues against individual claimant discovery.**

The Legal Representative asks that this court follow the holdings of other courts in asbestos-related

estimation proceedings which have rejected individual claimant discovery proposals and have instead relied

on expert evaluations of historical claims resolution data while allowing for adjustments for current trends.

 In particular, the Legal Representative refers to the estimation decision in Owens-Corning v. Credit Suisse

First Boston, 322 B.R. 719 (D.Del. 2005) in which the court specifically rejected a sampling discovery

program similar to that proposed by Debtors.   The Legal Representative asserts  that the Owens-Corning

court conducted an estimation hearing through expert testimony which was based on the debtor's historical

claims database and "took into account the expert's testimony on certain dynamics of prepetition litigation

'unlikely to be replicated' with regard to valuing future liability such as the effects of mass screenings, so-

called 'bundling' of asymptomatic claimants with mesothelioma and other cancer claimants, and punitive

damage awards."  (LR Memo. at 6) (citing Owens-Corning, 322 B.R. at 722-23).

Thus, the Legal Representative contends citing other asbestos liability estimation cases where the

courts have relied on expert analysis of the debtor's historical database, that "the Court should look to

expert testimony, based upon the extensive database on G-I's prepetition litigation and settlement

37

experience, as the basis to estimate the aggregate value of present claims and future demands." (LR Memo.

at 4-6) (citing <u>Owens Corning</u>, 322 B.R. 719 (Bankr. D.N.J.); <u>Babcock & Wilcox Co.</u>, No. 00-10992

(E.D. La. Oct. 8, 2004); <u>Eagle-Picher Indus., Inc.</u>, 189 B.R. 681 (Bankr. S.D. Ohio 1995)).

### The Legal Representative wants demands included in the malignancy only estimation phase.

The Legal Representative asks that the Court modify its decision in Estimation One which called for

estimation of future demands to be conducted after estimation of present malignant claims:

> The Legal Representative respectfully suggests that the Court should adjust its phased estimation approach to either (1) include in the initial phase an aggregate estimate of malignancy demand holder liability or (2) schedule for the second stage an aggregate estimate of malignancy demand holder liability. Such an adjustment will further the Court's intention of measuring whether G-I's liability for malignant diseases alone renders the company insolvent. Doing so would simply be a matter of forecasting the number of anticipated future malignancy claims and valuing them in the same manner as present malignancy claims, with some present value type adjustment. This would yield the most efficient method for determining G-I's solvency, and potentially avoiding "hard fought expensive litigation" over so-called unimpaired claims.

(LR Memo. at 7).

### The Legal Representative emphasizes that estimation should be conducted in the context of plan confirmation.

The Legal Representative emphasizes that "an aggregate liability estimate is not one conducted for

purposes of claim allowance." (LR Memo. at 7-8). Rather, the Legal Representative asserts that "an

aggregate liability estimate is one conducted for purposes of plan confirmation; it has no other utility." (LR

Memo. at 8).

The Legal Representative further distinguishes the rights of current claimants and future claimants

with respect to estimation:

38

Although, as this Court's Estimation Decision instructed, individual personal injury "claims" may be estimated for allowance purposes pursuant to a bankruptcy court's non-core jurisdiction, there is no statutory means, nor jurisdiction, core or non-core, to estimate individual "demands" for allowance purposes. Moreover, no individual personal injury claim estimation done for allowance purposes may be extrapolated to work a disallowance of a future "demand." Section 502(c)'s estimation for "allowance" provisions do not operate on "demands."

(LR. Memo at 8).

The Legal Representative's Opposition Memorandum adds additional points to its argument. First the Legal Representative asserts that Debtor has not provided any reason to depart from settled precedent. (LR Op. at 5). Secondly, the Legal Representative maintains that Debtors' estimation protocol will not yield useful information. (LR Op. at 12). Thirdly, the Legal Representative. argues that Debtors' summary judgment review of categories of claims is contrary to law. (LR Op. at 22). Lastly, the Legal Representative contends that Debtors' timetable for its proposed discovery is unrealistic. (LR Op. at 25).

**The Legal Representative refers to asbestos bankruptcy precedent**.

The Legal Representative contends the following:

Every major asbestos-related chapter 11 reorganization estimated the number and value of a debtor's present and future asbestos claims in the manner proposed by the Committee and Legal Representative. Two precedents, however , are particularly compelling on this record, Owens Corning and Eagle-Picher. Both of these courts were faced with the same two competing aggregate estimation proposals that this Court now faces, and both courts rejected the sampling approach as wasteful and unnecessary.

(LR Op. at 6).

The Legal Representative further asserts with respect to Owens Corning:

Perhaps most relevant to the applicability of the Owens Corning precedent to this case is that Judge Fullam was able to arrive at an estimation of present and future claims, without sampling, which took into account virtually all of the same factors that G-I contends in this case necessitate sampling: the effects of mass screenings, the effects of bundling and the so-called 'law of large numbers,' punitive damages, illegitimate B readings by plaintiff

oriented and paid B readers, state law criteria statutes, and other factors.

(LR Op. at 9).

The Legal Representative adds that the <u>Eagle Picher</u> court considered and rejected a request for

sampling and estimated present and future asbestos liability in the manner utilized by the <u>Owens Corning</u>

court years later and advocated by the Committee and Legal Representative in this matter. (LR Op. at 11).

**The Legal Representative argues Debtors' protocol is costly and time consuming and will not yield useful information.**

Specifically, the Legal Representative argues 1) "Data gathered by submitting conflicting B-readings

to a blue-ribbon panel will not yield information over and above what is already known;"[27] 2)"alleged

'changes' in the system for resolving asbestos claims provides no support for a complete departure from

the existing jurisprudence;"[28] and 3) "the massive use of deposition transcripts and file review for product

identification  and  causation  is  similarly  flawed.[29]"(LR  Op.  at  20).

---

[27]  The Legal Representative points out that the diagnosis of a single B-reader causes a claim to survive summary judgment. (LR Op. at 13 )(citing <u>Owens Corning</u> at 322 B.R. at 724). The Legal Representative further contends regarding a "blue ribbon" panel review of claimant x-rays that "[t]here is simply no valid purpose that can be achieved by such a review of x-rays other than to show what is already known: the conclusions of B-readers reviewing the same radiograph will often differ, raising a jury question." (LR Op. at 14). The Legal Representative also takes issue with Debtors' reliance on Judge Carl Rubin's study as support for expert panel review and contends that Debtors' characterization of the study contradicts the procedures used and the conclusions reached by the study. (LR Op. at 14).

[28]The Legal Representative argues that the developments Debtors refer to as bases for the discovery Debtors request (i.e. the Gitlin Study, the Manville Trust audit, non-meritorious claims yielded by mass-screenings and new state legislation) are not new and/or are not relevant and do not justify diverging from estimation precedent. (See *supra* notes 9-13; LR Op. at 15-20).

[29]  The Legal Representative argues that the Debtors are ignoring "how causation is proven in the real world" and that it is a false premise to assert that "the only way to establish causation is through direct testimony of the plaintiff identifying a GAF product". (LR Op. at 20). The Legal Representative

The Legal Representative argues that although G-I contends that the CCR data is incomplete because GAF was required to pay a set percentage even if the claimant only identified another CCR member and did not identify a GAF product, GAF bargained for precisely that arrangement to lower the overall costs associated with paying asbestos claims.  (LR Op. at 20-21).

**The Legal Representative contends that summary judgment review of categories or classes of claims is contrary to law**.

The Legal Representative opposes G-I's intention to challenge "substantive validity of categories of claims on a consolidated basis by filing motions for summary judgment." (LR Op. at 22).    The Legal Representative states that "G-I is unclear as to how it would define and establish 'categories' of claims, or

---

contends that "[i]n mesothelioma cases the injured party often dies from the horribly progressive disease before providing such testimony.  Accordingly, a plaintiff's counsel establishes a work history and obtains testimony of others who worked at the site about the conditions present; occasionally those some co-workers can identify the products involved, but the testimony may come from records or other sources." (LR Op. at 20).  The Legal Representative further asserts that "G-I's arrangement with the CCR made it unnecessary for plaintiffs to work up exposure evidence pertaining to GAF, and it is likely that the great majority of post-CCR plaintiffs with claims against G-I have not worked up their litigation files due to the futility of such an exercise in light of the automatic stay." (LR Op. at 21).  Therefore, the Legal Representative argues:

> [i]f the Court were to sanction this exercise as G-I proposes, it would necessarily require that the affected plaintiffs be given an opportunity to work up their exposure evidence. That in turn, will likely require paper discovery directed to and depositions of the targeted claimants or their relatives or their co-workers, all possible sources of exposure evidence. The notion that G-I's exercise ends with the subpoena of medical records is false. That would be the start of a discovery process that is more pertinent to individual claims litigation than claims estimation.  Instead, exposure history can be drawn from expert testimony based on, for instance, G-I's historical market shares and other theories. Sampling is not the answer because many of the prepetition records are incomplete for the reasons set forth above, and it will lead the parties, the Court and third parties down a contentious road of individual claim discovery.

(LR Op. at 21).

41

what the effect would be upon any particular individual claimant" and therefore "[w]e can only guess that

such a summary disposition would effectively render certain individual claims as disallowed for purposes

of distribution which, as we and the Committee have shown in other papers, is patently illegal in this

procedural context, and would trigger a whole panoply of procedural rights which the affected claimants

would be entitled to." (LR Op. at 23).

### The Legal Representative argues that G-I's timetable for discovery is unrealistic.

The Legal Representative argues that G-I's discovery timetable is unrealistic because it depends

on the full cooperation of numerous affected individuals such as "the parties, the lawyers subpoenaed, the

victims subpoenaed, the doctors subpoenaed, the repository retained, and the panelists employed." (LR

Op. at 25). Furthermore, the Legal Representative argues that Debtors' discovery timetable " doesn't

even account for additional discovery necessitated by conclusions reached in the sampling (i.e., discovery

by the Committee and the Legal Representative into claims where G-I erroneously concludes no evidence

of exposure)." (LR Op. at 26). The Legal Representative. opines that the discovery envisioned by

Debtors"will take over a year to get to hearing, and possibly years if the inevitable appeals follow summary

judgment rulings." (LR Op. At 26).

## IV.    Discussion

Despite the quantity of paper that has been submitted in this matter, the issue before the Court is

rather straight forward -what type of discovery should the parties be permitted to conduct in order to

prepare their cases for the phases of estimation hearings which will follow. The parties have raised several

substantial issues relating to the merits of their respective positions on estimation including such issues as

the date of valuation and whether federal or state procedural law controls.   The parties have also opined

42

about the appropriate discount rate to be applied to future demands. [30]  The scope of this opinion is limited and will only address the discrete issues that will place this matter in a position to proceed towards the long anticipated estimation hearings.

Although the parties have made comprehensive arguments on a multitude of issues in support of their respective estimation methodologies, the Court is not selecting an estimation methodology at this point. This holding expresses no opinion on the merits of the parties' respective estimation methodologies. Rather, this opinion is limited primarily to discovery issues leading up to estimation. The opinion further clarifies certain matters surrounding how the estimation will be conducted.

**A.    Should future malignant demands be estimated in Phase One of the Estimation Hearings?**

In Estimation One this Court ruled that future demands should be estimated subsequent to the estimation of pending claims.[31]  The Committee and Legal Representative request that this Court reconsider or adjust

---

[30]  As the parties concede, a decision at this point on the discount rate to be applied to future demands would be premature.  (See Comm. Reply at 30-31; G-I Resp. at 18).

[31]  Specifically, the Court determined the following:

Deciding to conduct the estimation proceeding in the aggregate still does not resolve every difficult issue. Simply put, several approaches can be adopted to estimate the Company's asbestos liability in the aggregate; namely: 1) estimate in the first instance only present mesothelioma and lung cancer claimants; 2) estimate all present asbestos claimants first, leaving future demand holders for a subsequent estimation hearing; or 3) estimate all present and future asbestos claimants in one proceeding. In adopting one approach, a Court must choose what it believes to be the best course, balancing all competing interests. G-I Holdings believes that the legitimate asbestos claims should approximate several hundred million dollars, thus leaving sufficient equity for the Company's shareholders. In contrast, the Committee claims the present mesothelioma and lung cancer claimants, by themselves, would most probably render the Company insolvent.

In attempting to balance these competing interests, this Court will order that the estimation proceed in the aggregate as to all present asbestos claimants, leaving aside future demand holders for a second estimation hearing, as necessary. Thus, and as will be more

its ruling in Estimation One and estimate future demands at the same time as pending claims. Debtors agree

with the Court's decision in Estimation One and argue against reconsideration. (See G-I Resp. at 42-44).

The Court, however, agrees in this respect with the position of the Committee and Legal Representative

and will reconsider and adjust that portion of Estimation One that provided for future demands to be

estimated in a separate proceeding.   Pending malignant claims and future malignant demands will be

estimated in the aggregate during Phase One of the estimation hearing.  The remainder of pending claims

and future demands will be estimated in the aggregate in Phase Two of the hearing.

**B.     Should the Court Appoint an Expert Panel to Review Medical Evidence?**

Debtors have requested that an independent  medical panel be appointed by the Court to review

evidence collected through Debtors proposed discovery sample of individual claimants .  (G-I Mot. at 22-

23; G-I Br. at 26-27).    Debtors assert that "[o]nce the medical records have been collected from the

random sample, they must be evaluated by a neutral panel of medical experts that can assist the Court with

respect to diagnostic issues, such as ILO scoring of films and  analysis of PFT results."(G-I Mot. at 22).

Debtors further claim that " [u]sing a panel of medical experts to assist the Court has precedent both in

---

specifically determined at a future hearing to be scheduled, discovery may be exchanged
between G-I Holdings and the Committee's constituency. More specifically, the estimation
hearing with respect to all present claimants will proceed in at least two phases. The first
phase of the estimation proceeding will estimate in the aggregate all of G-I Holdings's
asbestos liability solely with respect to claimants suffering from mesothelioma and lung
cancer. G-I Holdings will be afforded the opportunity to object to claims. After this first
phase, the estimation hearing will proceed to the second phase which would estimate all
remaining present claimants in the aggregate. After this second phase, the Court would
order a subsequent hearing to estimate in the aggregate holders of future demands.
In re G-I Holdings, Inc. 323 B.R. at  624-25 (footnotes omitted).

asbestos and breast implant litigation." (G-I Mot. at 22).    In their brief, Debtors refer to the "possible use

of [an] independent medical panel to assist the Court in estimation proceedings." (G-I Br. at 26).[32]

The Committee opposes the use of a medical panel and suggests that the proposed panel is just

another version of the "Claims Liquidation Committee" proposed by Debtors in their prior Estimation

Motion and rejected by this Court.  (Comm. Op. at 40).  The Committee argues that 1) the panel's

decision making powers would violate the law, particularly Federal Rule of Bankruptcy Procedure 9031,

which does not provide for the appointment of masters under the Code and 2) if the panel functions only

as a panel of neutral expert witnesses then it would have no place in an estimation proceeding.  (Comm.

Op. at 40-41).  The Committee further states that " the findings of such an expert panel would not justify

the wholesale disallowance of entire categories of claims in estimation."  (Comm. Op. at 41).  The Legal

Representative also posits that the use of such a panel will not yield information over and above what is

already known.  (LR Op. at 13-14).

---

[32]Debtors suggest that "[i]n finding qualified, neutral experts, the Court may seek
recommendations from the parties or seek assistance from the recognized medical organizations such as
the American Thoracic Society, the Committee on Pneumoconiosis of the American College of
Radiology, or the American College of Chest Physicians."  (G-I Br. at 27).  Furthermore Debtors
opine that

> some of the questions that might be considered by the Panel include questions relating
> to diagnostic data, including the examination and classification of results from x-rays and
> pulmonary function tests; questions relating to the diagnosis of asbestos related disease,
> including the need of pathological evidence to support a reliable diagnosis; questions
> relating to causation; and questions relating to the reliability of evidence and testimony
> proffered by the parties in support of their estimation. All of these issues are central to
> the determination of the validity of claims which must be considered before an accurate
> estimation of liability can be undertaken.

(G-I Br. at 27).

The Court finds that it is neither appropriate nor necessary to approve the appointment of such an expert panel.   The parties own experts can address the evidence as they see fit.   The authorities cited by Debtors in support of their request for an expert panel do not persuade the Court that such a panel would be particularly useful in this proceeding.    Furthermore, as the Court noted in Estimation One, and as the Committee argues, "Federal Rule of Bankruptcy Procedure 9031 explicitly precludes the bankruptcy court from appointing special masters in cases and proceedings under title 11. See Fed. R. Bankr.P. 9031 (West 2004) ('Rule 53 F.R. Civ.P does not apply in cases under the Code')."  In re G-I Holdings, Inc. 323 B.R. 583, n.35.

Therefore Debtors' request that the Court appoint an independent expert medical panel to review the medical evidence is denied.

**C.    Should the Court Reconsider its Decision to Permit Motions for Summary Judgment?**

This court ruled in Estimation One that Debtors will be permitted to file certain dispositive motions: "G-I Holdings will be permitted to move for summary judgment on certain issues on a claims-wide consolidated basis pursuant to Federal Rule of Bankruptcy Procedure 7042. See Fed. R. Bankr.P. 7042 (West 2004)."[33]  In re G-I Holdings, Inc., 323 B.R. at 626.   The Committee and the Legal Representative

---

[33] As stated in In re G-I Holding, Inc.: "Federal Rule of Bankruptcy Procedure 7042 incorporates Rule 42 of the Federal Rules of Civil Procedure which provides in relevant part as follows: "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."
 In re G-I Holding, Inc., 323 B.R. at n. 44 (citing Fed.R.Civ.P. 42(a) (West 2004)).

request that the Court reconsider this portion of the opinion and deny Debtors the ability to file motions for

summary disposition.    At the very least, the Committee urges that this Court require a pre-motion

conference before any summary judgment motions are filed to determine the parameters of such motions.

The Court will not reconsider its decision to allow Debtors the ability to file summary judgment motions.

However, the Court acknowledges the concerns of the Committee and Legal Representative regarding the

due process rights of individual claimants and the high burden Debtors would need to surmount to

successfully pursue summary dispositions.    Therefore, the Court will require that the parties participate in

a pre-motion conference prior to the filing of any summary judgment motions.

**D.**    **Should Debtors be allowed to conduct discovery on a random sample of individual
asbestos claimants?**

Prior to delving into the discovery question before the Court, the findings this Court made in

Estimation One regarding the opposing concerns of the various constituencies in asbestos mass tort

bankruptcies bear repeating:

> With only a finite amount of money available to pay claims, the competition for payment
> from the assets of the bankruptcy estate is more than an academic question. On one hand,
> thousands of innocent individuals may have been legitimately harmed by the products
> manufactured by the Company's predecessors, and these individuals should at the very
> least be afforded the opportunity to seek compensation for their damages. On the other
> hand is the real possibility that a once viable company will become extinct (with its own
> attendant repercussions such as loss of jobs, loss of business for third-party suppliers, and
> loss of shareholder equity) based upon the insurmountable personal injury claims facing the
> estate. As a result, perhaps quite expectedly, the proper mode of valuing a debtor's
> asbestos liability "reveals a fundamental, perhaps the fundamental divide between" the
> relevant constituencies.

In re G-I Holdings, Inc., 323 B.R. at 623. (citing In re USG Corp., 290 B.R. 223, 224

(Bankr.D.Del.2003)).

In order to fairly address the adverse interests and concerns of the asbestos bankruptcy

constituencies in Estimation One, this Court reached the following conclusion which is instructive:

> In situations where liabilities exceed the assets of a bankruptcy estate, a court will "assist the parties in apportioning the remaining assets among the legitimate claimants." As G-I Holdings argues, and as this Court agrees, if a debtor maintains that a portion of its creditors "are not legitimate and that, properly analyzed, claims against it do not exceed its assets, the Court must assist as well." Therefore, while a court will protect those who have been truly harmed, a bankruptcy court should also, "within the constraints of the law, reject unsubstantiated claims, bogus medical evidence and fanciful theories of causation." At the same time, however, a court should also provide for the expeditious and efficient administration of a bankruptcy case, and permit legitimate asbestos-related personal injury tort claimants to receive compensation sooner rather than later.

In re G-I Holdings, Inc.   323 B.R. at 623-24 (citing In re USG Corp., 290 B.R. 223, 224

(Bankr.D.Del.2003)).   The question then becomes one of degree: to what extent should the parties be

permitted to gather information in order to make their respective arguments regarding an aggregate

estimation of Debtors' liabilities.   Once again, the answer involves balancing the needs of the adverse

constituencies.

The Debtors, the Committee and the Legal Representative all appear to agree that the Debtors'

claims database is the starting place for any estimation analysis.   The Debtors, however, assert that the

claims database contains deficiencies in certain areas debtors consider necessary for estimation such as

disease categories, disease subcategories and exposure evidence.   Debtors believe that their sampling

program will address these deficiencies.   Furthermore, Debtors believe that events that have taken place

after their bankruptcy petition date and thus after the historical claims resolution data base was formed

should be considered in an aggregate estimation of their asbestos liabilities.[34]   In short, Debtors seek

---

[34] In addition to the sampling discovery, Debtors request that the Court order the Committee to provide them access to discovery exchanged in a separate action, G-I Holdings, Inc. v. Baron & Budd, No. 01-CIV-0216 (RWS) (S.D.N.Y.) (the "Baron Budd Action").  (G-I Reply at 6). Debtors

discovery that they assert is necessary to fill in the gaps in the historical claims database and to account for

changes and developments in the asbestos litigation landscape subsequent to their bankruptcy petition date.


       The Committee and the Legal Representative do not disagree that Debtors, or Debtors' experts,

should be able to address these issues in the context of estimation.   The conflict between the parties lies

in the manner in which the parties should be permitted to prepare their cases for the estimation hearings.

       Debtors contend  that to address the gaps in the historical claims resolution database and to

scrutinize the historical claims, they need more information on individual claims.   In order to gain the

information debtors believe is necessary for them to properly make their case during the phases of  the

estimation hearing, Debtors have proposed discovery from a random sample of approximately 2,000 to

2,500 individual claimants.   Towards that end, Debtors have submitted the declaration of Dr. Martin in

support of their contention that the random sample of individual claimants will provide significant

information.

       Dr. Martin's Declaration sets forth certain claimed deficiencies in Debtors' claims database and

how a random sample will address those deficiencies and provide a more precise estimate of Debtors'

liability:

---

assert that the Committee relies on discovery from the Baron Budd Action as support for its estimation
position, yet Debtors do not have access to the referenced discovery.  According to Debtors, the
discovery is the subject of a protective order in the Baron Budd Action and the Committee has refused
Debtors access to the discovery on the basis of that order. (G-I Reply at 5-6).  The Court finds it is
inappropriate to rule on Debtors' request for the Baron Budd Action discovery at this time.  Debtors
may bring their request by separate motion.

Information provided by a random sample of GAF claimant files would fill in gaps in the population of claims reflected in GAF's historical database and this information could be analyzed to develop a more precise estimate of GAF's aggregate liability.

To estimate GAF's aggregate liability as of the bankruptcy date, it is necessary to estimate the number (proportion) of claimants, by disease, and the settlement values, by disease. Indeed, the estimate of aggregate liability is the product of these two figures. One of the purposes of obtaining and analyzing a random sample of claim files from GAF asbestos claimants, then, is to gather the information needed to estimate the proportions of claimants in each category - information that is *not* available in GAF's historical database ...

The goals outlined above, which apply to malignant claims, demonstrate the applicability of sampling to the Court's first stage analysis. In the interest of efficiency, however, at the same time malignant claim files are being collected, non-malignant claim files would also be obtained. Reviewing these files would answer such disputed questions as the proportion of non-malignant claims suffering impairment, as well as the proportion of claims supported by diagnoses from high-volume B-reader doctors.

Martin Declaration at ¶¶ 9-10, 14.[35]

---

[35] Dr. Martin also gave more specific examples of how discovery of a sample of claimants would assist in estimation in the aggregate:

In estimating GAF's aggregate liability, for example, it is necessary to know, within the lung cancer category, the proportion of "higher value claims (i.e. those with underlying asbestosis, evidencing that their condition was caused by asbestos exposure) and the portion of "lower value" lung cancer claimants (i.e. those with a smoking history and whose cancer may not be attributable to asbestos exposure). Prior asbestos trusts differentiate the values awarded to lung cancer claimants depending on these attributes. However, GAF's historical database does not contain information on underlying asbestosis or smoking behavior. Obtaining a random sample of claim files would fill in this missing information and allow for a more precise estimate.

Disease has been an important driver of claim values in the tort system. Historically, there has been a significant difference in awards, for example, between mesothelioma claimants and unimpaired, asymptomatic non-malignant claimants. To estimate aggregate liability, then, it is necessary to know what proportion of the thousands of pending claims entered into GAF's historical database with an unknown disease are likely to be alleging a malignant disease. Even after cross comparing GAF's database to other defendant databases, though, a not-insignificant portion of the claims in the GAF database still remain with disease unknown. Analysis of a random sample of claim files would allow more precise estimation of the evolution of a claim from unknown to known disease and, therefore, of the proportion of GAF claimants with unknown disease alleging malignant

The Committee and the Legal Representative strongly oppose individual claimant discovery for a multitude of reasons.  Chief among the Committee and Legal Representative's arguments are the understandable predictions of expense and delay they believe Debtors' sampling discovery will generate. The Committee and Legal Representative further contend that delay will be caused by the inevitable discovery disputes that will result from the sampling.[36]

The Committee and Legal Representative refer the Court to other asbestos estimation proceedings in which an estimation of liability was reached without individual claimant discovery, such as the recent estimations in In re Armstrong World Industries, Inc. No. 00-471 (JKF) (Bankr. D.Del.), In re Federal-Mogul Global, Inc. 330, B.R. 133 (D. Del. 2005) and Owens Corning v. Credit Suisse, 322 B.R. 719 (D.Del. 2005). (See 6/26/06 Joint Surreply at 2, 4-5). The Committee and Legal Representative argue

---

versus non-malignant disease.

Product identification, i.e., exposure to GAF asbestos containing products, is another piece of information necessary for estimating aggregate liability.  Given GAF's participation in the Center for Claims Resolution ("CCR"), product identification is another data element that is not contained in GAF's database.  Thus, to estimate GAF's aggregate liability, we need to develop an estimate of the proportion of claimants able to demonstrate product identification against the Company.  To develop this estimate, transcripts from more than 15,000 asbestos-related depositions  (from those states having the highest number of claims against GAF) have been obtained and analyzed, as have deposition exhibits and the testimony of co-workers.  The requested random sample would allow us to verify further the product identification results indicated by this product identification analysis.

Martin Declaration at ¶¶11-13.

[36]The Debtors argue that the Committee's and Legal Representative cannot object to Debtors' proposed discovery on the basis that it will delay the proceedings since Debtors requested similar discovery long before  filing their current request.  Debtors argue that the Legal Representative and Committee refused to comply with Debtors' prior attempt to obtain discovery and requested and received a stay of such discovery.  (G-I Reply at 17; Order Staying Claims Estimation Discovery, Dated November 29, 2004 (Docket No. 4295)).

that Debtors' historical claims resolution database, in addition to the database of pending claims, are

sufficient sources of individual claimant information for Debtors to present their estimation methodology.

Furthermore, the Committee and Legal Representative believe that expert discovery and limited fact

discovery, both of which could be accomplished in a short time frame, are sufficient to conduct an

estimation of Debtors' asbestos liabilities in the aggregate.

The Court acknowledges the concerns of the Committee and Legal Representative.  The Court

also acknowledges that many of the arguments and supporting information contained in the parties' briefs,

and the exhibits annexed thereto, address the merits of their respective estimation methodology positions

and are more appropriate for presentation during the estimation hearing than in the matter sub judice.

It cannot be ignored that there have been changes in the asbestos litigation landscape since the filing

of Debtors' bankruptcy petition.  The court notes the Silica MDL proceedings, the changes in tort law in

certain states regarding asbestos-related claims and the Debtors, Committee's and Legal Representative's

opinions on how these developments should be factored into estimation of Debtors' liability.  However, the

court takes no position at this point on what bearing, if any, these developments have on Debtors'

aggregate asbestos liabilities.  That determination will be made at the conclusion of the estimation hearing

after the parties have argued and presented evidence regarding the merits of their proposed estimation

methodologies and resulting estimates of Debtors aggregate liability.

The Court, while sympathetic to the concerns of the Committee and Legal Representative and

cognizant of the need for this case to move forward towards confirmation is reluctant to comple tely deny

Debtors the information that they feel is necessary to properly present their estimation methodology during

the upcoming estimation hearing.[37]    The Court believes that each party is entitled to make it's case.[38]

However, the claimant discovery requested by Debtors must be narrowly tailored to fill in the gaps

referenced by Debtors in Dr. Martin's Declaration and which will allow the estimation to proceed.  The

Court is not adopting the laundry list of discovery suggested by Debtors in their Proposed Estimation

Discovery Plan and Order which was attached to Debtors' Motion as App. Ex. I.  The due process rights

of individual claimants will be protected. As well, any discovery plan must address concerns regarding the

---

[37]    As the Committee recognized in its Position Paper:

If G-I offers evidence showing that these supposed phenomena had a quantifiable
impact on historical claim values but will be eliminated from future tort litigation due
to forces that were in motion at the petition date - and if any such factors are not
outweighed by countervailing factors exerting equal or greater pressure in the other
direction - then perhaps the Court will be justified in making some adjustment to
claim values or forecasts in the estimation.

(Comm. Position Paper at 32-33).  Debtors argue that they cannot be denied access to the information
necessary to prove the need for such adjustments to the historical database: "[t]he Committee and the
Legal Representative cannot, on the one hand, embrace the concept that claims history must be
adjusted, and yet on the other hand, deny the Debtors access to medical and causation information
needed to show that this claims history overstates the Debtors' liability."  (G-I Resp. at 24).

[38]The Court notes the hearing before Judge Joy Flowers Conti, U.S.D.J. in In re USG Corp. in
which the court reached a similar determination:

I've already told you that if the debtor is going to proceed with an estimation
theory, they're going to be allowed to get evidence that they feel is necessary to
make their claim in this case.  I'm not going to cut them off at the pass, which is
what you want to do. You want me to look at the historical information.

Transcript of Hearing in  In re USG Corp., Case No. 01-2094  (D. Del.), dated
September 19, 2005, at p.34, lines 15-21. (G-I -New Authorities - 10/31/05, App. Ex.
B).

The Court is aware that the claimant discovery permitted in In re USG Corp. was subsequently
stayed after the parties executed a term sheet and jointly agreed to seek a stay of the estimation litigation.
(See LR 4/20/06 Response at 4,  Ex. A  (Order Staying Estimation Proceedings and Proceedings on
Debtors' Voting Rights Motion for Certain Parties, dated February 15, 2006); Comm. 4/21/06 Response
at 8).

handling of any original x-rays or other medical records.    Nonetheless, the Debtors will be granted a limited period of time to conduct their proposed sample.   The discovery requested by the Committee and the Legal Representative outlined  above may proceed forward subject to the parties' rights to assert objections.   Each party will be entitled to reciprocal discovery and each party's objections are fully reserved to be dealt with in the normal course during the pre-trial period.

**Discovery Schedule**

There will be  an immediate discovery conference set up during which the details of the sampling discovery, in addition to other fact and expert discovery, will be determined as well as the general deadlines for each phase of discovery, pre-trial matters and the scheduling of the first and second phase of the estimation hearing.[39]    A scheduling order will thereafter be entered reflecting determinations made during the discovery conference.   The Court will permit Debtors a 90 day period to conduct a narrowly tailored individual claimant sample; the 90 day period  will begin on the date of the entry of the scheduling order. The Committee and Legal Representative will be granted reciprocal discovery regarding the results of such sample.   Simultaneously, the additional fact discovery requested by the parties will commence.    Expert discovery will begin at the close of said fact discovery, including the exchange of expert reports.   Daubert motions and / or summary judgment motions will follow, leading to the pre-trial conference and hearing

---

[39] On July 31, 2006, Debtors submitted a proposed form of claimant questionnaire which is closely modeled after the claimant questionnaire submitted in In re USG Corp., No. 01-2094 (JFK) and which debtors previously submitted to the Court as an attachment to G-I  New Authorities - 3/28/06 . (G-I 7/31/06 Response to Joint Sur-reply - Exhibit A).  On August 1, 2006, the Committee submitted a letter, which the Legal Representative joined, lodging an objection to the questionnaire and reserving its rights with respect thereto.  The Court is not ruling on the merits of the proposed questionnaire.  Issues regarding the substance and form of the discovery sample, including any proposed questionnaires, will be addressed at the above-referenced discovery conference.

dates for both phases of the Estimation Hearing.  All deadlines will be fixed at the discovery conference.


An Order shall be submitted in accordance with this Opinion.


Dated: August 11, 2006

ROSEMARY GAMBARDELLA
UNITED STATES BANKRUPTCY JUDGE