Jeffrey D. Prol (JP7454)
**LOWENSTEIN SANDLER, PC**
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500

Elihu Inselbuch (EI2843)
**CAPLIN & DRYSDALE, CHARTERED**
375 Park Avenue, 35th Floor
New York, New York 10152
212.319.7125

Trevor W. Swett (TS8962)
Peter Van N. Lockwood (PL8843)
**CAPLIN & DRYSDALE, CHARTERED**
One Thomas Circle, N.W.
Washington, DC  20005
202.862.5000

*Co-Counsel to Official*
  *Committee of Asbestos Claimants*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>G-I HOLDINGS, INC., <u>et al.</u>,<br><br>             Debtors. | In Proceedings for Reorganization Under Chapter 11<br><br>Hon. Rosemary Gambardella, U.S.B.J.<br><br>Case Nos. 01-30135 (RG) and 01-389790 (RG) (Jointly Administered) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS TO
DEBTORS' TENTH APPLICATION FOR ORDER PURSUANT TO 11 U.S.C. § 1121(d)
EXTENDING EXCLUSIVE PERIODS DURING WHICH DEBTORS MAY FILE A
<u>CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF</u>**

The Official Committee of Asbestos Claimants of G-I Holdings, Inc. (the

"Committee") hereby objects to the tenth application (the "Application") of G-I Holdings, Inc.

and ACI Inc. (collectively, "G-I" or the "Debtor") for an order further extending the exclusive

periods during which the Debtor has the exclusive right to propose a chapter 11 plan and to solicit votes in favor of such a plan, and respectfully states as follows:

**INTRODUCTION**

1.    G-I filed a voluntary petition pursuant to chapter 11 of the United States Bankruptcy Code, 11 U.S.C. section 101 et seq., (the "Bankruptcy Code"), on January 5, 2001. ACI, Inc. filed its chapter 11 petition on August 3, 2001.  These cases have been consolidated for administrative purposes.

2.    On November 15, 2006, the Court entered an order granting — over the objections of the Committee, the legal representative for present and future holders of asbestos-related demands (the "Legal Representative"), and the United States Department of Justice on behalf of the Internal Revenue Service — the Debtor's eighth motion for an extension of its exclusive periods to file a plan and to solicit acceptances.  Under this order, exclusivity as to the filing of a plan was continued until June 29, 2007.

3.    In early March 2007, the Debtor, the Committee and the Legal Representative participated in a two-day mediation.  Following the mediation, the parties agreed in principle to a global settlement of their outstanding disputes in these chapter 11 cases.  To enable the parties to shift their focus from litigation to plan formulation, they agreed to stays of the various litigations arising in or related to this case, but stipulated that any party may terminate the stays on thirty days' notice.  *See* In re G-I Holdings Inc., Order Staying Certain Contested Matters and Adversary Proceedings entered on March 22, 2007 (Bankr. D. N.J.) [Docket No. 6902] (annexed as **Exhibit A**).[1]

---

[1]    District Judge Chelser entered a similar consensual stay order on March 27, 2007, in G-I Holdings Inc. v. Bennett, Case No. 02-03626 (D. N.J.) [Docket No. 188], sometimes referred to as the "Declaratory Relief Action."  On April 4, 2007, District Judge Sweet did likewise in the Committee and

4.    On June 21, 2007, the Debtor filed its ninth motion for an extension of the exclusive periods.  The Committee and the Legal Representative consented to an extension of the Debtor's exclusive period to file a plan until October 15, 2007, in order to permit the negotiation and drafting of a plan.  The consent order granting the Debtor's ninth extension of exclusivity contemplated that the Debtor would file a consensual plan on or before October 15, 2007.  That order further provided that if no consensual plan were filed by that deadline, the Debtor could move for a further extension on or before October 30, 2007.

5.    The Debtor has filed no plan, and it appears that no plan incorporating the March 2007 agreement in principle will be filed.  On October 30, 2007, the Debtor filed its tenth motion for an extension of the exclusive periods (the "Motion").  The Motion asks that the Debtor's exclusive right to file a plan be extended until April 30, 2008, and that the period for soliciting acceptances continue until June 30, 2008.

6.    The parties attended another mediation for a day and a half in early December.  No resolution has resulted and none is assured.

7.    In short, after seven years of costly litigation and protracted negotiations, a consensual resolution of this case remains elusive.

## ARGUMENT

8.    The law governing extensions of a debtor's exclusive periods is well settled and has been discussed at length by the parties and the Court in connection with the Debtor's prior requests to extend its exclusive periods.

9.    Section 1121(d) of the Bankruptcy Code provides that the Court may extend or reduce the exclusivity periods upon a showing of "cause."  11 U.S.C. Section 1121(d)

---

Legal Representative's fraudulent transfer action against Samuel Heyman and related entities.  Committee v. Heyman, Case No.01-08539 (S.D.N.Y.) [Docket No. 179].

(2005).  The movant bears the burden of demonstrating "cause."  *See* Transcript of Proceedings held July 14, 2004, at 128 [Docket No. 3919] (the "Fifth Exclusivity Opinion") (*citing* In re Nicolet,* 80 B.R. 733 (E.D. Pa. 1987).  In considering that burden, courts may not grant extension requests "routinely" or "cavalierly."  In re McLean Indus., Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987).  Unsupported allegations are insufficient to allow such extensions.  In re Parker St. Florist & Garden Ctr., Inc., 31 B.R. 206 (Bankr. D. Mass. 1983).  Rather, section 1121(d) "requires that an affirmative showing of cause, supported by evidence, be made by the party seeking the extension * * * of time." *Id.*  (Citations omitted).

10.    Courts generally look to the "totality of circumstances" when determining whether "cause" has been shown, and often focus on the paramount factor of whether extending or terminating exclusivity will lead to confirmation of a consensual plan within a reasonable period of time.  *Id.*; *see also*  In re Dow Corning Corp., 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997).

11.    Especially relevant here, the "Debtor's burden gets heavier with each extension it seeks as well as the longer the period of exclusivity lasts."  Dow Corning, 208 B.R. at 664.  Concomitantly, the "creditor's burden to terminate gets lighter with the passage of time." *Id.*  This Court has so held.  *See* Transcript of Proceedings held July 20, 2005, at 18 (the "Sixth Exclusivity Decision").

12.    This Court has also acknowledged that an extension of the exclusive periods "should not be employed as a tactical measure to put pressure on parties-in-interest to yield to a plan that they consider unsatisfactory."  Sixth Exclusivity Decision at 19.  *See* Timbers of Inwood Forest Associates, Ltd., 808 F.2d 363, 372 (5th Cir. 1987) (*en banc*), *aff'd*, 108 S.Ct.

626 (1988) (in enacting Bankruptcy Code Section 1121(d) Congress intended to limit the delay

that makes creditors the hostages of chapter 11 debtors).

      13.    It is widely recognized that termination of exclusivity and the filing of

competing plans serve as catalysts for compromise and resolution of difference.  In re Pub. Serv.

Co. of New Hampshire, 99 B.R. 155, 176 (Bankr. D.N.H. 1989); In re Texaco, 81 B.R. 806, 808-

809 (Bankr. S.D.N.Y. 1988); In re Geriatrics Nursing Home, Inc., 187 B.R. 128, 133 (D.N.J.

1995) (competing plans create a meaningful discourse among the various parties-in-interest,

which weeds out unfavorable plans and leads to the best possible result for all concerned parties).

The Third Circuit has underscored the positive dynamic engendered by competing plans:  "The

ability of creditors to compare the debtor's proposals against other possibilities is a powerful tool

by which to judge the reasonableness of the proposals.  A broad exclusivity provision, holding

that only the debtor's plan may be 'on the table,' takes this tool from creditors."  Century Grove,

Inc. v. First Am. Bank of New York, 860 F.2d 94, 102 (3d Cir. 1988); see also In re Rook Broad.

of Idaho, Inc., 154 B.R. 970, 976 (Bankr. D. Idaho 1993) ("It is in the interest of creditors that

they have a choice between competing plans.").

      14.    In its tenth motion to extend exclusivity, the Debtor asserts that exclusivity

should be extended because good faith progress continues to be made towards a consensual plan.

Alternatively, the Debtor insists, as it has done in previous applications, that even if settlement

negotiations are unproductive, a further extension is required because "a confirmable plan cannot

be proposed by any party absent an estimation of G-I's aggregate asbestos liability and a

resolution of the successor liability issues." Application at 10.  But the reality is that, after the

breakthrough achieved in the mediation last March, the Debtor has moved backwards, drawing

back from a consensual plan on the terms previously agreed upon in principle.  Simply put,

despite protracted negotiations and two lengthy mediations, the Debtor evidently still prefers confrontation to the filing a consensual plan.

15.     After seven years and nine extensions of exclusivity, the Court should not accept the Debtor's open-ended litigation agenda as cause for a further extension.  Instead, the Court should terminate exclusivity to lend impetus to the negotiations, to allow the creditor representatives to propose a plan, and to place the claims estimation dispute in the proper plan-formulation context.

16.     Seriatim extensions of exclusivity have deprived this case of the appropriate sense of urgency.  G-I's tort victims are being forced to wait many years for compensation, thereby suffering severe prejudice as a result of the extraordinary duration of the bankruptcy case.  In effect, the bankruptcy is being financed on the backs of those creditors.  The shareholder, by contrast, suffers little from the delay.  He remains comfortably ensconced in control of the Debtor's group, conducting all of the group's significant business affairs through the BMCA subsidiaries that — although not bankrupt and receiving little oversight by the Court — operate under an extraordinary Preliminary Injunction that insulates the group's assets from the claims of G-I's asbestos creditors.  He has adopted a strategy of attempting to expand the operating business rapidly by means of vast amounts of commercial debt, which creates significant downside risk for G-I's stake as the parent company, as has become painfully apparent in BMCA's poor performance for 2007.  This situation is unjust.  Means must be found to change it.

## I.     Protracted Negotiations Have Not Led to a Consensual Plan — and There Can Be No Assurance That They Ever Will.

17.     Extensive negotiations over a period of years, two lengthy mediations, and a seven-month stay have yielded no consensual plan.  The Debtor's argument that exclusivity

should continue because of "good faith progress" is thus misplaced. Indeed, the Debtor's failure to follow through on the agreement in principle reached last March is reason enough for terminating exclusivity.

18.    In In re Pub. Serv. Co. of New Hampshire, 88 B.R. 521 (Bankr. D.N.H. 1988) ("Public Service"), the court granted the debtor's first request for an extension of exclusivity. Thereafter, on the last day its first extension, the debtor filed a chapter 11 plan and sought a further extension of its exclusive period to solicit acceptances. In re Pub. Serv. Co. of New Hampshire, 99 B.R. 155, 156 (Bankr. D.N.H. 1989) ("Public Service II"). The court denied the second extension, finding that such relief would not "promote a consensual plan of reorganization within a reasonable time." Id. at 175-76. It noted the "vehement tone" of the pleadings filed in the bankruptcy case and related litigation, which manifested "a severe degree of distrust" among the parties. Id. at 172. In addition, the court observed that, despite intense negotiations, the parties were no closer to a consensual plan on the date of the hearing on the second exclusivity motion than they were at the hearing on the first exclusivity motion. Id. at 173.

19.    This Court has relied on Public Service in previous exclusivity decisions herein for its teaching that neither the size and complexity of the case nor the pendency of litigation, without more, can justify open-ended extensions of exclusivity. [2] "[E]xclusivity extensions must be 'paid for' by 'hard bargaining' during the period of the [d]ebtor's exclusivity." Public Service, 99 B.R. at 173. Where "hard bargaining" is unproductive, "a

---

[2]    See Transcript of Proceedings held November 8, 2006 [Docket No. 6660] (the "Eighth Exclusivity Decision") at 25:3-9; Transcript of Motion Proceedings held on February 17, 2006 [Docket No. 5910] (the "Seventh Exclusivity Decision") at 26:8-16; Sixth Exclusivity Decision at 17:7-16; Fifth Exclusivity Decision at 133-24-25 and 134:1-4.

further extension of exclusivity would only result in the parties continuing to argue in circles

endlessly on the various issues." *Id.* at 176.

> [O]pening up the process to alternative plans * * * will serve to quantify and make concrete various ways of resolving those circular questions. * * * [I]t will force the parties to use all of their considerable skills to negotiate resolutions on a fact basis (rather than and [sic] ideological basis dealing with unanswered and unanswerable interesting legal questions) under the gun of having the "reorganization train leave the station" before they are aboard.

*Id.*

20.    Courts overseeing other asbestos-related bankruptcy cases have employed

these principles with great success.  For example, in <u>Babcock & Wilcox</u>, the parties were

engaged in extremely contentious litigation about the merits of the mass tort claims when the

court terminated exclusivity.  Litigation then soon gave way to intensive negotiations, resulting

in the filing of a draft joint plan of reorganization and disclosure statement within six months and

ultimately the confirmation of a plan.  *See* Order entered May 16, 2002, Denying Debtor's

Motion to Extend Exclusivity Period, <u>In re The Babcock & Wilcox Company</u>, Case No. 00-

10922 (Bankr. E.D.La.) (Docket No. 3173) (copy annexed as **Exhibit B**).  *See also, id.,* Order

Confirming Third Amended Joint Plan of Reorganization entered on January 18, 2006 [Docket

No. 7053]; *id.*, Substantially Complete Consensual Draft Joint Plan and Draft Disclosure

Statement filed on December 19, 2002 [Docket No. 3835].

21.    This past July, Judge Fitzgerald took a similar tack in <u>W.R. Grace</u>, an

asbestos-related bankruptcy case that was filed several months after this one.  Frustrated by the

lack of progress in settlement negotiations amid contentious claims estimation litigation and

related discovery, Judge Fitzgerald denied Grace's tenth application for continued exclusivity,

finding that "despite over six years of exclusivity, Debtors have been unable to forge an

agreement or achieve a consensus with respect to asbestos personal injury liabilities," that "Debtors have had sufficient exclusive time to control negotiations with creditors and to propose a feasible plan," and that "termination of exclusivity will facilitate moving the case toward conclusion by changing the dynamics for negotiation while permitting Debtors to continue to operate their business, resolve claims and participate in negotiations."  *See* Order Denying Extension of Exclusivity and Terminating Same, In re W.R. Grace & Co., Case No. 01-1139 (Bankr. D. Del.) [Docket No. 16396]  (copy attached as **Exhibit C**).

22.     The instant case is similar to Babcock & Wilcox and W.R. Grace in many respects.  In each case, an entrenched debtor, rendered complacent by lengthy extensions of exclusivity, pursued aggressive litigation agendas while engaging in just enough "settlement negotiations" to argue that discussions were ongoing and so lay claim to further extensions.  The lesson that Babcock & Wilcox and W.R. Grace hold for this case is that, after seven years of bankruptcy proceedings and nine extensions of exclusivity with no plan on the table and no assurance that a consensual resolution is in the offing, exclusivity must be terminated.  Opening up the process to competing plans will stimulate compromise and, failing that, will guard against oppression of creditors and ensure the essential fairness of the bankruptcy.

**II.     A Tenth Extension of Exclusivity Will Not Promote the Filing of a Consensual Plan Within a Reasonable Period of Time.**

23.     A tenth extension of exclusivity to permit the Debtor to pursue its litigation agenda will do nothing but maximize delay without giving meaningful impetus to plan formulation.

24.     In support of its latest application, the Debtor once again argues that the pendency of the Declaratory Relief Action testing BMCA's successor liability warrants a further extension of exclusivity.  When the agreed stay took effect, this proceeding was *sub judice*

before Judge Chesler on Committee's motion for judgment, which argued, among other things
that, as a matter of law, a declaratory judgment is not available to a tort defendant as a means of
resolving future derivative tort liability.  *See* G-I Holdings, Inc. v. Bennett, Case No. 02-03626
(D.N.J.)[Docket No. 171].  When the consensual stay took effect, Judge Chesler dismissed that
action administratively, with leave to reopen it for a final determination.  *Id.* [Docket No. 189].
Yet, even if the parties terminate the stay and return to litigation, they are not likely to revive the
Declaratory Relief Action.  Among other reasons, as the Legal Representative has pointed out,
the ruling dismissing him from that action leaves the Debtor without any colorable means of
binding future claimants to a declaration, so that the action gives G-I no way of protecting
BMCA from derivative asbestos liability without submitting to a plan and channeling injunction
under section 524(g) of the Bankruptcy Code.  Even if that were not so, the idea that the Debtor's
reorganization should be delayed by litigation concerning the future liabilities of non-debtors can
hardly be justified when the Bankruptcy Code insists that even the fixing and liquidation of
present tort claims against the Debtor must not be allowed to impede reorganization.[3]  *See* 11
U.S.C. § 502(c) (mandating that any contingent or unliquidated claim be estimated if the fixing
or liquidation of the claim would "unduly delay the administration of the case").

   25. In view of the policy embedded in section 502(c) of the Code, G-I's
litigation against the Internal Revenue Service ("IRS") certainly affords no good cause for
extending exclusivity.  With trial not expected to occur until sometime in 2009, and with the
prospect of appeals, a final litigated resolution of the tax dispute claims is still many years away
— and G-I has every incentive to play out its hand in that litigation for as long as possible.

---

[3] In light of this analysis, it is hardly surprising that past exclusivity decisions of this Court, though
sometimes referring in passing to the status of the Declaratory Relief Action, have placed little emphasis
on it as a rationale for the extensions.  See Sixth Exclusivity Decision at 20; Seventh Exclusivity Decision
at 29-30.

Notably, the Motion does not single out the tax case as an independent reason to continue exclusivity.

26.     Also misplaced is the Debtor's continued reliance on the claims estimation proceeding as an unresolved "contingency" that warrants a further extension of exclusivity.  In Dow Corning, 208 B.R. at 666, the court recognized that the need to estimate mass tort claims gives no just cause for maintaining exclusivity.  Rather, "generally, the type of unresolved contingency which would be relevant to a motion to extend or terminate exclusivity is one which is external to the case itself." Id.  To rest extensions of exclusivity on claims estimation litigation is, quite simply, to invite the Debtor to make that litigation as contentious and lengthy as possible.

27.     In its objection to the Debtor's sixth application for an extension of exclusivity, the Committee traced the history of the claims estimation dispute up to that point:

> The Debtor filed its chapter 11 case on January 5, 2001, citing overwhelming asbestos claims.  The Debtor acknowledges that it was unable to overcome those claims in the tort system.  But the Debtor apparently spurns section 524(g) of the Bankruptcy Code, the statute by which Congress created reliable means of resolving asbestos bankruptcies, since that statute would require that any plan provide fairly for future claimants and obtain consent from a super-majority of present claimants.  See 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa); id. (4)(B)(ii).  Rather than coming to terms with its creditors, the Debtor prefers to use the Bankruptcy Court in lieu of the state courts as a forum for carrying on the litigation that it definitively lost in the tort system.  Thus, in bankruptcy the Debtor has pursued a constantly changing litigation program.  However, as time marches on and the Debtor's proposed course becomes more and more lengthy, the Debtor's true intention is unmasked − that is to "keep the ball in the air" through whatever means possible while it starves the creditors and hopes for Congressional rescue.  The approach is designed to maximize leverage for the Debtor's shareholder, Samuel Heyman, and thereby extract equity for him that the company's plight cannot justify.

Until recently, the cornerstone of the Debtor's program was its outlandish idea of disallowing most of the more than 150,000 pending asbestos claims in the guise of liquidation and estimation. The Debtor expended countless hours and engaged in more than two years of briefing in an effort to implement a "Claims Liquidation Committee" that would have applied self-serving criteria made up by the Debtor to rule out or value at zero large numbers of claims that are viable in the tort system.  In an opinion issued on February 1, 2005 [the "First Estimation Opinion"], this Court was constrained to reject the Debtor's novel scheme, finding, *inter alia*, that it violated asbestos tort victims' Seventh Amendment jury trial rights and that the Court lacked authority to appoint a committee of special masters to review claims.  These were patent flaws that flew in the face of clear statutory mandates. *See* 28 U.S.C. § 1411(a) (providing that nothing in title 11 alters the jury trial rights that holders of personal injury or wrongful death claims enjoy under nonbankruptcy law); Federal Bankruptcy Rule 3001 (expressly precluding the appointment of special masters in cases and proceedings under title 11).

In that same opinion, the Court concluded that asbestos claims should be estimated in the aggregate as proposed by the Committee and Legal Representative.  Although the methods for estimating asbestos claims in the aggregate are well developed and have been utilized in every major asbestos bankruptcy case filed to date, the Debtor now attempts to put a new spin on aggregate estimation.  By way of an elaborate claims data sampling program that would, by the Debtor's own estimate, require at least two years of fact and expert discovery prior to going to hearing on estimation, the Debtor proposed to prove that no more than 10% of asbestos claims filed against it are "valid."  This new claims sampling program, which is no less quixotic and fanciful than the one rejected by this Court in its February 1, 2005 opinion, was already advanced by Debtor's counsel on behalf of their other clients in the Owens Corning bankruptcy case.  It was firmly rejected by District Judge Fullam, who put the matter succinctly: "The relevant data have been available for analysis for many years." *See* Memorandum and Order, In re Owens Corning, Nos. 00-3837 to 3854 (JPF) (D. Del. Nov. 22, 2004).[4]

*See* Committee's Objection to Debtor's Sixth Application For Extension of Exclusive Periods

filed on May 10, 2005 [Docket No. 4832] at p. 4-6.

---

4          A copy of the above-cited ruling in <u>Owens Corning</u> is attached as **Exhibit D**.

28.     This Court provided the additional framework for the aggregate claims estimation in its decision of August 11, 2006 (the "Second Estimation Opinion"), and the subsequent scheduling order it entered in the estimation proceeding.  The Second Estimation Opinion afforded the Debtor a 90-day interval which to conduct "narrowly tailored" discovery by way of claims sampling for purposes of estimation.  However, when ultimately fitted into the overall scheduling order for "Phase I" of the estimation proceeding (which will concern itself exclusively with present and future claims for mesothelioma and lung cancer), that 90-day window for sampling proved to be just the beginning.  In all, the scheduling order for Phase I provides a full year for fact discovery, expert discovery, and pretrial submissions. Implementation of that schedule was stayed on consent of the parties to allow for the mediation process to play out.  *See* Second Amended Estimation Scheduling Order entered on March 9, 2007 [Docket No. 6845](copy attached as **Exhibit E**).  But, if there is no consensual resolution in the very near future, the Committee will exercise its absolute right to terminate the stay pursuant to the terms of the stay order, and full-bore litigation will resume.  If and when the stay is lifted, it will take the Debtor more than a year to proceed to trial in "Phase I" alone.

29.     And what would result from extending exclusivity if the Court accepted uncritically the Debtor's idea that claims estimation litigation provides sufficient cause?  More extensions — lots of them.  The Debtor now seeks an extension until April 30, 2007, but it is obvious that, if the Debtor and its shareholder persist on their present course, granting that application will not produce a plan before the extension runs out.  Another application will follow, and another, and another, for as long as the Debtor believes the Court will tolerate its course of conduct.

30.     Yet, in presuming upon the Court's indulgence, the Debtor may be overlooking that this Court has already recognized that claims estimation need not be finally resolved before a plan can be filed.  In the Seventh Exclusivity Decision, the Court stated:

> Until the estimation proceeding is further along, thereby clarifying, at the vesy least, the procedures as to how the estimation of the Debtors' potential asbestos liabilities will proceed and how long any needed discovery will take, this Court, in its view at least, could not adequately compare and consider competing plans. * * * *
>
> Again, the Court notes that this is a large, complex case in which significant contingencies remain, including, among others, the estimation opinion that the Court will be issuing.  It continues to be true that, at least in this Court's view, that no plan will move forward until the issues of the Debtors' aggregate asbestos liability is, as this Court has noted previously, put in clearer focus.
>
> **However, by clearer focus, this Court is not suggesting that the outstanding issues be resolved with finality.**  And the Court does continue to note the Debtors' burden of proof continues to increase with each extension it requests and the longer the period of exclusivity lasts.

Seventh Exclusivity Decision at 29, 31 (emphasis added).

31.     The Second Estimation Opinion and the subsequent scheduling order have now resolved "the procedures as to how the estimation * * * will proceed and how long any needed discovery will take," and have brought clearer focus to the estimation process as demanded by the Seventh Exclusivity Decision.  It is thus appropriate for a plan to be filed now to provide the correct plan formulation context for the estimation proceeding.  Pursuant to 28 U.S.C. § 157(b)(2)(B), the "estimation of claims or interests for the purposes of confirming a plan" is a core proceeding.  An estimation for any other purpose, by contrast, is a non-core proceeding which is subject to *de novo* review in the District Court.  Thus, terminating exclusivity as the estimation proceeding commences will promote the goals of the reorganization

process and allow for the filing of a plan that will place the estimation proceeding squarely within the Court's core jurisdiction

32.    Permitting plans to be filed at this stage will also simplify and streamline the estimation process.  In the context of plan formulation and confirmation, the Court need not determine the full amount of the Debtor's asbestos liability.  Rather, the Court will only be required to determine whether the asbestos liability exceeds the Debtor's assets.  *See* In re Federal Mogul Global, Inc., et al., 330 B.R. 133, 155 (D. Del. 2005)("an estimation by definition, is an approximation and necessarily involves comparing a known or established quantum of data to the thing being estimated"); *see also* Opinion, In re Armstrong World Industries, Inc., Case No. 00-4471(D. Del. August 14, 2006) [Docket No. 9734] (holding that the court need not determine the actual value of the asbestos liability, but rather was only required to determine whether the value of the asbestos liability plus other liabilities exceeded the value of the assets) (excerpt attached as **Exhibit F**).  As shown below, there is a high probability that the answer to that question will be "yes" — by a long shot.  When the Court considers the Debtor's argument that the pendency of claims estimation litigation is enough to warrant a tenth extension, it would be blinking reality not to recognize that what is already known about G-I's asbestos liability points to probable insolvency.  Certainly, the creditors are entitled to file a plan premised on the Debtor's insolvency, and thereby to delineate clearly the parameters of the estimation dispute and what it means for this case.

33.    If the latest mediation does not produce a settlement among the Debtor, the Committee, and the Legal Representative by the time this Motion comes on for hearing, there is no reason whatsoever to believe a consensual plan will result from holding exclusivity in place beyond that point.  Without such a settlement, moreover, it is inevitable that the creditors will

ultimately be permitted to propose a plan, and it would benefit no legitimate interest to delay those efforts any further. Far from diverting the parties' efforts to unimportant work, the process of formulating a creditors' plan at this stage goes to the essence of the reorganization and may well supply the impetus needed for a settlement. Even if the estimation proceeding wends its way toward a hearing at the pace contemplated by the previous scheduling order, allowing the creditors to propose a plan while that contested matter unfolds will ultimately save time later by allowing the Court to turn swiftly to a disclosure statement hearing at the conclusion of the estimation (or after Phase I thereof, if it proves conclusive). On the other hand, if the Court were to maintain exclusivity until deciding estimation, this would not only contradict its prior acknowledgement that a merits ruling on estimation is not a prerequisite for terminating exclusivity, but would also build a lengthy hiatus into the case since, in that scenario, the parties would not turn in earnest to plan formulation until estimation had run its course. Notably, G-I's only other major creditor besides the asbestos constituencies is the IRS. The Committee understands that IRS policy prevents it from negotiating an inter-creditor agreement while exclusivity remains in place, but also that, when exclusivity ends, the IRS would regard itself as free to enter into such discussions and would be willing to do so. Rather than maintaining a check on such discussions, the Court should lift exclusivity to facilitate them. Certainly, the Court must not accept the idea that the Debtor's litigation agenda, which stretches on into the indefinite future, provides the only path forward in this case. Instead the Court should allow the creditors to test whether they can produce a plan that would cut the litigation short and reorganize the Debtor much sooner than the Debtor's approach is capable of doing.

**III.    Information Already at Hand Points to G-I's Probable Insolvency and Thus Underscores that a Further Extension of Exclusivity Would Be Unfair to Creditors.**

34.    Accompanying this memorandum are two declarations.  The first, by Mark A. Peterson, PhD., the Committee's claims consultant, illustrates the order of magnitude of the Debtor's asbestos liability by focusing on just one subset of the asbestos claims — the *new* claims for mesothelioma and lung cancer that have accrued in the seven years since the Debtor filed bankruptcy.  The second, by Bradley Rapp, a principal of the Committee's financial advisor, provides a preliminary indication of the value of the Debtor's only substantial asset, its ownership interest in BMCA.

35.    Dr. Peterson's preliminary estimate shows that the Debtor's aggregate asbestos liability for mesothelioma and lung cancer claims arising during the seven years that this bankruptcy case has consumed so far is approximately $2.049 billion.  *See* Declaration of Mark A. Peterson ("Peterson Dec.") ¶ ¶  4, 18-20.  Notably, these illustrative analyses ignore (a) all asbestos claims, no matter what the disease category, filed against the Debtor before the bankruptcy, (b) all asbestos claims for "other cancers" and nonmalignant conditions that have accrued so far during the bankruptcy or will accrue before the case is resolved, (c) all asbestos claims, no matter what the disease category, that will accrue after the bankruptcy is over, and (d) all defense costs.  *See id.* ¶ ¶ 5, 20.

36.    No reasonable analysis can avoid the conclusion that the malignancy claims that have accrued against the Debtor from 2001 through 2007 represent a massive liability.  Even if one were to suppose — contrary to fact — that there was no increase after 1999 in the propensity to sue on the part of victims of these malignancies, G-I's liability for such claims accruing in 2001-2007 would be approximately $1.766 billion.  *See id.* ¶ 20.  And even if, on top of that unrealistic assumption, one were also to ignore sharp increases that actually took

place after 1999 in the tort-system values of asbestos claims for mesothelioma and lung cancer, G-I's new liability for such claims accrued in 2001-2007 would be approximately $812 million. *See id.* ¶ 3.

37.    The new mesothelioma and lung cancer claims represent only a small fraction of G-I's overall liability, but, as shown below, they alone far exceed the probable asset value of G-I.  Dr. Peterson's illustrative analysis of the value of recently accrued malignancy claims against the Debtor is very much in line with the aggregate claims estimations that courts have made in recent years in similar asbestos-driven bankruptcies, such as those of Babcock & Wilcox ($7.099 billion to $9.043 billion), Owens Corning ($7 billion), and Federal Mogul ($9 billion).[5]

38.    The human suffering behind these numbers is not to be ignored. According to authoritative epidemiology, the soundness of which has been corroborated by empirical data, 21,219 people have died from mesothelioma and 30,648 from asbestos-related lung cancer while this Debtor has dallied in Chapter 11.  *See* Peterson Dec. ¶ 8.  A large proportion of those deaths will predictably result in claims against G-I, which bears legal responsibility for the extensive operations of its predecessor involving a wide array of asbestos products.

39.    These rough indicia of the scale of G-I's asbestos liability should be kept in mind when considering G-I's asset value, which consists of its ownership stake in BMCA. The accompanying Declaration of Bradley Rapp sheds significant light on that subject.  *See*

---

[5]    *See* Owens Corning v. Credit Suisse First Boston, 332 B.R. 719, 725 (D. Del.) (estimating Owens Corning's liability for pending and future asbestos claims at $7 billion); Findings of Fact and Conclusions of Law Regarding Core Matters, Etc. at 48-49, In re The Babcock & Wilcox Company, No. 01-10992 (Bankr. E.D. La. Oct. 8, 2004) (relevant excerpts attached as **Exhibit G**) (confirmation order based on estimates of the debtor's asbestos liability in the range of $7.099 billion to $9.043 billion); In re Federal Mogul Global, 330 B.R. 133, 164 (D. Del. 2005) ($9 billion estimate for Turner & Newell).

Declaration of Bradley M. Rapp ("Rapp. Dec."). Mr. Rapp has brought to bear an "EBITDA multiples" approach, one of the conventional business valuation methodologies, to estimating on a preliminary basis the worth of BMCA's business enterprise as it now exists.[6]  *See* Rapp. Dec. ¶ 9. After estimating BMCA's EBITDA for 2007 (factoring out non-recurring charges related to BMCA's recent acquisition of Elk), Mr. Rapp has applied multiples of 6.5 and 8 in line with market data relevant to businesses in the building products sector. *See id.* ¶ 10. This indicates an enterprise value ranging from $1.82 billion to $2.24 billion. *Id.* From those figures, he has subtracted BMCA's interest-bearing commercial debt of $1.86 billion to arrive at a range of value for BMCA's equity — the stake that G-I holds as BMCA's owner. *Id.* On this basis, the equity value falls in a range from negative $40 million to positive $380 million. *Id.*[7]

40. Considering Mr. Rapp's Declaration alongside that of Dr. Peterson puts the plight of G-I's creditors into sharp focus: Of course, if G-I's equity in BMCA falls at the low end of the range suggested by Mr. Rapp's analysis, it represents a deficit, G-I is insolvent even before the first dollar of asbestos liability is taken into account, and any hope for a dividend to G-I's creditors depends entirely upon successful prosecution of avoidance power claims and on whether BMCA can achieve the hoped-for benefits of the Elk acquisition despite the burden of its commercial debt. On the other hand, if G-I's stock in BMCA is worth $380 million — the high end of the range suggested by Mr. Rapp's analysis — it falls far short of the $2.049 liability that Dr. Peterson's analysis indicates for just those mesothelioma and lung cancer claims that have accrued during the pendency of this bankruptcy case, and indeed well short of the $812 million estimate that would apply if claim values and propensities to sue for those malignancies

---

[6]    "EBITDA" stands for earnings before interest, taxes, depreciation, and amortization. Investment bankers and valuation experts commonly use EBITDA as a measure of a company's cash-generating capacity, which is one of the keys to determining its gross value as a going concern.

[7]    Mr. Rapp's analysis is offered as a preliminary indication of BMCA's enterprise value and equity value. A more fully fleshed-out analysis would take account of more detailed information than BMCA has publicly disclosed concerning, among other things, its 2007 cash flows and its reasonably expected future cash flows.

had not risen since 2000, as in fact they have.  *See* Peterson Dec. ¶ ¶ 3, 18-20.  On any view of the matter, then, G-I's creditors are at serious risk.  There can be no convincing justification for preventing them from proposing a creditors' plan .

41.    G-I's insolvency becomes all the more probable when one considers the impact of the claim asserted by the IRS.  According to its proof of claim, the IRS alleges that it is owed more than $400 million.[8]  It has already won partial summary judgment on an alternative theory[9] and thus has gained the upper hand in its effort to establish a very large liability.

42.    Of course, terminating exclusivity would not, by itself, prevent the Debtor from continuing to operate its business, pursue its own litigation strategy, and propose any plan it thinks appropriate.  But irrespective of which side's approach and plan prevails in the end, there is no basis in the Bankruptcy Code or in fairness to grant any further extensions of exclusivity to a Debtor that in all probability is deeply insolvent and whose approach has been to confront the creditors with the Hobson's Choice of litigating for years on end or else knuckling under to terms dictated by the Debtor's shareholder.

43.    A telling indication of the duress exerted upon creditors by the delay in resolving this bankruptcy is that many asbestos claimants who, by the petition date, already held *liquidated* claims against G-I in the form of *bonded judgments*, have settled their claims for fifty cents on the dollar rather than wait indefinitely for the expiration of the automatic stay and the collection of their judgments.[10]  As for holders of unliquidated asbestos claims, G-I has not paid

---

[8]    *See* IRS's Amended Proof of Claim dated December 8, 2003 (copy annexed as **Exhibit H**).

[9]    *See* Opinion and Order dated June 8, 2007, Granting Partial Summary Judgment in Favor of United States of America, United States v. G-I Holdings, Inc., Case No. 02-3082[Docket No. 231](copy attached as **Exhibit I**).

[10]    *See*, *e.g.* Application of G-I Holdings, Inc. for Order Pursuant to Bankruptcy Rule 9019(a) approving Settlement Agreement with William L. Martens, Esq. on Behalf of Various Parties Who Asserted Claims Against G-I [Docket No 6044] (settling claims of $71,948.20, plus statutory interest, for $35,974.10); Application of G-I Holdings Inc. for Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Agreement with Terry Gram, Personal Representative for the Estate of George O. Gram

them one cent since the inception of this case and will not make any such payments until a plan of reorganization is consummated.

44.      Meanwhile, G-I's subsidiary continues to operate under the protection of an extraordinary preliminary injunction that shields it from liability for its parent's asbestos liabilities and has enabled it to make interest payments aggregating $359 million to holders of its bank and bond debt while making principal payments of $97.4 million and refinancing most of the balance. *See* Rapp. Dec. ¶ 12.

45.      As the Committee has pointed out before, this state of affairs is not an accident of history, but the result of the Debtor's overall game-plan.  In October 2000, when G-I (then known as GAF Corporation) and BMCA were actively charting their course for this bankruptcy, a bond analyst named Raymond Kennedy from PIMCO, one of the world's leading bond fund management companies, sent an email to his colleagues reporting on "a long call with the CFO [of BMCA] about operations and the GAF asbestos liability."  Noting that G-I then faced 115,000 claims, Mr. Kennedy wrote as follows:

> GAF has stated that it does not have enough assets to settle the claims unless there is tort reform.  Thus, GAF will become insolvent.

E-Mail from R. Kennedy to High Yield Bond Fund Managers (October 23, 2000) (marked as Exhibit 5 to Deposition of R. Kennedy in the BMCA declaratory judgment action and reproduced as **Exhibit J** to this brief).

---

[Docket No 1366] (settling claim of $9,465.37, plus statutory interest, for $3,786.15); Application of G-I Holdings Inc. for Order Pursuant to Bankruptcy rule 9019(a) Approving Settlement Agreement with Eugene T. Kozowski [Docket No 1367] (settling claim of $19,345.15, plus statutory interest, for $7,738.06); Application of G-I Holdings Inc. for Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Agreement with John Westervelt, Personal Representative for the Estate of Jack E. Westervelt [Docket No 1729] (settling claim of $6,973.38, plus statutory interest, for $2,789.35).

46.     "The fact is," Mr. Kennedy continued, "that BMOC [*sic*, BMCA] is the only source (after GAF has exhausted its insurance claims) of cash that can be used to settle asbestos claims."   Exhibit J.   He foresaw that, although G-I would contend that asbestos claimants have recourse only against its equity in BMCA, asbestos claimants "will likely attack [BMCA] directly and go after the assets of [BMCA] and try to be secured equally with the bondholders of [BMCA]" under arguments of piercing the corporate veil, substantive consolidation, and fraudulent transfer.   *Id.* at 1-2.   He also predicted that BMCA would receive the protection of the Bankruptcy Court during the litigation of these inter-creditor disputes "since it represents an asset that could be used to settle GAF claims" — and that the delay involved in litigating these matters would inure to the great advantage of BMCA's bondholders in their competition with the asbestos claimants.   *Id.* at 2.   He wrote:

> What Will Happen?
>
> GAF will file Chapter 11, probably over the next 1-4 weeks. [BMCA] will likely NOT file Chapter 11.   The plaintiffs may try to attack [BMCA], but that will occur over time and it could take 5 to 7 years before they get an answer.   Interestingly enough, [BMCA] has paid dividends over $140MM [million] to GAF over the past 2 years.   These would stop and [BMCA] would generate free cash flow to retire debt.

*Id.* at 2.

47.     In prior applications for exclusivity extensions, the Debtor has insisted that asbestos victims are not prejudiced by the delay in confirming a plan because the value of BMCA has risen during its parent's bankruptcy.   The Debtor has also touted BMCA's increasing net income and net sales numbers as evidence that the parties are not faced here with a "melting iceberg".   *See, e.g.,* Eighth Application at p. 14.   These contentions are noticeably absent from the Debtor's tenth exclusivity application, and for good reason.

48.     BMCA is now struggling.  According to its  SEC Form 10-Q  for the nine-month period ended September 30, 2007, the results of operations for the combined BMCA and its newly acquired subsidiary, ElkCorp, on a pro forma basis, deteriorated significantly over the results from the comparable period in 2006.  Notably,

- net sales declined from $2.274 billion to $1.948 billion (a decline of 14.4%);

- earnings before interest and taxes decreased from $184.4 million to $141.1 million (a decline of 23.5%), after factoring out non-recurring costs and restructuring charges incurred in acquiring Elk;

- net income declined by more than 100% from $43.7 million to a net loss of $7.4 million irrespective of after factoring out non-recurring costs and restructuring charges tied to the Elk acquisition.

*See* Rapp. Dec. ¶ 8 & n.4.

49.     BMCA's highly leveraged capital structure exposes it and its owner, the G-I estate, to significant downside risk in hard times.  Even in good times, most of BMCA's cash flow went to pay interest to its financial creditors with little left over to benefit the parent and its creditors.  *See* Rapp. Dec. ¶ 11-13 (noting that from 2001 through 2006, BMCA paid $359 million in interest on its debt compared to $47.3 million in dividends or distributions to its parent).  BMCA's capital structure became even more heavily debt-laden by its 2007 acquisition of Elk, which was financed solely by additional debt.  As a result of the acquisition, total debt increased from $587.3 million at December 31, 2006, to $1.86 billion as of September 30, 2007.  *See id.* ¶¶ 6-7.  This, in combination with reduced sales, has strained BMCA's cash flows, with debt service rising to $139.2 million for the first nine months of 2006, a 200% increase over BMCA's actual interest expense for the corresponding period in 2006.  *See id.* at ¶ 8.

50.    Contrary to the Debtor's prior assertions, BMCA is certainly in danger of becoming a "melting iceberg."  BMCA's past growth was never a fair answer to the prejudice inflicted on G-I's tort victims by the lengthy delays of this case, especially considering that its debt-financed growth strategy meant that the cash flow mostly went to service debt rather than to maximize the value of G-I's stake.  But, as G-I made much of BMCA's past performance when arguing for previous extensions of exclusivity, it is appropriate to point out that BMCA is now performing poorly.   The Debtor can no longer paper over injustice to its creditors and subservience to its shareholder by facile references to BMCA's worth and prospects.

<u>**CONCLUSION**</u>

The Court should deny the Debtor's tenth application for extension of exclusivity.

Dated:  December 21, 2007                    Respectfully submitted,

LOWENSTEIN SANDLER, PC

By:  /s/ Jeffrey D. Prol
Jeffrey D. Prol (JP7454)
Jeffrey A. Kramer (JK8278)
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch (EI2843)
375 Park Avenue, 35th Floor
New York, New York 10152
212.319.7125

CAPLIN & DRYSDALE, CHARTERED
Trevor W. Swett  (TS8962)
Peter Van N. Lockwood (PL8843)
One Thomas Circle, N.W.
Washington, D.C.  20005
202.862.5081

*Co-Counsel to the Official*
*Committee of Asbestos Claimants*