**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.
THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL
BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : |  |
|  | : | Chapter 11 Case No. |
| **G-I HOLDINGS INC., <u>et</u> <u>al.</u>,** | : | 01-30135 (RG) |
|  | : | (Jointly Administered) |
|  | : |  |
| Debtors. | : |  |

------------------------------------------------------------x

**FIRST AMENDED DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT
PLAN OF G-I HOLDINGS INC. AND ACI INC. PURSUANT TO
<u>CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE</u>**

| | |
|---|---|
| DEWEY & LeBOEUF LLP<br>1301 Avenue of the Americas<br>New York, New York 10019<br>(212) 259-8000<br><br><br>Attorneys for Debtors in Possession | RIKER, DANZIG, SCHERER,<br>HYLAND & PERRETTI LLP<br>Headquarters Plaza<br>One Speedwell Avenue<br>Morristown, New Jersey 07962-1981<br>(973) 538-0800<br>Attorneys for Debtors in Possession |

Dated:  December 3, 2008

**FIRST AMENDED DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT
PLAN OF G-I HOLDINGS INC. AND ACI INC. PURSUANT TO
CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE
BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER
BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF
ACCEPTANCES OR REJECTIONS OF THE CHAPTER 11 PLAN DESCRIBED HEREIN.
ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT
ARE NOT INTENDED TO BE, AND SHOULD NOT IN ANY WAY BE CONSTRUED AS, A
SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION
CONTAINED IN THE DISCLOSURE STATEMENT BE RELIED ON FOR ANY PURPOSE
BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED
DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.**

**THE DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED
DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER THIS
DISCLOSURE STATEMENT.**

G-I Holdings Inc. ("G-I") and its affiliate ACI Inc. ("ACI" and, together with G-I, the
"Debtors") submit this first amended Disclosure Statement pursuant to section 1125 of title 11 of the
United States Code (the "Bankruptcy Code") to the holders of claims against and equity interests in the
Debtors in connection with (i) the solicitation of acceptances or rejections of the second amended chapter
11 plan of reorganization (the "Plan"), dated December 3, 2008, proposed by (a) the Debtors, (b) the
statutory Official Committee of Asbestos Claimants of G-I Holdings, Inc., consisting of the individuals
and entities appointed by the United States Trustee for the District of New Jersey (the "Asbestos
Claimants Committee"), and (c) C. Judson Hamlin, the Legal Representative of Present and Future
Holders of Asbestos Related Demands appointed by the Bankruptcy Court pursuant to its order dated
October 10, 2001 (the "Legal Representative" and, collectively with the Debtors and the Asbestos
Claimants Committee, the "Plan Proponents"), and filed with the United States Bankruptcy Court for the
District of New Jersey (the "Bankruptcy Court"), and (ii) the hearing on confirmation of the Plan (the
"Confirmation Hearing") scheduled for [January 28, 2009].

**Unless otherwise defined herein, all capitalized terms contained in this Disclosure
Statement shall have the meanings ascribed to them in the Plan.  All information about the Debtors
in this Disclosure Statement comes from the Debtors and not the other Plan Proponents.**

Attached as Exhibits to this Disclosure Statement are the following documents:

- The Plan (Exhibit A);

- Order of the Bankruptcy Court, dated [___], 2008, approving this Disclosure
Statement (the "Disclosure Statement Order") (Exhibit B);

- Ballot Tabulation and Solicitation Procedures, as approved by the order of the
Bankruptcy Court, dated [___], 2008 (the "Voting Procedures") (Exhibit C);

- Projected Financial Information (Exhibit D); and

- Liquidation Analysis (Exhibit E).

1

In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that the Debtors believe may be entitled to vote to accept or reject the Plan.

## I. OVERVIEW OF THE PLAN

### A    INTRODUCTION

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. Under chapter 11, a company endeavors to restructure its finances to enable the company to continue as a going concern outside bankruptcy. A chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and stockholders with respect to their claims against and equity interests in the debtor. According to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited only after a written disclosure statement has been provided to each creditor or stockholder who is entitled to vote on the plan. This Disclosure Statement is presented by the Debtors to holders of Claims against and Equity Interests in the Debtors to satisfy the disclosure requirements contained in section 1125 of the Bankruptcy Code.

### B    CHAPTER 11 PLAN

The Plan resolves G-I's liability for Asbestos Claims by channeling them to a trust established by G-I (the "Asbestos Trust"). In exchange for the Plan Consideration to be transferred by the Plan Sponsor or the Reorganized Debtors pursuant to the terms of the Plan (as more fully described herein and in the Plan), which includes cash on the Effective Date in an amount not to exceed $215 million, a Trust Note in the amount of $560 million, and other consideration for the benefit of the Asbestos Trust, the Asbestos Trust will assume and be responsible for all Asbestos Claims.

Holders of Asbestos Personal Injury Claims will be permanently enjoined from pursuing their claims against the Reorganized Debtors, Building Materials Corporation of America ("BMCA"), and certain other parties, and will look solely to the Asbestos Trust for payment of their claims.

The Asbestos Trust will not assume responsibility for any Claims or Demands upon G-I other than the Asbestos Claims. For example, as described more fully herein, the Asbestos Trust will not assume liability for the following claims, whether or not asserted before the conclusion of G-I's Chapter 11 Cases, and whether or not related, directly or indirectly, to asbestos: (i) Workmens' Compensation Claims, (ii) Environmental Claims, (iii) Asbestos Property Damage Claims, (iv) Asbestos Property Damage Contribution Claims, (v) Bonded Claims (other than any deficiency portion of a Bonded Asbestos Personal Injury Claim), (vi) Indirect Trust Claims held by an Affiliate or (vii) the claims of the Center for Claims Resolution, Inc. ("CCR") or its members.

Equity interests in the Debtors existing as of the Commencement Date will be extinguished pursuant to the Plan. The Debtors will issue G-I Class B Shares and ACI Class B Shares prior to the Effective Date, which will remain outstanding.

Specifically, the Plan and the Chapter 11 Cases accomplish the following objectives, which the Debtors believe are essential components of a successful reorganization:

- Fair treatment for all Claims and interests in accordance with the Bankruptcy Code;

- Channeling of Asbestos Personal Injury Claims and Indirect Trust Claims to a trust for processing and resolution under 11 U.S.C. § 524(g), while affording

2

protection against such Claims to the Debtors and certain related entities by means of a permanent injunction.

- Resolution of the Debtors' liability for Asbestos Property Damage Claims and Environmental Claims; and

- Corporate Reorganization of the Debtors.

### 1.    Plan Settlement Negotiations

On or about March 5, 2007, G-I, the Asbestos Claimants Committee, and the Legal Representative participated in a mediation under the auspices of former United States District Judge Nicholas H. Politan in an effort to resolve these Chapter 11 Cases and litigation related to these Chapter 11 Cases, all as more fully described below in Section IV. Following the mediation, the parties outlined the principal terms of a potential global settlement and agreed to endeavor to complete the global settlement with comprehensive documentation in the form of a proposed chapter 11 plan and its ancillary documents.

In order to preserve the resources of G-I pending the negotiation of the terms of a global settlement, the parties requested a stay of litigation from the Bankruptcy Court and other courts with jurisdiction over litigation related to these Chapter 11 Cases. On March 22, 2007, the Bankruptcy Court entered an order staying certain contested matters and adversary proceedings and shortly thereafter, similar orders were entered by the other courts with jurisdiction over such matters.

Subsequent to the entry of the orders staying litigation, the parties continued to engage in good-faith negotiations regarding a consensual plan of reorganization. Throughout the next several months, the parties exchanged draft term sheets and conducted various negotiations which led to a second mediation session with Judge Politan on December 1-2, 2007. The negotiations were complex. In early 2008, the Asbestos Claimants Committee and Legal Representative exercised their rights to terminate the stays of litigation, but the Bankruptcy Court urged that negotiations continue. Such negotiations ultimately resulted in the settlement described herein and embodied in the Plan.

### 2.    Basis for Global Compromise Embodied in the Plan

The Plan incorporates settlements and compromises designed to achieve a global resolution of these Chapter 11 Cases and litigation related to these Chapter 11 Cases. Thus, the Plan is premised upon a settlement, rather than litigation, of various disputes. The settlements and compromises embodied in the Plan represent, in effect, a linked series of concessions of the Debtors as well as the Asbestos Claimants Committee and the Legal Representative in favor of each other. The agreements are interdependent. The following description of the global compromise is qualified in its entirety by the full text of the Plan.

The Plan incorporates a global settlement of all of the disputes in these Chapter 11 Cases and related litigations among the Debtors and their shareholders and the Asbestos Claimants Committee and the Legal Representative, and third-party defendants. The Asbestos Claimants Committee and the Legal Representative allege that the liability of G-I for Asbestos Claims and Demands exceeds the value of G-I's estate by several billion dollars. In addition, the Asbestos Claimants Committee and the Legal Representative have pursued a number of causes of actions against G-I and certain of its present and former Affiliates in the Bankruptcy Court and the United States District Court. G-I disputes the aggregate liability for Asbestos Claims and Demands alleged by the Asbestos Claimants Committee and the Legal Representative, has asserted that the causes of action and allegations made by such parties are without merit, and has challenged the processes by which asbestos claims are prosecuted. The global settlement negotiated by the Debtors, the Asbestos Claimants Committee, and the Legal Representative is

implemented by the Plan and was arrived at prior to the estimation of G-I's aggregate asbestos liability, but after each party had investigated the issues thoroughly with its own experts.

To reach the global compromise, the Debtors, the Asbestos Claimants Committee, and the Legal Representative considered, among other things, the possible outcome of disputed issues, including the issues of substantive consolidation, successor liability, validity of the Asbestos Personal Injury Claims, and alleged fraudulent conveyances, and the cost and delay that would be occasioned by litigating to conclusion all such issues. In proposing the Plan, the Plan Proponents are offering a non-litigation solution to Creditors. This solution, which the Debtors believe fairly reflects the risks of litigation, will reduce the future duration of these Chapter 11 Cases and the expenses attendant to protracted disputes. While a litigated outcome of each of these issues might differ from the result produced by the Plan itself, the Debtors believe that, if the issues resolved by the Plan were litigated to conclusion, these Chapter 11 Cases would be prolonged for, at a minimum, an additional year,[1] and probably much longer, and the Debtors' estates would incur significant costs in connection therewith.

### 3.    Overall Fairness of the Settlement

The Debtors firmly believe that the global compromise embodied in the Plan is fair to the Debtors and Creditors and falls within the range of reasonableness required for approval by the Bankruptcy Court.

Although the Debtors believe the global compromise can be approved solely on the basis that the settlements contained therein fall within the range of reasonable outcomes, the Debtors also believe that the benefits obtained from avoiding continued litigation with Creditors and others who have conflicting interests cannot be overemphasized. Indeed, if a compromise had not been reached, the Debtors believe that the cost, delay, and uncertainty attendant to litigating the complex issues resolved by the Plan would have resulted in substantially lower recoveries for most, if not all, Creditors.

## C    DISTRIBUTIONS, CLASSIFICATION AND TREATMENT UNDER THE PLAN

### 1.    Priority of Distributions

In accordance with the Bankruptcy Code, all Allowed Administrative Expense Claims and priority claims are paid in full on the terms allowed by the Bankruptcy Code. Unsecured claims are classified logically into classes based on their origins (*i.e.*, asbestos claims, commercial claims, environmental claims) and are paid from the Debtors' estates or the Asbestos Trust, as the case may be. Equity Interests are paid nothing. Therefore, the Plan is fair and equitable and satisfies the absolute priority rule, even though such rule will not be implicated unless a class of impaired claims rejects the Plan.

The Plan further provides that Administrative Expense Claims may be fixed either before or after the Effective Date.

### 2.    Summary of Classification and Treatment

The table below summarizes the classification, treatment of, and estimated recovery on Allowed Claims and Equity Interests under the Plan. Further, the table identifies those Classes entitled to vote on the Plan based on the rules set forth in the Bankruptcy Code. The summary information reflected

---

[1] The evidentiary hearing for Phase I of the Estimation Litigation was scheduled for June 8, 2009, but that schedule has been superseded and all deadlines in this proceeding have been suspended by an Agreed Order Staying Certain Matters, which the Bankruptcy Court entered on August 22, 2008. For additional details on the Estimation Litigation, see Section IV(I) below.

in the table is qualified in its entirety by reference to the full text of the Plan. Please refer to Sections II(C) and V(B) hereof, as well as Exhibit A for additional information regarding the Plan and distributions thereunder. The recovery estimates set forth below are preliminary and are generally based upon information available to the Debtors as of December 1, 2008. The preliminary value of assets and amount of claims used to calculate the estimated recoveries may be significantly different than the ultimate values collected and the ultimate claims allowed. Therefore, the actual distributions under the Plan may be substantially higher or lower than the estimated recoveries set forth below.[2] Except with respect to funding the Asbestos Trust, the Reorganized Debtors shall make a payment on account of a Disputed Claim only after, and to the extent that, such Disputed Claim becomes Allowed. All payments to be made in Cash under the Plan shall be made, at the election of the Reorganized Debtors (or the Reorganized Debtors' agent), by check or wire transfer.

Pursuant to the settlement embodied in the Plan, the Debtors pay fixed amounts to the Asbestos Trust to satisfy all pending and future Asbestos Claims resolved in accordance with the Asbestos Trust's procedures. The estimates herein of recoveries to Asbestos Claims are based on estimates provided by the Asbestos Claimants Committee and Legal Representative.

Refer to Section IX, "Risk Factors and Other Factors to Be Considered," for additional information.

- The Effective Date is assumed to occur on or before February 17, 2009.

- The estimated aggregate amount of Allowed G-I Priority Non-Tax Claims and Allowed ACI Priority Non-Tax Claims against the Debtors is $0.

- The estimated aggregate amount of Allowed G-I Secured Claims and Allowed ACI Secured Claims against the Debtors is $0.

- The estimated aggregate amount of Allowed G-I Unsecured Claims against the Debtors is $1,110,629.

- The estimated aggregate amount of Allowed ACI Unsecured Claims against the Debtors is $0.

- The estimated aggregate amount of Asbestos Personal Injury Claims and demands against the Debtors is in excess of $7,000,000,000.

- The estimated aggregate amount of Allowed Asbestos Property Damage Claims and Allowed Asbestos Property Damage Contribution Claims against the Debtors is $0.

- The estimated aggregate CCR Payment Amount is $9,900,000.

- The estimated aggregate amount of Allowed Bonded Claims against the Debtors is $10,068,790.

- The estimated aggregate amount of Allowed ACI Affiliate Claims against the Debtors is $0.

---

[2] The estimated recoveries set forth below represent the estimated recovery of each Class under the Plan. Consequently, to the extent that a Creditor is entitled to satisfy all or a portion of such Creditor's Claim through setoff, offset or recoupment, such Creditor's recovery may be higher than reflected herein.

## SUMMARY OF CLASSIFICATION AND TREATMENT
## OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

| Class | Type of Claim or Equity Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| -- | Administrative Expense Claims | Unimpaired.  Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment with the applicable Debtor, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the applicable Debtor-in-Possession shall be paid in full and performed by the applicable Reorganized Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions. | 100% |
| -- | Priority Tax Claims | Unimpaired.  Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the applicable Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the applicable Reorganized Debtor and in full and complete satisfaction of any and all liability attributable to such Priority Tax Claim on the latest of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Allowed Priority Tax Claim is payable under applicable nonbankruptcy law, or as soon thereafter as is reasonably practicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim, (b) a transferable note that provides for a Cash payment in an amount equal to such Allowed Priority Tax Claim, together with interest at four percent (4%), on the sixth (6th) anniversary from the date of the final determination of the assessment of such Allowed Priority Tax Claim, or (c) any combination of Cash and a note, on the terms provided in subsections (a) and (b) hereof, in an aggregate Cash and principal amount equal to such Allowed Priority Tax Claim; *provided*, that the Debtors reserve the right to prepay any such note in part or in whole at any time without premium or | 100% |

6

| Class | Type of Claim or Equity Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| | | penalty; and provided, further, that no holder of an Allowed Priority Tax Claim shall be entitled to any payments on account of any pre-Effective Date interest accrued on or penalty arising after the Commencement Date with respect to or in connection with such Allowed Priority Tax Claim. | |
| Class 1A | G-I Priority Non-Tax Claims | Unimpaired. The legal, equitable, and contractual rights of the holders of Allowed G-I Priority Non-Tax Claims are unaltered by the Plan, or such Allowed G-I Priority Non-Tax Claims shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| Class 1B | ACI Priority Non-Tax Claims | Unimpaired. The legal, equitable, and contractual rights of the holders of Allowed ACI Priority Non-Tax Claims are unaltered by the Plan, or such Allowed ACI Priority Non-Tax Claims shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| Class 2A | G-I Secured Claims | Unimpaired. The legal, equitable, and contractual rights of the holders of Allowed G-I Secured Claims are unaltered by the Plan, or such Allowed G-I Secured Claims shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| Class 2B | ACI Secured Claims | Unimpaired. The legal, equitable, and contractual rights of the holders of Allowed ACI Secured Claims are unaltered by the Plan, or such Allowed ACI Secured Claims shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| Class 3A | G-I Unsecured Claims | Impaired. On the later of (i) the Effective Date and (ii) the date on which a G-I Unsecured Claim becomes an Allowed G-I Unsecured Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed G-I Unsecured Claim shall receive Cash in an amount equal to 8.6% of such Allowed Claim. | 8.6% |
| Class 3B | ACI Unsecured Claims | Unimpaired. The legal, equitable, and contractual rights of the holders of Allowed ACI Unsecured Claims are unaltered by the Plan, or such Allowed ACI Unsecured Claims shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code. | 100% |

7

| Class | Type of Claim or Equity Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| Class 4 | Environmental Claims for Remedial Relief | Unimpaired.  The legal, equitable, and contractual rights of the holders of Allowed Environmental Claims for Remedial Relief are unaltered by the Plan, or such Allowed Environmental Claims for Remedial Relief shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| Class 5 | Other Environmental Claims | Impaired.  On the later of (i) the Effective Date and (ii) the date on which an Other Environmental Claim becomes an Allowed Other Environmental Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Environmental Claim shall receive Cash in an amount equal to 8.6% of such Allowed Claim. | 8.6% |
| Class 6 | Asbestos Claims | Impaired.  All Class 6 Claims shall be resolved, determined, and paid pursuant to section 524(g) of the Bankruptcy Code and the terms, provisions, and procedures of the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures.  The Asbestos Trust will be funded in accordance with the provisions of Section 4.4 of the Plan.  The sole recourse of the holder of a Class 6 Claim shall be to the Asbestos Trust, and such holder shall have no right whatsoever at any time to assert its Class 6 Claim against any Protected Party.  ***Without limiting the foregoing, on the Effective Date, all holders of Asbestos Claims shall be subject to the Asbestos Permanent Channeling Injunction.***  Asbestos Claims will be temporarily allowed for the limited purpose of voting on the Plan, but the ultimate resolution of Asbestos Claims will be made pursuant to the Asbestos Trust Distribution Procedures rather than by means of an allowance proceeding in the Bankruptcy Court. | 8.6% |
| Class 7 | Asbestos Property Damage Claims and Asbestos Property Damage Contribution Claims | Impaired.  On the later of (i) the Effective Date and (ii) the date on which an (A) Asbestos Property Damage Claim becomes an Allowed Asbestos Property Damage Claim or (B) Asbestos Property Damage Contribution Claim becomes an Allowed Asbestos Property Damage Contribution Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Asbestos Property Damage Claim or Allowed Asbestos Property Damage Contribution Claim shall receive Cash in an amount equal to 8.6%[*] of such Allowed Claim; *provided,* | 8.6% |

---

[*] The percentage will match the Asbestos Trust Initial Payment Percentage.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Recovery |
|-------|----------------------------------|-----------|--------------------|
| | | *however*, that (i) all Allowed Asbestos Property Damage Claims or Allowed Asbestos Property Damage Contribution Claims shall be paid solely from the PD Existing Insurance and shall receive no Cash distribution from G-I, and (ii) such Allowed Property Damage Claims and Allowed Property Damage Contribution Claims shall be subject to the terms and provisions of Section 6.5 of the Plan. | |
| Class 8 | CCR Claim | Unimpaired if the CCR Settlement is Approved. | 100% |
| | | Impaired if the CCR Claim is litigated. | 8.6% |
| | | If, by the Effective Date, the CCR Claim has been Allowed pursuant to a CCR Settlement Agreement approved by the Bankruptcy Court and executed and delivered by the parties thereto, then on the Effective Date or as soon thereafter as is reasonably practicable, and in accordance with such CCR Settlement Agreement, the Reorganized Debtors shall pay to CCR the CCR Payment Amount as specified in clause (a) of the definition thereof. | |
| | | If no such CCR Settlement Agreement is approved, executed and delivered, then the Allowed amount, if any, of the CCR Claim shall be determined in a CCR Allowance Proceeding. | |
| | | If, before the Effective Date, the CCR Claim is Allowed pursuant to a Final Order in a CCR Allowance Proceeding, the Reorganized Debtors shall pay to CCR, on the Effective Date or as soon thereafter as is reasonably practicable, the CCR Payment Amount as specified in clause (b) of the definition thereof. The Plan may be consummated notwithstanding the pendency of a CCR Allowance Proceeding if, but only if, the Asbestos Claimants Committee and the Legal Representative, in their sole discretion, have provided the written consents described in Section 12.2(c) of the Plan. Upon the delivery of such written consents, the Reorganized Debtors shall create the CCR Escrow on the Effective Date as provided in Section 4.4(c)(i)(C) of the Plan, in the amount required by that Section, and thereafter, upon the entry of a Final Order in such CCR Proceeding, shall cause a sum equal to the CCR Payment Amount to be disbursed to CCR from the CCR Escrow. Once the CCR Escrow is created, the Debtors and Reorganized Debtors shall have no liability in respect of the CCR Claim beyond having | |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| | | the escrow agent turn over the appropriate amount from the CCR Escrow. | |
| Class 9 | Bonded Claims | Unimpaired.  On the later of (i) the Effective Date and (ii) the date on which a Bonded Claim becomes an Allowed Bonded Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Bonded Claim shall receive Cash in an amount equal to such Allowed Bonded Claim; *provided, however*, that (i) in no event shall such Cash distribution exceed the amount of the bond securing such Allowed Bonded Claim and (ii) each such holder of an Allowed Bonded Claim shall look solely to the bond securing its Claim for such Cash distribution, and shall receive no Cash distribution from G-I.  If the holder of the Bonded Claim and G-I do not agree on the Allowed amount of the Bonded Claim, the Bankruptcy Court shall determine the amount of such holder's Allowed Bonded Claim, which amount shall then be paid to such holder from the bond securing such holder's Allowed Bonded Claim. | 100% |
| Class 10A | G-I Affiliate Claims | Impaired.  On the Effective Date, each holder of a G-I Affiliate Claim shall receive no distribution of Cash or property in respect of such Claim. | 0% |
| Class 10 B | ACI Affiliate Claims | Unimpaired.  The legal, equitable, and contractual rights of the holders of Allowed ACI Affiliate Claims are unaltered by the Plan, or such Allowed ACI Affiliate Claims shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| Class 11 | G-I Equity Interest Redemption Claims | Impaired. On the Effective Date, each holder of a G-I Equity Interest Redemption Claim shall receive no distribution of Cash or property in respect of such Claim. | 0% |
| Class 12A | G-I Equity Interests | Impaired.  On the Effective Date, all instruments evidencing a G-I Equity Interest (but not the G-I Class B Shares) shall be canceled without further action under any applicable agreement, law, regulation, or rule. The G-I Equity Interests shall be extinguished and holders of G-I Equity Interests shall neither receive nor retain any property under the Plan. | 0% |
| Class 12B | ACI Equity Interests | Impaired.  On the Effective Date, all instruments evidencing an ACI Equity Interest (but not the ACI Class B Shares) shall be canceled without further | 0% |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Recovery |
|---|---|---|---|
| | | action under any applicable agreement, law, regulation, or rule. The ACI Equity Interests shall be extinguished and holders of ACI Equity Interests shall neither receive nor retain any property under the Plan. | |

For confirmation of the Plan to occur, the Confirmation Order must contain findings that are consistent with and required by section 524(g) of the Bankruptcy Code. Section 524(g) contains requirements for a "channeling injunction" of the type that is provided under the Plan. Only the Debtors, together with the Asbestos Claimants Committee and the Legal Representative may waive the satisfaction of these conditions to confirmation of the Plan. In addition, in order for confirmation of the Plan to occur, Class 6 (Asbestos Claims) must vote, by at least 75 percent (75%) of those voting, in favor of the Plan.

Following confirmation of the Plan, the Plan will not become effective until the Effective Date, which will be a Business Day selected by the Debtors that is on or after the date by which the conditions precedent to the effectiveness of the Plan specified in Section 10.1(b) of the Plan have been satisfied. The satisfaction of many of the conditions to the occurrence of the Effective Date is beyond the control of the Debtors. The Plan Proponents may jointly waive, in whole or in part, the conditions to the Effective Date to the extent practicable and legally permissible.

All Asbestos Claims will be resolved, determined, and paid pursuant to section 524(g) of the Bankruptcy Code and the terms, provisions, and procedures of the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures. The Asbestos Trust will be funded in accordance with the provisions of Section 4.4 of the Plan. The sole recourse of the holder of an Asbestos Claim will be to the Asbestos Trust, and such holder shall have no right whatsoever at any time to assert its Class 6 Claim against any Protected Party. ***Without limiting the foregoing, on the Effective Date and irrevocably thereafter, all holders of Asbestos Claims shall be subject to the Asbestos Permanent Channeling Injunction.***

## II.    INTRODUCTION TO DISCLOSURE STATEMENT

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against the Debtors in connection with (i) the solicitation of acceptances of the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, dated October 30, 2008, filed by the Plan Proponents with the United States Bankruptcy Court for the District of New Jersey and (ii) the confirmation Hearing scheduled for [January 28, 2009], commencing at 10:00 a.m., prevailing Eastern Time.

On [___], 2008, the Bankruptcy Court, under section 1125 of the Bankruptcy Code, approved this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of the solicited classes of Claims of the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT EITHER OF THE FAIRNESS OR THE MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

The Disclosure Statement Order, a copy of which is annexed hereto as Exhibit B, sets forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject

the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order, the Ballot, and the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## A        PURPOSE OF THIS DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the holders of Claims against the Debtors with adequate information to make an informed judgment about the Plan. This information includes, among other things, a brief history of the Debtors, a description of the Debtors' prepetition businesses, a description of the Debtors' prepetition assets and liabilities, a summary of the Debtors' Chapter 11 Cases, a summary of the distributions to be made under the Plan, and an explanation of the Plan mechanics.

## B        REPRESENTATIONS

This Disclosure Statement is intended for the sole use of Creditors and other parties in interest, and for the sole purpose of assisting those parties in making an informed decision about the Plan. Each Creditor is urged to review the Plan in full prior to voting on the Plan to ensure a complete understanding of the Plan and this Disclosure Statement.

No representations or other statements concerning the Debtors (particularly as to their future business operations or the value of their assets) or other Plan Proponents are authorized by the Debtors other than those expressly set forth in this Disclosure Statement. Creditors should not rely upon any representations or inducements made to secure acceptance of the Plan other than those set forth in this Disclosure Statement.

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtors, their businesses and properties, and related financial information were prepared by the Debtors, or taken from publicly available information.

This Disclosure Statement has not been approved or disapproved by the SEC; neither has the SEC passed upon the accuracy or adequacy of the statements contained herein.

This Disclosure Statement contains statements that are forward-looking. Forward-looking statements are statements of expectations, beliefs, plans, objectives, assumptions, projections, and future events or performance. Among other things, this Disclosure Statement contains forward-looking statements with respect to anticipated future performance of BMCA, as well as anticipated future determination of claims and distributions on claims. These statements, estimates, and projections may or may not prove to be correct. Actual results could differ materially from those reflected in the forward-looking statements contained herein. Forward-looking statements are not guarantees of future performance and involve risks and uncertainties that could cause actual results or outcomes to differ materially from those expressed. Such risks and uncertainties, include, without limitation: risks inherent in the Chapter 11 process, such as the non-confirmation of the Plan, non-occurrence or delayed occurrence of the Effective Date; the effects of the departure of past and present employees of the Debtors; the preliminary and uncertain nature of valuations and estimates contained in the Plan; potential environmental liabilities; economic, political, regulatory, and legal risks affecting the finances and operations of the Debtors; and the uncertain timing, costs, and recovery values involved in the Debtors' efforts to recover accounts receivable. The Debtors undertake no obligation to update any forward-

looking statement to reflect the occurrence of unanticipated events.  New factors emerge from time to time and it is not possible to predict all such factors, nor can the impact of any such factor be assessed.

**This Disclosure Statement summarizes the terms of the Plan, which summary is qualified in its entirety by reference to the full text of the Plan, and if any inconsistency exists between the terms and provisions of the Plan and this Disclosure Statement, then the terms and provisions of the Plan are controlling.**

**Unless otherwise specified, the statements contained in this Disclosure Statement are made as of the date of the Disclosure Statement and the delivery of this Disclosure Statement does not imply that there have been no changes in the information set forth herein after such date.  The Debtors undertake no duty to update this information.**

**This Disclosure Statement may not be relied on for any purpose other than to determine whether to vote to accept or reject the Plan, and nothing stated herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtors or any other party, or be deemed conclusive evidence of the tax or other legal effects of the plan on the Debtors or holders of Claims or Equity Interests.**

**All holders of Claims entitled to vote should carefully read and consider fully the risk factors set forth in Section IX hereof, before voting to accept or reject the Plan.**

**Summaries of certain provisions of agreements referred to in this Disclosure Statement are not complete and are subject to, and are qualified in their entirety by reference to, the full text of the applicable agreement, including the definitions of terms contained in such agreement.**

**Holders of Claims entitled to vote should read this Disclosure Statement and the Plan carefully and in their entirety and may wish to consult with counsel prior to voting on the Plan.**

## C        HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject a proposed plan.  Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are presumed to have accepted the plan and are not entitled to vote to accept or reject the plan.  Classes of claims or equity interests in which the holders of claims or equity interests will receive no recovery under a chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.  For a detailed description of the treatment of Claims and Equity Interests under the Plan, refer to Section V(B).

Classes 1A, 1B, 2A, 2B, 3B, 4, 8, 9 and 10B are unimpaired.  As a result, holders of Claims in those Classes are conclusively presumed to have accepted the Plan and are not entitled to vote; *provided, however*, that Class 8 is impaired and is entitled to vote if the CCR Settlement is not approved prior to the voting deadline.

Classes 3A, 5, 6 and 7 of the Plan are impaired and, to the extent Claims in such Classes are Allowed Claims, the holders of such Claims will receive distributions under the Plan.  Claims in Class 6 will be allowed for the limited purpose of voting on the Plan but, if the Plan is confirmed and consummated, will be channeled to the Asbestos Trust for resolution, rather than determined by the Bankruptcy Court in an allowance proceeding.  As a result, holders of Claims in those Classes are entitled

13

to vote to accept or reject the Plan.  As described more fully herein, while Class 5 is entitled to vote, the Debtors will conclusively deem Class 5 to have rejected the Plan.

Classes 10A, 11, 12A, and 12B of the Plan, consisting of all G-I Affiliate Claims, G-I Equity Interest Redemption Claims, G-I Equity Interests and ACI Equity Interests, are impaired.  Holders of G-I Affiliate Claims and holders of G-I Equity Interest Redemption Claims shall receive no distribution of Cash or property in respect of such Claims.  On the Effective Date, all instruments evidencing a G-I Equity Interest or an ACI Equity Interest (but not the G-I Class B Shares and the ACI Class B Shares) shall be canceled without further action under any applicable agreement, law, regulation, or rule.  The G-I Equity Interests and ACI Equity Interests (but not the G-I Class B Shares and the ACI Class B Shares) shall be extinguished and holders of such interests shall not receive nor retain any property under the Plan.  As a result, holders of Claims in Classes 10A and 11 and holders of Equity Interests in Classes 12A and 12B are conclusively deemed to have rejected the Plan and are not entitled to vote.

Section 1126 of the Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.  Thus, acceptance of the Plan by Classes 3A, 6 and 7 will occur only if at least two-thirds in dollar amount and a majority in number of the holders of such Claims in each Class that cast their Ballots vote in favor of acceptance of the Plan. The confirmation of the Plan is also subject to the further condition that the Plan be accepted by at least 75% of the holders of Class 6 Claims who vote on the Plan.  As noted above, Class 5 is conclusively deemed to have rejected the Plan.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  For a more detailed description of the requirements for confirmation of the Plan, refer to Section X for further information.

It is important that Creditors exercise their right to vote to accept or reject the Plan.  **Even if you do not vote to accept the Plan, you may be bound by it, if it is accepted by the requisite holders of Claims**.  The amount and number of votes required for confirmation of the Plan are computed on the basis of the total amount of Claims actually voting to accept or reject the Plan.  Refer to Section X for further information.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Plan Proponents reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both.  Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or equity interests.  Under that section, a plan may be confirmed by a bankruptcy court if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, refer to Section V(C).

In the event that a Class of Claims entitled to vote does not vote to accept the Plan, the determination whether to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code will be announced prior to or at the Confirmation Hearing.

## D    SUBMITTING A BALLOT

To determine whether you are entitled to vote on the Plan, refer to Section I(C)(2).  If you are entitled to vote, you should carefully review this Disclosure Statement, including the attached exhibits and the instructions accompanying the Ballot.  Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot or Ballots and return the Ballot(s) in the postage-paid envelope provided.  If you hold Claims in more than one Class and you are entitled to vote Claims in

more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims.  Refer to Exhibit C for further information.

Please vote and return your Ballot(s) to:

G-I Holdings Inc., *et al*. Ballot Processing
c/o Epiq Bankruptcy Solutions LLC
757 Third Avenue
New York, New York 10017
Attn:  G-I Holdings Inc.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>RECEIVED</u> BY NO LATER THAN 4:00 P.M. (PREVAILING EASTERN TIME) ON [JANUARY 23, 2009].  YOUR BALLOT WILL NOT BE COUNTED IF RECEIVED AFTER THIS DEADLINE.  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN WILL NOT BE COUNTED.

If the return envelope provided with your Ballot was addressed to your bank or brokerage firm, please allow sufficient time for that firm to process your vote on a Master Ballot before the Voting Deadline (4:00 p.m., prevailing Eastern Time, [January 23, 2009]).

Any Claim in an impaired Class as to which an objection or request for estimation is pending or that is listed on the Schedules as unliquidated, disputed, or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.

The Legal Representative has no vote on the Plan.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set [__], 2008 as the record date for voting on the Plan.  Accordingly, only holders of record as of [___], 2008 that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting on the Plan, please call or contact Epiq Bankruptcy Solutions LLC at (866) 258-8898 or their website:  http://chapter11.epiqsystems.com/GIH.

DO NOT RETURN YOUR SECURITIES OR ANY OTHER DOCUMENTS WITH YOUR BALLOT.

***THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO THE DEBTORS' CREDITORS.  THE DEBTORS THEREFORE BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND URGE ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.***

E      **CONFIRMATION HEARING**

Under section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled the Confirmation Hearing on [January 28, 2009 at 10:00 a.m.], prevailing Eastern Time, in the United States Bankruptcy Court for the District of New Jersey, Martin Luther King Jr. Federal Building, 50 Walnut Street, Third Floor, Newark, New Jersey, 67101.  The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.  The Bankruptcy Court has directed that objections, if any, to confirmation of the

Plan be filed and served on or before [January 8, 2009 at 4:00 p.m.], prevailing Eastern Time.  Refer to Section X(A) for further information.

## III.    GENERAL INFORMATION

### A        OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of its creditors, equity interest holders, employees, customers, and investors.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote fair treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's value.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "Debtor-in-Possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the order confirming a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

Holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.  The Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

### B        EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

G-I is a privately-held holding company with BMCA as its primary operating subsidiary. BMCA operates as a non-debtor and is not itself in chapter 11.  Prior to 1967, G-I's predecessor, General Aniline & Film Corporation, was engaged in the development, manufacturing and sale of photographic and chemical products.  In 1967, General Aniline & Film Corporation merged (the "1967 Merger") with the Ruberoid Company ("Ruberoid"), an industrial and building products company, and later changed its name to GAF Corporation.   As GAF Corporation, the Company continued its historic business and the business of Ruberoid.

To facilitate administrative efficiency, effective October 31, 2000, GAF Corporation, merged into its direct subsidiary, G-I Holdings Inc.  G-I Holdings Inc. then merged into its direct subsidiary, G Industries Corp., which in turn merged into its direct subsidiary, GAF Fiberglas Corporation.  In that merger, GAF Fiberglass Corporation changed its name to GAF Corporation. Effective November 13, 2000, GAF Corporation merged into its direct subsidiary, GAF Building Materials Corporation, whose name was changed in the merger to G-I Holdings, Inc.  G-I Holdings Inc. is a wholly-owned subsidiary of G Holdings Inc. ("G Holdings").  Samuel J. Heyman beneficially owns (as defined in Rule 13d-3 of the Securities Exchange Act) approximately 99% of G Holdings Inc.

16

G-I's asbestos liabilities arise primarily from Ruberoid's manufacture of an asbestos-containing thermal insulation product known as Calsilite®. Ruberoid began as a manufacturer of rubber-like roofing and coating products that did not contain asbestos. At the request of the United States Navy during World War II, however, Ruberoid produced Calsilite® – a thermal insulation product used on the United States' naval and other ships. Ruberoid supplied this product, manufactured in accordance with government specifications, to naval shipyards around the country. After the 1967 Merger, GAF Corporation designed an asbestos free product similar to Calsilite® which was rejected by the Navy. The Company ceased production of Calsilite® in 1971. In addition to Calsilite®, Ruberoid (until the 1967 Merger) and then GAF Corporation (after the 1967 Merger) produced a variety of other products that may have contained asbestos including asbestos fiber, asbestos paper, rollboard and millboard, coatings, felt, asbestos-cement boards, sheets and siding, shingles and roll roofing, flooring, and pipe covering,cement and block products. No GAF Corporation product contained asbestos as part of its formulation after 1981.

ACI, formerly known as Alkaril Chemicals, Inc. ("Alkaril"), was formed in 1978. Alkaril manufactured surfactants and other specialty chemicals. On August 18, 1992, Alkaril changed its name to ACI Inc. In November 1987, Alkaril and its Canadian affiliate Alkaril Chemicals Ltd. were acquired by GAF Corporation and its subsidiary GAF Chemicals Corporation through a series of stock purchase transactions. Alkaril and GAF Corporation are collectively referred to as "GAF" in the following discussion.

On February 12, 1990, pursuant to an Asset Sale Agreement, GAF sold the assets (the "Surfactants Assets") of the GAF surfactants business to two newly formed Grantor Trusts (the "Purchaser Trusts"), of which Alkaril and GAF were the sole beneficiaries. The Purchaser Trusts then contributed the Surfactants Assets to a limited partnership (the "Partnership") in exchange for limited partnership interests and, in turn, contributed such interests to a third trust which became a successor limited partner of the Partnership (the "Limited Partner Trust"). The Limited Partner Trust was entitled to priority distributions from the Partnership. The total consideration for the transferred Surfactants Assets was valued at approximately $480 million, including the assumption and payment of certain liabilities relating to the Surfactants Assets. After the formation of the Partnership, the Limited Partner Trust borrowed $450 million pursuant to a non-recourse loan which was secured by its interest in the Partnership.

GAF's investment in the Partnership was represented by an asset reflecting its investment in the Partnership and $450 million long-term indebtedness reflecting the related non-recourse loan. Although non-recourse to GAF, repayment of the debt was secured by a pledge of GAF's interest in the Partnership. On April 26, 1994, GAF settled outstanding disputes relating to GAF's interest in the Partnership. Under the terms of the settlement agreement, GAF agreed to terminate pending litigation and received a partnership distribution of a portion of its interest in the Partnership of approximately $25.5 million in April 1994. The settlement resulted in pre-tax income of $23 million. The settlement also provided that GAF would receive fixed monthly distributions until 1999 as well as a fixed final distribution in 1999.

On September 15, 1997, G-I Holdings Inc. received a notice from the Internal Revenue Service (the "IRS") of a deficiency in the amount of $84.4 million (after taking into account the use of net operating losses and foreign tax credits otherwise available for use in later years) in connection with the formation of the Partnership. On or about February 9, 1999, GAF transferred via an Amended and Restated Agreement of Trust its ownership interests in the Partnership to a Delaware Business Trust, the GA Trust. The Partnership then retired GAF's interest in the Partnership through a distribution of cash and United States Treasury bonds.

GAF was forced to seek chapter 11 protection in January 2001. G-I sought chapter 11 protection in 2001 due to the significant increase in both the number of asbestos claims filed against GAF Corporation and the amounts demanded by asbestos plaintiffs' lawyers to settle their cases. The

bankruptcies of four major asbestos defendants occurring immediately prior to the Commencement Date further increased the financial pressure on G-I to unanticipated levels.  The result was an inability to continue funding the resolution of rising asbestos claims.

## C      PREPETITION BUSINESS ACTIVITIES

### 1.      BMCA

G-I's principal asset is BMCA, a wholly-owned subsidiary of BMCA Holdings Corporation, which is a wholly-owned subsidiary of G-I, that was created in 1994 upon the transfer by G-I of substantially all of its operating assets relating to its roofing and building materials business to the newly-formed entity.  The following is a more detailed description of this transaction as well as another significant transaction involving G-I and BMCA.

#### a.      *The 1994 Transaction*

BMCA was incorporated under the laws of Delaware in 1994 and is a wholly-owned subsidiary of BMCA Holdings Corporation, which is a wholly-owned subsidiary of G-I Holdings Inc.  In 1994, BMCA acquired the operating assets and certain liabilities of GAF Building Materials Corporation, whose name has been changed to G-I Holdings Inc.  G-I Holdings Inc. is a wholly-owned subsidiary of G Holdings Inc. ("G Holdings").  As noted above, Samuel J. Heyman beneficially owns (as defined in Rule 13d-3 of the Securities Exchange Act) approximately 99% of G Holdings Inc.

In 1994, GAF BMC, the predecessor to G-I, was a major manufacturer of roofing and building materials and a well-recognized defendant in asbestos litigation (typically sued as "GAF Corporation").  Despite the efforts of GAF BMC's management to grow the company, the capital markets were not open to GAF BMC (except perhaps on a secured basis) because of the asbestos overhang on the company and, therefore, capital could not be raised to grow the business.  Rather than encumber all its assets, GAF BMC's management determined the most beneficial option for all parties in interest was to transfer its operating assets to a new, wholly-owned subsidiary.

Pursuant to the Reorganization Agreement, dated as of January 31, 1994, GAF BMC transferred substantially all its operating assets relating to its roofing and building materials business to BMCA, a newly-formed, wholly-owned subsidiary, in exchange for all issued shares of BMCA's common stock and its assumption of GAF BMC's related liabilities.  BMCA also assumed the first $204 million of asbestos liabilities payable in respect of claims for bodily injury pending against GAF BMC as of January 31, 1994, or settled prior to January 31, 1994, whether for indemnity or defense.

As a result of the separation of the BMCA assets from GAF BMC, BMCA's access to the capital markets was greatly enhanced.  Specifically, over the next six years, BMCA issued five different series of public bonds and entered into two credit facilities totaling approximately $700 million – all of which provided BMCA with capital to grow its roofing and building materials business.

#### b.      *The 2000 Transaction*

Faced with an escalating volume of asbestos claims filed against GAF Corporation and the bankruptcy filings of other major asbestos defendants, in late 2000 it became clear G-I had no choice but to seek protection under chapter 11 of the Bankruptcy Code.  To increase its liquidity in anticipation of its parent company's filing, in December 2000 BMCA obtained an additional $100 million secured credit facility with its existing lenders secured by first liens on substantially all BMCA's assets and amended its credit agreement.  BMCA sought and obtained consents from the holders of its outstanding unsecured notes to amend its existing indentures to permit the proposed refinancing.  In exchange for

such consents, BMCA granted the senior noteholders a second priority lien on BMCA's assets (the refinancing and related lien grants are referred to collectively below as the "2000 Transaction").

### 2.    Description of the Business

Financial and other information about BMCA and its subsidiaries can be found in (i) the Annual Report on Form 10-K for the fiscal year ended December 31, 2007, filed by BMCA with the Securities and Exchange Commission (the "SEC") on March 28, 2008, a copy of which is annexed hereto as Exhibit F, and (ii) the Quarterly Report on Form 10-Q for the period ended September 28, 2008, filed by BMCA with the SEC on November 12, 2008.  You may read and copy documents BMCA has filed with the SEC at the SEC's Public Reading Room located at 450 Fifth Street, N.W., Washington D.C. 20549.  You may obtain information on the operation of the Public Reading Room by calling the SEC at 1-800-SEC-0300.  The SEC also maintains an Internet site (www.sec.gov) through which you can access reports, proxy and information statements and other information regarding BMCA.  The Debtors' monthly operating reports are available on the Bankruptcy Court's Electronic Case Filing System which can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court.  See Section IX for important information that should be considered when reviewing G-I and BMCA's financial information. When applicable, references to BMCA include BMCA's subsidiaries.

### a.    *Residential Roofing Products*

BMCA is a leading national manufacturer and marketer of a broad line of asphalt and polymer-based roofing products and accessories for the residential and commercial roofing markets. BMCA also manufactures specialty building products and accessories for the professional and do-it-yourself remodeling and residential construction industries.  BMCA does business under the name "GAF Materials Corporation."

Residential roofing product sales represented approximately 75%, 74% and 75% of BMCA's net sales in 2007, 2006 and 2005, respectively.  BMCA's principal residential roofing products consist of laminated and strip asphalt shingles.  BMCA has improved its sales mix of residential roofing products in recent years by increasing emphasis on laminated shingles and accessory products, which generally are sold at higher prices with more attractive profit margins than standard strip shingle products. Based on unit sales, BMCA believes it is the largest manufacturer of residential roofing shingles in the United States.

BMCA's two principal lines are the Timberline® series and the Sovereign® series.  The Timberline Series offers a premium laminated product that adds dramatic shadow lines and substantially improves the appearance of a roof.  The Sovereign Series is designed to capitalize on the middle market for quality shingles.  BMCA also has a line of premium designer shingles which include the Slateline, Grand Slate, Grand Sequoia, Grand Canyon, Country Mansion, Capstone, and Camelot brands.  In addition to shingles, the Residential Roofing lines offer the components necessary to install a complete roofing system.  BMCA's Weather Stopper® Integrated Roofing System™ begins with Weather Watch® and Stormguard® waterproof underlayments for eaves, valleys and flashings to protect against water seepage between the roof deck and the shingles caused by ice build-up and wind-driven rain.  BMCA's Weather Stopper® Integrated Roofing System™ also includes Shingle-Mate®, Leatherback®, and Deck-Armor™ underlayments; Timbertex®, Ridglass™, Seal-A-Ridge® and Z® Ridge Hip and Ridge shingles, which are thicker and typically larger than standard hip and ridge shingles and provide dramatic accents to the slopes and planes of a finished roof; and the Cobra® and Master Flow® Vent series, which provide attic ventilation.

b.     *Commercial Roofing Products*

BMCA manufactures a full line of commercial roofing products, including modified bitumen and asphalt built-up roofing products, thermoplastic polyolefin products, liquid applied membrane systems and roofing accessories for use in the application of commercial roofing systems. Commercial roofing represented approximately 19%, 22% and 21% of BMCA's net sales in 2007, 2006 and 2005, respectively.

BMCA markets thermoplastic single-ply commercial roofing products under the EverGuard® trademark. The EverGuard® products address the important and growing single-ply segment of the commercial roofing market. The thermoplastic products offer building owners the reliability of heat-welded seams and ENERGY STAR® qualified systems. The EverGuard® brand also includes Freedom™ self-adhered TPO membranes, which feature faster installation without the need for hot asphalt, solvent-based adhesives, or open-flamed torches. Based on unit sales, BMCA believes it is the largest manufacturer of both asphalt built-up roofing products and modified bitumen products in the United States.

BMCA also manufactures fiberglass-based felts, which are made from asphalt impregnated glass fiber mat for use as a component in asphalt built-up roofing systems under the GAFGLAS® trademark. Most of BMCA's fiberglass-based roofing systems are assembled on the roof by applying successive layers of roofing with asphalt and topped, in some applications, with gravel or mineral surfaced sheets. Thermal insulation may be applied beneath the membrane. BMCA also manufactures base sheets, flashings and other roofing accessories for use in these systems; BMCA's TOPCOAT® roofing system, a liquid-applied membrane system designed to protect and waterproof existing roofing systems; and roof maintenance products. In addition, BMCA markets insulation products under the EnergyGuard™ brandname, which includes perlite and isocyanurate foam in addition to accessories, such as vent stacks, fasteners, and cements and coatings. These products allow BMCA to provide customers with a complete roofing system and the ability to market and sell extended guarantees.

BMCA also sells modified bitumen products under the Ruberoid® trademark. Modified bitumen products are used in new and re-roofing applications or in combination with glass membranes in GAF CompositeRoof™ systems. Modified bitumen systems provide an alternative to conventional built-up roofing systems, including ease of installation and maintenance.

c.     *Other Products*

BMCA also manufactures and markets a variety of specialty building products and accessories for the professional and do-it-yourself remodeling and residential construction industries. Specialty products and accessories represented approximately 6%, 4% and 4% of BMCA's net sales in 2007, 2006, and 2005, respectively. These products primarily consist of metal and fiberglass air distribution products for the HVAC (heating, ventilating and air conditioning) industry, decking and railing products, manufactured decorative stone products, and specialty fiber products. BMCA also manufactures a line of specialty coatings for various industrial applications.

d.     *Marketing and Sales*

BMCA's sales and marketing functions are designed to help customers grow their businesses and provide better service while offering property owners the best and safest choice from product offerings. BMCA believes it has one of the industry's largest roofing sales forces. BMCA has a staff of technical professionals who work directly with architects, consultants, contractors, and building owners and provide support to BMCA's sales force, distributors, lumberyards, and retailers. A major portion of BMCA's roofing product sales are to wholesale distributors and retailers, who resell BMCA's products to roofing contractors, builders, and property owners. BMCA believes the wholesale

distribution channel represents the principal distribution channel for professionally-installed asphalt roofing products.

BMCA's certified contractor programs offer marketing and support services to nationwide networks of roofing and decorative stone installers, as well as residential homebuilders. BMCA views these certified contractors and builders as an effective extension of its sales force, which promotes BMCA's products and support services (including enhanced warranty protection) directly to property owners, construction specifiers and architects.

e.      *Significant Customers*

No single customer accounted for over 10% of BMCA's net sales in 2007, 2006 and 2005, except for The Home Depot, Inc. and American Builders & Contractors Supply Company, Inc.

f.      *Raw Materials*

The major raw materials required for the manufacture of BMCA's roofing products are asphalt, mineral stabilizer, glass fiber, glass fiber mat, polyester mat, and granules. Asphalt and mineral stabilizer are available from a large number of suppliers on substantially similar terms. BMCA currently has contracts with several of these suppliers, and others are available as substitutes.

The major raw materials required for the manufacture of BMCA's specialty building products and accessories are steel tubes, sheet metal products, aluminum, motors, and cartons. The major raw materials for the manufacture of BMCA's specialty decking and mat product lines are polypropylene, filler, fiberglass, and binder. These raw materials are commodity-type products, the pricing for which is driven by supply and demand. Prices of other raw materials used in the manufacture of specialty building products and accessories are more closely tied to movements in inflation rates. All of these raw materials are available from a large number of suppliers on substantially similar terms.

Three of BMCA's roofing plants have easy access to deep water ports thereby permitting delivery of asphalt by ship, which BMCA believes is the most economical means of asphalt transport. BMCA's Nashville, Tennessee plant manufactures a portion of BMCA's glass fiber requirements for use in its Chester, South Carolina; Shafter, California and Ennis, Texas plants, which manufacture glass fiber mat substrate.

BMCA and its subsidiaries purchase a substantial portion of its headlap roofing granules, colored roofing granules, and algae-resistant granules, on a purchase order basis, from ISP Minerals, an Affiliate of the Debtors. The amount of mineral products purchased each year on this basis is based on current demand and is not subject to minimum purchase requirements. For the second quarter ended June 29, 2008, BMCA purchased $12.3 million of roofing granules, and for the six-month period ended June 29, 2008, BMCA purchased $19.5 million of roofing granules under this arrangement.

In addition to the granules products purchased by BMCA under the above-mentioned purchase order basis, the substantial balance of BMCA's granules requirements is purchased under a contract expiring in 2013. The amount of mineral products purchased each year under the contract is based on current demand and is not subject to minimum purchase requirements. Under the contract, for the second quarter ended June 29, 2008, BMCA purchased $22.8 million of roofing granules, and for the six-month period ended June 29, 2008, BMCA purchased $41.9 million of roofing granules.

g.      *Seasonal Variations and Working Capital*

Sales of roofing and specialty building products and accessories in the northern regions of the United States generally decline during the winter months due to adverse weather conditions.

Generally, BMCA's inventory practice includes increasing inventory levels in the first and second quarters of each year in order to meet peak season demand from June through November.

###### h.    *Warranty Claims*

BMCA provides certain limited warranties covering most of its residential roofing products for periods generally ranging from 20 to 40 years, although certain of its product lines provide for a lifetime limited warranty.  Although terms of warranties vary, BMCA believes its warranties generally are consistent with those offered by its competitors, with the exception of BMCA's unique "Golden Pledge™," "Peace of Mind™" and "Peak Performance®" warranties.  BMCA also offers certain limited warranties of varying duration covering most of its commercial roofing products.  Most of its specialty building products and accessories carry limited warranties for periods generally ranging from 5 to 20 years, with lifetime limited warranties on certain products.

###### i.    *Competition*

The roofing products industry is highly competitive and includes a number of national competitors.  These competitors in the residential roofing and accessories markets are Owens Corning, Tamko, and CertainTeed Corporation, and in the commercial roofing market are Johns Manville, Firestone Building Products, Carlisle Companies, Inc., Tamko, and CertainTeed Corporation.  In addition, there are numerous regional competitors, principally in the commercial roofing market.

Competition is based largely upon products and service quality, distribution capability, price and credit terms.  BMCA believes it is well-positioned in the marketplace as a result of its broad product lines in the residential and commercial markets, consistently high product quality, strong sales force, and national distribution capabilities.

BMCA's specialty building products and accessories business is highly competitive with numerous competitors due to the breadth of the product lines it markets.  Major competitors include Gibraltar, Southwark Metal Manufacturing Co., Lomanco Inc., Standex International Corp. and Hart & Cooley, Inc.

###### j.    *Research and Development*

BMCA primarily focuses its research and development activities on the development of new products and process improvements and the testing of alternative raw materials and supplies. BMCA's research and development activities, which are dedicated to residential, commercial and fiberglass products, are located at technical centers in Ennis, Texas; Wayne, New Jersey; Chester, South Carolina and Walpole, Massachusetts.  Research and development expenditures were approximately $8.7, $8.0 and $9.4 million in 2007, 2006 and 2005, respectively.

###### k.    *Intellectual Property*

BMCA holds a number of patents, trademarks and licenses obtained over a number of years and expiring at various times consistent with our business needs.  Generally, BMCA seeks statutory protection for strategic or financially important intellectual property, including patents, trademarks and licenses developed in connection with BMCA's businesses.  Certain intellectual property, where appropriate, is protected by contracts, licenses, confidentiality, or other similar agreements.

BMCA owns numerous United States and foreign patents (and their respective counterparts), the more important of which cover those technologies and inventions embodied in current products, or which are used in the manufacture of those products.  While BMCA believes its patent portfolio is important to its business operations and in the aggregate constitutes a valuable asset, no single

patent, or group of patents, is critical to the success of BMCA's businesses.  From time to time, BMCA grants licenses under its patents and technology and obtains licenses under the patents and technology of others.

In addition, BMCA owns numerous registered trademarks in the United States and in many foreign countries.

### l.    *Environmental Matters*

Since 1970, federal, state and local authorities have adopted and amended a wide variety of federal, state and local environmental laws and regulations relating to environmental matters.  The environmental laws and regulations deal with air and water emissions or discharges into the environment, as well as the generation, storage, treatment, transportation, and disposal of solid and hazardous waste and the remediation of any releases of hazardous substances and materials to the environment.  These laws and regulations affect BMCA because of the nature of the manufacturing processes employed by plants owned, operated, or acquired by BMCA.  BMCA made capital expenditures of approximately $0.4, $1.0 and $0.6 million in 2007, 2006 and 2005, respectively, relating to environmental compliance.  These expenditures are included in additions to property, plant, and equipment.

BMCA believes that its manufacturing facilities comply in all material respects with applicable environmental laws and regulations, and, while BMCA cannot predict whether more burdensome requirements will be adopted by governmental authorities in the future, nor can it predict with certainty future capital expenditures or operating costs for environmental compliance, BMCA does not believe they will have a material effect on its business, liquidity, results of operations, cash flows, financial position, or competitive position.

### m.    *Intercompany Transactions*

BMCA makes loans to, and borrows from, its parent corporations from time to time at prevailing market rates.  As of June 29, 2008 and July 1, 2007, BMCA Holdings Corporation owed BMCA $56.3 and $56.1 million, including interest of $1.0 and $0.8 million, respectively, and BMCA owed BMCA Holdings Corporation $52.8 and $52.8 million, with no unpaid interest, respectively.

Interest income on BMCA's loans to BMCA Holdings Corporation amounted to $0.8 and $1.2 million during the second quarter ended June 29, 2008 and July 1, 2007, respectively, and $1.8 and $2.5 million during the six-month periods ended June 29, 2008 and July 1, 2007, respectively.  Interest expense on BMCA's loans from BMCA Holdings Corporation amounted to $0.8 and $1.2 million during the second quarter ended June 29, 2008 and July 1, 2007, respectively, and $1.8 and $2.4 million during the six-month periods ended June 29, 2008 and July 1, 2007, respectively.

BMCA's loans payable to/receivable from its parent corporations are due on demand and provide each party with the right of offset of its related obligation to the other party and are subject to limitations as outlined in the Senior Secured Revolving Credit Facility, the Term Loan, the Junior Lien Term Loan and the Senior Notes. Under the terms of the Senior Secured Revolving Credit Facility and the indentures governing BMCA's Senior Notes, at June 29, 2008, BMCA could repay demand loans to its parent corporation amounting to $52.8 million, subject to certain conditions. BMCA also makes non-interest bearing advances to affiliates, of which no balance was outstanding as of June 29, 2008 and July 1, 2007. In addition, as of June 29, 2008 and July 1, 2007, BMCA did not owe any loans or enter into any lending activities with other affiliates.

BMCA has a management agreement (the "Management Agreement"), with ISP Management Company, Inc., a subsidiary of International Specialty Products Inc. to provide BMCA with certain management services.  International Specialty Products Inc. and its subsidiaries are referred to as

"ISP".  ISP is an affiliate of G-I and was an indirect subsidiary of G-I's predecessor, GAF.  The transaction by which ISP ceased to be a subsidiary of GAF has given rise to litigation described in Section III G of this Disclosure Statement.  Based on services provided to BMCA in 2008 under the Management Agreement, the aggregate amount payable to ISP Management Company, Inc. under the Management Agreement for 2008, inclusive of the services provided to G-I Holdings, is estimated to be similar to the $6.7 million paid in 2007.  BMCA does not expect any changes to the Management Agreement to have a material impact on its results of operations.

BMCA and its subsidiaries purchase a substantial portion of its headlap roofing granules, colored roofing granules, and algae-resistant granules, on a purchase order basis, from ISP Minerals.  The amount of mineral products purchased each year on this basis is based on current demand and is not subject to minimum purchase requirements.  For the second quarter ended June 29, 2008, BMCA purchased $12.3 million of roofing granules, and for the six-month period ended June 29, 2008, BMCA purchased $19.5 million of roofing granules under this arrangement.

In addition to the granules products purchased by BMCA under the above-mentioned purchase order basis, the balance of BMCA's granules purchases from ISP is purchased under a contract expiring in 2013.  The amount of mineral products purchased each year under the contract is based on current demand and is not subject to minimum purchase requirements.  Under the contract, for the second quarter ended June 29, 2008, BMCA purchased $22.8 million of roofing granules, and for the six-month period ended June 29, 2008, BMCA purchased $41.9 million of roofing granules.

The buildings in which BMCA operates its corporate headquarters, located at 1361 Alps Road in Wayne New Jersey, are leased from ISP Management Company, Inc. pursuant to a lease (at the time a sublease) dated January 1, 1998, as amended. The lease was originally scheduled to expire on December 31, 1998 but has been extended by various amendments thereto. Since April 1, 2001, the lease has been automatically extended for successive calendar quarters. Such quarterly extensions can be terminated by either ISP Management Company, Inc. or BMCA upon the giving of notice to the other party not less than 30 days prior to the expiration of the then current calendar quarter.

> n.     *Employees*

At December 31, 2007, BMCA employed approximately 4,200 people worldwide, approximately 900 of whom were subject to 14 union contracts.  The contracts are effective for one to five year periods.  During 2007 and the first quarter of 2008, three labor contracts expired and were renegotiated.

## D        PREPETITION CAPITAL STRUCTURE

### 1.     Prepetition Bank Debt and Other Indebtedness

As of the Commencement Date, the Debtors had no outstanding bank debt or other institutional indebtedness.  ACI has certain liabilities in favor of G-I Holdings in connection with the creation of the Partnership.

### 2.     Equity

As of the Commencement Date, G-I had 1,711,545 shares of common and preferred stock outstanding, all owned by G Holdings, Inc.  G Holdings, Inc. had 342,309 shares of common stock outstanding.  Of that number, approximately 340,220 or 99.4% of the total outstanding number of shares, were owned either directly or indirectly by Samuel J. Heyman.  The remaining 0.6% of outstanding shares were largely held by current or former employees.

E        **PREPETITION LITIGATION**

    1.    **Asbestos Bodily Injury Claims**

        In an effort to efficiently process, defend, and settle asbestos claims, G-I became a member of the CCR, a non-profit organization established in 1988 to act as a claims handling facility originally for twenty companies named as defendants in asbestos personal injury suits. In 1993, the CCR and representatives of the asbestos plaintiffs' bar reached a global settlement affecting all current and future asbestos claims asserted against its members (the "Georgine Settlement"). The Georgine Settlement was approved by the United States District Court for the Eastern District of Pennsylvania which had before it at the time the then pending federal asbestos cases. The Georgine Settlement was designed to assure prompt payment with reduced transaction costs to sick individuals and to defer payment of the claims of non-sick individuals until such time, if ever, that they became sick.

        In 1993, the CCR reached a proposed global settlement with a class of persons who alleged exposure to its members' asbestos products but had not yet filed suit (the "Georgine Settlement"). Under the proposed settlement, future asbestos claims of persons who did not validly opt out of the Georgine Settlement would have been processed and resolved under an alternative dispute resolution system with agreed medical criteria and compensation standards for a period of ten years. The Georgine Settlement was designed to assure prompt payment with reduced transaction costs to individuals demonstrating measurable impairment from asbestos-related disease and to defer payment of the claims of other persons unless and until their symptoms satisfied the agreed medical criteria. However, the courts ultimately refused to certify the class and the Georgine Settlement did not take effect.

        As the Georgine Settlement worked its way through the courts, the CCR also entered into separate agreements with certain asbestos plaintiffs' lawyers for the processing and resolution of future asbestos claims ("Futures Agreements"). The Futures Agreements provided an alternative dispute mechanism, embodied medical criteria that were generally consistent with the Georgine Settlement, and tolled the statute of limitations for individuals who did not currently meet the agreed medical criteria. CCR also agreed with certain asbestos plaintiffs' lawyers to settle some 50,000 pending asbestos cases for approximately $750 million. G-I (then still known as GAF) contributed approximately $200 million towards the $750 million.

        Prepetition, GAF faced a continuous and escalating stream of asbestos claims which were processed through the CCR. Although it disputed the merits of most of these claims, G-I found it appropriate to settle large numbers of the claims based on economic imperatives.

        As of January 17, 2000, CCR terminated G-I's membership in the CCR. As of October 1, 2000, G-I was defending against approximately 148,800 pending asbestos claims. During the first nine months before the Commencement Date, G-I received notice of filing of approximately 41,700 new asbestos claims.

        Certain disputes between G-I and CCR are the subject of a proposed settlement, made with the participation of Samuel J. Heyman and related entities, the Asbestos Claimants Committee, and the Legal Representative. That proposed settlement is being submitted to the Bankruptcy Court for its approval under Federal Rule of Bankruptcy Procedure 9019(a) and is incorporated into the Plan.

    2.    **Asbestos Property Damage Claims**

        G-I has been named as a co-defendant in asbestos-in-buildings cases for economic and property damage or other injuries based upon an alleged present or future need to remove asbestos-containing materials from public and private buildings. Most Asbestos Property Damage Claims do not seek to recover an amount of specific damages. Since these actions were first initiated approximately

20 years ago, G-I has successfully disposed of approximately 145 of these cases and remains a co-defendant in three lawsuits. These actions have been stayed as to G-I as a result of the Chapter 11 Cases.

### 3.    Insurance Matters

Before the onset of its Chapter 11 case, G-I and its predecessor used substantial amounts of insurance to fund their defense and indemnity costs pertaining to asbestos personal injury litigation. The Debtors are not aware that any additional amounts are available for that purpose under their insurance policies.

In October 1983, G-I filed a lawsuit in Los Angeles, California Superior Court against its past insurance carriers to obtain a judicial determination that those carriers were obligated to defend and indemnify it for Asbestos Property Damage Claims. G-I is seeking declaratory relief as well as compensatory damages. This action is presently in the pre-trial pleading stage. The parties have agreed to hold this action in abeyance pending developments in the Asbestos Property Damage Claims. Because this litigation is in early stages and evidence and interpretations of important legal questions are presently unavailable, it is not possible to predict the future of this litigation.

In all the Asbestos Property Damage Claims, G-I's defense costs have been paid by one of its primary insurance carriers. While G-I expects that this primary carrier will continue to be obligated to defend and indemnify G-I, this primary carrier has reserved its rights to later refuse to defend and indemnify G-I and to seek reimbursement for some or all of the fees paid to defend and resolve the Asbestos Property Damage Claims.

### 4.    Environmental Litigation

The Debtors and BMCA, together with other companies, are a party to a variety of proceedings and lawsuits involving environmental matters under the Comprehensive Environmental Response Compensation and Liability Act, and similar state laws, in which recovery is sought for the cost of cleanup of contaminated sites or remedial obligations are imposed, a number of which are in the early stages or have been dormant for protracted periods. Most of these Environmental Claims do not seek to recover an amount of specific damages.

In connection with BMCA's formation, it contractually assumed all environmental liabilities relating to existing plant sites. The environmental liabilities that BMCA did not assume relate primarily to closed manufacturing facilities. G-I estimates that, as of December 31, 2007, its liability in respect of the environmental liabilities of G-I not assumed by BMCA was approximately $11.5 million, not accounting for any possible reduction of liability as a result of the Chapter 11 Cases, before insurance recoveries reflected on its balance sheet of $3.7 million. BMCA estimates its liability as of December 31, 2007, in respect of assumed and other environmental liabilities is $2.6 million, and expects insurance recoveries of $1.7 million.

In June 1997, G-I commenced litigation on behalf of itself and its predecessors, successors, subsidiaries and related corporate entities in the Superior Court of New Jersey, Somerset County, seeking insurance recovery amounts substantially in excess of the estimated recoveries. This action was removed to the United States Bankruptcy Court for the District of New Jersey in February 2001, in conjunction with the Chapter 11 Cases. In November 2002, the parties agreed to have the action remanded to the Superior Court of New Jersey, Somerset County where it is pending. While the Debtors believe that their claims are meritorious, there can be no assurance that the Debtors will prevail in their efforts to obtain amounts equal to, or in excess of, the estimated recoveries.

On October 14, 2008, the United States filed a proof of claim against G-I, on behalf of the Environmental Protection Agency ("EPA") and the United States Department of the Interior, Fish and Wildlife Service ("FWS"), relating to the Vermont Asbestos Group Site ("VAG Site") in Eden and

26

Lowell, Vermont.  The United States asserts a general unsecured claim under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") on behalf of EPA for $241,420,370 for past and future cleanup costs; and on behalf of the FWS for $12,628,622 in natural resource damages.   EPA also alleged in its proof of claim and by adversary complaint the right to issue injunctive orders to G-I compelling the completion of six remedial items under the Clean Air Act ("CAA") and/or the Resource Conservation and Recovery Act ("RCRA").

On October 20, 2008, G-I filed a motion seeking a determination that all of its obligations to the United States relating to the VAG site give rise to claims which will be discharged upon confirmation of G-I's plan of reorganization.   On November 5, 2008, the United States opposed this motion which remains pending.

G-I intends to object further to the VAG claims and vigorously defend against these claims.

### 5.    Other Prepetition Litigation

On or about April 29, 1996, an action was commenced in the Circuit Court of Mobile County, Alabama against G-I on behalf of a purported nationwide class of purchasers of, or current owners of, buildings with certain asphalt shingles manufactured by G-I and certain of its affiliated entities.  The action alleged, among other things, that those shingles were defective and sought unspecified damages on behalf of the purported class.  On September 25, 1998, the parties agreed to settle this litigation on a national, class-wide basis for asphalt shingles manufactured between January 1, 1973 and December 31, 1997.  Following a fairness hearing, the court granted final approval of the class-wide settlement in April 1999.  Under the terms of the settlement, property owners whose shingles were manufactured during this period and suffered certain damages during the term of their original warranty period, and who file a qualifying claim, were provided with an opportunity to receive certain limited benefits from BMCA beyond those already provided in their existing warranty.  BMCA will continue to honor that settlement after the Effective Date.

In October 1998, G-I brought suit in the Superior Court of New Jersey—Middlesex County, on BMCA's behalf, against certain of G-I's insurers for recovery of the defense costs in connection with the Mobile County, Alabama class action and a declaration that the insurers are obligated to provide indemnification for all damages paid pursuant to the settlement of this class action and for other damages.  This action is pending.

### 6.    Tax Claim Against G-I Holdings

On September 15, 1997, G-I received a notice from the IRS of a deficiency in the amount of $84.4 million (after taking into account the use of net operating losses and foreign tax credits otherwise available for use in later years) in connection with the formation in 1990 of Rhône-Poulenc Surfactants and Specialties, L.P., or the surfactants partnership, a partnership in which G-I held an interest.

The Debtors filed petitions in the United States Tax Court challenging the IRS's notice of deficiency.  The filing of Debtors' bankruptcy petitions automatically stayed proceedings in the Tax Court, and the IRS thereafter filed proofs of claim in the Bankruptcy Court.  The IRS seeks, on a priority basis on which it would be paid over time, alleged back taxes of $84.4 million, plus interest and penalties. The Debtors have objected to the IRS's claims and are litigating these matters in an adversary proceeding described in Section IV(M).

## IV.  DEBTORS' CHAPTER 11 CASES

On January 5, 2001, G-I filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On the same date, the Bankruptcy Court approved certain orders designed to minimize the disruption of the Debtors' business operations and to facilitate their reorganization.  On August 3, 2001, ACI filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

## A      FIRST DAY ORDERS AND OTHER POSTPETITION ORDERS

### 1.      Case Administration Orders

Upon the commencement of these Chapter 11 Cases, the Bankruptcy Court entered certain orders with respect to the administration of these Chapter 11 Cases.  These orders: (i) established interim compensation procedures for professionals; (ii) granted an extension of the time to file the Debtors' schedules and statements; and (iii) approved notice procedures limiting notice on various matters to only affected parties and authorizing the Debtors or their agent, to act as agent for the clerk of the Bankruptcy Court in noticing all matters customarily noticed by the clerk pursuant to the Bankruptcy Code.

### 2.      Business Operations

The Bankruptcy Court authorized the Debtors to: (i) maintain existing bank accounts and business forms; (ii) maintain existing investment practices with financial institutions; (iii) maintain existing business forms; and (iv) provide adequate assurance to utility companies and establish procedures for determining requests for additional adequate assurance.

### 3.      Claims Process and Bar Date

#### a.      *Schedules and Statements*

On April 2, 2001, G-I filed with the Bankruptcy Court its statement of financial affairs, schedules of assets and liabilities and schedules of executory contracts and unexpired leases and a schedule of equity security holders.  On August 3, 2001, ACI filed its statement of financial affairs, schedules of assets and liabilities and schedules of executory contracts and unexpired leases and a schedule of equity security holders.

On September 17, 2008, the Debtors filed amended schedules of liabilities, executory contracts, unexpired leases, and equity security holders.

#### b.      *Bar Date*

On June 25, 2001, the Debtors filed a motion pursuant to Bankruptcy Rule 3003(c)(3) for an order fixing a final date for filing Proofs of Claim against the Estates of G-I and ACI and approving notices and publication procedures related thereto (the "Bar Date Motion").  The Asbestos Claimants Committee and the Legal Representative both objected to any form of bar date being imposed on holders of Asbestos Claims prior to estimation of G-I's asbestos liabilities.  On September 10, 2004, the Debtors filed a letter to the Court stating that, in order to expedite the cases and avoid unnecessary expense should a consensual deal be reached, G-I did not object and agreed to an estimation hearing prior to any bar date that could determine both the allowable amount of each type of asbestos claim and the aggregate liability of the G-I estate for both claims and demands.  Accordingly, the Bankruptcy Court did not conduct a hearing with respect to the Bar Date Motion pending resolution of the issues related to estimation of Asbestos Personal Injury Claims.  For a description of the estimation process please see Section IV(I).

As a result of the global settlement reached with the Legal Representative and the Asbestos Claimants Committee, the Debtors filed an Amended Bar Date Motion requesting that the Bankruptcy Court establish a date by which proofs of claim (excluding Asbestos Claims) against and proofs of interest in the Debtors must be filed, and the notice procedures related thereto.  The hearing for the Bar Date Motion and Amended Bar Date Motion occurred on September 5, 2008.  By order, dated September 5, 2008 (the "Bar Date Order"), the Bankruptcy Court fixed October 15, 2008 (the "Bar Date") as the date by which all proofs of claim against and interests in the Debtors must be filed other than certain Excluded Claims defined in the Bar Date Order to which the Bar Date will not apply.  In particular, the Bar Date will not apply to any Asbestos Personal Injury Claim, any Indirect Trust Claim, or the deficiency portion of any Bonded Asbestos Personal Injury Claim remaining after crediting the proceeds of any supersedeas bond or other payment assurances to which the holder of such a Bonded Asbestos Personal Injury Claim is determined by Final Order or agreement of the parties to be entitled.

### 4.    Joint Administration

On August 9, 2001, the Debtors filed an Application for Order Directing Joint Administration of the Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(b).  On October 10, 2001, the Bankruptcy Court entered an order directing the procedural consolidation and joint administration of the chapter 11 cases of G-I and ACI.

### 5.    Executory Contracts and Unexpired Leases

As part of the efforts to reduce their operating expenses, the Debtors engaged in an analysis of their owned and leased real property and their contracts related to satellite manufacturing and services (collectively, the "Executory Contracts").

### 6.    Employee Matters

#### a.    *Wages, Compensation and Employee Benefits*

The Debtors currently have no employees.

Starting in the early 1980s, G-I established various employee benefit plans for certain of its employees and certain employees of its direct and indirect subsidiaries (collectively, the "401K Plans").  Each of the 401K Plans were amended and restated effective January 1, 1998.  Since its formation and pursuant to various agreements between ISP and G-I, ISP performed, directly or indirectly, all services required to administer G-I's employee benefits plans, including the 401K Plans.  Despite this, G-I remains a named party in the 401K Plans.  On December 26, 2001, G-I filed a Motion to Assume and Assign Certain Employee Benefit Plans and Related Agreements to ISP.  The requested assignment was a ministerial application meant to correctly reflect ISP's administration of the 401K Plans, which ISP had performed since 1991.  However, by letter dated January 24, 2002, the Debtors withdrew this motion in light of objections by the Asbestos Claimants Committee, which Debtors believe would have required their estates and the Bankruptcy Court to become unnecessarily involved in the administration of the 401K Plans and unnecessarily complicate their administration.

#### b.    *Key Employee Retention Program*

The Debtors have not instituted a key employee retention program in connection with their Chapter 11 Cases.  During the course of the Debtors' Chapter 11 Cases, BMCA established a key employee retention program and certain bonuses were paid to a limited number of executives of BMCA, in their capacities as BMCA executives.

Following the filing of G-I's bankruptcy petition, BMCA entered into Employment Security Agreements with certain key employees, seven of whom are currently employed by BMCA.  The

Employment Security Agreements provide for, among other things, the payment of certain salary and bonus amounts to those employees in the event of a termination of their employment by BMCA within a 36-month period following a "change in control" of BMCA.  The Employment Security Agreements also provide for vesting of stock options, continuation of coverage under Welfare Plans and other matters relating to severance.

### 7.    Retention of Professionals

The Bankruptcy Court authorized the interim retention of the following Debtors' professionals (all of which were subsequently approved by entry of a final order authorizing their retention): (i) Weil, Gotshal & Manges LLP, (ii) Riker Danzig Scherer, Hyland & Peretti, (iii) Sedgwick, Detert, Moran & Arnold, (iv) Friedman Wang & Bleiberg, P.C., (v) The Law Offices of Joseph D. Pope, (vi) McCarter & English LLP, (vii) Skadden, Arps, Slate, Meagher & Flom LLP, (viii) McKee Nelson LLP (f/k/a/ McKee, Nelson, Ernst & Young), (ix) Cahill Gordon & Reindel LLP, (x) Perkins Coie LLP, (xi) Akin, Gump, Straus, Hauer & Feld LLP, (xii) DeWitt & Roberts LLP, and (xiii) Ober, Kaler, Grimes & Shriver.

By order dated February 14, 2008, the Bankruptcy Court approved the retention of Dewey & LeBoeuf LLP and the substitution of Dewey & LeBoeuf LLP for Weil, Gotshal & Manges LLP as the Debtors' primary bankruptcy attorneys.

### 8.    Exclusivity

Pursuant to sections 1121(b) and 1121(c)(3) of the Bankruptcy Code, G-I's initial period during which it held the exclusive right to file a plan of reorganization was set to expire on May 5, 2001 and the period by which G-I could solicit votes in favor of such plan was set to expire on July 5, 2001 (together, the "Exclusive Periods").  On April 24, 2001, the Debtors filed their first application to extend the Exclusive Periods.  The relief requested in that application was granted, and subsequent orders have extended the Debtors' Exclusive Periods.  Upon consideration of the Debtors' Tenth Application for an Order Extending Exclusive Periods, the Bankruptcy Court found cause to extend the Debtors' Exclusive Periods to through and including April 30, 2008 and June 30, 2008, respectively.  Prior to the expiration of the Exclusive Periods, by application dated April 25, 2008, the Debtors requested a further extension of the Exclusive Periods.   In connection with the global compromise, the Plan Proponents agreed to enter into a stipulation extending the Exclusive Periods while the parties work towards confirmation of the co-proposed Plan.  By stipulation and order entered August 20, 2008, the Court ordered that the co-proponency of the Plan will not impair exclusivity if confirmation does not occur.  The Plan Proponents subsequently proposed the Plan.

As set forth in the Plan, the Plan Proponents means G-I, ACI, the Asbestos Claimants Committee, and the Legal Representative.

**B**    **APPOINTMENT OF ASBESTOS CLAIMANTS COMMITTEE AND LEGAL REPRESENTATIVE**

    **1.**    **Asbestos Claimants Committee**

        a.    **Appointment.**  On January 22, 2001, the United States Trustee for the District of New Jersey (the "U.S. Trustee"), pursuant to its authority under section 1102 of the Bankruptcy Code, appointed a Statutory Committee of Creditors (the "Asbestos Claimants Committee") in these Chapter 11 Cases.

        b.    **Original Composition.**  As originally appointed, the Asbestos Claimants Committee consisted of the following members:

| | |
|---|---|
| Marjorie Anderson, Executrix<br>for the Estate of Harold Anderson<br>c/o Steven J. Kherkher, Esq.<br>Williams Bailey Law Firm, LLP<br>8441 Gulf Freeway, #600<br>Houston, TX 77017-5001<br>Tel: (713) 230-2314<br>Fax: (713) 643-6226 | Robert Carlson, Executor for the<br>Estate of  Gertrude Carlson<br>c/o Jonathan R. Sennett, Esq.<br>Levy, Phillips et al.<br>520 Madison Ave. 4th Floor<br>New York, NY 10022<br>Tel: (212) 605-6200<br>Fax: (212) 605-6290 |
| Mary LaPointe, Individually and<br>as Personal Representative of the<br>Estate of Daniel LaPointe<br>c/o Matthew P. Bergman, Esq.<br>Bergman & Pageler<br>1201 Third Avenue, Ste. 5300<br>Seattle, WA 98101-3000<br>Tel: (206) 583-2190<br>Fax: (206) 583-2191 | Elmer L. Richardson<br>c/o Michelle Ward, Esq.<br>Cumbust, Cumbust, Hunter<br>& McCormick<br>P.O. Box 1287<br>Pascagoula, MS 39568-1287<br>Tel: (228) 762-5422<br>Fax: (228) 762-4864 |
| Marjorie Oscasek, Special<br>Administrator for Roy White<br>c/o John D. Cooney, Esq.<br>Cooney & Conway<br>120 LaSalle Street, 30th Fl<br>Chicago, IL 60602<br>Tel: (312) 236-6166<br>Fax: (312) 236-3029 | Ronald A. Bailey<br>c/o Mark H. Iola, Esq.<br>Stanley, Mandel & Iola, LLP<br>3100 Monticello Avenue, Ste. 750<br>Dallas, TX 75205<br>Tel: (214) 443-4303<br>Fax: (214) 443-0358 |
| Peter Velemirovich<br>Mark C. Meyer, Esq.<br>Goldberg, Persky et al.<br>1030 Fifth Avenue, 3rd Fl.<br>Pittsburgh, PA 15219-6205<br>Tel: (412) 471-3980<br>Fax: (412) 471-8308 | Ralph L. Pilgrim<br>c/o Baron & Budd, PC<br>3102 Oak Lawn Ave., Ste 1100<br>Dallas, TX 75219<br>Tel: (214)<br>Fax: (214) 520-1181 |
| Roy Grimm<br>c/o Kelly & Ferraro, LLP<br>1300 East Ninth Street, Ste. 1901<br>Cleveland, OH 44114<br>Tel: (216) 575-0777<br>Fax: (216) 575-0799 | Denise Collette, Estate<br>Representative of Jose A. Pilon<br>c/o Ness, Motley, et al.<br>28 Bridgeside Boulevard<br>P.O. Box 1792<br>Mt. Pleasant, SC 29465<br>Tel: (843) 216-9545<br>Fax: (843) 216-9450 |

David Harkey, Sr.
c/o Wise & Julian
3555 College Avenue
P.O. Box 1108
Alton, IL 62002
Tel: (618) 462-2600
Fax: (618) 462-2622

      c.     **Retention of Professionals.**  The Asbestos Claimants Committee has retained the following advisors:

| Attorneys | Financial Advisors |
|---|---|
| Caplin & Drysdale, Chartered<br>One Thomas Circle, N.W.<br>Washington, D.C. 20005 | Charter Oak Financial Consultants, LLC<br>430 Center Avenue<br>Mamaroneck, NY 10543 |
| Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, NJ 07068 | L. Tersigni Consulting, P.C.<br>2001 West Main Street Suite #220<br>Stamford, CT 06902 |
| | Legal Analysis Systems, Inc.<br>970 Calle Arroyo<br>Thousand Oaks, CA 90361 |

By order dated July 24, 2007, the Bankruptcy Court approved the substitution of Charter Oak Financial Consultants, LLC for L. Tersigni Consulting, P.C.

     **2.**     **Legal Representative**

On October 10, 2001, the Bankruptcy Court appointed Mr. Judson Hamlin as the representative of present and future persons holding asbestos-related legal demands in G-I's chapter 11 case (the "Legal Representative").  The Legal Representative has retained the following advisors:

| Attorneys | Financial Advisors |
|---|---|
| Keating Muething & Klekamp PLL<br>1400 Provident Tower<br>One East Fourth Street<br>Cincinnati, Ohio 45202 | Bederson & Company LLP<br>405 Northfield Avenue<br>West Orange, NJ 07052 |
| Saiber LLC<br>Gateway 1, 13th Floor<br>Newark, NJ 07102-5311 | Decipher<br>17644 Ravens Rock Road<br>Bluemont, VA  20135 |

The Debtors have kept the Asbestos Claimants Committee and the Legal Representative apprised of G-I and BMCA's business operations and both the Asbestos Claimants Committee and Legal Representative have actively participated during the pendency of these chapter 11 cases.

     **3.**     **Requests for Additional Committees**

Counsel for the Unofficial Committee of Select Asbestos Claimants filed a notice of appearance before the Bankruptcy Court on December 6, 2001.  Subsequent to that appearance, the Unofficial Committee filed only one pleading related to the Debtors' chapter 11 cases commenting on the

position taken by the Committee with regard to Debtors' Application for an Order Establishing a Method for Liquidating Asbestos Claims and Motion for Order for Fixing Final Date for Filing Proofs of Claim. No motion was made during the course of these chapter 11 cases seeking court appointment of any other committees – official or unofficial.

## C      PRELIMINARY INJUNCTION

On January 9, 2001, G-I filed a complaint seeking a preliminary injunction enjoining the assertion of present and future asbestos claims against BMCA. G-I Holdings Inc. v. Those Parties Listed on Exhibit A to Complaint et al., Adv. Proc. No. 01-3013 (Bankr. D. N. J.). A hearing on G-I's request for a preliminary injunction was held before the Bankruptcy Court on June 9, 2001 and on June 22, 2001. The Bankruptcy Court rendered an oral decision granting the preliminary injunction on certain terms and conditions, which were incorporated into the order entered February 22, 2002 (hereinafter, as subsequently amended, the "Preliminary Injunction Order").

The Preliminary Injunction Order authorizes BMCA to continue to operate its business in the ordinary course as a non-debtor, but requires BMCA to make certain disclosures to the Asbestos Claimants Committee and provide notice to the Asbestos Claimants Committee of its intent to carry out certain specified transactions. Specifically, the order requires BMCA to give the Committee 30 days written notice before engaging in certain actions such as (i) the refinancing or replacement of the Credit Agreement (as defined in the Preliminary Injunction Order); (ii) making prepayments on senior notes or indentures; (iii) making any transfer or incurring any obligation to any affiliate other than payments to G-I; (iv) amending or replacing the restated Management Agreement (as defined in the Preliminary Injunction Order); (v) making transfers to any insider except payments in the ordinary course of business; (vi) granting over 100,000 Incentive Units under the BMCA Long Term Incentive Plan (as defined in the Preliminary Injunction Order) in any calendar year; and (vii) paying any claim out of the proceeds of any insurance that may be applicable for indemnity or defense costs with respect to asbestos related personal injuries or property damages.

The Preliminary Injunction Order does not prevent the repayment of debt, nor does it prevent BMCA from proceeding with normal, ordinary business transactions. The Preliminary Injunction Order further provides for the tolling of certain statutes of limitations and repose in connection with "asbestos-related" causes of action against BMCA "that had not expired as of January 5, 2001." If the Plan is confirmed and consummated, the Preliminary Injunction will terminate but BMCA will become a Protected Party.

## D      THE RICO ACTION

On January 10, 2001, G-I filed a RICO action in the United States District Court for the Southern District of New York to recover damages from attorneys and law firms alleged to have engaged in a scheme, through a pattern of corrupt and unethical conduct, to abuse the American civil justice system. G-I Holdings Inc. v. Baron & Budd et al., 01 Civ. 0216 (RWS) (S.D.N.Y.). The complaint, as amended, asserts thirteen claims for relief against defendants Baron & Budd P.C., Frederick M. Baron, Russell Budd, Ness, Motley, Loadhold, Richardson & Poole, Ronald Motley, Joseph Rice, Weitz & Luxenberg P.C., Perry Weitz, and Robert Gordon alleging prima facie tort, tortious interference with economic advantage, tortious interference with contract, antitrust violations, RICO violations, breach of contract, fraudulent inducement and common law fraud.

The Debtors' claims for prima facie tort, anti-trust violations, certain RICO violations and fraudulent inducement were dismissed by District Court Judge Robert W. Sweet in two opinions, the first dated December 11, 2001 and the second dated July 17, 2002. The Debtors' claim for common law fraud against defendant Weitz & Luxenberg, P.C. was dismissed pursuant to Rule 41(a)(2) in an opinion dated February 27, 2004. Judge Sweet also denied the Debtors' motion to leave to file a Fifth Amended

Complaint, as well as its subsequent motion for reconsideration.  In addition, Judge Sweet has made other rulings, both oral and written, adverse to G-I.

        The claims asserting common law fraud against Baron & Budd, P.C. and the remaining RICO claims were recently dismissed pursuant to the Baron & Budd Defendants' Motion for Partial Summary Judgment.  G-I submitted a letter to Judge Sweet stating that based on the existing record (which was created through a discovery process G-I believes to have been improperly limited by court rulings), G-I was unable to oppose the summary judgment motion.  G-I's claims for tortious interference with economic advantage, tortious interference with contract and breach of contract have been dismissed pursuant to a stipulation of dismissal (with prejudice).  The RICO Action is currently pending on G-I's appeal before the United States Court of Appeals for the Second Circuit, which appeal has been fully briefed but has not yet been argued orally.  The action had been stayed pending final documentation of a global settlement of this and various other actions described in this Disclosure Statement pursuant to the agreed-upon Order Staying Certain Contested Matters and Adversary Proceedings, entered by the Bankruptcy Court on March 22, 2007.  The stay was terminated shortly before the parties reached the global compromise embodied in the Plan, but on September 3, 2008, the Court of Appeals entered a second consensual stay order at the parties' request in view of the filing of the Plan.  If the Plan is confirmed and consummated, the RICO Action will be dismissed with prejudice.

**E        THE SUCCESSOR LIABILITY ACTION**

        On February 7, 2001, G-I and BMCA filed a complaint against certain named asbestos claimants seeking a declaratory judgment that BMCA does not have liability for pending or future asbestos claims against G-I under theories of successor liability or "alter ego" (the "Successor Liability Action") and requesting the certification of a defendant class consisting of all individuals having asbestos claims against G-I.  G-I Holdings Inc. v. Bennet et al., 02 Civ. 3626 (SRC) (D.N.J.).  The Asbestos Claimants Committee intervened as a defendant and filed a counterclaim, and its motion to withdraw the reference was granted by the District Court on May 13, 2003.  The Bank of New York intervened in opposition to the counterclaim.  G-I and BMCA amended their complaint so as to eliminate their class action allegations and joined the Legal Representative as a defendant.  On July 6, 2005, the District Court dismissed the Legal Representative as a party upon granting his motion for judgment on the pleadings. After discovery, the remaining parties stipulated to the dismissal of the individual defendants, and on May 30, 2008, the District Court granted the Committee's motion for judgment on the pleadings and dismissed the action.  There has been no appeal from that decision.  The District Court did not decide the merits of G-I and BMCA's position with respect to successor liability.

**F        THE SUBSTANTIVE CONSOLIDATION ACTION**

        On February 8, 2001, the Asbestos Claimants Committee filed a complaint requesting substantive consolidation (retroactive to the January 5, 2001 Commencement Date) of BMCA with G-I, or an order compelling G-I to cause BMCA to commence a chapter 11 case of its own (hereinafter the "Substantive Consolidation Complaint").  Official Committee of Asbestos Claimants v. G-I Holdings Inc. et al., Adv. No. 01-3065 (Bankr. D.N.J.).  The Asbestos Claimants Committee moved for an interim decree of substantive consolidation by way of preliminary injunctive relief.  Massachusetts Mutual Life Insurance Company, a creditor of BMCA, moved to intervene and opposed the request for preliminary relief, as did Pacific Investment Life Management Company, LLC and Caywood-Scholl Capital Management in their capacity as investment advisors on behalf of various clients.

        After certain discovery and a three day evidentiary hearing, on April 6, 2001, the Bankruptcy Court issued an opinion denying the request for interim substantive consolidation.  The Bankruptcy Court found that, based on the record before it, the claims and defenses asserted were subject to disputes of fact and law and that the Asbestos Claimants Committee had not met its burden of establishing the elements for interim relief.  In view of the preliminary nature of the proceeding, the

Bankruptcy Court also held that its decision did not determine the issue of BMCA's alleged successor liability, which was to be litigated in the Successor Liability Action. Official Committee of Asbestos Claimants v. G-I Holdings Inc. et al, 2001 W.L. 159178 * 14 (Bankr. D.N.J., Apr. 6, 2001). By order dated April 9, 2001, the Bankruptcy Court denied G-I's motion to dismiss the Substantive Consolidation Complaint. In view of the denial of preliminary relief, however, the Asbestos Claimants Committee held in abeyance any further proceedings on that complaint, pending the outcome of the Successor Liability Action. If the Plan is confirmed and consummated, the Substantive Consolidation Complaint will be dismissed with prejudice.

## G        THE ISP FRAUDULENT TRANSFER ACTION

On May 14, 2001, the Bankruptcy Court granted the Asbestos Claimants Committee authority to prosecute claims against Mr. Heyman and related entities to avoid the January 1, 1997 transfer by which ISP ceased to be a subsidiary of GAF and to recover the transferred property or the value thereof for the benefit of G-I's estate. Official Committee of Asbestos Claimants et al. v. Samuel J. Heyman et al., 01 Civ. 8539 (RWS) (S.D.N.Y.). On September 20, 2001, the Asbestos Claimants Committee filed suit on such claims in the United States District Court for the Southern District of New York (the "ISP Fraudulent Transfer Action"), alleging, among other things, that GAF's transfer of ISP to GAF's shareholders prejudiced the rights of GAF's creditors. By subsequent orders, the Bankruptcy Court authorized the Legal Representative to serve as co-representative of the bankruptcy estate in the ISP Fraudulent Transfer Action, and the District Court allowed the Legal Representative to intervene. The complaint has been twice amended, and certain entities related to Mr. Heyman have been joined as defendants. The ISP Fraudulent Transfer Action remains in the discovery stage. No discovery cut-off is in effect, and no trial date has been set.

The ISP Fraudulent Transfer Action was stayed by order entered on April 5, 2007, with the consent of the parties in view of their efforts to make a global settlement of G-I's Chapter 11 Case and related disputes among them. The Committee and Legal Representative terminated the consensual stay on February 1, 2008, but on September 9, 2008, the District Court entered a second consensual stay order at the request of all parties in view of the filing of the Plan. If the Plan is confirmed and consummated, the actions against Mr. Heyman and his related entities will be dismissed with prejudice.

## H        THE ASBESTOS CLAIMANTS COMMITTEE'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE

On November 11, 2002, the Asbestos Claimants Committee filed a second motion for appointment of a chapter 11 trustee (the "Trustee Motion"). G-I filed an objection to the Asbestos Claimants Committee's Trustee Motion on December 10, 2002. A hearing on the Trustee Motion was held before the Bankruptcy Court on December 13, 2002. By order dated January 16, 2003, the Bankruptcy Court denied the Asbestos Claimants Committee's request for the appointment of a Chapter 11 Trustee.

On January 28, 2003, the Asbestos Claimants Committee filed a notice of appeal of the Bankruptcy Court's order denying the Trustee Motion to the District Court. On June 30, 2003, the District Court affirmed. The Asbestos Claimants Committee appealed to the Court of Appeals for the Third Circuit, which on September 24, 2004, affirmed the District Court's decision.

## I        ESTIMATION OF ASBESTOS LIABILITY

Seeking to implement an efficient, inexpensive method to liquidate asbestos claims, on June 19, 2002, G-I filed a motion to liquidate individual asbestos claims by use of a medical matrix and without a jury trial (the "Estimation Motion"). On May 23, 2002, the Asbestos Claimants Committee filed a motion seeking to estimate G-I's asbestos claims in the aggregate for chapter 11 plan confirmation

purposes.  The District Court denied motions by the Legal Representative and the Asbestos Claimants Committee to withdraw the reference of these motions.  After extensive briefing by all parties, the Bankruptcy Court held a hearing on January 15, 2004, on the threshold legal issues pertaining to G-I's Estimation Motion.  By order dated February 1, 2005, the Bankruptcy Court denied G-I's Estimation Motion and granted, in part, the Asbestos Claimants Committee's motion seeking an aggregate estimation of G-I's asbestos claims.  G-I appealed the denial of its Estimation Motion.  Its appeal was dismissed as premature and the dismissal is on appeal to the Third Circuit where it has been argued and is *sub judice*.

The estimation of G-I's asbestos liability is a central issue in G-I's Chapter 11 Case.  The Bankruptcy Court has made a series of rulings concerning the nature and scope of the asbestos personal-injury claims estimation proceeding and proposed discovery therein, and has authorized G-I to issue a detailed questionnaire to a sample of asbestos personal injury claimants.  The Bankruptcy Court also established a schedule for discovery and trial, and bifurcated the trial, with claims for present and future mesothelioma and asbestos-related lung cancer to be estimated in "Phase I" and claims for present and future asbestos-related non-malignant conditions to be estimated, if necessary, in "Phase II."  After several amendments, the schedule contemplated that trial of Phase I would commence on June 10, 2010.  Upon the filing of the Plan, the Bankruptcy Court entered an order dated August 22, 2008, agreed to by G-I, the Asbestos Claimants Committee, and the Legal Representative, that, among other things, stayed the claims estimation proceeding and suspended all deadlines previously established therein.  The estimation proceeding, including G-I's Third Circuit appeal, will be rendered moot if the Plan is confirmed and consummated.  By letter dated September 22, 2008, counsel to G-I informed the Clerk of the Third Circuit of the pending Plan and the likelihood that confirmation of the Plan would resolve the issues on appeal.

## J    REFINANCING OF THE PREPETITION BMCA BANK FACILITY

On March 18, 2003, BMCA provided the Asbestos Claimants Committee and the Legal Representative with notice, pursuant to the Preliminary Injunction Order, of its intention to enter into a new senior secured revolving credit facility (the "Citibank Facility"), the proceeds of which would be used to refinance BMCA's then-existing prepetition credit agreement with the Bank of New York ("BNY"), as agent, and to fund the payment, when due, of BMCA's then-existing 10.5% Senior Notes due September 2003.  Following the Bankruptcy Court's entry of an order modifying the Preliminary Injunction Order, BMCA, the Asbestos Claimants Committee and the Legal Representative entered into a stipulation (the "Refinancing Stipulation"), which provided, among other things, that BMCA's entry into the Citibank Facility and repayment of the BNY credit facility and other BMCA public debt would not prejudice the rights, if any, that the Asbestos Claimants Committee, the Legal Representative, or the G-I estate may have against BNY or BMCA's public noteholders (the "Noteholders").  The proposed Refinancing Stipulation also provided that BMCA would not commence a repurchase program with respect to BMCA's public notes without first providing the Asbestos Claimants Committee 30 days notice.

BNY and Mass Mutual Life Insurance Company, on behalf of the Noteholders, filed limited objections to the Refinancing Stipulation, challenging the Bankruptcy Court's jurisdiction to prejudice their rights without their consent to the stipulation.  The Asbestos Claimants Committee then responded by objecting to BMCA's entry into the Citibank Facility, absent a ruling that BNY or the Noteholders could not use repayment as a defense to a future action.

On June 18, 2003, the Bankruptcy Court overruled the Asbestos Claimants Committee's objection, holding that the issue of BNY's and the Noteholders' future defenses or rights was not ripe for judicial review and that the Bankruptcy Court lacked subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b).  Consistent therewith, the Bankruptcy Court entered an order (the "Refinancing Order") modifying the Preliminary Injunction Order to (i) allow BMCA to enter into the Citibank Facility and (ii)

preserve any rights or defenses of BNY.  On appeal by the Asbestos Claimants Committee, the District Court and the Third Circuit affirmed the Bankruptcy Court's order on the same grounds.

**K**      **THE 2004 REFINANCING OF THE 8 5/8% SENIOR NOTES DUE 2006**

On January 9, 2004, in accordance with the terms of the Refinancing Stipulation, G-I provided notice to the Asbestos Claimants Committee of BMCA's intent to issue up to $150,000,000 of new senior secured notes and to use the proceeds to redeem the 8 5/8% Senior Notes due 2006 under the applicable optional redemption provision (the "2004 Refinancing").  It also announced the possibility of using its funds for an opportunistic open market purchase of BMCA's outstanding Senior Notes.  The Asbestos Claimants Committee filed an objection.

On June 8, 2004 the Bankruptcy Court issued a decision, as modified on July 7, 2004, permitting the 2004 Refinancing.

**L**      **THE MOTION FOR DERIVATIVE STANDING TO PROSECUTE ALLEGED AVOIDANCE CLAIMS**

On or about February 27, 2004, the Asbestos Claimants Committee filed a Motion for Authorization to Prosecute Claims on Behalf of the Debtor's Estate (the "Motion to Prosecute").  Among other things, the Motion to Prosecute requested that the Bankruptcy Court modify the Preliminary Injunction Order to permit the Asbestos Claimants Committee to commence an adversary proceeding for avoidance of the 1994 Transaction and certain subsequent transactions involving BMCA and recovery for the benefit of G-I's estate of certain payments made by BMCA to certain of its former lenders and to holders of notes publicly issued by BMCA before the commencement of G-I's Chapter 11 Case.

On June 8, 2004 the Bankruptcy Court issued its opinion denying in part and granting in part the Motion to Prosecute.  The Bankruptcy Court authorized the Asbestos Claimants Committee to file an adversary proceeding on behalf of G-I's estate challenging the 1994 Transaction as a fraudulent transfer pursuant to sections 544(b) and 550 of the Bankruptcy Code.  The Bankruptcy Court denied other relief requested in the Motion to Prosecute.  The Asbestos Claimants Committee proceeded to file a complaint in the Bankruptcy Court, naming as defendants BMCA, certain of its Affiliates, certain former lenders to BMCA, and numerous entities alleged to be or to have been holders of notes issued by BMCA before the commencement of G-I's Chapter 11 Case.  Official Committee of Asbestos Claimants v. Building Materials Corp. of America et al., Adv. Proc. No. 04-2192 (Bankr. D.N.J.).  The Committee also initiated discovery for the purpose of identifying other Entities that are or were holders of such notes.

On July 20, 2004, the Asbestos Claimants Committee filed with the District Court an appeal of the Bankruptcy Court's decision, insofar as it refused authorization to raise certain claims and theories.  G-I, BMCA, and the Bank of New York then cross-appealed the Bankruptcy Court's decision insofar as it granted leave for the Asbestos Claimants Committee to prosecute claims to avoid the 1994 Transaction.

By order and opinion issued on June 21, 2006, the District Court granted the cross-appeal and vacated and remanded the Bankruptcy Court's decision with directions to set forth a cost-benefit analysis with respect to the Asbestos Claimants Committee's proposed prosecution of an action to avoid the 1994 Transaction.  The District Court affirmed the other rulings of the Bankruptcy Court.

On June 30, 2006, the Asbestos Claimants Committee filed with the District Court a motion for reconsideration (the "Motion for Reconsideration") of the District Court's June 21, 2006 order and opinion.  By order dated August 7, 2006, the District Court granted the Motion for Reconsideration and remanded the matters raised in the Asbestos Claimants Committee's appeal to the Bankruptcy Court with directions to include those matters in the cost-benefit analysis.

On March 22, 2007, the Bankruptcy Court stayed the proceeding on remand with the consent of the parties as they attempted to complete negotiations on a proposed global settlement. The consensual stay was terminated on February 1, 2008, but, in view of the filing of the Plan, the remanded proceeding was again stayed on consent of the parties pursuant to an order entered by the Bankruptcy Court on August 22, 2008. If the Plan is confirmed and consummated, the Asbestos Claimants' Committee's Motion to Prosecute avoidance claims pertaining to the 1994 Transaction and subsequent transactions involving BMCA will be dismissed with prejudice.

**M        THE IRS ACTION**

On September 21, 2001, the IRS filed a proof of claim with respect to such deficiency against G-I in the chapter 11 cases. G-I filed an objection to the proof of claim, which is the subject of an adversary proceeding pending in the United States District Court for the District of New Jersey. United States v. G-I Holdings Inc., 02 Civ. 3082 (SRC). By opinion and order dated September 8, 2006, the District Court ruled on the parties' respective motions for Partial Summary Judgment, granting the government summary judgment on the issue of "adequate disclosure" for statute of limitations purposes and denying G-I summary judgment on its other statute of limitations defense (finding material issues of fact that must be tried). In an opinion dated June 8, 2007, the District Court decided that G-I cannot avail itself of the "binding contract" transitional relief with respect to the 1999 distribution of U.S. Treasury Bonds to G-I. This IRS claim is not part of the global settlement. If the Plan is confirmed, the IRS and G-I will continue to litigate the allowance of the claim and the Plan provides whatever allowed claim, if any, is ultimately granted will be paid in accordance with the Bankruptcy Code.

**V. THE PLAN OF REORGANIZATION**

The Debtors believe that (i) through the Plan, holders of Allowed Claims will obtain a greater recovery from the estates of the Debtors than the recovery that they would receive if the assets of the Debtors were liquidated under chapter 7 of the Bankruptcy Code and (ii) the Plan will afford the Debtors the opportunity and ability to continue in business as a viable going concern and preserve ongoing employment for the Debtors' employees.

The Plan is annexed hereto as Exhibit A and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

**A        STRUCTURE OF THE REORGANIZED DEBTORS**

It is contemplated that, on the Effective Date, the management, control, and operation of the Reorganized Debtors shall become the general responsibility of the Boards of Directors of the Reorganized Debtors.

The Boards of Directors of each of the Debtors immediately prior to the Effective Date will serve as the initial Boards of Directors of the Reorganized Debtors on and after the Effective Date and are identified in Schedule 8.2 of the Plan Supplement. Each of the members of such Boards of Directors will serve in accordance with applicable non-bankruptcy law and each Debtors' certificate or articles of incorporation and by-laws, as each of the same may be amended from time to time. The officers of the Debtors immediately prior to the Effective Date will serve as the initial officers of the Reorganized Debtors on and after the Effective Date. Such officers shall serve in accordance with

applicable non-bankruptcy law and any employment agreement with the Debtors, if assumed, or with the Reorganized Debtors.

The articles or certificate of incorporation and by-laws of the Debtors will be amended as of the Effective Date to provide substantially as set forth in the Reorganized Debtors' Certificate of Incorporation and the Reorganized Debtors' By-Laws.  The articles or certificate of incorporation and by-laws shall contain provisions (i) prohibiting the issuance of non-voting equity securities, as required by section 1123(a)(6) of the Bankruptcy Code (subject to further amendment of such certificates of incorporation and by-laws as permitted by applicable law), and (ii) effectuating the provisions of the Plan, in such case without further action by the stockholders or directors of the Debtors, the Debtors-in-Possession, or the Reorganized Debtors.

On the Effective Date, the adoption of the Reorganized Debtors' Certificate of Incorporation and the Reorganized Debtors' By-Laws shall be authorized and approved in all respects, in each case without further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Reorganized Debtors.  All other matters provided under the Plan involving the corporate structure of the Reorganized Debtors or corporate action by the Reorganized Debtors shall be deemed to have occurred, be authorized, and shall be in effect without requiring further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Reorganized Debtors.  Without limiting the foregoing, from and after the Confirmation Date, the Debtors or the Reorganized Debtors shall take any and all actions deemed appropriate to consummate the transactions contemplated herein.

As set forth in the Plan, the Plan Sponsor and Reorganized Debtors (as applicable) and only the Plan Sponsor and Reorganized Debtors shall be responsible for Distributions required by the Plan.  The Asbestos Trust and only the Asbestos Trust shall be responsible for resolving and paying Class 6 Claims and Demands in accordance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures.

## B    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

The Plan governs the treatment of Claims against and Equity Interests in the Debtors in these chapter 11 cases.  The table in Section I(C)(2) summarizes the treatment under the Plan for each class.

Unless otherwise indicated, the characteristics and amount of the Claims or Equity Interests in the following classes are based on the Debtors' books and records.  Each subclass is treated as a separate class for purposes of the Plan and the Bankruptcy Code.  Except for Asbestos Claims, which will be resolved by the Asbestos Trust in accordance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures, only Claims that are "allowed" under the Bankruptcy Code or by the Bankruptcy Court will receive any distribution under the Plan.

The Plan classifies Claims and Equity Interests separately and provides different treatment for different Classes of Claims and Equity Interests in accordance with the Bankruptcy Code.  As described more fully below, the Plan provides, separately for each Class, that holders of certain Claims will receive various amounts and types of consideration, thereby giving effect to the different rights of holders of Claims and Equity Interests in each Class.

### 1.    Administrative Expense Claims.

In order to confirm the Plan, Allowed Administrative Expense Claims and Allowed Priority Tax Claims must be paid in full or in a manner otherwise agreeable to the holders of such Claims.

Administrative expenses are the actual and necessary costs and expenses of the Debtors' Chapter 11 Cases. Administrative Expense Claims are Claims constituting a cost or expense of administration of the Chapter 11 Cases allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code. Such Claims include all actual and necessary costs and expenses of preserving the estates of the Debtors, all actual and necessary costs and expenses of operating the business of the Debtors-in-Possession, any indebtedness or obligations incurred or assumed by the Debtors-in-Possession in connection with the conduct of their business, the actual, reasonable, and necessary professional fees and expenses of the professionals retained by the Debtors, the Asbestos Claimants Committee and the Legal Representative, and all cure amounts owed in respect of leases and contracts assumed by the Debtors-in-Possession. The Debtors estimate that the amount of Allowed Administrative Expense Claims that have not previously been paid pursuant to an order of the Bankruptcy Court will not exceed $5,500,000.

Pursuant to the Plan, except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment with the applicable Debtor, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the applicable Debtor-in-Possession shall be paid in full and performed by the applicable Reorganized Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

To the extent that an Administrative Expense Claim is Allowed against the Estate of more than one Debtor, there shall be only a single recovery on account of such Allowed Claim; *provided, however*, that an Entity holding an Allowed Claim against one or more Debtors which are co-obligors on such Claim may recover distributions from any of such Debtors until such Entity has received payment in full on such Allowed Claim.

### 2.    Compensation and Reimbursement Claims.

Compensation and reimbursement Claims are Administrative Expense Claims for the compensation of professionals and reimbursement of expenses incurred by such professionals pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Bankruptcy Code (the "Compensation and Reimbursement Claims").

All payments to professionals for Compensation and Reimbursement Claims will be made in accordance with the procedures established by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Bankruptcy Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. The aggregate amount incurred by the Debtors in respect of compensation for services rendered and reimbursement of expenses incurred by professionals (including professionals employed by the Debtors and the Creditors' Committee) through November 23, 2008 is approximately $202,002,000. The Bankruptcy Court will review and determine all applications for compensation for services rendered and reimbursement of expenses.

Section 503(b) of the Bankruptcy Code provides for payment of compensation to creditors, indenture trustees and other entities making a "substantial contribution" to a reorganization case, and to attorneys for and other professional advisors to such entities. At this time, the Debtors do not know the amounts, if any, which may be sought by entities for such compensation. Requests for compensation must be approved by the Bankruptcy Court after a hearing on notice at which the Debtors and other parties in interest may participate and, if appropriate, object to the allowance of any claims for compensation and reimbursement of expenses.

Pursuant to the Plan, all holders of any Claim for an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code shall (i) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by a date no later than the date that is ninety (90) days after the Effective Date or by such other date as may be fixed by the Bankruptcy Court and (ii) if granted such an award by the Bankruptcy Court, be paid in full in such amounts as are Allowed by the Bankruptcy Court (A) on the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable, or (B) upon such other terms as may be mutually agreed upon between such holder of an Administrative Expense Claim and the Reorganized Debtors.

To the extent that an Administrative Expense Claim is Allowed against the Estate of each Debtor, there shall be only a single recovery on account of such Allowed Claim; *provided, however*, that an Entity holding an Allowed Claim against each of the Debtors as co-obligors on such Claim may recover distributions from any such Debtor until such Entity has received payment in full on such Allowed Claim.

### 3. Priority Tax Claims.

Priority Tax Claims are Claims against the Debtors of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Pursuant to the Plan, except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the applicable Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the applicable Reorganized Debtor and in full and complete satisfaction of any and all liability attributable to such Priority Tax Claim on the latest of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Allowed Priority Tax Claim is payable under applicable nonbankruptcy law, or as soon thereafter as is reasonably practicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim, (b) a transferable note that provides for a Cash payment in an amount equal to such Allowed Priority Tax Claim, together with interest at four percent (4%), on the sixth (6th) anniversary from the date of final determination of the assessment of such Allowed Priority Tax Claim, or (c) any combination of Cash and a note, on the terms provided in subsections (a) and (b) hereof, in an aggregate Cash and principal amount equal to such Allowed Priority Tax Claim; *provided,* that the Debtors reserve the right to prepay any such note in part or in whole at any time without premium or penalty; and *provided, further,* that no holder of an Allowed Priority Tax Claim shall be entitled to any payments on account of any pre-Effective Date interest accrued on or penalty arising after the Commencement Date with respect to or in connection with such Allowed Priority Tax Claim.

### 4. Allowed G-I Priority Non-Tax Claims (Class 1A)

The Claims in Class 1A consist of G-I Priority Non-Tax Claims.

Pursuant to the Plan, G-I Priority Non-Tax Claims are any Claims against G-I or its estate, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment in accordance with sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code, but only to the extent entitled to such priority.

**Pursuant to the Plan, the legal, equitable, and contractual rights of the holders of Allowed G-I Priority Non-Tax Claims are unaltered by the Plan, or such Allowed G-I Priority Non-Tax Claims shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code.**

41

The Debtors estimate that the amount of Claims in Class 1A will be $0.

Class 1A is unimpaired by the Plan.  Each holder of a Class 1A Claim is conclusively presumed to have accepted the Plan, and is thus not entitled to vote to accept or reject the Plan.

### 5.  Allowed ACI Priority Non-Tax Claims (Class 1B)

The Claims in Class 1B consist of ACI Priority Non-Tax Claims.

Pursuant to the Plan, ACI Priority Non-Tax Claims are any Claims against ACI or its estate, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment in accordance with sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code, but only to the extent entitled to such priority.

**Pursuant to the Plan, the legal, equitable, and contractual rights of the holders of Allowed ACI Priority Non-Tax Claims are unaltered by the Plan, or such Allowed ACI Priority Non-Tax Claims shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code.**

The Debtors estimate that the amount of Claims in Class 1B will be $0.

Class 1B is unimpaired by the Plan.  Each holder of a Class 1B Claim is conclusively presumed to have accepted the Plan, and is thus not entitled to vote to accept or reject the Plan.

### 6.  G-I Secured Claims (Class 2A).

Class 2A consists of all G-I Secured Claims.

Pursuant to the Plan, the Claims in Class 2A are Claims against G-I, to the extent reflected in the Schedules or a proof of claim as a Secured Claim, that are secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

**Pursuant to the Plan, the legal, equitable, and contractual rights of the holders of Allowed G-I Secured Claims are unaltered by the Plan, or such Allowed G-I Secured Claims shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code.**

The Debtors estimate that the Claims in Class 2A will be $0.

Class 2A is unimpaired by the Plan.  Each holder of a Class 2A Claim is conclusively presumed to have accepted the Plan, and is thus not entitled to vote to accept or reject the Plan.

### 7.  ACI Secured Claims (Class 2B).

Class 2B consists of all ACI Secured Claims.

Pursuant to the Plan, the Claims in Class 2B are Claims against ACI, to the extent reflected in the Schedules or a proof of claim as a Secured Claim, that are secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

**Pursuant to the Plan, the legal, equitable, and contractual rights of the holders of Allowed ACI Secured Claims are unaltered by the Plan, or such Allowed ACI Secured Claims shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code.**

The Debtors estimate that the Claims in Class 2B will be $0.

Class 2B is unimpaired by the Plan. Each holder of a Class 2B Claim is conclusively presumed to have accepted the Plan, and is thus not entitled to vote to accept or reject the Plan.

### 8.    G-I Unsecured Claims (Class 3A)

Class 3A consists of all Unsecured Claims against G-I.

Pursuant to the Plan, an Unsecured Claim is any Claim against one or more of the Debtors (regardless of whether such Claim is covered by insurance), to the extent that such Claim is neither secured nor entitled to priority under applicable law. Unsecured Claims expressly include, without limitation, (a) any claim arising from the rejection of an executory contract or unexpired lease under section 365 of the Bankruptcy Code; (b) any portion of a Claim that is not a Secured Claim (*i.e.*, an unsecured deficiency claim); (c) any deficiency portion of a Bonded Non-Asbestos Claim remaining after crediting proceeds of any supersedeas bond or other payment assurances to which the holder of such Claim is determined by Final Order or agreement of the parties to be entitled; and (d) any Claims arising from the provision of goods or services to the Debtors prior to the Commencement Date, including the Claims of commercial trade creditors. Unless otherwise specifically provided in an applicable provision of the Plan, Unsecured Claims shall not include (i) Administrative Expense Claims; (ii) Priority Tax Claims; (iii) G-I Priority Non-Tax Claims; (iv) ACI Priority Non-Tax Claims; (v) G-I Secured Claims; (vi) ACI Secured Claims; (vii) Asbestos Claims; (viii) Asbestos Property Damage Claims; (ix) Asbestos Property Damage Contribution Claims; (x) Environmental Claims; (xi) Bonded Claims; (xii) the CCR Claim; (xiii) G-I Affiliate Claims; (xiv) ACI Affiliate Claims; (xv) Workers' Compensation Claims; or (xvi) G-I Equity Interest Redemption Claims.

**Pursuant to the Plan, On the later of (i) the Effective Date and (ii) the date on which a G-I Unsecured Claim becomes an Allowed G-I Unsecured Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed G-I Unsecured Claim shall receive Cash in an amount equal to 8.6% of such Allowed Claim.**

The Debtors believe that the Claims in Class 3A will approximate $1,110,629.

Class 3A is impaired by the Plan. Each holder of an Allowed Class 3A Claim is entitled to vote to accept or reject the Plan.

### 9.    ACI Unsecured Claims (Class 3B)

Class 3B consists of all Unsecured Claims against ACI.

Pursuant to the Plan, an Unsecured Claim is any Claim against one or more of the Debtors (regardless of whether such Claim is covered by insurance), to the extent that such Claim is neither secured nor entitled to priority under applicable law. Unsecured Claims expressly include, without limitation, (a) any claim arising from the rejection of an executory contract or unexpired lease under section 365 of the Bankruptcy Code; (b) any portion of a Claim that is not a Secured Claim (*i.e.*, an unsecured deficiency claim); (c) any deficiency portion of a Bonded Non-Asbestos Claim remaining after crediting proceeds of any supersedeas bond or other payment assurances to which the holder of such Claim is determined by Final Order or agreement of the parties to be entitled; and (d) any Claims arising from the provision of goods or services to the Debtors prior to the Commencement Date, including the Claims of commercial trade creditors. Unless otherwise specifically provided in an applicable provision

of the Plan, Unsecured Claims shall not include (i) Administrative Expense Claims; (ii) Priority Tax Claims; (iii) G-I Priority Non-Tax Claims; (iv) ACI Priority Non-Tax Claims; (v) G-I Secured Claims; (vi) ACI Secured Claims; (vii) Asbestos Claims; (viii) Asbestos Property Damage Claims; (ix) Asbestos Property Damage Contribution Claims; (x) Environmental Claims; (xi) Bonded Claims; (xii) the CCR Claim; (xiii) G-I Affiliate Claims; (xiv) ACI Affiliate Claims; (xv) Workers' Compensation Claims; or (xvi) G-I Equity Interest Redemption Claims.

**Pursuant to the Plan, the legal, equitable, and contractual rights of the holders of Allowed ACI Unsecured Claims are unaltered by the Plan, or such Allowed ACI Unsecured Claims shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code.**

The Debtors believe that the Claims in Class 3B will be $0.

Class 3B is unimpaired by the Plan.  Each holder of a Class 3B Claim is conclusively presumed to have accepted the Plan, and is thus not entitled to vote to accept or reject the Plan.

**10.    Environmental Claims for Remedial Relief (Class 4)**

Class 4 consists of all Environmental Claims for Remedial Relief.

Pursuant to the Plan, an Environmental Claim for Remedial Relief is an Environmental Claim by a governmental unit for remedial relief to address on-going hazards as an exercise of state or federal regulatory power at properties currently owned or operated by the Debtors, but does not include a Claim for monetary relief for reimbursement or contribution in respect of prepetition remediation expenditures or any other prepetition monetary Claim. Environmental Claims are Claims relating to alleged hazardous materials, hazardous substances, contamination, pollution, waste, fines or mine or mill tailings released, threatened to be released or present in the environment or ecosystem, including without limitation, alleged contamination under federal or state environmental laws, codes, orders or regulations, common law, as well as any entitlements to equitable remedies, including, without limitation, investigation, restoration, natural resource damages, reclamation, remediation and cleanup, including without limitation, any Environmental Claim for Remedial Relief and any Other Environmental Claim; *provided*, *however*, for the avoidance of doubt, the term "Environmental Claim" shall not include or pertain to any Asbestos Claim, Asbestos Property Damage Claim, Asbestos Property Damage Contribution Claim, Bonded Asbestos Personal Injury Claim, CCR Claim, Workers' Compensation Claim, or Claim of an Affiliate.

**Pursuant to the Plan, the legal, equitable, and contractual rights of the holders of Allowed Environmental Claims for Remedial Relief are unaltered by the Plan, or such Allowed Environmental Claims for Remedial Relief shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code.**

Class 4 is unimpaired by the Plan.  Each holder of a Class 4 Claim is conclusively presumed to have accepted the Plan, and is thus not entitled to vote to accept or reject the Plan.

**11.    Other Environmental Claims (Class 5)**

Class 5 consists of all Other Environmental Claims.

The Debtors will presume Class 5 rejects the Plan.  As a practical matter, because all the claims are disputed, there would likely be no claims voting, or claims would have to be allowed on a temporary basis (to the extent allowed by law) for voting purposes.  Because the Plan provides substantially the same economic treatment to the claims in Class 5 as it does to all G-I Unsecured Claims in Class 3, the Debtors believe the Plan can be confirmed over the rejection of Class 5.

Pursuant to the Plan, an Other Environmental Claim is any Environmental Claim that is not an Environmental Claim for Remedial Relief, including without limitation Claims for monetary relief for reimbursement or contribution in respect of prepetition remediation expenditures and any prepetition monetary Claims relating to environmental laws or regulations, whether for property owned or operated by G-I prepetition, postpetition, or both.

Environmental Claims are Claims relating to alleged hazardous materials, hazardous substances, contamination, pollution, waste, fines or mine or mill tailings released, threatened to be released or present in the environment or ecosystem, including without limitation, alleged contamination under federal or state environmental laws, codes, orders or regulations, common law, as well as any entitlements to equitable remedies, including, without limitation, investigation, restoration, natural resource damages, reclamation, remediation and cleanup, including without limitation, any Environmental Claim for Remedial Relief and any Other Environmental Claim; *provided*, *however*, for the avoidance of doubt, the term "Environmental Claim" shall not include or pertain to any Asbestos Claim, Asbestos Property Damage Claim, Asbestos Property Damage Contribution Claim, Bonded Asbestos Personal Injury Claim, CCR Claim, Workers' Compensation Claim, or Claim of an Affiliate.

**Pursuant to the Plan, on the later of (i) the Effective Date and (ii) the date on which an Other Environmental Claim becomes an Allowed Other Environmental Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Environmental Claim shall receive Cash in an amount equal to 8.6%[*] of such Allowed Claim.**

Class 5 is impaired by the Plan. Each holder of a Class 5 Claim is conclusively deemed to reject the Plan and is thus not entitled to vote to accept or reject the Plan. By presuming that Class 5 has rejected the Plan, the Debtors will avoid any costs and delay associated with providing ballots to Class 5 claimholders.

### 12.    Asbestos Claims (Class 6).

Class 6 consists of Asbestos Claims.

As provided in the Plan, an Asbestos Claim is any (i) Asbestos Personal Injury Claim, (ii) Indirect Trust Claim, and (iii) any deficiency portion of a Bonded Asbestos Personal Injury Claim remaining after crediting the proceeds of any supersedeas bond or other payment assurances to which the holder of such Claim is determined by Final Order or agreement of the parties to be entitled, *provided, however,* for the avoidance of doubt, the term "Asbestos Claim" shall not include or pertain to the CCR Claim or any Asbestos Property Damage Claim, Asbestos Property Damage Contribution Claim, Bonded Claim, Claim held by an Affiliate (even if such Claim would constitute an Indirect Trust Claim if it arose in favor of a non-Affiliate), Environmental Claim, or Workers' Compensation Claim. Accordingly, the following types of Claims and Demands are illustrative of what constitutes an Asbestos Claim:

- <u>Asbestos Personal Injury Claim</u> means any Claim or Demand against G-I, now existing or hereafter arising, whether or not such Claim, remedy, liability, or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, for death, bodily injury, sickness, disease, medical monitoring or other personal injuries (whether physical, emotional or otherwise) to the extent caused or allegedly caused, directly or indirectly, by the presence of or exposure (whether prior to or on and after the Commencement Date) to asbestos or asbestos-containing products or things that was or were

---

[*] The percentage will match the Asbestos Trust Initial Payment Percentage.

installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, used, removed, replaced or disposed by G-I or an Entity for whose products or operations G-I allegedly has liability or for which G-I is otherwise allegedly liable, including, without limitation,

> (i) any Claim, remedy, liability, or demand for compensatory damages (such as loss of consortium, wrongful death, medical monitoring, survivorship, proximate, consequential, general, and special damages) and punitive damages;

> (ii) any Claim, remedy, liability or demand for reimbursement, indemnification, subrogation and contribution (including an Indirect Trust Claim); and

> (iii) any Claim under any settlement pertaining to an Asbestos Personal Injury Claim, which settlement was actually or purportedly entered into by or on behalf of G-I prior to the Commencement Date;

*provided*, *however*, for the avoidance of doubt, the term "Asbestos Personal Injury Claim" shall not include or pertain to the CCR Claim or any Asbestos Property Damage Claim, Asbestos Property Damage Contribution Claim, Bonded Claim, Claim held by an Affiliate (even if such Claim would constitute an Indirect Trust Claim if it arose in favor of a non-Affiliate), Environmental Claim, or Workers' Compensation Claim.

- <u>Indirect Trust Claim</u> means any Claim or Demand against G-I, now existing or hereafter arising, that is

> (i) held by any Entity (other than a director or officer entitled to indemnification pursuant to Section 7.5 of the Plan) who has been, is, or may be a defendant in an action seeking damages for death, bodily injury, sickness, disease, or other personal injuries (whether physical, emotional, or otherwise) to the extent based on, arising from, or attributable to an Asbestos Personal Injury Claim; and

> (ii) on account of alleged liability of G-I for reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity has paid or may pay on account of an Asbestos Personal Injury Claim; *provided, however*, that the term "Indirect Trust Claim" shall not include or pertain to the CCR Claim or any Asbestos Property Damage Claim, Asbestos Property Damage Contribution Claim, Bonded Claim, Environmental Claim, Workers' Compensation Claims, ACI Affiliate Claim, or G-I Affiliate Claim.

- <u>Deficiency portion of a Bonded Asbestos Personal Injury Claim</u> means that portion remaining *after* crediting the proceeds of any supersedeas bond or other payment assurances to which the holder of such Claim is determined by Final Order or agreement of the parties to be entitled with respect to a Bonded Asbestos Personal Injury Claim.  Please refer to the treatment of Bonded Claims – Class 9, below, for further information regarding treatment of Bonded Asbestos Personal Injury Claims.

**Pursuant to the Plan, all Class 6 Claims shall be resolved, determined, and paid pursuant to section 524(g) of the Bankruptcy Code and the terms, provisions, and procedures of the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures.  The Asbestos Trust will be funded in accordance with the provisions of Section 4.4 of the Plan.  The sole recourse of the holder of a Class 6 Claim shall be to the Asbestos Trust, and such holder shall have no right whatsoever at any time to assert its Class 6 Claim against any Protected Party.  *Without limiting the***

46

*foregoing, on the Effective Date, all holders of Asbestos Claims shall be subject to the Asbestos Permanent Channeling Injunction.*

The Debtors are advised by the Asbestos Claimants Committee and Legal Representative that the estimated aggregate amount of Asbestos Personal Injury Claims and demands against the Debtors is in excess of $7,000,000,000.

Class 6 is impaired and the holders of Claims in Class 6 are entitled to vote to accept or reject the Plan.

### 13.    Asbestos Property Damage Claims and Asbestos Property Damage Contribution Claims (Class 7).

Class 7 consists of Asbestos Property Damage Claims and Asbestos Property Damage Contribution Claims.

Pursuant to the Plan, Asbestos Property Damage Claims consist of (i) any Claim or remedy or liability against G-I, whether or not such Claim, remedy, or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, for damages for property damage, including but not limited to, the cost of inspecting, maintaining, encapsulating, repairing, decontaminating, removing or disposing of asbestos or asbestos-containing products in buildings, other structures, or other property arising from the installation in, presence in or removal from buildings or other structures of asbestos or asbestos-containing products that was or were installed, manufactured, engineered, designed, fabricated, constructed, sold, supplied, produced, distributed, released, specified, selected, marketed, serviced, repaired, maintained, purchased, owned, used, removed, replaced or disposed of by G-I prior to the Commencement Date, or for which G-I is otherwise allegedly liable, including, without express or implied limitation, any such Claims, remedies and liabilities for compensatory damages (such as proximate, consequential, general, and special damages) and punitive damages, and any Claim, remedy or liability for reimbursement, indemnification, subrogation and contribution, including, without limitation, any Asbestos Property Damage Contribution Claim; and (ii) any Claim under any settlement pertaining to an Asbestos Property Damage Claim, which settlement was actually or purportedly entered into by or on behalf of G-I prior to the Commencement Date; *provided, however*, for the avoidance of doubt, the term "Asbestos Property Damage Claim" shall not include or pertain to an Asbestos Personal Injury Claim, Bonded Claim, Indirect Trust Claim, CCR Claim, Environmental Claim or Workers' Compensation Claim.

Pursuant to the Plan, Asbestos Property Damage Contribution Claims consist of any Claim or remedy or liability against G-I, whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases for such Claim, remedy or liability are known or unknown, that is (i) held by (a) any Entity (other than a director or officer entitled to indemnification pursuant to Section 7.5 of the Plan) who has been, is, or may be a defendant in an action seeking damages for property damage, including but not limited to, the cost of inspecting, maintaining, encapsulating, repairing, decontaminating, removing or disposing of asbestos or asbestos-containing products in buildings, other structures, or other property, arising from the installation in, presence in or removal from buildings or other structures of asbestos or asbestos-containing products that was or were installed, manufactured, engineered, designed, fabricated, constructed, sold, supplied, produced, distributed, released, specified, selected, marketed, serviced, repaired, maintained, purchased, owned, used, removed, replaced or disposed of by G-I prior to the Commencement Date, or for which G-I is otherwise allegedly liable, including, without express or implied limitation, any such Claims, remedies and liabilities for compensatory damages (such as proximate, consequential, general, and special

47

damages) and punitive damages, or (b) any assignee or transferee of such Entity; and (ii) on account of alleged liability of G-I for reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity has paid or may pay to the plaintiff in such action; *provided*, *however*, for the avoidance of doubt, the term "Asbestos Property Damage Contribution Claim" shall not include or pertain to an Asbestos Personal Injury Claim, Bonded Claim, Indirect Trust Claim, CCR Claim, Environmental Claim, or Workers' Compensation Claim.

Pursuant to the Plan, on the later of (i) the Effective Date and (ii) the date on which an (A) Asbestos Property Damage Claim becomes an Allowed Asbestos Property Damage Claim or (B) Asbestos Property Damage Contribution Claim becomes an Allowed Asbestos Property Damage Contribution Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Asbestos Property Damage Claim or Allowed Asbestos Property Damage Contribution Claim shall receive Cash in an amount equal to 8.6% of such Allowed Claim, without interest; *provided, however*, that (i) all Allowed Asbestos Property Damage Claims or Allowed Asbestos Property Damage Contribution Claims shall be paid solely from the PD Existing Insurance and shall receive no Cash distribution from G-I, and (ii) such Allowed Property Damage Claims and Allowed Property Damage Contribution Claims shall be subject to the terms and provisions of Section 6.5 of the Plan.

The Debtors believe that the Claims in Class 7 will be $0.

Class 7 is impaired by the Plan. Each holder of an Allowed Class 7 Claim is entitled to vote to accept or reject the Plan.

### 14.    CCR Claim (Class 8)

Class 8 consists of the Allowed CCR Claim.

Pursuant to the Plan, a CCR Claim means any means any Claim arising from facts or legal relationships that existed before or during G-I's bankruptcy that CCR or its members, in their capacity as such, have asserted or could assert against G-I or its bankruptcy estate, including, without limitation, any Claim for compensatory damages, contribution, indemnity, payment, reimbursement, subrogation, or any other remedy, whether or not raised in the alternative dispute resolution proceedings that were pending between CCR and G-I when G-I's bankruptcy case commenced. The CCR Claim shall include, but not necessarily be limited to, all Claims based on or relating to (i) alleged breach by G-I of the CCR Producer Agreement or any amendments thereof; (ii) alleged payment or advances of funds, or financing of expenses, by or through CCR on G-I's account or for G-I's benefit; and (iii) any liability or expense allegedly incurred or paid by or through CCR as a result of G-I's failure or refusal to pay any obligation it allegedly incurred under any agreement made by CCR, during G-I's membership in CCR, for the settlement of any asbestos-related personal injury or wrongful death Claim.

As noted in the Plan, the CCR Settlement Agreement is an agreement to be entered into between and among the Debtors, Asbestos Claimants Committee, Legal Representative, and CCR, and submitted for approval to the Bankruptcy Court, which will implement the letter of understanding with CCR dated June 30, 2008, and provide for a compromise and settlement governing the treatment of the Allowed CCR Claim under the Plan.

**Pursuant to the Plan, if, by the Effective Date, the CCR Claim has been Allowed pursuant to the CCR Settlement Agreement approved by the Bankruptcy Court and executed and delivered by the parties thereto, then on the Effective Date or as soon thereafter as is reasonably practicable, and in accordance with such CCR Settlement Agreement, the Reorganized Debtors shall pay to CCR the CCR Payment Amount as specified in clause (a) of the definition thereof. If no such CCR Settlement Agreement is approved, executed and delivered, then the Allowed amount, if any, of the CCR Claim shall be determined in a CCR Allowance Proceeding. If, before the**

**Effective Date, the CCR Claim is Allowed pursuant to a Final Order in a CCR Allowance Proceeding, the Reorganized Debtors shall pay to CCR, on the Effective Date or as soon thereafter as is reasonably practicable, the CCR Payment Amount as specified in clause (b) of the definition thereof.  The Plan may be consummated notwithstanding the pendency of a CCR Allowance Proceeding if, but only if, the Asbestos Claimants Committee and the Legal Representative, in their sole discretion, have provided the written consents described in Section 12.2(c) of the Plan.   Upon the delivery of such written consents, the Reorganized Debtors shall create the CCR Escrow on the Effective Date as provided in Section 4.4(c)(i)(C) of the Plan, in the amount required by that Section, and thereafter, upon the entry of a Final Order in such CCR Proceeding, shall cause a sum equal to the CCR Payment Amount to be disbursed to CCR from the CCR Escrow.  Once the CCR Escrow is created, the Debtors and Reorganized Debtors shall have no liability in respect of the CCR Claim beyond having the escrow agent turn over the appropriate amount from the CCR Escrow.**

The Debtors anticipate that the CCR Payment Amount will be $9,900,000.

If the CCR Settlement Agreement has been executed and delivered by each of the parties thereto and approved by the Bankruptcy Court prior to the Confirmation Hearing, the Class 8 Claim is unimpaired by the Plan and the holder of the Class 8 Claim is conclusively presumed to have accepted the Plan, and is thus not entitled to vote to accept or reject the Plan.  If no CCR Settlement Agreement has been approved by the Bankruptcy Court prior to the Confirmation Hearing, then Class 8 is impaired by the Plan, and the holder of an Allowed Class 8 Claim is entitled to vote to accept or reject the Plan.

### 15.    Bonded Claims (Class 9).

Class 9 consists of Bonded Claims.

Pursuant to the Plan, Bonded Claims constitute any Bonded Asbestos Personal Injury Claim or Bonded Non-Asbestos Claim, but shall not include the deficiency portion, if any, of any such Claims.  Accordingly, the following types of Claims and Demands are illustrative of what constitutes a Bonded Claim:

- Bonded Asbestos Personal Injury Claim means an Asbestos Personal Injury Claim evidenced by a judgment as to which, but only to the extent that, a supersedeas bond or equivalent form of payment assurance was posted by a Debtor or by an Affiliate as security for such Claim.

- Bonded Non-Asbestos Claim means any Claim, other than an Asbestos Claim and a Bonded Asbestos Personal Injury Claim, evidenced by a judgment as to which, but only to the extent that, a supersedeas bond or equivalent form of payment assurance was posted by a Debtor or by an Affiliate as security for such Claim.

The deficiency portions of Bonded Asbestos Personal Injury Claims (*i.e.*, that portion remaining *after* crediting the proceeds of any supersedeas bond or other payment assurances to which the holder of such Claim is determined by Final Order or agreement of the parties to be entitled with respect to a Bonded Asbestos Personal Injury Claim) will be treated as Asbestos Claims.

The deficiency portions of Bonded Non-Asbestos Claims (*i.e.*, that portion remaining *after* crediting the proceeds of any supersedeas bond or other payment assurances to which the holder of such Claim is determined by Final Order or agreement of the parties to be entitled with respect to a Bonded Non-Asbestos Claim) will be treated as either G-I Unsecured Claims or ACI Unsecured Claims, as the case may be.

**Pursuant to the Plan, on the later of (i) the Effective Date and (ii) the date on which a Bonded Claim becomes an Allowed Bonded Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Bonded Claim shall receive Cash in an amount equal to such Allowed Bonded Claim;** *provided, however,* **that (i) in no event shall such Cash distribution exceed the amount of such bond securing such Allowed Bonded Claim and (ii) each such holder of an Allowed Bonded Claim shall look solely to the bond securing its Claim for such Cash distribution, and shall receive no Cash distribution from G-I.   If the holder of the Bonded Claim and G-I do not agree on the Allowed amount of the Bonded Claim, the Bankruptcy Court shall determine the amount of such holder's Allowed Bonded Claim, which amount shall then be paid to such holder from the bond securing such holder's Allowed Bonded Claim.**

The Debtors estimate that the Claims in Class 9 will be $10,068,790.

Class 9 is unimpaired by the Plan.  Each holder of a Class 9 Claim is conclusively presumed to have accepted the Plan, and is thus not entitled to vote to accept or reject the Plan.

### 16.    G-I Affiliate Claims (Class 10A)

Class 10A consists of all G-I Affiliate Claims.

Pursuant to the Plan, on the Effective Date, each holder of a G-I Affiliate Claim shall receive no distribution of Cash or property in respect of such Claim.

Class 10A is impaired by the Plan.  Each holder of a G-I Affiliate Claim is conclusively deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

### 17.    ACI Affiliate Claims (Class 10B)

Class 10B consists of all ACI Affiliate Claims.

**Pursuant to the Plan, the legal, equitable, and contractual rights of the holders of Allowed ACI Affiliate Claims are unaltered by the Plan, or such Allowed ACI Affiliate Claims shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code.**

The Debtors estimate that the Claims in Class 10B will be $0.

Class 10B is unimpaired by the Plan.  Each holder of an ACI Affiliate Claim is conclusively presumed to have accepted the Plan and is thus not entitled to vote to accept or reject the Plan.

### 18.    G-I Equity Interest Redemption Claims (Class 11)

Class 11 consists of all G-I Equity Interest Redemption Claims.

**Pursuant to the Plan, on the Effective Date, each holder of a G-I Equity Interest Redemption Claim shall receive no distribution of Cash or property in respect of such Claim.**

Class 11 is impaired by the Plan.  Each holder of a G-I Equity Interest Redemption Claim is conclusively deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

### 19.    G-I Equity Interests (Class 12A).

Class 12A consists of all Equity Interests in G-I and any rights to acquire common stock or other equity securities of G-I.

Pursuant to the Plan, an Equity Interest is any equity interest or proxy related thereto, direct or indirect, in any of the Debtors represented by duly authorized, validly issued and outstanding shares of preferred stock or common stock, stock appreciation rights or any other instrument evidencing a present ownership interest, direct or indirect, inchoate or otherwise, in any of the Debtors, or right to convert into such an equity interest or acquire any equity interest of the Debtors, whether or not transferable, or an option, warrant or right contractual or otherwise, to acquire any such interest, which was in existence prior to or on the Commencement Date; *provided, however,* for the avoidance of doubt, the term "Equity Interest" does not include or pertain to any ACI Class B Shares or G-I Class B Shares.

**On the Effective Date, all instruments evidencing a G-I Equity Interest (but not the G-I Class B Shares) shall be canceled without further action under any applicable agreement, law, regulation, or rule. The G-I Equity Interests shall be extinguished and holders of G-I Equity Interests shall not receive nor retain any property under the Plan.**

Prior to the Effective Date, for good and valuable consideration as part of the global settlement referred to in Section 4.1 of the Plan, G-I will authorize and issue to Holdings the G-I Class B Shares, subject to the Capital Stock Lien.  On the Effective Date, as a result of all Equity Interests in G-I (but not the G-I Class B Shares) being cancelled, one hundred percent (100%) of the equity interest in G-I shall be represented by the G-I Class B Shares held by Holdings.

Class 12A is impaired by the Plan.  Each holder of a G-I Equity Interest is conclusively deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

### 20.    ACI Equity Interests (Class 12B).

Class 12B consists of all Equity Interests in ACI and any rights to acquire common stock or other equity securities of ACI.

Pursuant to the Plan, an Equity Interest is any equity interest or proxy related thereto, direct or indirect, in any of the Debtors represented by duly authorized, validly issued and outstanding shares of preferred stock or common stock, stock appreciation rights or any other instrument evidencing a present ownership interest, direct or indirect, inchoate or otherwise, in any of the Debtors, or right to convert into such an equity interest or acquire any equity interest of the Debtors, whether or not transferable, or an option, warrant or right contractual or otherwise, to acquire any such interest, which was in existence prior to or on the Commencement Date; *provided, however,* for the avoidance of doubt, the term "Equity Interest" does not include or pertain to any ACI Class B Shares or G-I Class B Shares.

**On the Effective Date, all instruments evidencing an ACI Equity Interest (but not the ACI Class B Shares) shall be canceled without further action under any applicable agreement, law, regulation, or rule. The ACI Equity Interests shall be extinguished and holders of ACI Equity Interests shall not receive nor retain any property under the Plan.**

Prior to the Effective Date, for good and valuable consideration as part of the global settlement referred to in Section 4.1 of the Plan, ACI will authorize and issue to G-I the ACI Class B Shares.  On the Effective Date, as a result of all Equity Interests in ACI (but not the ACI Class B Shares) being cancelled, one hundred percent (100%) of the equity interest in ACI shall be represented by the ACI Class B Shares held by G-I.

Class 12B is impaired by the Plan.  Each holder of an ACI Equity Interest is conclusively deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

C      **RESERVATION OF "CRAM DOWN" RIGHTS**

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan over the rejection of any class of claims or equity interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the reorganization process.  It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Debtors reserve the right to seek confirmation of the Plan, notwithstanding the rejection of the Plan by any class entitled to vote.  In the event a class votes to reject the Plan, the Debtors will request the Bankruptcy Court to rule that the Plan meets the requirements specified in section 1129(b) of the Bankruptcy Code with respect to such class.  The Debtors will also seek such a ruling with respect to each class that is deemed to reject the Plan. For the classes deemed to reject the Plan, the Debtors will request confirmation pursuant to Bankruptcy Code section 1129(b).  However, confirmation of the Plan is subject to the condition that the Plan be accepted by at least 75% of the holders of Class 6 Claims who vote on the Plan**.**

## VI.  THE ASBESTOS TRUST

The following summarizes the terms of the governing documents for the Asbestos Trust. These documents consist of the Asbestos Trust Agreement (the "Asbestos Trust Agreement") and the G-I Asbestos Settlement Trust Distribution Procedures (the "Trust Distribution Procedures") to be implemented by the Asbestos Trustees pursuant to the terms and conditions of the Plan and the Asbestos Trust Agreement to process, liquidate, and pay Asbestos Claims.  The following is intended only to be a summary and is qualified in its entirety by reference to the full text of such documents.  In the event of any inconsistency between the provisions of these documents and the summary contained herein, the terms of such documents will control.  Interested parties should therefore review the Asbestos Trust Agreement and the Trust Distribution Procedures, copies of which are attached to the Plan as Exhibits 1.1.17 and 1.1.18, respectively.[3]  The Trust Distribution Procedures were formulated by the Asbestos Claimants Committee and the Legal Representative, and not by any of the Debtors or their affiliates.

A      **GENERAL DESCRIPTION OF THE ASBESTOS TRUST**

### 1.      Creation and Purposes of the Asbestos Trust

The Plan provides for the creation of a section 524(g) trust to which all Asbestos Claims, including Demands, will be channeled and paid.  The Asbestos Trust will have the exclusive liability and responsibility for paying all Asbestos Claims.  The Debtors, the Reorganized Debtors, BMCA, and certain other Protected Parties identified in the Plan will have no liability for the payment of Asbestos Claims other than the liability provided for in the Plan to make certain payments to the Asbestos Trust.

The Plan provides that the Asbestos Trust shall be created as of the Effective Date.  The Asbestos Trust shall be a "qualified settlement fund" within the meaning of section 468B of the Tax Code and the Treasury Regulations thereunder and shall be established as a statutory trust under the laws of the State of Delaware pursuant to the Asbestos Trust Agreement.  The purpose of the Asbestos Trust is, among other things, (a) to direct the processing, resolution, liquidation, and payment of all Asbestos Claims in accordance with section 524(g) of the Bankruptcy Code, the Plan, the Asbestos Trust

---

[3]      Capitalized terms used in this Article IV of this Disclosure Statement that are not otherwise defined herein or in the Plan shall have the meanings assigned to them in the Asbestos Trust Agreement and the Trust Distribution Procedures.

Agreement, the Trust Distribution Procedures, and the Confirmation Order, and (b) to preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Asbestos Claims.

The Plan further provides that, on the Confirmation Date, the Bankruptcy Court will appoint the individuals selected jointly by the Asbestos Claimants Committee and the Legal Representative to serve as the Asbestos Trustees for the Asbestos Trust pursuant to the terms of the Asbestos Trust Agreement. Such appointment shall be effective as of the Effective Date. The individuals so appointed shall be identified in Exhibit 4.3 of the Plan.

The Trust Distribution Procedures provide, among other things, for the resolution of Asbestos Claims pursuant to the terms of the Trust Distribution Procedures, and that resolution of an Asbestos Claim by the Asbestos Trust shall result in a full release of such Claim against the Asbestos Trust. The Asbestos Trust shall pay Asbestos Claims as provided by, and at the rates set forth in, the Trust Distribution Procedures.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall assign to the Asbestos Trust all of the Trust Causes of Action,[4] and the Asbestos Trust shall retain and have the exclusive right to enforce against any Entity any and all of the Trust Causes of Action, with the proceeds of the recoveries of any such actions to be deposited in the Trust; *provided, however*, that nothing herein shall alter, amend or modify the Asbestos Permanent Channeling Injunction, releases, discharges, or Supersedeas Bond Action provisions contained elsewhere in the Plan.

## 2.    The Asbestos Trustees

The three individuals who will serve as the initial Asbestos Trustees of the Asbestos Trust are Marina Corodemus, Alan B. Rich and Stephen M. Snyder. The initial Asbestos Trustees shall each serve a term that shall end on the second anniversary of the Effective Date. On the second anniversary of the Effective Date, the number of Asbestos Trustees shall be reduced from three to one. When the number of Asbestos Trustees is reduced from three to one, Stephen M. Snyder shall serve as the sole Asbestos Trustee. Prior to the second anniversary of the Effective Date, Mr. Snyder shall serve as Managing Trustee and shall undertake the administrative duties typically associated with such position.

Each Asbestos Trustee will serve until the earliest of the end of the Asbestos Trustee's term (if any), his or her death, resignation or removal, or the termination of the Asbestos Trust. An Asbestos Trustee may be removed by the unanimous vote of the remaining Trustees (if any) or at the recommendation of the Trust Advisory Committee and the Legal Representative, with the approval of the Bankruptcy Court, in the event he or she becomes unable to discharge his or her duties due to accident or physical or mental deterioration, or for other good cause, including any substantial failure to comply with

---

[4] As set forth in the Plan, these actions include any and all actions, claims, rights, defenses, counterclaims, suits, and causes of action of the Debtors, whether known or unknown, at law, in equity or otherwise, whenever or wherever arising under the laws of any jurisdiction attributable to:  (a) all defenses to any Asbestos Claim; (b) with respect to any Asbestos Claim, all rights of setoff, recoupment, contribution, reimbursement, subrogation, or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect Claim of any kind whatsoever, whenever, and wherever arising or asserted; and (c) subject to the provisions of the Plan, any other Claims or rights with respect to Asbestos Claims that the Debtors would have had under applicable law if the Chapter 11 Cases had not occurred and the holder of such Asbestos Claim had asserted it by initiating or continuing civil litigation against any such Debtor.  Notwithstanding the foregoing, Trust Causes of Action shall not include (i) any of the Debtors' rights arising under or attributable to the Supersedeas Bond Actions; (ii) the property, rights, or assets, if any, of the Debtors or their Affiliates that were previously used to secure or obtain a supersedeas bond with respect to any Bonded Claim and which are recoverable or recovered by any of the Debtors or any of their Affiliates after full satisfaction of such Claim; or (iii) any Claims or rights that were or could have been asserted in the Covered Matters.

the general administration provisions of the Asbestos Trust Agreement, a consistent pattern of neglect and failure to perform or participate in performing the duties of Asbestos Trustees or repeated non-attendance at scheduled meetings.  In the event of a vacancy in an Asbestos Trustee position, the remaining Asbestos Trustees (if any) will consult with the Trust Advisory Committee and the Legal Representative concerning appointment of a successor Asbestos Trustee.  The vacancy will be filled by the unanimous vote of the remaining Asbestos Trustees (if any) unless a majority of the Trust Advisory Committee or the Legal Representative vetoes the appointment.  In that event, the Bankruptcy Court will make the appointment.  If there are no remaining Asbestos Trustees, the vacancy shall be filed by the Trust Advisory Committee and the Legal Representative.  In the event the Trust Advisory Committee and the Legal Representative cannot agree on the successor Asbestos Trustee, the Bankruptcy Court will make the appointment.

Each Asbestos Trustee shall receive a retainer from the Asbestos Trust for his or her service as an Asbestos Trustee in the amount of $60,000.00 per annum, which amount shall be payable in quarterly installments.  In addition, for all time expended attending Asbestos Trust meetings with other Asbestos Trustees (if any) or with the Trust Advisory Committee and the Legal Representative, preparing for such meetings, and working on authorized projects, the Asbestos Trustees shall receive the sum of $500 per hour computed on a quarter-hour basis.  The Asbestos Trustees shall also be reimbursed for out-of-pocket costs and expenses.  The Asbestos Trustees' annual retainer and hourly compensation will be reviewed every year and appropriately adjusted for changes in the cost of living.

### 3.    The Trust Advisory Committee

The Asbestos Trust Agreement provides for the establishment of a Trust Advisory Committee.  The initial members of the Trust Advisory Committee will be Steven T. Baron, Matthew Bergman, John D. Cooney, Robert Komitor, Mark C. Meyer and Joseph F. Rice.  The initial members of the Trust Advisory Committee shall serve staggered three-, four- or five-year terms as set forth in the Asbestos Trust Agreement.  Thereafter, each term of office shall be five years.  Each member of the Trust Advisory Committee will serve until the earliest of (i) the end of his or her full term in office, (ii) his or her death, (iii) his or her resignation, (iv) his or her removal, or (v) the termination of the Asbestos Trust.  Any Trust Advisory Committee member may be removed by the remaining Trust Advisory Committee members with the approval of the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member under the Asbestos Trust Agreement, such as repeated non-attendance at scheduled meetings or for other good cause.

In the event of a vacancy caused by the resignation or death of a Trust Advisory Committee member or the expiration of his or her term, the successor shall be pre-selected by such Trust Advisory Committee member, or by his or her law firm in the event that such member has not pre-selected a successor.  There is no limit on the number of terms a Trust Advisory Committee member may serve.  If neither the member nor the law firm exercises the right to make such a selection, the successor shall be chosen by a majority vote of the remaining Trust Advisory Committee members.  If a majority of the remaining members cannot agree, the Bankruptcy Court shall appoint the successor.  In the event of a vacancy caused by the removal of a Trust Advisory Committee member, the remaining members of the Trust Advisory Committee by majority vote shall name the successor.  If the majority of the remaining members of the Trust Advisory Committee cannot reach agreement, the Bankruptcy Court shall appoint the successor.

The Asbestos Trustees are required to consult with the Trust Advisory Committee on the appointment of successor Asbestos Trustees, the general implementation and administration of the Asbestos Trust and the Trust Distribution Procedures, and on various other matters required by the Asbestos Trust Agreement.  The Asbestos Trustees must also obtain the consent of the Trust Advisory

Committee members on a variety of matters, including amendments to the Asbestos Trust Agreement and the Trust Distribution Procedures, acquisition, merger or participation with other claims resolution facilities, and termination of the Asbestos Trust under certain conditions specified in the Asbestos Trust Agreement.

The members of the Trust Advisory Committee will not be entitled to receive compensation from the Asbestos Trust for their services as Trust Advisory Committee members. The members of the Trust Advisory Committee will be reimbursed promptly for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder.

### 4.      The Legal Representative

The Asbestos Trust Agreement provides for the appointment of a Legal Representative, C. Judson Hamlin, who will serve in a fiduciary capacity, representing the interests of the holders of future Asbestos Claims against the Asbestos Trust for the purposes of protecting the rights of such persons.

The Legal Representative will serve until the earliest of his death, resignation or removal, or the termination of the Asbestos Trust. The Legal Representative may resign at any time by written notice to the Asbestos Trustees and may be removed by the Bankruptcy Court in the event he becomes unable to discharge his duties due to accident, physical deterioration, mental incompetence or a consistent pattern of neglect and failure to perform or to participate in performing his duties under the Asbestos Trust Agreement, such as non-attendance at scheduled meetings or for other good cause.

A vacancy caused by death or resignation shall be filled with an individual nominated prior to the death or the effective date of the resignation by the deceased or resigning Legal Representative, and a vacancy caused by removal of the Legal Representative shall be filled with an individual nominated by the Asbestos Trustees in consultation with the Trust Advisory Committee, subject, in each case, to the approval of the Bankruptcy Court. In the event a majority of the Asbestos Trustees cannot agree, or a nominee has not been pre-selected, the successor shall be chosen by the Bankruptcy Court.

The Asbestos Trustees are required to consult with the Legal Representative on the appointment of successor Asbestos Trustees, the general implementation and administration of the Asbestos Trust and the Trust Distribution Procedures, and on various other matters required by the Asbestos Trust Agreement. The Asbestos Trustees must also obtain the consent of the Legal Representative on a variety of matters, including amendments to the Asbestos Trust Agreement and the Trust Distribution Procedures, acquisition, merger or participation with other claims resolution facilities, and termination of the Asbestos Trust under certain conditions specified in the Asbestos Trust Agreement.

The Legal Representative will be entitled to receive compensation from the Asbestos Trust in the form of payment at the Legal Representative's normal hourly rate for services performed and will be reimbursed by the Asbestos Trust for all reasonable out-of-pocket costs and expenses incurred by the Legal Representative in connection with the performance of his duties hereunder.

## B      TRANSFER OF CERTAIN PROPERTY TO THE ASBESTOS TRUST

### 1.      Transfer of Asbestos Claims Books and Records

On the Effective Date or as soon thereafter as is reasonably practicable, the books and records of the Debtors that pertain directly to Asbestos Claims shall be transferred, assigned, or otherwise disposed of pursuant to the terms and provisions of a certain Cooperation Agreement to be entered into by and between the Reorganized Debtors and the Asbestos Trust on the Effective Date.

### 2.        Transfer of CCR Claims Books and Records

On the date on which (i) the CCR Payment Amount is paid to CCR, consistent with the terms of the CCR Settlement Agreement or (ii) the Final Order is entered in the CCR Allowance Proceeding, as applicable, or as soon thereafter as is practicable, CCR shall assign to the Asbestos Trust all data and documentation concerning the underlying Asbestos Personal Injury Claims and any rights and claims against G-I that CCR received by agreement or operation of law in settling such Claims.

### 3.        Effective Date Transfers of Plan Consideration

Section 4.4(c) of the Plan provides for the transfer of a Cash payment to the Asbestos Trust under the following circumstances.

- On the Effective Date, if the CCR Claim has been Allowed and the CCR Payment Amount is $10.0 million or less, the Reorganized Debtors' First Payment To Asbestos Trust shall be Cash in the aggregate amount of $215,000,000 less half of the CCR Payment Amount.

- On the Effective Date, if the CCR Claim has been Allowed and the CCR Payment Amount is greater than $10.0 million, the Reorganized Debtors' First Payment To Asbestos Trust shall be Cash in an aggregate amount calculated by subtracting the CCR Payment Amount from $220,000,000.

- If a CCR Allowance Proceeding remains pending after confirmation of the Plan but the Asbestos Claimants Committee and Legal Representative have provided the written consents described in Section 12.2(c) of the Plan, then the Reorganized Debtors shall create the CCR Escrow on the Effective Date. The Reorganized Debtors shall deposit the CCR Escrow Amount into the CCR Escrow, for eventual disbursement to CCR if, when, and to the extent the CCR Claim is Allowed pursuant to a Final Order in the CCR Allowance Proceeding. If the CCR Escrow becomes applicable, then the Reorganized Debtors' First Payment To Asbestos Trust shall be computed as $220,000,000 minus the CCR Escrow Amount, and CCR's sole recourse for payment of the CCR Claim shall be against the CCR Escrow. Any balance remaining in the CCR Escrow after the CCR Claim is paid or disallowed shall be distributed as follows:

> (i) If the CCR Claim is disallowed by Final Order, Reorganized G-I shall receive $5 million *plus* an allocable *pro rata* share of any CCR Escrow Earnings, and the Asbestos Trust shall receive all remaining proceeds of the CCR Escrow, including all remaining CCR Escrow Earnings;

> (ii) If the CCR Claim is Allowed by Final Order and the resulting CCR Payment Amount is $10 million or less, the Reorganized G-I shall receive the difference between $5 million and 50% of the CCR Payment Amount, *plus* a *pro rata* share of any CCR Escrow Earnings, and the Asbestos Trust shall receive the entire remaining balance of the CCR Escrow *plus* all remaining CCR Escrow Earnings; and

> (iii) If the CCR Claim is allowed by Final Order and the resulting CCR Payment Amount is more than $10 million, the Asbestos Trust shall receive the entire remaining balance of the CCR Escrow *plus* all CCR Escrow Earnings.

**4.        Transfer of Other Consideration to the Asbestos Trust**

On the Effective Date (A) Reorganized G-I shall execute and deliver to the Asbestos Trust the Trust Note, which shall be secured by the Capital Stock Lien, as well as any and all documents and instruments related thereto; and (B) immediately after such delivery of the Trust Note, the Letter of Credit shall be delivered to the LC Agent. Upon such delivery of the Letter of Credit, the Capital Stock Lien shall be immediately extinguished.  The Trust Note terms and conditions are set forth in Exhibit 1.1.105 to the Plan.

**5.        Post-Effective Date Transfers of Plan Consideration**

After the Effective Date, and in addition to the applicable Cash payment required by Section 4.4(c) of the Plan, the Reorganized Debtors shall make the payments and repayments set forth in the Trust Note; *provided, however,* that the Plan Sponsor may voluntarily make any or all Cash payments or repayments set forth in the Trust Note, in place of the Reorganized Debtors, *provided, further* that any claims or rights that might thereby arise in favor of the Plan Sponsor against G-I with respect to the Trust Note, the Letter of Credit, or any related collateral security therefor, including (by way of illustration and not of limitation) claims for subrogation, reimbursement, contribution, indemnity, or interest, shall be fully subordinated to the rights of the Trust and the Holder of the Trust Note and shall not be paid or become payable until all principal and interest payable under the Trust Note shall have been indefeasibly paid in full.

**6.        Assumption of Certain Liabilities by the Asbestos Trust**

In accordance with sections 524(g) and 1141 of the Bankruptcy Code and in furtherance of the purposes of the Asbestos Trust and the Plan, on the Effective Date all liability and responsibility for all Asbestos Claims shall be assumed and succeeded to by the Asbestos Trust, and the Reorganized Debtors shall be completely discharged of such Claims and have no further financial or other responsibility or liability therefor.

**7.        Assignment and Enforcement of Trust Causes of Action**

As set forth in Section 4.4(g) of the Plan, on the Effective Date, by virtue of the confirmation of the Plan, without further notice, action, or deed, the Trust Causes of Action shall be automatically assigned to, and indefeasibly vested in, the Asbestos Trust, and the Asbestos Trust will thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, with the exclusive right to enforce any and all of the Trust Causes of Action against any Entity, and the proceeds of the recoveries of any such Trust Causes of Action shall be deposited in the Asbestos Trust; provided, however, that nothing in section 4.5(g) of the Plan shall alter, amend or modify the Asbestos Permanent Channeling Injunction, releases, discharges, or Supersedeas Bond Action provisions contained elsewhere in the Plan.

**8.        Asbestos Trust Termination Provisions**

The Asbestos Trust is irrevocable, but will dissolve ninety (90) days after the first to occur of any of the following events:

- the Asbestos Trustees decide to dissolve the Asbestos Trust because (a) they deem it unlikely that new asbestos claims will be filed against the Asbestos Trust, (b) all Asbestos Claims duly filed with the Asbestos Trust have been liquidated and paid to the extent provided in the Asbestos Trust Agreement and the Trust Distribution Procedures or disallowed by a final, non-appealable order, to the extent possible based upon the funds available through the Plan, and (c) twelve (12) consecutive

57

months have elapsed during which no new Asbestos Claim has been filed with the Asbestos Trust; or

- if the Asbestos Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the Asbestos Trust in a manner consistent with this Asbestos Trust Agreement and the Trust Distribution Procedures, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a final order; or

- to the extent that any rule against perpetuities will be deemed applicable to the Asbestos Trust, the date on which twenty-one (21) years less ninety-one (91) days pass after the death of the last survivor of all of the descendents of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof.

On the dissolution date or as soon as reasonably practicable, after the wind-up of the Asbestos Trust's affairs by the Asbestos Trustees and payment of all the Asbestos Trust's liabilities have been provided for as required by applicable law, all monies remaining in the Asbestos Trust estate will be given to such organization(s) exempt from federal income tax under Section 501(c)(3) of the Tax Code, which tax-exempt organization(s) will be selected by the Asbestos Trustees using their reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) will be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos-related lung disease or disorders, and (ii) the tax-exempt organization(s) will not bear any relationship to Reorganized Debtors within the meaning of Section 468(d)(3) of the Tax Code. The Plan Proponents believe that the likelihood of any monies remaining in the Asbestos Trust after the Asbestos Trust terminates is extremely remote.

Following the dissolution and distribution of the assets of the Asbestos Trust, the Asbestos Trust shall terminate and the Asbestos Trustees, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the Asbestos Trust to be filed with the State of Delaware. The existence of the Asbestos Trust as a separate legal entity shall continue until the filing of the Certificate of Cancellation.

### 9.        Amendment of the Asbestos Trust Documents

The Asbestos Trustees, subject to the Trust Advisory Committee's and the Legal Representative's consent, may modify or amend certain provisions of the Asbestos Trust Agreement or any document annexed thereto. However, the Asbestos Trust provisions may not be modified or amended in any way that could jeopardize, impair, or modify the applicability of section 524(g) of the Bankruptcy Code, the efficacy or enforceability of the injunction entered thereunder, or the Asbestos Trust's qualified settlement fund status within the meaning of Treasury Regulations Section 1.468B-1, *et seq.*, promulgated under Section 468B of the Tax Code.

### C        INSTITUTION AND MAINTENANCE OF LEGAL AND OTHER PROCEEDINGS

As of the date subsequent to the Effective Date on which the Asbestos Trustees confirm in writing to the Reorganized Debtors that the Asbestos Trust is in a position to assume the responsibility, the Asbestos Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Asbestos Trust, including Trust

Causes of Action. The Asbestos Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of G-I, ACI, or any of the Reorganized Debtors if deemed necessary or appropriate by the Asbestos Trust. The Asbestos Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising from or associated with any legal action or other proceeding that is the subject of Section 4.5 of the Plan.

## D    SUPERSEDEAS BONDS AND PAYMENT ASSURANCES

### 1.    Preserved Actions

All Supersedeas Bond Actions and the rights and Claims asserted or to be asserted therein shall be preserved and shall be prosecuted or defended, as the case may be, by the Reorganized Debtors on and after the Effective Date.

### 2.    Assumption by the Asbestos Trust

As of the Effective Date, the Asbestos Trust shall assume, and shall have exclusive liability for, any deficiency portion of a Bonded Asbestos Personal Injury Claim remaining after crediting proceeds of any supersedeas bond or other payment assurances to which the holder of such Claim is determined by Final Order or agreement of the parties to be entitled. To the extent the Reorganized Debtors successfully prosecute or defend against a Supersedeas Bond Action resulting in the discharge or release of the relevant supersedeas bond or other payment assurance provided in connection therewith, any such recoveries shall inure to the benefit of the Reorganized Debtors.

### 3.    Reservation of Rights of Issuers and Insurers of Payment Assurances

Notwithstanding anything to the contrary contained herein, nothing in the Plan shall be deemed to impair, prejudice, compromise, or otherwise affect any defense or counterclaim asserted by any issuer or insurer of payment assurances issued on behalf of the Debtors, or any other defendant in the Supersedeas Bond Actions, to any claim of the Debtors, including, without limitation, any defense based on an asserted right of setoff or recoupment, or other defense under applicable non-bankruptcy law. Any right of setoff or recoupment shall be satisfied out of the assets in the possession of the sureties or insurers relating to such payment assurances and any claims or liabilities including, without limitation, claims for premiums for bonds provided by any such issuers or insurers.

### 4.    Compromise and Settlement

The Reorganized Debtors shall be entitled to compromise or settle any of the Supersedeas Bond Actions; *provided*, *however*, that any such compromise or settlement shall require the consent of the Asbestos Trust (which consent shall not be unreasonably withheld or delayed) to the extent the compromise or settlement results in there being any deficiency portion of a Bonded Asbestos Personal Injury Claim after applying the proceeds of any supersedeas bond or equivalent form of payment assurance.

## E    THE ASBESTOS PERMANENT CHANNELING INJUNCTION

The Confirmation Order will contain, among other things, the Asbestos Permanent Channeling Injunction and will therefore be submitted to the United States District Court for its issuance. Pursuant to the Asbestos Permanent Channeling Injunction, all Entities will be forever stayed, restrained, and enjoined from taking certain actions specified in the Plan against any Protected Party for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Personal Injury Claims, all of which will be channeled to the Asbestos Trust for resolution as set forth in the Trust Distribution Procedures, against any Protected Party or its property (other than actions

brought to enforce any right or obligation under the Plan, any Exhibits to the Plan, or any other agreement or instrument between the Debtors or the Reorganized Debtors and the Asbestos Trust, which actions will be in conformity and compliance with the provisions of the Plan).  Nothing contained in the Asbestos Permanent Channeling Injunction will be deemed a waiver of any claim, right, or cause of action that the Debtors, the Reorganized Debtors, or the Asbestos Trust may have against any Entity in connection with or arising out of an Asbestos Personal Injury Claim.

It is the intent of the provisions of the Plan relating to treatment of Asbestos Personal Injury Claims to channel all such claims (except workers' compensation claims), regardless of theory of recovery, and regardless of  how the claim arises, *i.e.*, directly or indirectly, to the Asbestos Trust.  For example, regardless of whether a claim arises by virtue of a product liability theory of recovery, a premises liability theory of recovery, a contract theory of recovery or any other theory of recovery, if it relates to a personal injury (including medical monitoring, fear of injury, emotional distress, loss of consortium, or any other injury of or relating to a person) it will be channeled to the Asbestos Trust.

In 1994, the Bankruptcy Code was amended to add subsections (g) and (h) to section 524. These subsections confirm the validity of existing injunctions (such as those used in the chapter 11 cases of Johns Manville Corporation and UNR Corporation) similar to the Asbestos Permanent Channeling Injunction and codify a court's authority to issue a permanent injunction in asbestos related reorganizations under chapter 11 to supplement the injunctive relief afforded by section 524.  Section 524(g) provides that, if certain specified conditions are satisfied, a court may issue a supplemental permanent injunction, such as the Asbestos Permanent Channeling Injunction, barring claims and demands against the reorganized company and certain identified protected parties and channeling those claims and demands to an independent trust.

Pursuant to the Asbestos Permanent Channeling Injunction and the Plan, the following entities will be "Protected Parties" and, therefor, protected by the scope of the Asbestos Permanent Channeling Injunction:

- the Debtors;

- the Reorganized Debtors;

- any Affiliate listed on Exhibit 1.1.94(c) to the Plan;

- any Entity that, pursuant to the Plan or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any assets of the Debtors, the Reorganized Debtors, or the Asbestos Trust, but solely to the extent that an Asbestos Claim is asserted against such Entity by reason of its becoming such a transferee or successor;

- any Entity that, pursuant to the Plan or after the Effective Date, makes a loan to the Reorganized Debtors, any Protected Party, or the Asbestos Trust or to a successor to, or transferee of, any assets of the Debtors, the Reorganized Debtors, or the Asbestos Trust, but solely to the extent that an Asbestos Claim is asserted against such Entity by reason of its making such loan or to the extent that any pledge of assets made in connection with such a loan is sought to be upset or impaired; or

- any Entity alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on the Debtors, the Reorganized Debtors, or the Asbestos Trust on account of Asbestos Claims by reason of one or more of the following:

o    such Entity's ownership of a financial interest in the Debtors, the
Reorganized Debtors, a past or present Affiliate of the Debtors or the
Reorganized Debtors, or a predecessor in interest of the Debtors or the
Reorganized Debtors, but solely in such Entity's capacity as such;

o    such Entity's involvement in the management of the Debtors, an
Affiliate, the Reorganized Debtors, or any predecessor in interest of the
Debtors, or the Reorganized Debtors, but solely in such Entity's capacity
as such;

o    such Entity's service as an officer, director, or employee of the Debtors,
the Reorganized Debtors, any past or present Affiliate of the Debtors or
the Reorganized Debtors, any predecessor in interest of the Debtors or
the Reorganized Debtors, or any Entity that owns or at any time has
owned a financial interest in the Debtors or the Reorganized Debtors, any
past or present Affiliate of the Debtors or the Reorganized Debtors, or
any predecessor in interest of the Debtors or the Reorganized Debtors,
but solely in such Entity's capacity as such;

o    such Entity's provision of insurance to the Debtors, the Reorganized
Debtors, any past or present Affiliate of the Debtors or the Reorganized
Debtors, any predecessor in interest of the Debtors or the Reorganized
Debtors, or any Entity that owns or at any time has owned a financial
interest in the Debtors or the Reorganized Debtors, any past or present
Affiliate of the Debtors or the Reorganized Debtors, or any predecessor
in interest of the Debtors or the Reorganized Debtors, but only to the
extent that the Debtors, the Reorganized Debtors, or the Asbestos Trust
enters into a settlement with such Entity that is approved by the
Bankruptcy Court and expressly provides that such Entity shall be
entitled to the protection of the Asbestos Permanent Channeling
Injunction as a Protected Party; or

o    such Entity's involvement in a transaction changing the corporate
structure, or in a loan or other financial transaction (including
involvement in providing financing or advice to an Entity involved in
such a transaction or acquiring or selling a financial interest in an Entity
as part of such a transaction), affecting the financial condition of the
Debtors, an Affiliate, the Reorganized Debtors, any past or present
Affiliate of the Debtors or the Reorganized Debtors, or any predecessor
in interest of the Debtors or the Reorganized Debtors, but solely in such
Entity's capacity as such.

Pursuant to the Asbestos Permanent Channeling Injunction, the Protected Parties will be
protected against any Entity taking any of the following actions for the purpose of, directly or indirectly,
collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Personal Injury
Claims, including, but not limited to:

•    commencing, conducting, or continuing in any manner, directly or indirectly, any
suit, action, or other proceeding (including, without express or implied limitation,
a judicial, arbitral, administrative, or other proceeding) in any forum against or
affecting any Protected Party or any property or interests in property of any
Protected Party;

61

- enforcing, levying, attaching (including, without express or implied limitation, any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

- creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

- setting off, seeking reimbursement of, contribution from, indemnification of or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

- proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Asbestos Trust Agreement or the Asbestos Trust Distribution Procedures, except in conformity and compliance therewith.

The Debtors will seek the issuance of the Asbestos Permanent Channeling Injunction pursuant to section 524(g) and any other applicable provision of the Bankruptcy Code. To qualify under the statute, a trust must meet certain standards that are specified in section 524(g). To ensure that the Asbestos Trust meets these standards, the Debtors have made compliance with them a condition precedent to confirmation of the Plan.

## F        COMPLIANCE WITH QSF REGULATIONS

The Plan provides that the Asbestos Trust shall be a "qualified settlement fund" within the meaning of section 468B of the Tax Code and the Treasury Regulations thereunder. The purpose of the Asbestos Trust is, among other things, (a) to direct the processing, resolution, liquidation, and payment of all Asbestos Claims in accordance with section 524(g) of the Bankruptcy Code, the Plan, the Asbestos Trust Agreement, the Asbestos Trust Distribution Procedures, and the Confirmation Order, and (b) to preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Asbestos Claims.

The Debtors plan to request a private letter ruling from the IRS substantially to the effect that, among other things, the Asbestos Trust will be a "qualified settlement fund" within the meaning of section 468B of the Internal Revenue Code and the Treasury Regulations thereunder. As a condition to the occurrence of the Effective Date, the Debtors must have received either a favorable ruling from the IRS with respect to the qualification of the Asbestos Trust as a "qualified settlement fund" or an opinion of counsel with respect to the tax status of the Asbestos Trust as a "qualified settlement fund" reasonably satisfactory to the Debtors, the Asbestos Claimants Committee, and the Legal Representative.

Within sixty (60) days before or after the funding of the Asbestos Trust (but not later than February 15 of the following calendar year), the Debtors or the Reorganized Debtors will obtain, if applicable, a Qualified Appraisal of the fair market value of the Trust Assets transferred (or to be transferred) to the Asbestos Trust. Following the funding of the Asbestos Trust and, if applicable, the receipt of the Qualified Appraisal (and in no event later than February 15 of the calendar year following the funding of the Asbestos Trust), the Reorganized Debtors will provide a "§ 1.468B-3 Statement" to the Asbestos Trustees in accordance with Treasury Regulations section 1.468B-3(e).

## G    DISCHARGE OF ALL LIABILITIES RELATED TO ASBESTOS CLAIMS

As of the Effective Date, all Asbestos Claims, other than Demands, shall be discharged and all Demands shall be permanently and irrevocably enjoined and channeled to the Asbestos Trust.  The Asbestos Trust shall assume sole and exclusive responsibility for all Asbestos Claims, including without limitation, Demands and Indirect Trust Claims, and such Asbestos Claims shall be paid solely by the Asbestos Trust from its assets in accordance with the Asbestos Trust Distribution Procedures.  Any action or attempt to recover against the Debtors, the Reorganized Debtors, their respective estates or the Protected Parties with respect to any Asbestos Claim, including without limitation Demands and Indirect Trust Claims, shall be barred.

In accordance with and not in limitation of sections 524 and 1141 of the Bankruptcy Code, and except as provided in the Plan, upon the Effective Date, all Claims against the Debtors shall be, and shall be deemed to be, discharged in full, and all holders of Claims shall be precluded and enjoined from asserting against the Reorganized Debtors, or any of their assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim.  Upon the Effective Date, all Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Debtors.

## H.    TRUST DISTRIBUTION PROCEDURES

### 1.    Asbestos Trust Goals

The Asbestos Trustees will implement and administer the Trust Distribution Procedures, which are attached to the Plan as Exhibit 1.1.18.  The Trust Distribution Procedures have been adopted after negotiations between the Legal Representative and the Asbestos Claimants Committee.  The goal of the Asbestos Trust is to treat all Asbestos Claims that involve similar claims in substantially the same manner, as required by 11 U.S.C. § 524(g).  The Trust Distribution Procedures further that goal by setting forth procedures for processing and paying the Debtors' several shares of the unpaid portion of the liquidated value of Asbestos Claims generally on an impartial, first-in, first-out ("FIFO") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their Asbestos Claims based on historical values for substantially similar claims in the tort system. To this end, the Trust Distribution Procedures establish a schedule of eight asbestos-related diseases ("Disease Levels"), seven of which have presumptive medical and exposure requirements ("Medical/Exposure Criteria") and specific liquidated values ("Scheduled Values"), and five of which have anticipated average values ("Average Values") and caps on their liquidated values ("Maximum Values").  The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values have all been selected and derived with the intention of achieving a fair allocation of the Asbestos Trust funds as among claimants suffering from different disease processes in light of the best available information and taking into consideration the Debtors' histories of settling claims and the rights claimants would have in the tort system absent the Chapter 11 Cases.

### 2.    Disease Levels, Scheduled Values and Medical/Exposure Criteria

The eight Disease Levels covered by the Trust Distribution Procedures together with the Medical/Exposure Criteria for each and the Scheduled Values for the seven Disease Levels eligible for expedited review under the terms of the Trust Distribution Procedures, are set forth below.  Evidentiary requirements for both medical diagnoses and exposure are set forth below at Section VI.H.19. of this Disclosure Statement.  These Disease Levels, Scheduled Values, and Medical/Exposure Criteria shall apply to all PI Trust Voting Claims (as defined in the Trust Distribution Procedures) filed with the Asbestos Trust (except Pre-Petition Liquidated Claims, as defined in Section VI.H.10. below) on or before the Initial Claims Filing Date (defined in Section VI.H.8. below) for which a claimant elects the expedited review process described in the Trust Distribution Procedures (the "Expedited Review

Process"). Thereafter, for purposes of administering the Expedited Review Process (and with the consent of the Trust Advisory Committee and the Legal Representative), the Asbestos Trustees may add to, change or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values or Medical/Exposure Criteria; or determine that a novel or exceptional Asbestos Claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the then current Disease Levels. The Asbestos Trust, with the consent of the Trust Advisory Committee and the Legal Representative, shall periodically adjust the Scheduled Values to account for inflation.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma (Level VIII) | $155,000 | (1) Diagnosis[5] of mesothelioma; and (2) G-I Exposure.[6] |
| Lung Cancer 1 (Level VII) | $ 45,000 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease,[7] (2) six months G-I Exposure prior to December 31, 1982, (3) Significant Occupational Exposure[8] to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| Lung Cancer 2 (Level VI) | None | (1) Diagnosis of a primary lung cancer; (2) G-I Exposure prior to December 31, 1982, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question.

Lung Cancer 2 (Level VI) claims are claims that do not meet the more stringent medical and/or exposure |

---

[5]    The requirements for a diagnosis of an asbestos-related disease that may be compensated are set forth in the Trust Distribution Procedures.

[6]    As defined in the Trust Distribution Procedures.

[7]    Evidence of "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the criteria for establishing Disease Levels I, II, III, V, and VII is described in the Trust Distribution Procedures as either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or, (ii) (x) a chest X-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (e.g., an ILO report, a written radiology report or a pathology report). Solely for asbestos claims filed against G-I or another defendant in the tort system prior to the Petition Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician or, (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with, or compatible with, a diagnosis of asbestos-related disease shall be evidence of Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Disease Levels I, II, III, V and VII. Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982). "Qualified Physician" is defined in the Trust Distribution Procedures.

[8]    As defined in the Trust Distribution Procedures.

requirements of Lung Cancer (Level VII) claims. All claims in this Disease Level shall be individually evaluated. The estimated likely average of the individual evaluation awards for this category is $15,000, with such awards capped at $35,000, unless the claim qualifies for Extraordinary Claim treatment (described in Section VI.H.17. below).

Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Non-malignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims shall be treated as having any significant value, especially if the claimant is also a Smoker.[9] In any event, no presumption of validity shall be available for any claims in this category.

| | | |
|---|---|---|
| Other Cancer (Level V) | $ 15,000 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months G-I Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level IV) | $ 30,000 | (1) Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestos, plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months G-I Exposure prior to December 31, 1982, (3)  Significant Occupational Exposure |

---

[9]    There is no distinction between Non-Smokers and Smokers for either Lung Cancer (Level VII) or Lung Cancer (Level VI), although a claimant who meets the more stringent requirements of Lung Cancer (Level VII) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure) and who is also a Non-Smoker may wish to have his or her claim individually evaluated by the Asbestos Trust.  In such a case, absent circumstances that would otherwise reduce the value of the claim, it is anticipated that the liquidated value of the claim might well exceed the $45,000 Scheduled Value for Lung Cancer 1 (Level VII) shown above.  "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question.

**Asbestosis/**
Pleural Disease (Level III)    $ 8,300

(1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease, plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months G-I Exposure prior to December 31, 1982, (3)  Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question.

Asbestosis/
Pleural Disease (Level II)    $ 2,625

(1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and (2) six months G-I Exposure prior to December 31, 1982, and (3) five years cumulative occupational exposure to asbestos.

Other Asbestos Disease (Level I -
Cash Discount Payment)    $ 225

(1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma, and (2) G-I Exposure prior to December 31, 1982.

### 3.    Claims Liquidation Procedures

Asbestos Claims will be processed based on their place in a FIFO processing queue ("Asbestos FIFO Processing Queue") to be established pursuant to the Trust Distribution Procedures. The Asbestos Trust will take all reasonable steps to resolve Asbestos Claims as efficiently and expeditiously as possible at each stage of claims processing and arbitration, which steps may include conducting settlement discussions with claimants' representatives with respect to more than one Asbestos Claim at a time, provided that the claimants' respective positions in the Asbestos FIFO Processing Queue are maintained and each Asbestos Claim is individually evaluated pursuant to the valuation factors set forth in the Trust Distribution Procedures. The Asbestos Trust will also make every effort to resolve each year at least that number of Asbestos Claims required to exhaust the maximum annual payment ("Maximum Annual Payment") and the maximum available payment ("Maximum Available Payment") for Category A Claims (as defined in Section VI.H.6. below) and Category B Claims (as defined in Section VI.H.6. below) under the Trust Distribution Procedures.

The Asbestos Trust will liquidate all Asbestos Claims, except Foreign Claims (as defined in the Trust Distribution Procedures), that meet the presumptive Medical/Exposure Criteria of Disease Level I (Other Asbestos Disease — Cash Discount Payment), Disease Level II (Asbestosis/Pleural

Disease), Disease Level III (Asbestosis/Pleural Disease), Disease Level IV (Severe Asbestosis), Disease Level V (Other Cancer), Disease Level VII (Lung Cancer 1) and Disease Level VIII (Mesothelioma) under the Expedited Review Process.  A holder of an Asbestos Claim qualifying for treatment under Asbestos Disease Level IV, V, VII or VIII may alternatively seek to establish a liquidated value for the Asbestos Claim that is greater than its Scheduled Value by electing the process for individual review under the Trust Distribution Procedures (the "Individual Review Process").  However, the liquidated value of an Asbestos Claim that undergoes the Individual Review Process for valuation purposes may be determined to be less than its Scheduled Value and, in any event, will not exceed the Maximum Value for the relevant Disease Level, unless the Asbestos Claim qualifies as an Extraordinary Claim (as defined in Section VI.H.17. below), in which case its liquidated value cannot exceed the maximum extraordinary value specified in Section VI.H.17. below for Extraordinary Claims.  Asbestos Claims qualifying for treatment under Disease Level VI (Lung Cancer 2) and all Foreign Claims may be liquidated only pursuant to Individual Review.

All unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of the Asbestos Claim will be subject to mandatory pro bono evaluation or mediation and then to binding or non-binding arbitration at the election of the claimant, under procedures that are provided in Attachment A to the Trust Distribution Procedures.  Asbestos Claims that are the subject of a dispute with the Asbestos Trust that cannot be resolved by non-binding arbitration may enter the tort system.  However, if and when the holder of such an Asbestos Claim obtains a judgment in the tort system, the judgment will be payable subject to the applicable payment percentage under the Trust Distribution Procedures (the "Payment Percentage"), the Maximum Available Payment and the claims payment ratio under the Trust Distribution Procedures (the "Claims Payment Ratio").

### 4.    Payment Percentage

After the liquidated value of any Asbestos Claim other than an Asbestos Claim qualifying for treatment under Disease Level I is determined pursuant to the Expedited Review Process, pursuant to the Individual Review Process, by arbitration or by litigation in the tort system as set forth in Trust Distribution Procedures, the holder of such Claim will ultimately receive a pro rata share of that value based on the Payment Percentage.  The Payment Percentage will also apply to all Pre-Petition Liquidated Claims.

The Initial Payment Percentage has been set at 8.6%.  The Initial Payment Percentage has been calculated on the assumption that the Average Values under the Trust Distribution Procedures will be achieved with respect to existing present Asbestos Claims and projected future Asbestos Claims involving Disease Levels IV-VIII.

The Payment Percentage may be adjusted upwards or downwards from time to time by the Asbestos Trustees with the consent of the Trust Advisory Committee and the Legal Representative to reflect then-current estimates of the Asbestos Trust's assets and its liabilities, as well as the then-estimated value of pending and future Asbestos Claims.  If the Payment Percentage is increased over time, holders of Asbestos Claims that were liquidated and paid in prior periods under the Trust Distribution Procedures will receive additional payments only as provided in Section 4.3 of the Trust Distribution Procedures.  Because there is uncertainty in the prediction of both the number and severity of future Asbestos Claims and the amount of the Asbestos Trust's assets, no guarantee can be made of any Payment Percentage of an Asbestos Claim's liquidated value.

### 5.    Maximum Annual Payment and Maximum Available Payment

The Asbestos Trust will estimate or model the amount of cash flow anticipated to be necessary over its entire life to ensure that funds will be available to treat all present and future holders of Asbestos Claims as similarly as possible.  In each year the Asbestos Trust will be empowered to pay out

all of the income earned during the year (net of taxes payable with respect thereto), together with a portion of its principal, calculated so that the application of Asbestos Trust funds over its life will correspond with the needs created by the estimated initial backlog of Asbestos Claims and the estimated anticipated future flow of Asbestos Claims (*i.e.*, the Maximum Annual Payment), taking into account the Payment Percentage provisions of the Trust Distribution Procedures. The Asbestos Trust's distributions to all claimants for that year will not exceed the Maximum Annual Payment determined for that year.

In distributing the Maximum Annual Payment, the Asbestos Trust will first allocate the amount in question to (a) outstanding Pre-Petition Liquidated Claims, (b) Asbestos Claims involving Disease Level I (Cash Discount Payment) that have been liquidated by the Asbestos Trust, (c) any Asbestos Claims based upon a diagnosis dated prior to the Effective Date that have been liquidated by the Asbestos Trust ("Existing Claims") and (d) Exigent Hardship Claims (as defined in Section VI.H.17. below). Should the Maximum Annual Payment be insufficient to pay all such claims in full, they shall be paid in proportion to the aggregate value of each such group of claims and the available funds allocated to each group shall be paid to the maximum extent to claimants in the particular group based on their place in their respective FIFO payment queue ("Asbestos FIFO Payment Queue"). Claims in any group for which there are insufficient funds shall be carried over to the next year and placed at the head of their Asbestos FIFO Payment Queue. Any remaining portion of the Maximum Annual Payment (*i.e.*, the Maximum Available Payment) will then be allocated and used to satisfy all other liquidated Asbestos Claims, subject to the Claims Payment Ratio. Claims in the groups described in (a), (b), (c) and (d) above shall not be subject to the Claims Payment Ratio.

### 6.    Claims Payment Ratio

Based upon G-I's claims settlement history and analysis of present and future Asbestos Claims, a Claims Payment Ratio has been determined which, as of the Effective Date, has been set at 85% for Asbestos Claims qualifying for treatment under Asbestos Disease Level IV - VIII ("Category A Claims") and at 15% for Asbestos Claims qualifying for treatment under Asbestos Disease Level II or III ("Category B Claims"). In each year, after the determination of the Maximum Available Payment, 85% of that amount will be available to pay Category A Claims and 15% will be available to pay Category B Claims that have been liquidated since the Petition Date, except for claims that are not subject to the Claims Payment Ratio as described above. If there are excess funds in either or both Categories in any year, the excess funds shall be rolled over and shall remain dedicated to the respective Category to which they were originally allocated.

No amendment to the Claims Payment Ratio to reduce the percentage allocated to Category A Claims may be made without the unanimous consent of the members of the Trust Advisory Committee and the consent of the Legal Representative. The Claims Payment Ratio may not be amended until the second anniversary of the date the Asbestos Trust first accepts for processing proof of claim forms and other materials required to file a claim with the Asbestos Trust. The Asbestos Trustees, with the consent of the Trust Advisory Committee and the Legal Representative, may offer the option of a reduced Payment Percentage to holders of either Category A Claims or Category B Claims in return for more prompt payment.

### 7.    Indirect Trust Claims

Indirect Trust Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Asbestos Trustees, which procedures (a) shall determine the validity, allowability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Asbestos Trust would have afforded the holders of the underlying valid Asbestos Claims, while protecting the Asbestos Trust from incurring multiple liability with respect to the same claim.

68

Indirect Trust Claims asserted against the Asbestos Trust shall be treated as presumptively valid and paid by the Asbestos Trust subject to the applicable Payment Percentage if (a) such claim satisfied the requirements of the Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by section 502(e) of the Bankruptcy Code or subordinated under Section 509(c) of the Bankruptcy Code, and, and (b) the holder of such claim (the "Indirect Claimant") establishes to the satisfaction of the Asbestos Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the Asbestos Trust to the individual claimant to whom the Asbestos Trust would otherwise have had a liability or obligation under the Trust Distribution Procedures (the "Direct Claimant"), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Asbestos Trust from all liability to the Direct Claimant, and (iii) the claim is not otherwise barred by a statute of limitation or repose or by other applicable law.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, the Indirect Claimant may request that the Asbestos Trust review the Indirect Trust Claim individually.  Any dispute between the Asbestos Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures provided in Attachment A to the Trust Distribution Procedures.  If such dispute is not resolved by said ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system as provided in the Trust Distribution Procedures.

## 8.    Ordering of Claims

The Asbestos Trust will order Asbestos Claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis (i.e., by reference to a claimants' position in the Asbestos FIFO Processing Queue) except as otherwise provided in the Trust Distribution Procedures.  For all Asbestos Claims filed on or before the date six months after the date that the Asbestos Trust first makes available the proof of claim forms and other claims materials required to file an Asbestos Claim with the Asbestos Trust  (the "Initial Claims Filing Date"), a claimant's position in the Asbestos FIFO Processing Queue will be determined as of the earliest of (a) the date prior to January 5, 2001 (the "Petition Date") that the specific Asbestos Claim was either filed against G-I in the tort system or was actually submitted to G-I pursuant to an administrative settlement agreement, if any, (b) the date before the Petition Date that an Asbestos Claim was filed against another defendant in the tort system if at the time the Asbestos Claim was subject to a tolling agreement with G-I, (c) the date after the Petition Date but before the date the Asbestos Trust first makes available the proof of claim form and other claims material required to file an Asbestos Claim with the Asbestos Trust that the Asbestos Claim was filed against another defendant in the tort system, (d) the date after the Petition Date but before the Effective Date that a proof of Claim was filed against G-I in the Chapter 11 Cases, or (e) the date a Ballot was submitted on behalf of the claimant in the Chapter 11 Cases for purposes of voting on the Plan in accordance with the voting procedures approved by the Bankruptcy Court.

Following the Initial Claims Filing Date, the claimant's position in the Asbestos FIFO Processing Queue will be determined by the date the Asbestos Claim is filed with the Asbestos Trust.  If any Asbestos Claims are filed on the same date, the claimant's position in the Asbestos FIFO Processing Queue will be determined by the date of the diagnosis of the claimant's asbestos-related disease.  If any Asbestos Claims are filed and diagnosed on the same date, the claimant's position in the Asbestos FIFO Processing Queue will be determined by the date of the claimant's birth, with older claimants given priority over younger claimants.

## 9.    Payment of Claims

Asbestos Claims that have been liquidated pursuant to the Expedited Review Process, pursuant to the Individual Review Process, by arbitration or by litigation in the tort system will be paid in

FIFO order based on the date their liquidation became final, all such payments being subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio, except as otherwise provided in the Trust Distribution Procedures.

### 10.    Resolution of Pre-Petition Liquidated Claims

As soon as practicable after the Effective Date, the Asbestos Trust will, upon submission by the claimant of the appropriate documentation, pay all Asbestos Claims that were liquidated by (a) a binding settlement agreement for the particular claim entered into prior to the Petition Date that is judicially enforceable by the claimant, (b) a jury verdict or non-final judgment in the tort system obtained prior to the Petition Date, or (c) by a judgment that became final and non-appealable prior to the Petition Date (collectively, "Pre-Petition Liquidated Claims").  In order to receive payment from the Asbestos Trust, the holder of a Pre-Petition Liquidated Claim must submit all documentation necessary to demonstrate to the Asbestos Trust that the claim was liquidated in the manner described in the preceding sentence, which documentation shall include (A) a court authenticated copy of the jury verdict (if applicable), a non-final judgment (if applicable) or a final judgment (if applicable) and (B) the name, social security number and date of birth of the claimant and the name and address of the claimant's lawyer.

The liquidated value of a Pre-Petition Liquidated Claim will be the unpaid portion of the amount agreed to in the binding settlement agreement, the unpaid portion of the amount awarded by the jury verdict or non-final judgment or the unpaid portion of the amount of the final judgment, as the case may be, plus interest that has accrued on that amount in accordance with the terms of the agreement, if any, or under applicable state law for settlements or judgments as of the Petition Date; however, except as otherwise provided below, the liquidated value of a Pre-Petition Liquidated Claim will not include any punitive or exemplary damages.  In the absence of a final order of the Bankruptcy Court determining whether a settlement agreement is binding and judicially enforceable, a dispute between the claimant and the Asbestos Trust over this issue will be resolved pursuant to the same procedures in the Trust Distribution Procedures that are provided for resolving the validity and/or liquidated value of an Asbestos Claim.

Pre-Petition Liquidated Claims will be processed and paid in accordance with their order in a separate Asbestos FIFO Processing Queue to be established by the Asbestos Trustees based on the date the Asbestos Trust received all required documentation for the particular claim.  If any Pre-Petition Liquidated Claims were filed on the same date, the respective positions of the holders of such claims in the Asbestos FIFO Processing Queue for such claims will be determined by the date on which each claim was liquidated.  If any Pre-Petition Liquidated Claims were both filed and liquidated on the same dates, the positions of those claimants in the Asbestos FIFO Processing Queue will be determined by the claimants' dates of birth, with older claimants given priority over younger claimants.

### 11.    Resolution of Unliquidated Claims

Within six months after the establishment of the Asbestos Trust, the Asbestos Trustees with the consent of the Trust Advisory Committee and the Legal Representative will adopt procedures for reviewing and liquidating all unliquidated Asbestos Claims, which will include deadlines for processing such claims.  Such procedures will also require claimants seeking resolution of unliquidated Asbestos Claims to first file a proof of claim form, together with the required supporting documentation.  It is anticipated that the Asbestos Trust will provide an initial response to the claimant within six months of receiving the proof of claim form.

### 12.    Expedited Review Process

The Asbestos Trust's Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all Asbestos Claims (except those claims qualifying for treatment under Disease Level VI and all Foreign Claims, which will be liquidated pursuant to the Individual Review Process) where the claim can easily be verified by the Asbestos Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level.  Expedited Review thus provides claimants with a substantially less burdensome process for pursuing Asbestos Claims than does Individual Review.  Expedited Review is also intended to provide qualifying claimants a fixed and certain claims payment.

Asbestos Claims that undergo the Expedited Review Process and meet the presumptive Medical/Exposure Criteria for the relevant Disease Level will be paid the Scheduled Value for such Disease Level.  However, except for Asbestos Claims qualifying for treatment under Disease Level I, all Asbestos Claims liquidated pursuant to the Expedited Review Process will be subject to the applicable Payment Percentage, and all such claims other than (i) claims qualifying for treatment under Disease Level I, (ii) Existing Claims and (iii) Exigent Hardship Claims will be subject to the Maximum Available Payment and the Claims Payment Ratio.  Claimants holding claims that cannot be liquidated by Expedited Review because they do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may elect Individual Review.

### 13.    Claims Processing Under Expedited Review

All claimants seeking liquidation of their Asbestos Claims pursuant to the Expedited Review Process must file the Asbestos Trust's proof of claim form.  As a proof of claim form is reached in the Asbestos FIFO Processing Queue, the Asbestos Trust will determine whether the claim described therein meets the Medical/Exposure Criteria for one of the seven Disease Levels eligible for Expedited Review and will advise the claimant of its determination.  If a Disease Level is determined to be applicable to a claim, the Asbestos Trust will tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable Payment Percentage, together with a form of release approved by the Asbestos Trust.  If the claimant accepts the Scheduled Value and returns the release properly executed, the claim will be placed in the Asbestos FIFO Payment Queue, following which the Asbestos Trust will disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

### 14.    Individual Review Process

The Asbestos Trust's Individual Review Process provides a claimant with an opportunity for individual consideration and evaluation of an Asbestos Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Level I, II, III, IV, V, VII or VIII.  In such case, the Asbestos Trust will either deny the claim or, if the Asbestos Trust is satisfied that the claimant has presented an Asbestos Claim that would be cognizable and valid in the tort system, the Asbestos Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level.

Claimants holding Asbestos Claims qualifying for treatment under Asbestos Disease Level IV, V, VII or VIII will also be eligible to seek Individual Review of the liquidated value of their claims, as well as of their medical/exposure evidence.  Individual Review is intended to result in payments equal to the full liquidated value for each Asbestos Claim multiplied by the Payment Percentage, except that the liquidated value of any Asbestos Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review.  Moreover, the liquidated value for an Asbestos Claim qualifying for treatment under Disease Level IV, V, VI, VII or VIII will not exceed the Maximum Value for the relevant Disease Level set forth below, unless the claim meets the requirements of an Extraordinary Claim, in which case its liquidated

71

value cannot exceed the maximum extraordinary value set forth in Section VI.H.17. below for such claims.  Because the detailed examination and valuation process pursuant to Individual Review requires substantial time and effort, claimants electing to undergo Individual Review may be paid the liquidated value of their Asbestos Claims later than would have been the case had the claimant elected Expedited Review.  Subject to the claims audit program provision of the Trust Distribution Procedures, the Asbestos Trust will devote reasonable resources to the review of all Asbestos Claims to ensure that there is a reasonable balance maintained in reviewing all classes of claims.

### 15.    Valuation Factors To Be Considered in Individual Review

The Asbestos Trust will liquidate the value of each Asbestos Claim that undergoes Individual Review based on the historic liquidated values of other similarly situated claims in the tort system for the same Disease Level.  The Asbestos Trust will, thus, take into consideration all of the factors that affect the severity of damages and values within the tort system, including but not limited to, credible evidence of (a) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question, (b) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages and pain and suffering, (c) whether the claimant's damages were (or were not) caused by asbestos exposure, including exposure to an asbestos-containing product for which G-I has legal responsibility prior to December 31, 1982 (e.g., alternative causes and the strength of documentation of injuries), (d) the industry of exposure, (e) settlements and verdict histories and other law firms' experiences in the Claimant's Jurisdiction (as defined in the Trust Distribution Procedures) for similarly situated claims; and (f) settlement and verdict histories for the claimant's law firm for similarly situated claims.

### 16.    Scheduled, Average and Maximum Values

The Scheduled, Average and Maximum Values for the Disease Levels compensable under the Trust Distribution Procedures are the following:

| Disease Level | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Level VIII (Mesothelioma) | $155,000 | $225,000 | $450,000 |
| Level VII (Lung Cancer 1) | $45,000 | $55,000 | $100,000 |
| Level VI (Lung Cancer 2) | None | $15,000 | $35,000 |
| Level V (Other Cancer) | $15,000 | $18,000 | $35,000 |
| Level IV (Severe Asbestosis) | $30,000 | $35,000 | $50,000 |
| Level III (Asbestosis/Pleural Disease) | $8,300 | None | None |
| Level II (Asbestosis/Pleural Disease) | $2,625 | None | None |
| Level I (Other Asbestos Disease — Cash Discount Payment) | $225 | None | None |

These Scheduled Values, Average Values and Maximum Values will apply to all PI Trust Voting Claims, other than Pre-Petition Liquidated Claims, filed with the Asbestos Trust on or before the Initial Claims Filing Date.  Thereafter, the Asbestos Trust, with the consent of the Trust Advisory

Committee and the Legal Representative, shall periodically adjust these valuation amounts to account for inflation and otherwise may adjust the values for good cause and consistent with other restrictions on the amendment power.

### 17.    Extraordinary and/or Exigent Hardship Claims

For purposes of the Trust Distribution Procedures, "Extraordinary Claim" means an Asbestos Claim that otherwise satisfies the medical criteria for Disease Level IV, V, VI, VII or VIII and that is held by a claimant whose exposure to asbestos (a) occurred predominately as the result of working in a manufacturing facility of G-I during a period in which G-I was manufacturing asbestos-containing products at that facility or (b) was at least 75% the result of exposure to asbestos or an asbestos-containing product or to conduct for which G-I has legal responsibility and, in either case, there is little likelihood of a substantial recovery elsewhere.  All such Extraordinary Claims will be presented for Individual Review and, if valid, will be entitled to an award of up to a maximum extraordinary value of five times the Scheduled Value for claims qualifying for treatment under Disease Level IV, V, VII or VIII, and five times the Average Value, for claims qualifying for treatment under Disease Level VI, in each case multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status will be submitted to a special "Extraordinary Claims Panel" established by the Asbestos Trustees with the consent of the Trust Advisory Committee and the Legal Representative.  All decisions of such panel will be final and not subject to any further administrative or judicial review.  An Extraordinary Claim, following its liquidation, will be placed in the Asbestos FIFO Payment Queue ahead of all other Asbestos Claims (except Pre-Petition Liquidated Claims, Claims qualifying for treatment under Disease Level I, Existing Claims and Exigent Hardship Claims, which will be paid first) based on its date of liquidation and will be subject to the Maximum Available Payment and Claims Payment Ratio described above unless otherwise provided above.

At any time the Asbestos Trust may liquidate and pay Asbestos Claims that qualify as Exigent Hardship Claims.  Such claims may be considered separately regardless of the order of processing that otherwise would have been under the Trust Distribution Procedures.  An Exigent Hardship Claim, following its liquidation, will be placed first in the Asbestos FIFO Payment Queue ahead of all other liquidated Asbestos Claims (except Pre-Petition Liquidated Claims, Claims qualifying for treatment under Asbestos Disease Level I and Existing Claims).  For purposes of the Trust Distribution Procedures, an Asbestos Claim is an "Exigent Hardship Claim" if it meets the Medical/Exposure Criteria for Disease Level IV, V, VI, VII or VIII and the Asbestos Trust, in its sole discretion, determines (a) that the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income and (b) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

### 18.    Secondary Exposure Claims

If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally-exposed person, such as a family member, the claimant must seek Individual Review of his or her Asbestos Claim.  The proof of claim form will contain an additional section for Secondary Exposure Claims (as defined in the Trust Distribution Procedures).  All other liquidation and payment rights and limitations under the Trust Distribution Procedures will be applicable to such claims.

### 19.    Evidentiary Requirements

a.    *Medical Evidence*

All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first

exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a ten (10)-year latency period.  A finding by a physician after the Effective Date that a claimant's disease is "consistent with" or "compatible with" asbestosis shall not alone be treated by the Asbestos Trust as a diagnosis.[10]

Except for claims filed against G-I or any other defendant in the tort system prior to the Petition Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease. All living claimants must also provide (i) for Disease Levels I - III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 5 above); (ii) for Disease Level IV, an ILO reading of 2/1 or greater or pathological evidence of asbestosis, and (iii) for Disease Levels III and IV, pulmonary function testing.[11]

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; or (ii) pathological evidence of the non-malignant asbestos-related disease; or (iii) in the case of Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 5 above), and for Disease Level IV, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iv) for either Disease Level III or IV, pulmonary function testing.

All diagnoses of an asbestos-related malignancy (Disease Levels V–VIII) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) on a diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").

If the holder of an Asbestos Claim that was filed against G-I or any other defendant in the tort system prior to the Petition Date has available a report of a diagnosing physician engaged by the holder or his or her law firm who conducted a physical examination of the holder as described above, or if the holder has filed such medical evidence and/or a diagnosis of the asbestos-related disease by a physician not engaged by the holder or his or her law firm who conducted a physical examination of the holder with another asbestos-related personal injury settlement trust that requires such evidence, without regard to whether the claimant or the law firm engaged the diagnosing physician, then the holder shall provide such diagnosis to the Asbestos Trust notwithstanding the exception described above.

b.    *Credibility of Medical Evidence*

Before making any payment to a claimant, the Asbestos Trust must have reasonable confidence that the medical and exposure evidence provided in support of the claim is credible and consistent with recognized medical standards.  The Asbestos Trust may require the submission of X-rays,

---

[10]    All diagnoses of Asbestosis/Pleural Disease (Disease Levels II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VIII) shall be presumed to be based on findings that the disease involves a malignancy.  However, the Asbestos Trust may refute such presumptions.

[11]    "Pulmonary function testing" or "PFT" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("ATS") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration.  PFT performed in a hospital accredited by the JCAHO, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing.  If the PFT was not performed in a JCAHO accredited hospital, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however that if the PFT was conducted prior to the Effective Date of the Plan and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other qualified party, in the form provided by the Asbestos Trust, certifying that the PFT was conducted in material compliance with ATS standards.

CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable.  Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to G-I to settle for payment similar disease cases prior to G-I's bankruptcy, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the Asbestos Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of the Trust Distribution Procedures for payment of an Asbestos Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system.  However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Asbestos Trust in any Individual Review proceeding or any Extraordinary Claim proceeding conducted by the Asbestos Trust.

c.    *Exposure Evidence*

To qualify for any Disease Level the claimant must demonstrate a minimum exposure to an asbestos-containing product manufactured, produced or distributed by G-I or to conduct for which G-I has legal responsibility.  Claims based on conspiracy theories that involve no exposure to an asbestos-containing product manufactured, produced or distributed by G-I are not compensable under the Trust Distribution Procedures.  To meet the presumptive exposure requirements of Expedited Review, the claimant must show (i) for all Disease Levels, G-I Exposure prior to December 31, 1982, (ii) for Asbestos/Pleural Disease Level II, six (6)-months G-I Exposure prior to December 31, 1982, plus five (5) years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV), Other Cancer (Disease Level V), or Lung Cancer 1 (Disease Level VII), the claimant must show six (6)-months G-I Exposure prior to December 31, 1982, plus Significant Occupational Exposure to asbestos.  If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review of his or her claim based on exposure to asbestos or an asbestos-containing product or to conduct for which G-I has legal responsibility.

The claimant must demonstrate (a) meaningful and credible exposure, which occurred prior to December 31, 1982, to asbestos or asbestos-containing products supplied, specified, manufactured, installed, maintained, or repaired by G-I and/or any entity for which G-I has legal responsibility.  That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant; by an affidavit or sworn statement of a co-worker or the affidavit or sworn statement of a family member in the case of a deceased claimant (providing the Asbestos Trust finds such evidence reasonably reliable); by invoices, employment, construction or similar records; or by other credible evidence.  The specific exposure information required by the Asbestos Trust to process a claim under either Expedited or Individual Review shall be set forth on the proof of claim form to be used by the Asbestos Trust.  The Asbestos Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

**20.    Second Disease (Malignancy) Claims**

Notwithstanding the provision of the Trust Distribution Procedures stating that a claimant may not assert more than one Asbestos Claim thereunder, the holder of an Asbestos Claim involving a non-malignant asbestos-related disease (i.e., a claim qualifying for treatment under Disease Level I, II, III or IV) may assert a new Asbestos Claim against the Asbestos Trust for a malignant disease (i.e., a claim qualifying for treatment under Disease Level V, VI, VII or VIII) that is subsequently diagnosed.

### 21.    Punitive Damages

Except as provided in the Trust Distribution Procedures for Asbestos Claims asserted under the Alabama Wrongful Death Statute, in determining the value of any liquidated or unliquidated Asbestos Claim, punitive or exemplary damages (i.e., any damages other than compensatory damages) will not be considered or allowed, notwithstanding their availability in the tort system.

### 22.    Suits in the Tort System

If the holder of an Asbestos Claim disagrees with the Asbestos Trust's determination regarding the Disease Level of the claim, the claimant's exposure history or the liquidated value of the claim and, if the holder has first submitted the claim to non-binding arbitration, the holder may file a lawsuit in the Claimant's Jurisdiction.  Any such lawsuit must be filed by the claimant in her or her own right and name and not as a member or representative of a class and no such lawsuit may be consolidated with any other lawsuit.  All defenses (including, with respect to the Asbestos Trust, all defenses which could have been asserted by G-I) will be available to both sides at trial, except that the Asbestos Trust may waive any defense and/or concede any issue of fact or law.  If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim was filed with the Asbestos Trust, the case will be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

# VII.  MEANS OF IMPLEMENTATION

## A        METHOD OF DISTRIBUTION UNDER THE PLAN

### 1.        Distributions

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the descriptions below.  In general, an "allowed" claim or an "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the bankruptcy court determines, that the claim or interest, and the amount thereof, is in fact a valid obligation of the debtor.

Any Claim that is not a Disputed Claim and for which a proof of claim has been filed is an Allowed Claim.  Any Claim that has been listed by any Debtor in such Debtors' schedules of assets and liabilities, as may be amended from time to time, as liquidated in amount and not disputed or contingent is an Allowed Claim in the amount listed in the schedules unless an objection to such Claim has been filed.  If the holder of such Claim files a proof of claim in an amount different than the amount set forth on the Debtors' schedules of assets and liabilities, the Claim is an Allowed Claim for the lower of the amount set forth on the Debtors' schedules of assets and liabilities and on the proof of claim and a Disputed Claim for the difference.  Any Claim that has been listed in the Debtors' schedules of assets and liabilities as disputed, contingent, or not liquidated and for which a proof of claim has been timely filed is a Disputed Claim.  Any Claim for which an objection has been timely interposed is a Disputed Claim. For an explanation of how Disputed Claims will be determined, see Section VII(A)(15).

Except as set forth above, all Distributions under the Plan shall be made by the Disbursing Agent.  At the option of the Debtors, any Cash payment to be made under the Plan may be made by a check or wire transfer.  Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Disbursing Agent shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank; *provided, however,* that no cash payment of less than one hundred dollars ($100) shall be made to a holder of an Allowed Claim unless a request therefor is made in writing to the Reorganized Debtors.

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### 2.    Disbursing Agent

All Distributions under the Plan shall be made by the Disbursing Agent.

### 3.    Delivery of Distributions

Pursuant to the Plan, whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due. The Distributions shall be made to the holders of Allowed Claims as of the Record Date and the Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of a Claim occurring after the Record Date.

### 4.    Distribution Deadlines

Any Distribution to be made by the Disbursing Agent pursuant to the Plan shall be deemed to have been timely made if made within twenty (20) days after the time therefor specified in the Plan or such other agreements. No interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

### 5.    Distributions with Respect to Allowed Claims

Subject to Bankruptcy Rule 9010, all Distributions under the Plan to holders of Allowed Claims in Classes 3A, 3B, 5 and 7 shall be made by the Disbursing Agent to the holder of each Allowed Claim in such Classes at the address of such holder as listed on the Schedules as of the Record Date, unless the Debtors or, on and after the Effective Date, the Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such holder that provides an address for such holder different from the address reflected on the Schedules. If any Distribution to any such holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such Distribution shall be made to such holder without interest; *provided, however,* that, at the expiration of one (1) year from the Effective Date such undeliverable Distributions shall be deemed unclaimed property and shall be treated in accordance with Section 5.7 of the Plan.

### 6.    Responsibility for Transfers and Distributions

The Plan Sponsor and Reorganized Debtors (as applicable) and only the Plan Sponsor and Reorganized Debtors shall be responsible for Distributions required by the Plan. The Asbestos Trust and only the Asbestos Trust shall be responsible for resolving and paying Class 6 Claims and Demands in accordance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures.

### 7.    Manner of Payment Under the Plan

Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Disbursing Agent shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank; *provided, however,* that no Cash payment of less than one hundred dollars ($100) shall be made to a holder of an Allowed Claim unless a request therefor is made in writing to the Reorganized Debtors.

8.    **Unclaimed Property**

a.    *Plan Distributions*

All Distributions under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the Reorganized Debtors, and any entitlement of any holder of any Claim to such Distributions shall be extinguished and forever barred.

b.    *1989 LBO Transactions*

Any unclaimed, un-cashed, or undeliverable Cash or check previously earmarked or tendered for the redemption of certain Equity Interests relating to the 1989 LBO Transaction, which Cash or checks G-I currently holds or has remitted to an appropriate state agency, and as to which such Equity Interests remain un-tendered by their holders, shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the Reorganized Debtors, and any entitlement of any holder of any Claim to such Cash or checks shall be extinguished and forever barred.

9.    **Time Bar to Cash Payments**

Checks issued by the Disbursing Agent for Distributions on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for re-issuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (a) the first (1st) anniversary of the Effective Date or (b) ninety (90) days after the date of issuance of such check, if such check represents a final Distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Reorganized Debtors shall retain all monies related thereto.

10.    **Distributions After Effective Date**

Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of the Plan.

11.    **Setoffs**

The Reorganized Debtors may, but shall not be required to, pursuant to applicable non-bankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account thereof (before any Distribution is made on account of such Claim), the claims, rights, and causes of action of any nature that the Debtors' estates or the Reorganized Debtors hold against the holder of such Allowed Claim (other than an Asbestos Claim); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, Debtors-in-Possession or the Reorganized Debtors of any such claims, rights and causes of action that the Debtors, Debtors-in-Possession or the Reorganized Debtors may possess against such holder.

12.    **Cancellation of Existing Securities And Agreements**

On the Effective Date, any document, agreement, or instrument evidencing any Claim or Equity Interest, other than an Asbestos Claim or any Claim that is unimpaired by the Plan, shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests, as the case may be, shall be discharged; *provided, however*, that each

78

Asbestos Claim (other than any Demand) shall be discharged as to the Reorganized Debtors, and all Asbestos Claims (including all Demands) shall be subject to the Asbestos Permanent Channeling Injunction.

### 13.    Payment of Interest on Allowed Claims

Interest shall be paid on Allowed Claims only to the extent the payment of interest is provided for by a contractual agreement between the Debtors and the holder of any such Allowed Claim.

### 14.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### 15.    Procedures for Treating Disputed Claims Under the Plan

a.    *Disputed Claims*

A Disputed Claim ("Disputed Claim") is a Claim that is not an Allowed Claim, a Disallowed Claim, or an Asbestos Claim, and is any Claim, proof of which was filed, or an Administrative Expense Claim or other Claim, which is the subject of a dispute under the Plan or as to which Claim the Debtors have interposed a timely objection and/or a request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018 or other applicable law, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and any Claim, proof of which was required to be filed by order of the Bankruptcy Court, but as to which a proof of claim was not timely or properly filed.

A Claim for which a proof of claim has been filed but that is listed on the Debtors' schedules of assets and liabilities as unliquidated, disputed or contingent, and which has not yet been resolved by the parties or by the Bankruptcy Court, is a Disputed Claim. If a holder of a Claim has filed a proof of claim that is inconsistent with the Claim as listed on the Debtors' schedules of assets and liabilities, such Claim is a Disputed Claim to the extent of the difference between the amount set forth in the proof of claim and the amount scheduled by the Debtors. Any Claim for which the Debtors or any party in interest have interposed (or will interpose) a timely objection is a Disputed Claim.

Pursuant to the Plan, the Reorganized Debtors shall object to the allowance of Claims filed with the Bankruptcy Court (other than Asbestos Claims) with respect to which the Reorganized Debtors dispute liability in whole or in part. All objections filed and prosecuted by the Reorganized Debtors as provided herein shall be litigated to Final Order by the Reorganized Debtors; *provided, however,* that the Debtors or Reorganized Debtors, as the case may be, may compromise and settle, withdraw or resolve by any other method, without requirement of Bankruptcy Court approval, any objections to Claims; *provided, further, however,* that in the case of a CCR Allowance Proceeding (i) such CCR Allowance Proceeding shall be prosecuted by the Reorganized Debtors, the Asbestos Claimants Committee, and the Legal Representative, and (ii) such CCR Allowance Proceeding may only be compromised, settled, withdrawn, or otherwise resolved with the consent of each of the Reorganized Debtors, the Asbestos Claimants Committee, and the Legal Representative. Subject to the treatment described in Section 3.11 of the Plan with respect to the CCR Claim, each of G-I, ACI, the Committee, and the Legal Representative shall oppose the allowance of any Claim by or on behalf of any Entity that is or was a member of CCR, arising from facts or legal relationships that existed during the period when G-I and the Entity asserting the Claim (or on whose behalf it is asserted) were both members of CCR, or

arising from or relating to any agreement made by CCR during such period for the settlement of any asbestos-related personal injury or wrongful death claim.

Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections by the Reorganized Debtors to Claims shall be served and filed on or before the later of (i) one hundred eighty (180) days after the Effective Date, and (ii) such date as may be fixed by the Bankruptcy Court, after notice and hearing, whether fixed before or after the date specified in clause (i) above.

### b.    Estimation of Disputed Claims

The Plan provides for the estimation of Disputed Claims.  Unless otherwise limited by an order of the Bankruptcy Court, the Reorganized Debtors may at any time request that the Bankruptcy Court estimate for final Distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law regardless of whether the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on such objection, and the Bankruptcy Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided, however,* that, if the estimate constitutes the maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as the case may be, may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, *provided, further,* that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

### c.    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no Distribution or Trust Distribution provided for hereunder shall be made on account of any portion of such Claim unless and until such Disputed Claim becomes an Allowed Claim.  No interest shall be paid on account of Disputed Claims that later become Allowed except to the extent that payment of interest is required under section 506(b) of the Bankruptcy Code.

### d.    Distributions After Allowance

The Plan provides that, to the extent a Disputed Claim ultimately becomes an Allowed Claim, a Distribution shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court or other applicable court of competent jurisdiction (including any appeal therefrom) allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Claim the Distribution to which such holder is entitled hereunder on account of or in exchange for such Allowed Claim.

### e.    Distributions Related to Allowed Insured Claims

Nothing contained in the Plan shall constitute or be deemed a waiver of any Claim, defense, right or cause of action that the Debtors, the Reorganized Debtors, the Asbestos Trust, or any Entity may hold under any policies of insurance against any other Entity, including, without limitation, insurers, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.  Section 6.5 of the Plan shall not limit the

liability or obligations of any of the Debtors under the Plan with respect to the uninsured portion of any Claim.

> f.    *Management of Existing Tax Claim Litigation*

The Plan provides that, under the Confirmation Order, the District Court shall retain sole jurisdiction over the litigation in the action styled *United States v. G-I Holdings Inc.*, Case No. 02-03082 (D.N.J.) (pending resolution or dismissal without prejudice of that action) and, as a consequence, the Reorganized Debtors shall not file any petition in the United States Tax Court with respect to the Claims subject to that litigation pending resolution or dismissal without prejudice of that action.

## B    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

The Plan provides that any executory contract or unexpired lease not set forth on Schedule 7.1 of the Plan Supplement that has not expired by its own terms on or prior to the Confirmation Date, which has not been assumed and assigned or rejected with the approval of the Bankruptcy Court, or which is not the subject of a motion to assume and assign or reject as of the Confirmation Date, shall be deemed rejected by the Debtors-in-Possession on the Confirmation Date and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Any executory contracts or unexpired leases of the Debtors that are set forth on Schedule 7.1 of the Plan Supplement shall be deemed to have been assumed by the Debtors and the Plan shall constitute a motion to assume such executory contracts and unexpired leases.

Each executory contract or unexpired lease assumed under the Plan shall include any modifications, amendments, supplements or restatements to such contract or lease.  Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumed executory contract or unexpired lease is in the best interest of the Debtors, their bankruptcy estates, and all parties in interest in the Chapter 11 Cases.

The Debtors reserve the right, at any time prior to the Effective Date, to amend Schedule 7.1 to (a) delete and executory contract or unexpired lease listed therein, thus providing for its rejection under the Plan; or (b) add any executory contract or unexpired lease to Schedule 7.1, thus providing for its assumption.  The Debtors will provide notice of any amendments to Schedule 7.1 to the parties to the executory contracts and unexpired leases affected thereby.  Nothing herein or in the Plan shall constitute an admission by a Debtor or Reorganized Debtor that any contract or lease is an executory contract or unexpired lease or that a Debtor or Reorganized Debtor has any liability thereunder.

Notwithstanding anything contained in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as executory contracts under the Plan and will be assumed pursuant to the Plan, effective as of the Effective Date. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that assumption of the insurance policies is in the best interest of the Debtors, their bankruptcy estates, and all parties in interest in the Chapter 11 Cases.  Nothing contained in the Plan shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any Entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

2.    **Cure of Defaults and Survival of Contingent Claims under Assumed Executory Contracts and Unexpired Leases**

Except as may otherwise be agreed to by the parties, on or before the thirtieth (30th) day after the Effective Date, provided the non-debtor party to any such assumed executory contract or unexpired lease has timely filed a proof of claim with respect to such cure amount, the Reorganized Debtors shall cure any and all undisputed defaults under each executory contract and unexpired lease assumed by the Debtors pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. All disputed defaults required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Reorganized Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties. Unless a proof of claim was timely filed with respect thereto, all cure amounts and all contingent reimbursement or indemnity claims for prepetition amounts expended by the non-debtor parties to assumed executory contracts and unexpired leases shall be discharged upon entry of the Confirmation Order by the Clerk of the Bankruptcy Court.

3.    **Deadline for Filing Rejection Damage Claims**

The Plan provides that, if the rejection of an executory contract or unexpired lease by the Debtors-in-Possession pursuant to Section 7.1 of the Plan results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors, or their properties, their agents, successors, or assigns, unless a proof of claim is filed with the Debtors' court-appointed claims agent or with the Bankruptcy Court and served upon the Debtors or Reorganized Debtors on or before thirty (30) days after the latest to occur of (a) the Confirmation Date, and (b) the date of entry of an order by the Bankruptcy Court authorizing rejection of such executory contract or unexpired lease.

4.    **Indemnification and Reimbursement Obligations**

For purposes of the Plan, the obligations of the Debtors to indemnify and reimburse persons who are or were directors, officers, or employees of any of the Debtors on the Commencement Date or at any time thereafter against and for any obligations (including, without limitation, fees and expenses incurred by the board of directors of any of the Debtors, or the members thereof, in connection with the Chapter 11 Cases) pursuant to articles of incorporation, codes of regulations, bylaws, applicable state law, or specific agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected hereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Commencement Date.

5.    **Compensation and Benefit Programs**

Except as provided in Section 7.1 of the Plan, the Debtors' existing pension plans, savings plans, retirement plans, health care plans, performance-based incentive plans, retention plans, workers' compensation programs and life, disability, directors and officers liability, and other insurance plans are treated as executory contracts under the Plan and shall, on the Effective Date, be deemed assumed by the Debtors in accordance with sections 365(a) and 1123(b)(2) of the Bankruptcy Code. On and after the Effective Date, all claims submitted for payment in accordance with the foregoing benefit programs, whether submitted prepetition or postpetition, shall be processed and paid in the ordinary course of business of the Reorganized Debtors, in a manner consistent with the terms and provisions of such benefit programs.

Nothing in the Confirmation Order, the Plan, the Bankruptcy Code (and section 1141 thereof), or any other document filed in any of the Debtors' bankruptcy proceedings shall be construed to discharge, release or relieve the Debtors, the Reorganized Debtors, or any other party, in any capacity,

from any liability or responsibility with respect to the Retirement Plan for Hourly Paid Employees of Building Materials Corporation of America ("Pension Plan") under any law, governmental policy, or regulatory provisions.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility as a result of any of the provisions of the Plan, including those providing for satisfaction, release, and discharge of claims, the Confirmation Order, the Bankruptcy Code (and section 1141 thereof), or any other document filed in any of the Debtors' bankruptcy proceedings.

### 6.    Retiree Benefits

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors (within the meaning of section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which the Debtors had obligated themselves to provide such benefits.

## VIII.  OTHER ASPECTS OF THE PLAN

### A    CORPORATE GOVERNANCE AND MANAGEMENT OF REORGANIZED DEBTORS

### 1.    Board of Directors

On the Effective Date, the management, control, and operation of the Reorganized Debtors shall become the general responsibility of the Board of Directors of the Reorganized Debtors.

### 2.    Reorganized Debtors' Directors and Officers

The Boards of Directors of each of the Debtors immediately prior to the Effective Date shall serve as the initial Boards of Directors of the Reorganized Debtors on and after the Effective Date and, if different than the individuals identified in the Disclosure Statement, shall be identified in Schedule 8.2 to the Plan.  Each of the members of such Boards of Directors shall serve in accordance with applicable non-bankruptcy law and each Debtors' certificate or articles of incorporation and bylaws, as each of the same may be amended from time to time.  The officers of the Debtors immediately prior to the Effective Date shall serve as the initial officers of the Reorganized Debtors on and after the Effective Date.  Such officers shall serve in accordance with applicable non-bankruptcy law and any employment agreement with the Debtors, if assumed, or with the Reorganized Debtors.

### 3.    Amendment of Articles of Incorporation and By-Laws

The certificate or articles of incorporation and by-laws of the Debtors shall be amended as of the Effective Date to provide substantially as set forth in the Reorganized Debtors' Certificates of Incorporation and the Reorganized Debtors' By-Laws.  The certificate or articles of incorporation and by-laws shall contain provisions (i) prohibiting the issuance of non-voting equity securities, as required by section 1123(a)(6) of the Bankruptcy Code (subject to further amendment of such certificates of incorporation and by-laws as permitted by applicable law), and (ii) effectuating the provisions of the Plan, in such case without further action by the stockholders or directors of the Debtors, the Debtors-in-Possession, or the Reorganized Debtors.

Copies of the Reorganized Debtors' Certificates of Incorporation and By-Laws are Schedules to the Plan.

### 4.    Corporate Action

On the Effective Date, the adoption of the Reorganized Debtors' Certificate of Incorporation and the Reorganized Debtors' By-Laws shall be authorized and approved in all respects, in each case without further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Reorganized Debtors.  All other matters provided under the Plan involving the corporate structure of the Reorganized Debtors or corporate action by the Reorganized Debtors shall be deemed to have occurred, be authorized, and shall be in effect without requiring further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Reorganized Debtors.  Without limiting the foregoing, from and after the Confirmation Date, the Debtors or the Reorganized Debtors shall take any and all actions deemed appropriate to consummate the transactions contemplated herein.

### 5.    Authority of the Debtors

Effective on the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement effectively their respective obligations under the Plan and the Plan Documents.

## B    CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

### 1.    Conditions Precedent to the Effective Date of the Plan

The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent:

a.    The Bankruptcy Court and the District Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtors, the Asbestos Claimants Committee, and the Legal Representatives. The Confirmation Order or ancillary orders shall provide the following findings and conclusions and shall approve the following relief:

(i)    The Asbestos Permanent Channeling Injunction is implemented in connection with the Plan and the Asbestos Trust;

(ii)    The Plan (including the Plan Documents) complies with section 524(g) of the Bankruptcy Code for the issuance of an irrevocable injunction against Demands subject to the exclusive subject matter jurisdiction of the District Court;

(iii)    The Reorganized Debtors, the Plan Sponsor, each Protected Party and their respective successors and assigns are permanently enjoined from requesting any tribunal to enjoin draws on the Letter of Credit for any reason, including, without limitation, if any one of them becomes a debtor under title 11 of the United States Code; *provided, however*, that this provision shall not impair any of such enjoined persons' remedies if such a draw shall have been wrongful or fraudulent;

(iv)    The global compromise and settlement embodied in the Plan is approved;

(v)    At the time of the order for relief with respect to G-I, G-I had been named as a defendant in personal injury, wrongful death, and property

84

damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(vi)       The Asbestos Trust, as of the Effective Date, will assume all the liabilities of the Debtors with respect to all Asbestos Claims;

(vii)       The Asbestos Trust is to be funded in whole or in part by securities of the Reorganized Debtors and by the contingent obligation of the Reorganized Debtors to make future payments;

(viii)       The Asbestos Trust is to own, or by the exercise of rights granted under the Plan, for purposes of section 524(g) of the Bankruptcy Code, would be entitled to own, if specified contingencies occur, a majority of the voting shares of G-I;

(ix)       G-I is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Claims that are addressed by the Asbestos Permanent Channeling Injunction;

(x)       The actual amounts, numbers, and timing of the future Demands referenced in Section 10.1(a)(ix) of the Plan cannot be determined;

(xi)       Pursuit of the Demands referenced in Section 10.1(a)(ix) of the Plan outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands;

(xii)       The terms of the Asbestos Permanent Channeling Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan and the Disclosure Statement;

(xiii)       The Plan establishes, in Class 6 (Asbestos Claims), a separate class of the claimants whose Claims are to be addressed by the Asbestos Trust;

(xiv)       The Legal Representative was appointed as part of the proceedings leading to issuance of the Asbestos Permanent Channeling Injunction for the purpose of protecting the rights of persons that might subsequently assert unknown Asbestos Claims and Demands that are addressed in the Asbestos Permanent Channeling Injunction and transferred to the Asbestos Trust;

(xv)       Applying the Asbestos Permanent Channeling Injunction to each Protected Party in the Asbestos Permanent Channeling Injunction is fair and equitable with respect to persons that might subsequently assert Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Asbestos Trust by or on behalf of any such Protected Party;

(xvi)       Class 6 (Asbestos Claims) has voted, by at least 75 percent (75%) of those voting, in favor of the Plan; and

(xvii)       Pursuant to court orders or otherwise, the Asbestos Trust will operate through mechanisms such as structured, periodic, or supplemental payments, *pro rata* distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Claims and Demands, or other comparable

85

mechanisms, that provide reasonable assurance that the Asbestos Trust will liquidate, and be in a financial position to pay, Asbestos Claims and Demands that involve similar Claims in substantially the same manner.

b.     The Effective Date shall not occur, and the Plan shall be of no force and effect, until satisfaction of the following conditions precedent:

(i)     The Confirmation Order shall have been entered for at least ten (10) days and then is not stayed or enjoined;

(ii)     The Bankruptcy Court and/or the District Court, as required, shall have entered or affirmed the Asbestos Permanent Channeling Injunction (which may be included in the Confirmation Order), which shall contain terms satisfactory to the Debtors, the Asbestos Claimants Committee, and the Legal Representative;

(iii)     The Confirmation Order and the Asbestos Permanent Channeling Injunction shall be in full force and effect;

(iv)     All Asbestos Trustees shall have been selected and shall have executed the Asbestos Trust Agreement;

(v)     All agreements and instruments that are exhibits to the Plan or included in the Plan Supplement shall have been duly executed and delivered; *provided, however*, that no party to any such agreements and instruments may unreasonably withhold its execution and delivery of such documents to prevent this condition precedent from occurring;

(vi)     Such other actions and documents as the Debtors deem necessary to implement the Plan shall have been effected or executed; *provided, however*, that the execution, delivery, and approval of the CCR Settlement Agreement shall not constitute a condition to the Effective Date and the issuance of a Final Order in the CCR Allowance Proceeding shall not constitute a condition to the Effective Date; and

(vii)     All conditions to closing set forth in the Trust Note and the Letter of Credit shall have been fulfilled to the reasonable satisfaction of the Asbestos Claimants Committee and the Legal Representative (such satisfaction not to be unreasonably withheld).

c.     The Debtors shall have received (i) a favorable ruling from the Internal Revenue Service with respect to the qualification of the Asbestos Trust as a "qualified settlement fund" or (ii) an opinion of counsel with respect to the tax status of the Asbestos Trust as a "qualified settlement fund" reasonably satisfactory to the Debtors, the Asbestos Claimants Committee and the Legal Representative.

## 2.    Waiver of Conditions Precedent

To the extent practicable and legally permissible, each of the conditions precedent in Section 10.1 of the Plan may be waived, in whole or in part by the Plan Proponents, jointly. Any such waiver of a condition precedent may be effected at any time by filing with the Bankruptcy Court a notice thereof that is executed by the Plan Proponents, jointly. If any Plan Proponent desires to waive a condition precedent to facilitate confirmation, the other Plan Proponents shall confer promptly with it as to whether or not the suggested waiver should be given, in recognition that time is of the essence.

**C    ALTERNATIVE PLAN(S) OF REORGANIZATION**

The Debtors have evaluated numerous reorganization alternatives to the Plan.  After evaluating these alternatives, the Debtors have concluded that the Plan, assuming confirmation and successful implementation, is the best alternative and will fairly treat holders of Claims.  If the Plan is not confirmed, then the Debtors could remain in chapter 11.  Should this occur, then the Debtors could continue to operate their businesses and manage their properties as Debtors-in-Possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  Moreover, the Debtors (whether individually or collectively) or, subject to further determination by the Bankruptcy Court as to extensions of exclusivity under the Bankruptcy Code, any other party in interest could attempt to formulate and propose a different plan or plans.  This would take time and result in an increase in the operating and other administrative expenses of these Chapter 11 Cases.

**D    LIQUIDATION UNDER CHAPTER 7**

If no chapter 11 plan can be confirmed, then the Debtors' cases may be converted to cases under chapter 7 of the Bankruptcy Code, whereby a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to the holders of Claims in accordance with the strict priority scheme established by the Bankruptcy Code.

Under chapter 7, the cash amount available for distribution to Creditors would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors, augmented by the unencumbered cash held by the Debtors at the time of the commencement of the liquidation cases.  Such cash amount would be reduced by the costs and expenses of the liquidation and by such additional administrative and priority claims as may result from the termination of the Debtors' businesses and the use of chapter 7 for the purposes of liquidation.

Because there is no section 524(g) channeling injunction available in chapter 7, the Debtors believe their principal asset, BMCA, would have substantially less value, and that both commercial creditors and asbestos creditors would receive materially smaller recoveries in chapter 7 than under the Plan.

The Liquidation Analysis attached as Exhibit E reflects the Debtors' estimates regarding recoveries in a chapter 7 liquidation.  The Liquidation Analysis is based upon the hypothetical disposition of assets and distribution on Claims under a chapter 7 liquidation in contrast to the distribution of Cash and Plan Securities under the Plan.  The Liquidation Analysis assumes that, in the chapter 7 cases, the Bankruptcy Court will approve the settlements and compromises embodied in the Plan and described in the Disclosure Statement as fair and reasonable and determines that each of those settlements and compromises represents the best estimate, short of a final determination on the merits, of how these issues would be resolved.  The Liquidation Analysis further takes into consideration the increased costs of a chapter 7 liquidation, the impact on the value of the three Operating Entities and the expected delay in distributions to Creditors.

The Debtors submit that the Liquidation Analysis evidences that the Plan satisfies the best interest of creditors test and that, under the Plan, each holder of an Asbestos Claim that is payable under the Trust Distribution Procedures, and each holder of an Allowed Claim in another Class of Claims that is impaired,[12] will receive value that is not less than the amount such holder would receive in a

---

[12] As noted in Section I.C.2 of this Disclosure Statement, the classes of Claims and Interests that are impaired consist of G-I Unsecured Claims, Other Environmental Claims, Asbestos Claims, Asbestos Property Damage and Asbestos Property Damage Contribution Claims, the CCR Claim (if the CCR Claim is litigated, rather than resolved pursuant to the proposed CCR Settlement), G-I Affiliate Claims, G-I Equity Interest Redemption Claims, G-I Equity Interests, and ACI Equity Interests.

87

chapter 7 liquidation.  Further, the Debtors believe that pursuant to chapter 7 of the Bankruptcy Code, holders of Equity Interests would receive no distributions.

Estimating recoveries in any chapter 7 case is an uncertain process due to the number of unknown variables such as business, economic and competitive contingencies beyond the chapter 7 trustee's control, and this uncertainty is further aggravated by the complexities of these Chapter 11 Cases. The underlying projections contained in the Liquidation Analysis have not been compiled or examined by independent accountants.  The Debtors make no representations regarding the accuracy of the projections or a chapter 7 trustee's ability to achieve forecasted results.  Many of the assumptions underlying the projections are subject to significant uncertainties.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the ultimate financial results.  In the event these Chapter 11 Cases are converted to chapter 7, actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.  As such, the Liquidation Analysis is speculative in nature, but the unavailability of a section 524(g) channeling injunction in chapter 7 is not speculative.

## E        MISCELLANEOUS PLAN PROVISIONS

### 1.        Effectuating Documents and Further Transactions

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the Board of Directors, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such action as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 2.        Cooperation

Subject to any rights to revoke or withdraw the Plan as set forth therein, the Plan Proponents shall cooperate and together use their best efforts in pursuing confirmation of the Plan by the Bankruptcy Court.

### 3.        Title to Assets

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the estates of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests created prior to the Effective Date, except as provided in the Plan and the Plan Documents.  From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

### 4.        Discharge of Claims

In accordance with and not in limitation of sections 524 and 1141 of the Bankruptcy Code, and except as provided in the Plan, upon the Effective Date, all Claims against the Debtors shall be, and shall be deemed to be, discharged in full, and all holders of Claims shall be precluded and enjoined from asserting against the Reorganized Debtors, or any of their assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim.  Upon the Effective Date, all Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim and any Demand against the Debtors.

### 5.    Injunction Against Claims

In accordance with and not in limitation of sections 524 and 1141 of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, the Confirmation Order or other applicable order of the Bankruptcy Court, all Persons or Entities who have held, hold or may hold Claims or other debts or obligations discharged pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other discharged debt or obligation pursuant to the Plan against the Debtors, the Debtors-in-Possession or the Reorganized Debtors, the Debtors' estates or properties or interests in properties of the Debtors or the Reorganized Debtors, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Debtors-in-Possession or the Reorganized Debtors, the Debtors' estates or properties or interests in properties of the Debtors, the Debtors-in-Possession or the Reorganized Debtors, (c) creating, perfecting, or enforcing any encumbrance of any kind securing a discharged claim against the Debtors, the Debtors-in-Possession or the Reorganized Debtors or against the property or interests in property of the Debtors, the Debtors-in-Possession or the Reorganized Debtors, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559 or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind with respect to any obligation due from the Debtors, the Debtors-in-Possession or the Reorganized Debtors or against the property or interests in property of the Debtors, the Debtors-in-Possession or the Reorganized Debtors, with respect to any such Claim or other debt or obligation that is discharged pursuant to the Plan.

### 6.    Terms of Existing Injunctions or Stays

Unless otherwise provided in the Plan, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

### 7.    Injunction Against Interference With Plan of Reorganization

Pursuant to sections 1142 and 105 of the Bankruptcy Code, from and after the Effective Date, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and Affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan except for actions allowed to attain legal review.

### 8.    Exculpation

None of the Debtors, the Reorganized Debtors, their Affiliates, any of the members of the Asbestos Claimants Committee, the Legal Representative, or any of their respective officers, directors, members, employees, advisors, attorneys, financial advisors, accountants, agents, or other professionals retained with Bankruptcy Court approval shall have or incur any liability to any Entity for any act or omission in connection with or arising out of the Chapter 11 Cases, including, without limitation, the commencement of the Chapter 11 Cases, the negotiation of the Plan, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct, and in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Plan; *provided, however*, that the foregoing exculpation shall not apply to L. Tersigni Consulting P.C. or Loreto T. Tersigni.

### 9.    Mutual Releases

The Plan provides that, upon the Effective Date, the Debtors, the Debtors-in-Possession, the Plan Sponsor, the Reorganized Debtors, and the respective Affiliates and subsidiaries of the foregoing Entities shall be deemed to have unconditionally waived and released the Asbestos Claimants Committee, the Legal Representative, the defendants in *G-I Holdings Inc. v. Baron & Budd, et al.*, Case No. 01-CV-0216 (RWS), the Noteholder Defendants, and each of their respective members, employees, agents, advisors, attorneys, financial advisors, accountants, and other professionals from any and all claims, obligations, suits, judgments, damages, rights, causes of action arising from or based on any Claim, Equity Interest, or litigation, including, but not limited to, the Covered Matters, and all pending litigation among the Debtors, the Debtors-in-Possession, shareholders of the Debtors, the Asbestos Claimants Committee, the Noteholder Defendants, and the Legal Representative (including any of the Covered Matters) shall be dismissed with prejudice and without costs to any party; *provided, however*, that the foregoing release shall not apply to L. Tersigni Consulting P.C. or Loreto T. Tersigni; and *provided further, however*, that nothing in the Plan shall relieve the Debtors, the Reorganized Debtors, the Plan Sponsor, the Asbestos Claimants Committee, the Legal Representative, or the Asbestos Trust of their obligations under the Plan, the Plan Documents, the Confirmation Order, the documents and instruments contained in the Plan Supplement, and the Asbestos Trust Agreement.

Upon the Effective Date, the Asbestos Claimants Committee and the Legal Representative shall be deemed to have unconditionally waived and released the Debtors, the Debtors-in-Possession, the Plan Sponsor, the Reorganized Debtors, the respective Affiliates and subsidiaries of the foregoing Entities, the Noteholder Defendants, and each of the foregoing Entities' respective present and former officers, directors, employees, advisors, attorneys, financial advisors, accountants, and other professionals from any and all claims, obligations, suits, judgments, damages, rights, causes of action arising from or based on any Claim (other than an Asbestos Claim), Equity Interest, or litigation, including, but not limited to, the Covered Matters, and all pending litigation among the Debtors, the Debtors-in-Possession, shareholders of the Debtors, the Asbestos Claimants Committee, the Noteholder Defendants, and the Legal Representative (including any of the Covered Matters) shall be dismissed with prejudice and without costs to any party; *provided, however*, that nothing in the Plan shall relieve the Debtors, the Reorganized Debtors, the Plan Sponsor, the Asbestos Claimants Committee, the Legal Representative, or the Asbestos Trust of their obligations under the Plan, the Plan Documents, the Confirmation Order, the documents and instruments contained in the Plan Supplement, and the Asbestos Trust Agreement

Consistent with the foregoing releases, the parties will execute any and all appropriate documentation to effectuate the dismissal of all pending litigation.

### 10.    Avoidance Actions

The Reorganized Debtors shall release any avoidance, equitable subordination, piercing the corporate veil, alter ego or similar claims, rights, or causes of action that the Debtors, the Debtors-in-Possession or their Chapter 11 estates hold, arising under sections 510, 541, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or non-bankruptcy law, including, but not limited to, any and all causes of action that were or could have been asserted in the Covered Matters.

### 11.    Reservation of Rights

Except with respect to Covered Matters (as defined in the Plan) or as otherwise specifically provided in the Plan, nothing herein shall constitute or be deemed a waiver of any claim, right, or cause of action that the Debtors, the Reorganized Debtors, or the Asbestos Trust may have against any Entity other than a Protected Party in connection with or arising out of an Asbestos Claim,

and the Asbestos Permanent Channeling Injunction shall not apply to the assertion of any such claim, right, or cause of action by the Debtors, the Reorganized Debtors, or the Asbestos Trust.

### 12.    Post-Confirmation Date Fees and Expenses

The Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons incurred from and after the Effective Date by the Reorganized Debtors, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

### 13.    Plan Modifications

Prior to the Confirmation Date, the Plan Proponents, in their sole discretion, may jointly amend, modify or supplement the terms and provisions of the Plan, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Code may otherwise direct. After the Confirmation Date, so long as such action does not affect materially and adversely the treatment of Claims under the Plan, the Plan Proponents may jointly institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan. If any Plan Proponent suggests a modification of the Plan to facilitate confirmation, the other Plan Proponents shall confer promptly with it as to whether or not to modify the Plan accordingly, in recognition that time is of the essence.

### 14.    Revocation or Withdrawal

If the Effective Date does not occur by the last date permitted by the definition thereof, or if the Plan does not otherwise become effective by such date, the Confirmation Order and the Plan shall become null and void in all respects, unless each Plan Proponent, in its sole and absolute discretion, executes and files with the Bankruptcy Court a written notice waiving the foregoing requirement of Plan effectiveness by such date.

If a CCR Allowance Proceeding remains pending after confirmation of the Plan, the Plan shall be deemed withdrawn, and may not be consummated, unless the Asbestos Claimants Committee and Legal Representative, in their sole discretion, consent in writing to (i) consummation of the Plan, with the CCR Allowance Proceeding to be resolved after the Effective Date, (ii) the creation of a CCR Escrow pursuant to Section 4.4(c)(i)(C) of the Plan, and (iii) any adjustment in the First Payment to Asbestos Trust required by Section 4.4(c)(i)(C) of the Plan.

If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings pending in, arising in, or relating to the Chapter 11 Cases

In the event that the Effective Date does not occur, the parties shall be returned to the position they would have held had the Confirmation Order not been entered, and nothing in the Plan, the Disclosure Statement, any of the Plan Documents, or any pleading filed or statement made in court with respect to the Plan or the Plan Documents shall be deemed to constitute an admission or waiver of any sort or in any way limit, impair, or alter the rights of any Entity.

## 15.    Retention of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, including any exclusive jurisdiction it may have, over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases or the Plan, or relating to the following:

a.    to interpret, enforce, and administer the terms of the Plan, the Plan Documents (including all annexes and exhibits thereto), and the Confirmation Order;

b.    to resolve any matters related to the assumption, assignment, or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to the amendment after the Effective Date of the Plan, to add any executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be rejected;

c.    to enter such orders as may be necessary or appropriate to implement or consummate the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided*, *however*, that nothing in the Plan shall detract from or contravene any jurisdictional provisions of any such written agreement or instrument, including the Trust Note, any agreement regarding a pledge or collateral to secure the Trust Note, or any escrow agreement with respect to the CCR Escrow, that permits or requires legal actions or proceedings to be brought in another court;

d.    to determine any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtors, the Asbestos Claimants Committee, or the Legal Representative, after the Effective Date including, without limitation, any claims to recover assets for the benefit of the Debtors' estate, except for matters waived or released under the Plan;

e.    to ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

f.    to hear and determine any timely objections to Administrative Expense Claims or to proofs of Claim (other than Asbestos Claims), both before and after the Confirmation Date, including any objections to the classification of any Claim (other than Asbestos Claims), and to allow, disallow, determine, liquidate, classify, estimate or establish the priority of or secured or unsecured status of any Claim (other than Asbestos Claims), in whole or in part;

g.    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

h.    to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

i.      to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

j.      to hear and determine all applications for allowances of compensation and reimbursement of expenses of professionals under sections 330 and 331 of the Bankruptcy Code and any other fees and expenses authorized to be paid or reimbursed under the Plan, except as otherwise provided in Section 13.8 of the Plan;

k.      to hear and determine disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan or the extent of any Entity's obligations incurred in connection with or released under the Plan;

l.      to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

m.      to recover all assets of the Debtors and property of the Debtors' estates, wherever located;

n.      to resolve any Disputed Claims;

o.      to determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code;

p.      to determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Disclosure Statement, including any of the Plan Documents;

q.      to the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim (excluding any Asbestos Claim) or cause of action by or against the Debtors' estates;

r.      to hear and determine any other matters that may be set forth in the Plan, the Confirmation Order or the Asbestos Permanent Channeling Injunction, or that may arise in connection with the Plan, the Confirmation Order or the Asbestos Permanent Channeling Injunction;

s.      to hear and determine any proceeding that involves the validity, application, construction, or enforceability of the Asbestos Permanent Channeling Injunction, or that may arise in connection with the Plan, the Confirmation Order, or the Asbestos Permanent Channeling Injunction;

t.      to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

u.      to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code;

v.       to enter a final decree closing the Chapter 11 Cases; and

w.      to hear and determine all objections to the termination of the Asbestos Trust.

To the extent that the Bankruptcy Court under applicable law lacks core jurisdiction over, or is otherwise not permitted to render dispositive orders or judgments in, any of the foregoing matters, the reference to the "Bankruptcy Court" in this Article XI shall be deemed to be replaced by the "District Court."  Notwithstanding anything in this Article XI to the contrary, (i) the resolution and payment of Asbestos Claims, and the forum in which such resolution and payment will be determined, will be governed by and in accordance with the Asbestos Trust Distribution Procedures and the Asbestos Trust Agreement, and (ii) the Bankruptcy Court and the District Court shall have concurrent rather than exclusive jurisdiction with respect to (x) disputes relating to rights under insurance policies issued to the Debtors, and (y) disputes relating to the Debtors' rights to insurance with respect to Workers' Compensation Claims.

### 16.    Discharge of Debtors

Except as otherwise provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court as may be applicable, on the Effective Date the Debtors and Reorganized Debtors shall be discharged from all Claims whatsoever and all Demands shall be permanently and irrevocably channeled to the Asbestos Trust, and the Debtors' and reorganized Debtors' only liabilities shall be those set forth in the Plan.  All Persons and Entities shall be precluded from asserting against the Debtors, the Debtors-in-Possession, their successors or assigns, including, without limitation, the Reorganized Debtors or their respective assets properties or interests in property, any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not the facts or legal bases therefor were known or existed prior to the Confirmation Date and regardless of whether a proof of Claim or Equity Interest was filed, whether the holder thereof voted to accept or reject the Plan or whether the Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest.

### 17.    Plan Supplement

A specimen form of the documents to be included in the Plan Supplement shall be (a) filed with the clerk of the Bankruptcy Court no later than ten (10) days prior to the last date by which holders of impaired Claims may vote to accept or reject the Plan; and (b) posted at http://chapter11.epiqsystems.com/GIH as they become available, but no later than ten (10) days prior to the last date by which holders of impaired Claims may vote to accept or reject the Plan.  Upon its filing with the clerk of the Bankruptcy Court, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court during normal court hours.

## IX.  RISK FACTORS AND OTHER FACTORS TO BE CONSIDERED

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER EACH OF THE FACTORS SET FORTH BELOW, AS WELL AS OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN.

THE RISKS AND UNCERTAINTIES DESCRIBED BELOW SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

## A    BANKRUPTCY RISKS

### 1.    Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court (including, without limitation, satisfaction of secured, priority and administrative claims in accordance with the Bankruptcy Code), there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications will not necessitate the re-solicitation of votes.  In particular, the Plan embodies various settlements and compromises and there can be no assurance that the Bankruptcy Court will approve such settlements and compromises as part of the confirmation of the Plan.

### 2.    Non-Consensual Confirmation

In the event any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtors' request if at least one impaired Class has accepted the Plan (such acceptance being determined without including the vote of any "insider" in such Class), and as to each impaired Class that has not accepted the Plan, if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  Refer to Section X(F) for further information.  The Debtors believe that the Plan satisfies these requirements.

### 3.    Risk of Non-Occurrence or Delayed Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur after the Confirmation Date following satisfaction of any applicable conditions precedent, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan are not fulfilled (or have been waived) by each of the Plan Proponents by the last day on which the Effective Date may occur, then the Plan will be null and void, in which event no distributions will be made under it, the Debtors and all holders of Claims and Equity Interests will be restored to the position they would have held had the Confirmation Order not been entered, and the Debtors' obligations with respect to Claims and Equity Interests will remain unchanged.

## B    VARIANCE FROM ESTIMATES AND PROJECTIONS

The estimated recoveries and projections set forth in this Disclosure Statement are highly speculative and based on information available at the time that each analysis was prepared.  Actual results **will vary and may vary materially** from those reflected herein.  Refer to the entirety of Section IX for a discussion of potential risks and variances.

### 1.    Forward-Looking Statements

Each of the estimated recoveries and projections set forth in this Disclosure Statement is based, in large part, on forward-looking statements.

Forward-looking statements are statements of expectations, beliefs, plans, objectives, assumptions, projections, and future events or performance.  These statements, estimates and projections may or may not prove to be correct.  Actual results could differ materially from those reflected in the forward-looking statements.  Forward-looking statements are not guarantees of future performance and involve risks and uncertainties that could cause actual results or outcomes to differ materially from those expressed.  Such risks and uncertainties include, without limitation:  risks inherent in the Chapter 11 process, such as the non-confirmation of the Plan, non-occurrence or delayed occurrence of the Effective Date, or delayed distribution or non-distribution of Plan Securities; the effects of the departure of

personnel who rendered, or are rendering, services to the Debtors under the Management Agreement; the preliminary and uncertain nature of valuations and estimates contained in the Plan; potential environmental liabilities; increasing competition and operational hazards faced by BMCA and its subsidiaries; and economic, political, regulatory, and legal risks affecting the finances and operations of the Reorganized Debtors.

The Debtors and the Reorganized Debtors undertake no obligation to update any forward-looking statement included in the projections to reflect the occurrence of unanticipated events. New factors emerge from time to time and it is not possible to predict all such factors, nor can the impact of any such factor be assessed.

## 2.    Estimated Recoveries

The recovery estimates set forth herein are based on various estimates and assumptions. Moreover, Bankruptcy Code section 524(g)(2)(B)(ii)(II) requires as a condition of the channeling injunction that the actual amounts, numbers, and timing of future demands cannot be determined.  For example, if the estimated amount of Allowed Claims relied upon to calculate the estimated recoveries ultimately varies significantly from the actual amount of Allowed Claims, then actual creditor recoveries will vary significantly as well.  Similarly, as the estimated amount of Allowed Claims is a forward-looking statement based upon information available to the Debtors as of December 1, 2008, the actual results may vary significantly as Claims are Allowed or otherwise resolved over time.

At commencement of these Chapter 11 Cases over 148,000 asbestos-related personal injury claims against the Debtors were pending.  The disputes applicable to these claims together with the incalculable Demands render it impossible for the Debtors to determine the maximum amount of their potential liability.

## 3.    Financial Projections

Pursuant to the Plan, the payments to the Asbestos Trust are comprised of Cash on the Effective Date in an amount not to exceed $215 million, a Trust Note in the amount of $560 million, and other consideration for the benefit of the Asbestos Trust.  The Debtors have prepared the projections set forth in Exhibit D (as well as incorporated into the estimated creditor recoveries included herein) based on certain assumptions that they believe are reasonable under the circumstances.  Certain assumptions are described in each of the relevant Appendices.  The projections have not been compiled or examined by independent accountants.  The Debtors make no representations regarding the accuracy of the projections or any ability to achieve forecasted results.  Many of the assumptions underlying the projections are subject to significant uncertainties.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate financial results.  Therefore, the actual results achieved will vary from the forecasts, and the variations may be material.  In evaluating the Plan, Creditors are urged to examine carefully all of the assumptions underlying the financial projections.

## 4.    Liquidation Analysis

The Debtors have prepared the Liquidation Analysis attached as Exhibit E based on certain assumptions that they believe are reasonable under the circumstances.  Those assumptions that the Debtors consider significant are described in the Liquidation Analysis.  The underlying projections have not been compiled or examined by independent accountants.  The Debtors make no representations regarding the accuracy of the projections or a chapter 7 trustee's ability to achieve forecasted results. Many of the assumptions underlying the projections are subject to significant uncertainties.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the ultimate financial results.  In the event these Chapter 11 Cases are converted to chapter 7, actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.  As such, the

Liquidation Analysis is speculative in nature.  In evaluating the Plan, Creditors are urged to examine carefully all of the assumptions underlying the Liquidation Analysis.

## C        SECURITIES LAW MATTERS

In connection with the Plan, pursuant to section 1145 of the Bankruptcy Code, and except as provided in subsection (b) thereof, any issuance of (a) shares of common stock issued pursuant to the Plan and (b) the Trust Note issued pursuant to the Plan shall be exempt from registration pursuant to section 5 of the Securities Act of 1933, as amended, and all other applicable non-bankruptcy laws or regulations.

### 1.    Issuance and Resale of New Securities

Section 1145(a) of the Bankruptcy Code generally exempts from registration under the Securities Act of 1933 (the "Securities Act") the offer or sale of securities of a debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or an equity interest in, such debtor, or principally in such exchange and partly for Cash.  The Debtors and/or the Reorganized Debtors may attempt to rely on this exemption and seek to have common stock and any rights issued on the Effective Date exempted from the registration requirements of the Securities Act.  If so authorized, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  Recipients of securities issued under the Plan, if any, are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

In view of the complex, subjective nature of the question of whether a particular person may be an underwriter or an affiliate of the Reorganized Debtors, the Debtors make no representations concerning the right of any person to trade in any new stock that may be distributed in connection with the confirmation of the Plan.  Accordingly, in the event securities are issued in connection with the confirmation of the Plan, the Debtors recommend that potential recipients of such securities consult their own counsel concerning whether they may freely trade such securities.

### 2.    Legends

If stock or rights are issued in connection with confirmation of the Plan, then certificates evidencing shares of new common stock received by holders of at least 10% of the outstanding new common stock and received by holders of new stock upon exercise of rights issued pursuant to Regulation D will bear a legend substantially in the form below:

THE SHARES OF COMMON STOCK REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

**D**    **RISKS ASSOCIATED WITH THE BUSINESS**

Additional discussion of risks related to the Debtors' and BMCA's business are set forth in greater detail in BMCA's Form 10-K for the fiscal year ended December 31, 2007, annexed hereto at Exhibit F.

## X.  CONFIRMATION OF THE PLAN

**A**    **CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a Plan.  The Bankruptcy Court has ordered that the hearing on confirmation of the Plan will begin at __:__.m. Eastern Time, on _____ __, 2008, before the Honorable Rosemary Gambardella, United States Bankruptcy Judge, Third Floor of the United States Bankruptcy Court, Martin Luther King Jr. Federal Building, 50 Walnut Street, Third Floor, Newark, New Jersey.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

The Plan will not constitute a valid, binding contract between the Debtors and their creditors until the Bankruptcy Court has entered a Final Order confirming the Plan.  The Bankruptcy Court must hold a confirmation hearing before deciding whether to confirm the Plan.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a Plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Federal Rules of Bankruptcy Procedure, must set forth the name of the objector, the nature and amount of Claims or interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon and received no later than 4:00 p.m. Eastern Time on ___ __, 2008 by (i) G-I Holdings Inc., 1361 Alps Road, Wayne, New Jersey (Attn: Samuel Heyman); (ii) the attorneys for the Debtor, Dewey & LeBoeuf LLP, 1301 Sixth Avenue, New York, New York 10019 (Attn: Martin J. Bienenstock, Esq., Judy G.Z. Liu, Esq., and Timothy Q. Karcher, Esq.) and Riker, Danzig, Scherer, Hyland & Peretti LLP., Headquarters Plaza, One Speedwell Avenue, Morristown, New Jersey 07962 (Attn: Dennis J. O'Grady, Esq.); (iii) the Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, New Jersey 07102 (Attn: Mitchell B. Hausman, Esq.); (iv) the attorneys for the Asbestos Claimants Committee, Caplin & Drysdale, Chartered, One Thomas Circle N.W., Washington D.C. 20005-5802 (Attn: Trevor W. Swett, Esq. and Peter Van N. Lockwood, Esq.) and Lowenstein Sandler, P.C., 65 Livingston Avenue, Roseland, New Jersey 07068 (Attn: Jeffrey Prol, Esq. and Kenneth Rosen, Esq.); and (v) the attorneys for the Legal Representative, Keating, Muething & Klekamp, P.L.L., 1400 Provident Tower, One East Fourth Street, Cincinnati, Ohio 45202 (Attn: Kevin E. Irwin, Esq. and Michael Scheier, Esq.) and Saiber LLC, Gateway 1, 13th Floor, Newark, New Jersey, 07102-5311 (Attn: David R. Gross, Esq. and Nancy A. Washington, Esq.).

Objections to confirmation of the Plan are governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**B**    **REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements for confirmation listed in section 1129 of the Bankruptcy Code.  If the

Bankruptcy Court determines that those requirements are satisfied, it will enter an order confirming the Plan and submit the order to the United States District Court for its signature in respect of the channeling injunction.  As set forth in section 1129 of the Bankruptcy Code, the requirements for confirmation are as follows:

1.    The plan complies with the applicable provisions of the Bankruptcy Code.

2.    The proponent of the plan complies with the applicable provisions of the Bankruptcy Code.

3.    The plan has been proposed in good faith and not by any means forbidden by law.

4.    Any payment made or promised by the proponent of the plan, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5.    a.    The proponent of the plan has disclosed:

(1)    the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(2)    the appointment to, or continuance in, the office of the individual, is consistent with the interests of creditors and equity security holders and with public policy.

b.    The proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for the insider.

6.    Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or the rate change is expressly conditioned on such approval.

7.    With respect to each impaired class of claims or interests:

a.    Each holder of a claim or interest of the class has

(1)    accepted the plan; or

(2)    will receive or retain under the plan on account of the claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that the holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on that date; or

b.    If section 1111(b)(2) of the Bankruptcy Code applies to the claims of the class, the holder of the claim of the class will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value of the holder's interest in property of the estate that secures the claim.

8.    With respect to each class of claims or interests:

a.    The class has accepted the plan; or

99

       b.       The class is not impaired under the plan.

9.       Except to the extent that the holder of a particular claim has agreed to a different treatment of the claim, the plan provides that:

       a.       With respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of the Bankruptcy Code, on the effective date of the plan, the holder of the claim will receive on account of the claim cash equal to the allowed amount of the claim;

       b.       With respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5), or 507(a)(6) of the Bankruptcy Code, each holder of a claim of the class will receive:

       (1)       if the class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of the claim; or

       (2)       if the class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of the claim; and

       c.       With respect to a claim of a kind specified in section 507(a)(7) of the Bankruptcy Code, the holder of a claim will receive on account of the claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

10.       If a class of claims is impaired under the plan, at least one class of claims that is impaired has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of the class.

11.       Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

12.       All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

13.       The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide the benefits.

The Debtors believe that the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of chapter 11, and that the Plan is proposed in good faith.

The Debtors believe that all holders of Asbestos Claims and all holders of Allowed Claims impaired under the Plan will receive payments under the Plan having a present value as of the Effective Date not less than the amounts they would likely receive if the Debtors were liquidated in a case under chapter 7 of the Bankruptcy Code.  At the Confirmation Hearing, the Bankruptcy Court will determine whether holders of Allowed Claims would receive greater distributions under the Plan than they would have received in a liquidation under chapter 7 of the Bankruptcy Code.

**C      FEASIBILITY**

       The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization not proposed in the plan.  The Debtors believe that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.  At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan is feasible.

**D      BEST INTERESTS TESTS**

       As described above, the Bankruptcy Code requires that each holder of an impaired Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

       The first step in determining whether this test has been satisfied is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of Cash that would be available for satisfaction of Claims and Equity Interests would be the sum of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by any unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case.

       The next step is to reduce that gross amount by the costs and expenses of the liquidation itself and by such additional administrative and priority Claims that are projected to result from the liquidation of the Debtors.  Any remaining net Cash would be allocated to creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code.  Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) are compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

       The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.  Other liquidation costs include the expenses incurred during the chapter 11 cases Allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals for the Debtor, the Asbestos Claimants Committee and the Legal Representative, and costs and expenses of members of the Asbestos Claimants Committee, as well as other compensation Claims.

       The foregoing types of Claims, costs, expenses, fees, and other similar charges that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and Unsecured Claims.

       The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Debtors.  The analysis is based on a number of significant assumptions which are described below.  The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.

**E      LIQUIDATION ANALYSIS**

       As noted above, the Debtors believe that under the Plan all holders of impaired Claims and Equity Interests will receive property with a value not less than the value such holder would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Equity Interests, including (a) the

unavailability of a section 524(g) channeling injunction in chapter 7, without which the amount a buyer would pay for the stock of BMCA will likely diminish materially, (b) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee and professional advisors to the trustee, (c) the erosion in value of assets in a chapter 7 case in the context of the rapid liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, (d) the adverse effects on BMCA's businesses as a result of the likely departure of key employees and the probable loss of customers, (e) the substantial increases in Claims, such as estimated contingent Claims, which would be satisfied on a priority basis or on parity with the holders of impaired Claims and Equity Interests of the chapter 11 cases, (f) the reduction of value associated with a chapter 7 trustee's operation of the BMCA business, and (g) the substantial delay in distributions to the holders of impaired Claims and Equity Interests that would likely ensue in a chapter 7 liquidation and (ii) the liquidation analysis prepared by the Debtors which will be filed with the Bankruptcy Court prior to the Disclosure Statement Hearing (the "Liquidation Analysis").

The Debtors believe that any liquidation analysis is speculative, as such an analysis necessarily is premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. Thus, there can be no assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that the Bankruptcy Court will accept the Debtors' conclusions or concur with their assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

For example, the Liquidation Analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. This estimate is based solely upon (a) the Asbestos Claimants Committee's and Legal Representative's estimate of the number and value of Asbestos Personal Injury Claims and Demands, and (b) for other claims, the Debtors' review of their books and records and the Debtors' estimates as to additional Claims that may be filed in the chapter 11 cases or that would arise in the event of a conversion of the case from chapter 11 to chapter 7. No order or finding has been entered by the Bankruptcy Court or any other court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. The estimate of Asbestos Claims and Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including any determination of the value of any distribution to be made on account of such Claims under the Plan.

To the extent that confirmation of the Plan requires the establishment of amounts for the chapter 7 liquidation value of the Debtor, funds available to pay Claims, and the reorganization value of the Debtor, the Bankruptcy Court will determine those amounts at the Confirmation Hearing. Accordingly, the annexed Liquidation Analysis is provided solely to disclose to holders the effects of a hypothetical chapter 7 liquidation of the Debtor, subject to the assumptions set forth therein.

## F    SECTION 1129(B)

The Bankruptcy Court may confirm a plan over the rejection or deemed rejection of the plan by a class of claims or equity interests if the plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

### 1.    No Unfair Discrimination

This test applies to classes of Claims or Equity Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, only that such treatment be "fair."

### 2.    Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, Unsecured Claims and equity) and includes the general requirement that no class of Claims receive more than 100% of the Allowed amount of the Claims in such class.  As to the treatment that must be afforded to each rejecting class, the test sets different standards, depending on the type of Claims or interests in such class:

- *Secured Creditors*.  Each holder of an impaired secured Claim must either (i) retain its liens on the property, to the extent of the Allowed amount of its secured Claim and receive deferred Cash payments having a value, as of the effective date, of at least the Allowed amount of such Claim, or (ii) have the right to credit bid the amount of its Claim if its collateral security is sold and retain its liens against the proceeds of the sale (or if sold, on the proceeds thereof) or (iii) receive the "indubitable equivalent" of its Allowed secured Claim.

- *Unsecured Creditors*.  Either (i) each holder of an impaired Unsecured Claim must receive or retain under the plan property of a value equal to the amount of its Allowed Claim or (ii) the holders of Claims and interests that are junior to the Claims of the dissenting class must not receive any property under the plan.

- *Equity Interests*.  Either (i) each Equity Interest holder must receive or retain under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the Equity Interests of the dissenting class must not receive or retain any property under the Plan.

The Debtors believe the Plan will satisfy the "fair and equitable" requirements.

## XI.  PROJECTIONS

### A    INTRODUCTION

This section includes projections for the Reorganized Debtors (as successor to the Debtors) based on information available at the time of the preparation of this Disclosure Statement.

The projections assume an Effective Date of December 31, 2008, with Allowed Claims and Asbestos Claims treated in accordance with the provisions set forth in the Plan.  Expenses incurred as a result of the Chapter 11 Cases are assumed to be paid on the Effective Date.

It is important to note that the projections described below may differ from actual performance and are highly dependent on significant assumptions concerning the future operations of BMCA.  These assumptions include the growth of certain lines of business, labor and other operating costs, inflation, and the level of investment required for capital expenditures and working capital.  Please refer to Section IX for a discussion of many of the factors that could have a material effect on the information provided in this section.

### B    PROJECTIONS

A copy of G-I's *pro forma* balance sheet and other Debtor financial information is annexed hereto as Exhibit D.

## XII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Allowed Claims.  The following summary does not address the federal income tax consequences to holders of Claims or Equity Interests that are either unimpaired under the Plan or deemed to reject the Plan or to entities having no tax consequences such as governmental holders of Priority Tax Claims.

The following summary is based on the Tax Code, Treasury regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof.  These rules are subject to change, possibly on a retroactive basis, and any such change could significantly affect the U.S. federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested a ruling from the IRS with respect to any of the tax aspects of the Plan, other than a ruling that the Asbestos Trust is a "qualified settlement fund" under Treasury Regulation section 1.468B-1 *et seq.*  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary addresses neither state, local, or foreign income or other tax consequences of the Plan, nor the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, persons holding an equity interest as part of an integrated constructive sale or straddle, and investors in pass-through entities).

*Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.*

*To ensure compliance with Internal Revenue Service Circular 230, holders of Claims and Equity Interests are hereby notified that:  (a) any discussion of federal income tax issues contained or reflected in this Disclosure Statement is not intended or written to be used, and cannot be used, by any holder for the purpose of avoiding penalties that may be imposed on the holder under the Internal Revenue Code; (b) such discussion is written to support the promotion or marketing of the transactions or matters addressed herein; and (c) holders should seek advice based on their particular circumstances from an independent tax advisor.*

## A.    CONSEQUENCES TO DEBTORS

### 1.    Treatment of the Asbestos Trust

The Asbestos Trust is intended to be a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1 *et seq.*  In accordance with the Plan, the Debtors have requested a ruling from the IRS confirming such treatment with respect to the Asbestos Trust.  Moreover, it is a condition to the effectiveness of the Plan (waivable by the Debtors, with appropriate consents) that a favorable ruling be obtained from the IRS with respect to the qualification of the Asbestos Trust as a "qualified settlement fund" or that the Debtors have received an opinion of counsel with respect to the tax status of the trust reasonably satisfactory to the Debtors, the Asbestos Claimants Committee, and the Legal Representative.

Assuming the Asbestos Trust is treated as a qualified settlement fund, the Debtors generally would be entitled to a current federal income tax deduction for all transfers of cash, stock, and

other property (other than notes) to the Asbestos Trust to the same extent it would have been entitled to a deduction if such amounts had been paid directly to the holder of an Asbestos Claim.

The Debtors expect to obtain a substantial tax deduction upon the funding of the Asbestos Trust on the Effective Date and, consequently, to have substantial Net Operating Losses ("NOL") that may be carried back ten years.  The Reorganized Debtors will only be entitled to a deduction with respect to the Trust Note contributed to the Asbestos Trust as and when payments are made on such note.

As a qualified settlement fund, the Asbestos Trust will be subject to a separate entity level tax at the maximum rate applicable to trusts and estates.  In accordance with the Plan, the Debtors have requested a ruling from the IRS that: (a) any amounts transferred by the Debtors or the Reorganized Debtors to the Asbestos Trust  to satisfy a liability for which the fund is established will be excluded from the trust's income; (b) any sale, exchange, or distribution of property by the Asbestos Trust generally will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of disposition and the adjusted tax basis of the Asbestos Trust in such property; and (c) administrative costs (including state and local taxes) incurred by the Asbestos Trust will be deductible.  In general, the adjusted tax basis of property received by the Asbestos Trust pursuant to the Plan will be its fair market value at the time of transfer to the trust.

### 2. Cancellation of Debt Income

Generally, the discharge of a debt obligation by a taxpayer for an amount less than its adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of debt ("COD") income, which must be included in the taxpayer's income. In an exception to this rule, a debtor in a bankruptcy case excludes COD income from taxable income if the debt discharge giving rise to it is granted by the court or occurs pursuant to a court-approved plan of reorganization. Instead, certain income tax attributes otherwise available and of value to the debtor are reduced, in most cases by the amount of the debt discharged.

In connection with the implementation of the Plan, the Debtors may recognize COD income. Such COD income should be excluded from taxable income under the bankruptcy exception contained in the Tax Code (except, perhaps, in connection with certain Claims of Affiliates), and will result in a reduction of certain tax attributes of the Debtors.

## B. CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS.

### 1. Consequences to Holders of Certain Claims Receiving Cash

The holder of a Claim (other than Asbestos Claims, Asbestos Property Damage Claims, and Asbestos Property Damage Contribution Claims) that receives cash in satisfaction of the Claim will generally recognize gain or loss in an amount equal to the difference between the amount of cash received (other than cash allocable to interest on the Claim, which will be taxed as ordinary interest income) and the holder's basis in the Claim. Any gain or loss recognized will be capital or ordinary, depending on the status of the Claim in the holder's hands, including whether the Claim constitutes a market discount bond.

Gain or loss recognized by a holder of an Allowed Claim will be a long-term capital gain or loss if the Claim is a capital asset in the holder's hands and if the holder has held the Claim for more than one year, unless the holder has previously claimed a bad debt or worthless securities deduction or the holder has accrued market discount with respect to the Claim. All or part of the cash received by a holder of an Allowed Claim that has previously claimed a bad debt or worthless securities deduction with respect to the Claim may be ordinary income.

### 2. Distributions in Discharge of Accrued but Unpaid Interest

105

In general, a Claim holder that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim will be required to take such amount into income as taxable interest.

### 3.        Consequences to Holders of Asbestos Claims

Each Asbestos Personal Injury Claim will be liquidated and satisfied in cash (if payable under the Trust Distribution Procedures) solely from the Asbestos Trust, in accordance with the Asbestos Trust Distribution Procedures.  The federal income tax treatment of a receipt of payments by a holder of such Claim generally will depend upon the nature of the Claim.  Because the amounts received by the holder of an Asbestos Personal Injury Claim generally will be attributable to, and compensation for, such holder's personal physical injuries or sickness, within the meaning of section 104 of the Tax Code, any such amounts received by the holder should be nontaxable.  Each holder of an Asbestos Claim should consult his or her own tax advisors as to the proper tax treatment of any amounts received with respect to such Claim.

### 4.        Consequences to Holders of Asbestos Property Damage Claims and Property Damage Contribution Claims

Each Allowed Asbestos Property Damage Claim and Allowed Property Damage Contribution Claim will be satisfied in Cash in an amount equal to its Proportional Share of the PD Existing Insurance.  The federal income tax treatment of a receipt of payments by a holder of such Claim generally will depend upon the nature of the Claim. If any amount received by such holder with respect to such Claim is used to restore damaged property to its original condition, such amount generally should be nontaxable to the holder. However, any amount received in respect of property that has been destroyed and will not be replaced by the holder generally should be treated as received in respect of a sale or exchange of such property and may give rise to gain or loss generally equal to the difference between (i) such amount and (ii) the adjusted tax basis of the holder in the destroyed property. To the extent the amount received is used to replace destroyed property with similar property, the holder may be able to avoid recognizing gain under section 1033 of the Tax Code (governing involuntary conversions). Because the tax treatment of any amount received by a holder under the Plan will depend on facts peculiar to each holder, all holders of Asbestos Property Damage Claims and Property Damage Contribution Claims should consult their own tax advisors as to the proper tax treatment of such receipts.

### 5.        Information Reporting and Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding (including employment tax withholding).  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate (currently 28%).  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.

The Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, the following:  (i) certain transactions that result in the taxpayer claiming a

106

loss in excess of specified thresholds; and (ii) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## XIII.  CONCLUSION

The Debtors believe the Plan is in the best interests of all creditors and urge the holders of impaired Claims to vote to accept the Plan and to evidence such acceptance by timely returning their Ballots.

Dated:  December 3, 2008

Respectfully submitted,

By: /s/ Samuel J. Heyman
      Name: Samuel J. Heyman
      Title:  President and Chief Executive Officer

## LIST OF EXHIBITS

Exhibit A   Joint Plan of Reorganization
Exhibit B   Disclosure Statement Order
Exhibit C   Voting Procedures
Exhibit D   Projected Financial Information
Exhibit E   Liquidation Analysis
Exhibit F   BMCA 2007 Form 10-K

# EXHIBIT A

# SECOND AMENDED JOINT PLAN OF REORGANIZATION

# EXHIBIT B

# DISCLOSURE STATEMENT ORDER

# EXHIBIT C


# VOTING PROCEDURES

# EXHIBIT D

# PROJECTED FINANCIAL INFORMATION

# EXHIBIT E


# LIQUIDATION ANALYSIS

# EXHIBIT F

# BMCA 2007 FORM 10-K