RIKER, DANZIG, SCHERER,
HYLAND & PERRETTI LLP
Co-Attorneys for the Debtors
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
(973) 538-0800
Dennis J. O'Grady, Esq. (DJO 7430)
Mark E. Hall, Esq. (MH 9621)

DEWEY & LEBOEUF LLP
Co-Attorneys for the Debtors
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000
Martin J. Bienenstock, Esq. (MJB 3001)
Judy G. Z. Liu, Esq. (JL 6449)
Timothy Q. Karcher, Esq. (TQK 6173)

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
Special Litigation Counsel for the Debtors
Andrew J. Rossman (AR 0596)
Scott C. Shelley (SS 1013)
Christopher Kercher (CK 1755)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7199
Facsimile: (212) 849-7100

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| In re | Chapter 11 |
|---|---|
| G-I HOLDINGS INC., et al., | Case Nos. 01-30135 and 01-38790 (RG) |
| Debtors. | |

**REPLY BRIEF IN FURTHER SUPPORT OF CONFIRMATION AND IN
SUPPORT OF PLAN AMENDMENT REGARDING APPLICABLILITY OF
PLAN TERMS TO INDIRECT AS WELL AS DIRECT ASSESSMENTS**

The IRS seeks to scuttle Confirmation by opposing amended section 2.4, which is essential for two simple reasons. *First*, if the IRS were able to collect from G-I (indirectly via BMCA) up to a potential of $500 million in tax liability in a single lump-sum, together with as much as $150 million in post-petition interest – as the IRS claims is its right – this would undoubtedly drive G-I back into bankruptcy. Debtors fully expect that BMCA will generate enough cash to satisfy all Plan obligations currently proposed, and the six-year note terms have been carefully structured to allow G-I and BMCA sufficient breathing room to ensure the successful refinancing of $2.1 billion of BMCA debt that matures between 2012 and 2014. But if the IRS could evade those Plan terms, this would undermine the feasibility of the Plan. *Second*, even if G-I turned out to be strong enough *post*-Confirmation to survive such a threat to its solvency, it makes no sense for Mr. Heyman to provide now, *pre*-Confirmation, the New Value needed to make the Plan work in the face of such uncertainty. Indeed, no rational investor, especially in these parlous economic times, could be expected to put $800 million of his own assets at risk and contribute $220 million in cash on day one, when the IRS retains unilateral power to make an end-run around the Plan terms, violate a Tolling Agreement it drafted, and render his investment significantly less valuable and more vulnerable.

The IRS understands perfectly that its claims against BMCA, if left unaddressed by this Court, would sound the death knell for the Plan. By postponing Confirmation and subjecting G-I to ongoing uncertainty, the IRS hopes to retain leverage it can try to use to extract a higher settlement in the underlying district court tax dispute. But the IRS has no legal basis for postponing the last issue standing in the way of Confirmation. Its suggestion that the Court lacks power to confirm the Plan is baseless. Where necessary

1

to effectuate a successful reorganization, courts in title 11 cases have ample power to approve plans with provisions affecting claims against nondebtors.[1] Moreover, the IRS's half-hearted arguments on the merits of the Plan amendment – particularly its efforts to avoid the plain meaning of the Tolling Agreement – border on frivolous. The IRS's outrage that it might have to abide by the terms of a confirmable Plan eight and half years in the making and by contract terms that it alone drafted has no grounding in law or fact.

## I.   The IRS's Efforts to Undermine the Court's Power are Unavailing

The IRS offers five reasons why, in its view, the Court lacks power to prevent the IRS from evading the Plan terms and collecting indirectly from G-I what the Plan prevents it from collecting directly. None of these arguments has any merit.

### A.   Subject Matter Jurisdiction

First, the IRS argues that the Court lacks jurisdiction over BMCA's tax liability, arguing, incredibly, that a ruling regarding BMCA's liability *"could* [not] *conceivably have any effect"* on G-I. IRS at 10 (quoting *In re Kaplan*, 104 F.3d 589, 595 (3d Cir. 1997)). The IRS ignores the crucial facts that any amount paid by BMCA would deplete cash relied upon to fund the Plan and that G-I would be required to reimburse BMCA for any amount paid.[2] The Court's "related to" jurisdiction is clear.[3] The Court not only has "related to" jurisdiction, but also jurisdiction simply by virtue of the fact that the matter arises under title 11 in a case under title 11. The Court's power is invoked under sections

---

[1] *See, e.g., Dow Corning Corp.*, 280 F.3d at 657; *In re Ingersoll, Inc.*, 562 F.3d at 864.
[2] The government's suggestion that G-I might reject and renegotiate the Tax Sharing Agreement (IRS at 27) is ludicrous: such a strategy would require the consent of BMCA's creditors, who could never be expected to agree to a change so obviously detrimental to their interests.
[3] *See, e.g., In re Farmland Industries, Inc.*, 567 F.3d 1010, 1019 (8th Cir. 2009); *In re El Paso Refinery, LP*, 302 F.3d 343, 348-49 (5th Cir. 2002); *Belcufine v. Aloe*, 112 F.3d 633, 636-37 (3d Cir. 1997); *In re Dow Corning Corp.*, 86 F.3d 482, 488, 490-94 (6th Cir. 1996); *In re Campbell Enters., Inc.*, 66 B.R. 200, 204 (Bankr. D.N.J. 1986) (Gambardella, J.).

105, 106, 505, 524, 1129, 1141, and 1142 of title 11 and the dispute arises in a case under title 11 because absent Plan confirmation, the issue could not arise.[4] Jurisdiction is beyond dispute. The Supreme Court has ruled that bankruptcy judges have ample power to protect a debtor where, as here, one party seeks to collect from another party who is indemnified by the debtor. *Celotex Corp. v. Edwards*, 514 U.S. 300, 310 (1995).

### B.   Non-Core Proceeding

Second, the IRS contends that even if the Court does have "related to" jurisdiction (which it clearly does), this is a non-core proceeding requiring the consent of the parties. IRS at 12. The IRS overlooks that the District Court has joined in presiding over this confirmation proceeding and partially withdrawn the reference. Thus, regardless of whether this is a core or non-core proceeding (and it is core because it arises under title 11 and in a case under title 11), the District Court has authority to issue a final order on these issues. 28 U.S.C. §157(c), (d). Moreover, the IRS fails to mention that it waived its rights to article III adjudications by filing a proof of claim against G-I. 28 U.S.C. § 157(b)(2)(C). Once a proof of claim is filed, all counterclaims become core proceedings determinable by article I bankruptcy judges. *See Katchen v. Landy*, 382 U.S. 323 (1966).

### C.   Case or Controversy

Third, the IRS repackages its jurisdictional argument by positing that the single remaining issue threatening to derail the Plan is not a ripe "case or controversy." IRS at 12-13. It may be true that *if* BMCA's tax payments did not affect G-I (and there were no subject matter jurisdiction over them), then BMCA could sit back and wait for the IRS's

---

[4] *See Cargill, Inc. v. Man Financial, Inc. (In re Refco, Inc.)*, 354 B.R. 515, 521 (8th Cir. BAP 2006); *Williams v. CitiFinancial Mortg. Co. (In re Williams)*, 256 B.R. 885, 891 (8th Cir. BAP 2001) (same); *Grauz v. Englander*, 321 F.3d 467, 471-72 (4th Cir. 2003); *Geruschat v. Ernst Young LLP (In re Seven Fields Development Corp.)*, 505 F.3d 237 (3d Cir. 2007).

3

assessment. But G-I *is* in bankruptcy; G-I *is* a holding company which depends entirely on BMCA to fund the Plan; and G-I *must* indemnify BMCA for any amounts paid to the IRS, so the Court cannot confirm the Plan and let G-I emerge from bankruptcy while at the same timing deferring a ruling on the extent of BMCA's tax liability.[5] It is inherent in the bankruptcy process that courts routinely must address all sorts of contingencies that, absent an impact on the bankrupt entity, would not yet have ripened into justiciable controversies. BMCA's tax liability is now the central issue in this bankruptcy – one that must be resolved if the Plan is to be funded and confirmed, and ultimately to succeed.[6]

### D.    Anti-Injunction Act

Fourth, the IRS initially attacks Plan section 2.4, by citing *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), for exactly the opposite of its holding. The IRS contends that *Combustion Engineering* vacates "§ 105 injunction shielding non-debtor subsidiaries from liabilities of debtor corporation." IRS Brief at 15. In fact, *Combustion Engineering* holds, "the Bankruptcy Code precludes the use of § 105(a) to extend a channeling injunction to *non-derivative third-party actions against a non-debtor.*" *Id.* at 202(emphasis supplied). Thus, in *Combustion Engineering,* the debtor sought an injunction protecting nondebtors from liabilities *different from* those of the debtor. Here, G-I requests relief protecting nondebtors from acts to collect the *same taxes* owed by G-I, and only as long as G-I makes timely payments under the Plan. The IRS erroneously relies on *In re Becker's Motor Transp.*, Inc., 632 F.2d 242 (3d Cir. 1980) and *Pazzo Pazzo, Inc. v. New Jersey*, 2007 WL 4166017 (D.N.J., Nov. 20, 2007),

---

[5] *Cf.* Celotex Corp. v. Edwards, 514 U.S. 300, 310 (1995).
[6] The IRS's assertion that G-I cannot bind non-Debtors or assert claims on their behalf (IRS at 13) is belied by the IRS's own decision to have G-I execute the Tolling Agreement on behalf of its affiliates. Tolling Agreement at 2; *see also Campbell Enterprises*, 66 B.R. at 205.

4

although *Becker's Motor* could not (it was decided in 1980) and *Pazzo Pazzo* did not consider the 1994 amendment to section 106 of the Bankruptcy Code and the Supreme Court's decision in *Central Virginia Community College v. Katz*, 546 U.S. 356 (2006).

As the courts have recognized, "In the context of tax assessments and collections the government's sovereign immunity has been codified by the Anti-Injunction Act, I.R.C. § 7421(a) (1988)." *Jack Randall v. United States*, 64 F.3d 101 (2nd Cir. 1995); *see Murphy v. IRS*, 493 F.3d 170, 174 (D.C. Cir. 2007). The amendment to Bankruptcy Code section 106(a) in 1994, however, starts by negating sovereign immunity: "Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following...[includes Bankruptcy Code sections 105, 106, 505, 524, 1141, 1142...]. Moreover, in *Central Virginia* at 361, the Supreme Court ruled that even without the amendment, the U.S. Constitution had abrogated sovereign immunity in the bankruptcy court. Accordingly, all the IRS' defenses based on the Anti-Injunction Act are futile.

Moreover, contrary to the IRS's apparent belief, Debtors here are not seeking an injunction. As the IRS recognizes at page 13 of its brief, if the IRS were to violate the terms of the Plan as amended and try to collect from BMCA an amount different from what is permitted under the Plan, BMCA at that point would be able to defend the action by invoking section 2.4 of the Plan and res judicata principles.[7]

---

[7] If the Court *were* to treat the Amendment as requesting an injunction (it is not), the Court would not apply the generic injunction standards employed outside bankruptcy; it is well-recognized that bankruptcy courts may issue an injunction where such relief is simply necessary to the successful reorganization of a debtor. *See Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978-79 (1st Cir. 1995); *LTV Steel Co. v. Board of Ed. (In re Chateaugay Corp.)*, 93 B.R. 26, 29 (S.D.N.Y. 1988); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (Bankr. S.D.N.Y. 1987); *In re L&S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993); *Continental Illinois Nat'l Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co.*, 294 U.S. 648, 675-76 (1935). Even where Courts apply an elemental injunction standard in bankruptcy, they generally apply a modified standard

5

E.  **Release of Non-Debtors**

Finally, the IRS's complaint that the Amendment releases Non-Debtors of liability for the tax claims fails for two reasons. *First*, the Amendment does not release the nondebtors from liability for the same taxes G-I will owe on the Priority Tax Claim; it simply provides that those amounts are collectable from BMCA on the same terms as from G-I. *Second*, the IRS ignores the numerous statutory provisions supporting this Court's authority to approve the Plan Amendment—Bankruptcy Code sections 1123(b)(6), 1142(b), 105(a), 106(a) and 505(a)(1) and Bankruptcy Rule 3020(c)(1) and (d). Debtors' Supplemental Brief at 11-15. Many courts have exercised even broader authority pursuant to sections 105 and 1123(b)(6) than sanctioned by the Supreme Court in *Energy Resources* (which the IRS mischaracterizes in its brief),[8] including the confirmation of plans that release nondebtors from direct claims by creditors of the estate and plans that release nondebtors from claims by third parties that do not even hold claims against the estate.[9] And where, as here, creditors have sought to collect on a claim asserted against a nondebtor, and the nondebtor has a right of indemnity against the title 11 debtor for the same claim, courts have exercised jurisdiction to address the claim against the nondebtor without running afoul of section 524(e).[10]

---

recognizing the unique policies of bankruptcy laws. *See In re Monroe Well Service, Inc.*, 67 B.R. 746, 751 (Bankr. E.D. Pa. 1986). Moreover, in place of *likelihood* of success on the merits would be the question of who *actually prevails* on the merits, which is clear here. *See infra* at Section II.
[8] As explained in Debtors' Supplemental Brief at 15, approval of the Amendment requires exercise of far more *limited power* than the Supreme Court approved in *Energy Resources*.
[9] *See, e.g., In re Ingersoll, Inc.*, 562 F.3d 856, 864 (7th Cir. 2009); *In re Airadigm Communs., Inc.*, 519 F.3d 640, 657 (7th Cir. 2008); *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 656-76 (6th Cir. 2002).
[10] *See Menard-Sanford v. Mabey (A.H. Robins Co. Inc.)*, 880 F.2d 694, 702 (4th Cir. 1989); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).

II.   **The IRS Lacks Any Basis for Opposing Section 2.4 of the Plan on the Merits**

The IRS devotes comparatively little attention to the merits of section 2.4 – for good reason. The merits here are clear. All relevant evidence confirms that Section 2.4 is necessary to ensure the success of the Plan and is compelled by the IRS's own contract.

A.   **The IRS Ignores Evidence that Overwhelmingly Supports Section 2.4**

In a half-hearted effort either to defeat section 2.4 on the merits or at least delay its consideration, the IRS relies on vague assertions that G-I and BMCA have plenty of cash or, at the very least, the Court should reopen discovery regarding their finances. IRS at 11, 27. But we have already had discovery and a trial that included abundant evidence regarding G-I and BMCA's finances. Indeed, all the operating projections that form the basis of the Plan incorporate the terms specified in Section 2.4 and have been in the IRS's possession since December 2008. The evidence that the Court already has heard on the subject is, of course, relevant *both* to its evaluation of the six-year note terms that will govern G-I's repayments under section 1129(a)(9)(c) *and* to the amount and timing of any potential BMCA obligations. After all, the consequences for the estate will be identical, regardless of whether the IRS assesses against G-I or BMCA.[11] Whatever factual conclusions the Court draws regarding the appropriate note terms for G-I will necessarily bear upon the appropriate payment terms for BMCA as well.

G-I has supplied ample evidence supporting the interest rate and payment terms of section 2.4. *See* Memorandum in Support of Confirmation at 15-17. If the IRS were free to vary those terms – and collect greater amounts on an accelerated schedule – it would undermine the Plan at its core and jeopardize its success. BMCA must refinance $2.1

---

[11] *See* Draft Transcript of Testimony of Samuel J. Heyman, at 68-69, 81-82, 84.

7

billion of debt in 2012-2014.[12] Section 2.4's provisions are structured so that G-I and BMCA will not be burdened with substantial principal repayment proximate to these major refinancings. If the IRS were able to circumvent those Plan terms – and subject G-I and BMCA to a large tax liability before or shortly after one of these due dates – this would substantially aggravate what is already a genuine refinancing risk. Additionally, an assessment against BMCA would impose a lien against all its property, potentially resulting in a breach of BMCA's covenants under its existing credit agreements.[13]

Moreover, whether or not G-I and BMCA could *in fact* survive the imposition of larger payments on an accelerated schedule, Mr. Heyman in 2009 is not in a position to accept that risk and make a new investment that is so dependent on the whims of the IRS. A unilateral change in the interest rate by the IRS would alone eat up a substantial portion of the $220 million in cash that Mr. Heyman is contributing. And an acceleration of the payment terms would risk triggering another bankruptcy and subjecting Mr. Heyman to a loss not just of that cash but of the full $800 million in assets he is putting at risk.

Mr. Heyman has made a business decision to contribute cash and put assets at risk based on BMCA's projections and the terms of the Plan as drafted. All along he has expected that upon confirmation of the Plan were, the IRS would abide by its terms and not sidestep them via an assessment against BMCA – both because the Tolling Agreement on its face prohibits the IRS from collecting greater amounts from BMCA than from G-I and because all participants in the bankruptcy case understood all along

---

[12] *See* Debtors' Amended List of Exhibits, Nos. 86-87, 89 ($600 million revolving credit line in 2012; $975 million term loan in February 2014; $250 million senior notes in August 2014; and $325 million junior term loan in September 2014).
[13] *See* Internal Revenue Code §§ 6321, 6322; Debtors' Amended List of Exhibits Nos. 87, 89.

that BMCA was G-I's sole source of cash.[14] If the IRS were now given the unilateral ability to ignore the Plan terms and render Mr. Heyman's investment less valuable and more vulnerable, the investment would no longer be prudent and neither Mr. Heyman nor any other investor would contribute the New Value necessary to make the Plan work. The issue must be resolved now – both to ensure the feasibility of the Plan down the road and to prevent the Plan from unraveling today.

### B. IRS Cannot Avoid the Plain Terms of a Contract of its Own Creation

The IRS suggests that while the Tolling Agreement may bar *assessment* against BMCA of any more than it may *assess* against G-I, it nonetheless may *collect* from BMCA a great deal *more* than it may *collect* from G-I. Likewise, the IRS expressly contends it may assess against G-I a greater claim than is allowable against G-I, as long as it does not collect the unallowable portion of what it assesses. This absurd reading is wrong as a matter of contract law and as a matter of bankruptcy and tax law.[15]

As a matter of contract law, the IRS's argument has two glaring flaws. First, if the Tolling Agreement were interpreted as the IRS proposes, the agreement would have the same meaning with or without the last quoted sentence in note 15. The sentence would have no meaning, and the IRS would be able to seek greater amounts against BMCA than G-I as if the sentence protecting affiliates had never been included.[16] Second, the

---

[14] The IRS from inception of the tax case in 1997 has led G-I and BMCA to believe that BMCA would not be assessed for these amounts as long as G-I paid its obligations as due – and BMCA's financial statements and SEC filings have consistently reflected that belief.

[15] The Tolling Agreement provides: "The Taxpayer agrees that *the nonbankrupt corporations shall be liable for the income tax liability* (including tax, interest, additional amounts, additions to the tax and penalties) (the 'tax liability') *of the GAF group* . . . ; *the amount of such liability to be that which is ultimately determined against the Taxpayer*," Tolling Agreement at 2; and "The Commissioner further agrees that *he will not assess any amount against the nonbankrupt corporations with respect to said tax liability that is greater than the amount of the liability that he may assess against the Taxpayer*." Tolling Agreement at 3.

[16] *See, e.g., Princeton Ins. Co. v. Converium Reinsurance (North America) Inc.*, 2009 WL

9

operative sentence that the IRS seeks to render meaningless must be read in the context of the broader contract,[17] which is drafted to ensure that G-I and BMCA "ultimately" are "liable" for the same "amount" of "tax liability," without regard to what amounts might be "assessed." In any event, any ambiguity in the contract language (there is none) must be construed against the IRS, as it was the sole drafter of the agreement.[18]

Not only is the IRS's reading of "assess" incoherent as a matter of contract law, it is also legally impossible as a matter of bankruptcy and tax law. The IRS's reading of the contract hinges on its alleged ability to assess against G-I greater amounts than the bankruptcy law and Plan permit it to *collect* – that is, to assess for claims (post-petition interest) not allowed by Bankruptcy Code section 502(b)(2). This it cannot do. The discharge injunction granted to G-I on confirmation of its Plan, "operates as an injunction against the commencement or continuation of an action, the employment of process, *or an act, to collect, recover or offset any such debt* as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 USC § 524(a)(2) (emphasis added). As the IRS well knows – but does not disclose – its assessment against G-I automatically imposes a lien against all G-I's property[19] Any "assessment" against G-I of an *un*allowable amount such as gap interest flouts the Court's authority as an act to collect a discharged claim in violation of Bankruptcy Code section 524(a)(2).

## CONCLUSION

The Court should confirm the Plan as amended to include revised section 2.4.

---

2915092 (3rd Cir. 2009).
[17] *See, e.g., E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985);
[18] *See* Declaration of Albert H. Turkus, attached hereto as Exhibit A, at ¶ 4.
[19] *See* 26 USC § 6321 ("amount" "shall be a lien"); 26 USC § 6322 ("the lien imposed by section 6321 shall arise at the time the assessment is made").

10

Dated: October 13, 2009
       Morristown, New Jersey

Respectfully submitted,


By: /s/ Dennis J. O'Grady
Dennis J. O'Grady (DO 7430)
RIKER, DANZIG, SCHERER,
HYLAND & PERRETTI LLP
Co-Attorneys for the Debtors
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
Telephone: (973) 538-0800

Martin J. Bienenstock (MJB 3001)
Judy G.Z. Liu (JL 6449)
Timothy Q. Karcher (TK 6173)
DEWEY & LEBOEUF LLP
Co-Attorneys for the Debtors
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000

Andrew J. Rossman (AR 0596)
Scott C. Shelley (SS 1013)
Christopher Kercher (CK 1755)
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7199
Facsimile: (212) 849-7100

Jonathan T. Molot
Special Counsel
600 New Jersey Avenue N.W.
Washington, D.C. 20001-2075
Telephone: (202) 662-4062


3987713.1

# EXHIBIT A

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000
Martin J. Bienenstock, Esq. (MJB 3001)
Judy G. Z. Liu (JL 6449)
Timothy Q. Karcher, Esq. (TQK 6173)

Counsel for Debtors in Possession

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7199
Facsimile: (212) 849-7100
Andrew J. Rossman (AR 0596)
Christopher Kercher (CK 1755)

Special Counsel for Debtors in Possession

RIKER, DANZIG, SCHERER,
HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
(973) 538-0800
Dennis J. O'Grady, Esq. (DJO 7430)
Mark E. Hall, Esq. (MH 9621)

Counsel for Debtors in Possession

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>G-I HOLDINGS INC., et al.,<br><br>Debtor. | Chapter 11<br><br>Case Nos. 01-30135 (RG) and 01-38790 (RG)<br><br>(Jointly Administered) |

### DECLARATION OF ALBERT H. TURKUS

Albert H. Turkus, declares as follows:

I am over the age of eighteen (18) years and am otherwise qualified to make this Declaration.

1. I am a partner in the tax controversy group of Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates ("Skadden").

2. In that capacity, I have represented G-I Holdings, Inc. (G-I), successor to GAF Corporation (GAF), in the above-captioned case.

3. In connection with Skadden's representation of G-I, I was involved in discussions leading to the Agreement to be Bound, Waiver, and Agreement to Defer Assessment made between G-I and the Commissioner of Internal Revenue, dated November 30, 2001 (attached hereto as Exhibit 1) (the "Tolling Agreement").

4. The first draft of the Tolling Agreement was drafted by the Internal Revenue Service ("IRS") and forwarded to me via facsimile by John A. Guarnieri, Special Trial Attorney at the IRS, on November 17, 2001.

5. In subsequent conversations with Mr. Guarnieri, modifications were discussed with respect to language in the Tolling Agreement. Thereafter, Mr. Guarnieri revised the draft agreement and forwarded the final version of the agreement on November 28, 2001. The agreement was executed without further modification on or about November 30, 2001.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Washington, D.C. on the 9th day of October, 2009.

_Albert H. Turkus_

2