U.S. BANKRUPTCY COURT
FILED
NEWARK, NJ

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

09 NOV 12 PM 1:52

JAMES J. WALDRON

BY: _____
DEPUTY CLERK

|  |  |
|---|---|
| In Re:<br><br>**G-1 HOLDINGS INC. (f/k/a GAF Corporation),**<br>**and ACI Inc.,**<br><br>**Debtors.** | Case No. 09-CV-05035 (GEB)<br><br>Hon. Garrett E. Brown Jr. C.U.S.D.J. |

---

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In Re:<br><br>**G-1 HOLDINGS INC. (f/k/a GAF Corporation),**<br>**and ACI Inc.,**<br><br>**Debtors.** | Chapter 11<br><br>Bankr. Case Nos. 01-30135 (RG)  &<br>01-38790 (RG)<br>(Jointly Administered)<br><br>Hon. Rosemary Gambardella, U.S.B.J. |

**OPINION**

APPEARANCES:

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI, LLP
BY:    DENNIS J. O'GRADY, ESQ.
        MARK E. HALL, ESQ.
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey  07962
*Co-Counsel for the Debtors, G-I Holdings, Inc. and ACI, Inc.*

DEWEY & LeBOEUF
BY:    MARTIN J. BIENENSTOCK, ESQ.
        JUDY G.Z. LIU, ESQ.
        TIMOTHY Q. KARCHER, ESQ.
1301 6th Avenue
New York, NY 10019
*Co-Counsel for the Debtors, G-I Holdings, Inc. and ACI, Inc.*

QUINN EMANUEL, URQUHART, OLIVER & HEDGES, LLP
BY:    ANDREW J. ROSSMAN, ESQ.
51 Madison Avenue
New York, NY 10010
*Co-Counsel for the Debtors, G-I Holdings, Inc. and ACI, Inc.*

OFFICE OF THE UNITED STATES TRUSTEE
BY:    MITCHELL B. HAUSMAN, ESQ.
Suite 2100
One Newark Center
Newark, NJ 07102
*Attorney(s) for the United States Trustee*

CAPLIN & DRYSDALE
BY:    TREVOR W. SWETT, III, ESQ.
        JAMES P. WEHNER, ESQ.
399 Park Avenue
New York, NY 10022
*Co-Counsel for the Official Committee of Asbestos Claimants*

LOWENSTEIN SANDLER, P.C.
BY:    JEFFREY D. PROL, ESQ.
65 Livingston Avenue
Roseland, New Jersey 07068-1791
*Co-Counsel for the Official Committee of Asbestos Claimants*

KEATING, MUETHING & KLEKAMP, P.L.L.
BY:    KEVIN E. IRWIN, ESQ.
        ROBERT G. SANKER, ESQ.
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202
*Co-Counsel for C. Judson Hamlin, the Legal Representative of Present and
Future Holders of Asbestos-Related Demands*

SAIBER, L.L.C.
BY:    NANCY A. WASHINGTON, ESQ.
       DAVID R. GROSS, ESQ.
One Gateway Center, 13th Floor
Newark, New Jersey 07102
*Co-Counsel for C. Judson Hamlin, the Legal Representative of Present and
Future Holders of Asbestos-Related Demands*

U.S. DEPARTMENT OF JUSTICE, TAX DIVISION
BY:    ARI  D. KUNOFSKY, ESQ.
       JAN M. GEHT, ESQ.
P.O. Box 227, Ben Franklin Station
Washington, D.C. 20044
*Attorney(s) for the Internal Revenue Service*

DAY PITNEY, LLP
BY:    RICHARD M. METH, ESQ.
P.O. Box 1945
Morristown, NJ 07962
*Attorney(s) for certain Noteholder Defendants*

BRACEWELL GUILIANI, LP
BY:    GREGORY W. NYE, ESQ.
1177 Avenue of the Americas
New York, NY 10036
*Attorney(s) for numerous Noteholder Defendants*

TROUTMAN SANDERS, LLP
BY:    MARK I. SCHLESINGER, ESQ.
405 Lexington Avenue
New York, NY 10174
*Attorney(s) for Continental Casualty Company*

WHITE AND WILLIAMS
BY:    JOSEPH GIBBONS, ESQ.
1800 One Liberty Place
Philadelphia, PA 19103
*Attorney(s) for Century Indemnity Company*

WOLLMUTH MAHER & DEUTSCH LLP
BY:    GEORGE BENAUR, ESQ.
1 Gateway Center - 9th Floor
Newark, NJ 07102
*Attorney(s) for U.S. Gypsum Company*

ROBINS, KAPLAN, MILLER & CIRESI, LLP
BY:    BERNICE CONN, ESQ.
2049 Century Park East - Suite 3700
Los Angeles, CA 90067
*Attorney(s) for the Los Angeles Unified School District*

OFFICE OF THE ATTORNEY GENERAL, STATE OF ILLINOIS
BY:    RAYMOND CALLERY, ESQ.
500 South Second Street
Springfield, Illinois 62706
*Attorney(s) for the State of Illinois*

FOX ROTHSCHILD LLP
BY:    PHILIP GOODMAN, ESQ.
       JEFFREY M. POLLOCK, ESQ.
100 Park Avenue
New York, NY 10017
*Attorney(s) for the New York City Housing Authority*

<u>BROWN</u>, Chief District Judge

<u>GAMBARDELLA</u>, Bankruptcy Judge

## I.    <u>INTRODUCTION</u>

Before the Court is the Eighth Amended Joint Plan of Reorganization ("the Plan") of G-1

Holdings, Inc. ("G-1") and ACI, Inc., ("ACI," and together with G-1, the "Debtors") under

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") dated October 5, 2009,

submitted by the Debtors, together with the Official Committee of Asbestos Claimants (the

"ACC" or "Committee"), and C. Judson Hamlin, the Legal Representative for Present and Future

Asbestos-Related Demands (the "Legal Representative," and together with the Debtors and the

ACC, the "Plan Proponents").   Also before the Court is the Motion of the United States[1] to

Temporarily Allow its Unsecured, Non-priority Claims for Purposes of Voting on Confirmation

(the "IRS Vote Allowance Motion") and the Motion of the United States to Unseal its Second,

Amended Objection to Confirmation (the "Motion to Unseal")[2] that will be decided in

conjunction with the confirmation of the plan.   Objections to the Plan have been filed by the

Internal Revenue Service ("IRS"), the United States Trustee[3] (the "UST"), the New York City

Housing Authority ("NYCHA"), the Los Angeles Unified School District ("LAUSD"), the State

of Illinois ("ILL"), Quigley Company, Inc. ("Quigley"), Pfizer, Inc. ("Pfizer"),  U.S. Gypsum

Company ("USG"), the Novak Group ("Novak"), Owens-Illinois, Inc ("Owens Illinois"),

Century Indemnity Company ("Century") and Continental Casualty Company ("Continental").

Certain objections have been withdrawn or resolved and will not be discussed in this opinion.  A

confirmation hearing was held beginning on September 30, 2009, continuing on October 5, 2009,

October 6, 2009 and concluding on October 15, 2009 (the "Confirmation Hearing"), and

provided for future party submissions.[4]  After the Confirmation Hearing, on November 7, 2009,

Samuel J. Heyman, the chairman and owner of the Debtors, and the Plan Sponsor,[5] died of

natural causes.  Although Mr. Heyman's enormous individual effort helped build consensus upon

---

[1] The IRS Vote Allowance Motion, the Motion to Unseal and the United States' Objections to the Plan were all submitted to this Court by the United States acting in its capacity as the United States Department of Justice, Division of Taxation, on behalf of the Internal Revenue Service.

[2] On September 17, 2009, the IRS filed its Motion to Unseal its Second, Amended Objection to Confirmation.  (D.N. 9548.)  Pursuant to a Protective Order entered by the Court on December 30, 2008 (D.N. 8735), the Debtors had designated certain documents as "Highly Confidential."   Because the United States cited to portions of these documents in its Objection to Confirmation, it was required to file its objection under seal.  The issue was resolved by a settlement between the parties prior to the Confirmation Hearing.

[3] For Region Three.

[4] By Order dated September 29, 2009, pursuant to 28 U.S.C. § 157(d), the District Court partially withdrew the reference for the Confirmation Hearing to enable the Bankruptcy Court and the District Court to preside jointly over confirmation.

[5] Capitalized terms and phrases used but not otherwise defined herein have the meanings ascribed to them in the Plan.

which the Plan could be formed and proposed, his tragic death on the eve of confirmation of the Plan will not impede this Court's ruling for reasons discussed below.

As a preliminary matter, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Each of the Debtors was and is qualified to be a debtor under section 109 of the Bankruptcy Code. Venue of the Chapter 11 Cases in the United States District Court and the United States Bankruptcy Court for the District of New Jersey was proper as of the petition date, pursuant to 28 U.S.C. § 1408, and continues to be proper. The District Court has jurisdiction to enter a final order with respect to Confirmation of the Plan. The following constitutes this Court's findings of fact and conclusion of law.

## II. <u>FINDINGS OF FACT</u>[6]

### A. <u>Background</u>

On January 5, 2001, G-I Holdings filed a voluntary petition under chapter 11 of the Bankruptcy Code.[7] On August 3, 2001, ACI, Inc., a subsidiary of G-I Holdings, filed a voluntary chapter 11 petition. On October 10, 2001, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an Order directing the joint administration of the G-I Holdings and ACI, Inc. bankruptcy cases. Since the filing of its bankruptcy petition, G-I Holdings has been operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

G-I Holdings is the successor-in-interest to GAF Corporation (hereinafter "GAF"), an entity named in approximately 500,000 asbestos actions. The Committee submits that, as successor-in-interest to GAF, G-I Holdings remains liable for approximately 150,000 asbestos

---

[6] Certain facts that are not in dispute have been adapted from the Debtors Proposed Findings of Fact and Conclusions of Law regarding the Eighth Amended Joint Plan of Reorganization of G-1 and ACI Inc., submitted to the Court on October 15, 2009.

[7] Citations to the Bankruptcy Code and to the Federal Rules of Bankruptcy Procedure are to the sections and rules as numbered and in effect prior to October 17, 2005.

lawsuits ("Asbestos-Related Actions") filed, but unresolved, as of the petition date and for unknown numbers of asbestos claims that will be filed in the future.  *See In re G-I Holdings, Inc. f/k/a GAF Corporation, et. al.,* 323 B.R. 583, 588 (Bankr. D.N.J. 2005).

Building Materials Corporation of America (hereinafter "BMCA"), a leading manufacturer of roofing and building products, is an indirect subsidiary of G-I Holdings, and is also the primary operating subsidiary and principal asset of G-I Holdings.[8]  BMCA, which was established in 1994, received substantially all the assets of GAF's roofing products business and expressly assumed $204 million of asbestos liability, with G-I Holdings indemnifying BMCA against any additional asbestos liability.  *G-I Holdings, Inc. v. Those Parties Listed On Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 621 (Bankr. D.N.J. 2004).[9]

The ACC is an official committee of creditors which was appointed on January 18, 2001 by the United States Trustee pursuant to section 1102(a) of the Bankruptcy Code to represent those individuals who allegedly suffered injuries related to the exposure to asbestos from products manufactured by the predecessors of G-I Holdings.  *See* 11 U.S.C. § 1102(a).  The Bankruptcy Court appointed C. Judson Hamlin as the Legal Representative on October 10, 2001. The Legal Representative is a fiduciary who represents persons who hold present and future asbestos-related claims against G-I Holdings.

## B.  Global Settlement of Asbestos Personal Injury Claims lead to a Reorganization Plan

In early 2007 the Debtors, the ACC and the Legal Representative commenced mediation under the auspices of former United States District Judge Nicholas H. Politan in an effort to resolve the asbestos personal injury claims.  Following the mediation, the parties outlined the

---

[8] BMCA is not a debtor in this bankruptcy case.
[9] Although BMCA claims to have never manufactured any products containing asbestos, the company has been named as an additional defendant in more than one thousand asbestos bodily injury lawsuits against GAF since September of 2000.  *In re G-I Holdings, Inc., 313 B.R. at 621.*

principal terms of a potential global settlement and agreed to endeavor to complete the global settlement with comprehensive documentation in the form of a proposed chapter 11 plan and its ancillary documents.   To preserve the status quo pending the negotiation of the terms of a settlement, the parties mutually requested a stay from the Bankruptcy Court and other courts with jurisdiction of all litigation related to these Chapter 11 Cases that were encompassed by the potential global settlement.   The negotiations were lengthy and initially unsuccessful, but they were ongoing until a settlement agreement was reached in August 2008.[10]  On August 22, 2008, the Debtors filed a Joint Plan of Reorganization (the "Original Plan") that implemented a global settlement (the "Global Settlement") of the asbestos-related personal injury claims.

Under the Original Plan (and all subsequent versions, including the current Plan), the Plan Sponsor was Samuel J. Heyman, the owner and Chairman of G-1 and BMCA.  The Original Plan provided for the creation of an asbestos trust ("Asbestos Trust") pursuant to section 524(g) of the Bankruptcy Code, to which all asbestos-related personal injury claims against the Debtors would be channeled.   Pursuant to the Global Settlement, the Asbestos Trust would assume the Debtors' liability for asbestos-related personal injury claims, in exchange for cash on the effective date of the Original Plan in an amount not to exceed $215 million,[11] and a note in the

---

[10] The parties attribute their success at reaching an agreement in significant part to the laudable efforts of Judge Politan.

[11] This is an approximation, subject to the terms of Section 4.4(c)(i) of the Plan, which provides in relevant part:

(A) On the Effective Date, if the CCR Claim has been Allowed and the CCR Payment Amount is $10.0 million or less, the Reorganized Debtors' First Payment To Asbestos Trust shall be Cash in the aggregate amount of $215,000,000 less half of the CCR Payment Amount.

(B) On the Effective Date, if the CCR Claim has been Allowed and the CCR Payment Amount is greater than $10.0 million, the Reorganized Debtors' First Payment To Asbestos Trust shall be Cash in an aggregate amount calculated by subtracting the CCR Payment Amount from $220,000,000.

(C) If a CCR Allowance Proceeding remains pending after confirmation of the Plan but the Asbestos Claimants Committee and the Legal Representative have provided the written consents described in Section 12.2(b) of the Plan, then the Reorganized Debtors shall create the CCR

amount of $560 million issued by the reorganized Debtors, secured by a letter of credit. (Original Plan § 4.4.)

## C.  **The Second Amended Plan of Reorganization**

On December 3, 2008, after finalizing the terms of the Global Settlement, Debtors filed the (i) Second Amended Joint Plan of G-I Holdings Inc. and ACI Inc. Pursuant to Chapter 11 of the Bankruptcy Code ("Second Amended Plan") and (ii) an Amended Disclosure Statement ("Disclosure Statement").  Like the Original Plan, the Second Amended Plan implements the Global Settlement, and calls for the creation of an Asbestos Trust and provided for the issuance of a channeling injunction to prohibit the assertion of future asbestos personal injury claims against the Debtors and any other Protected Parties, specifically identified under the Plan.

## D.  **The Disclosure Statement**

By Order dated December 5, 2008 (the "Disclosure Statement and Solicitation Procedures Order") the Bankruptcy Court approved the Debtors' Disclosure Statement as containing adequate information pursuant to 11 U.S.C. § 1125.  (Disclosure Statement &

---

Escrow on the Effective Date. The Reorganized Debtors shall deposit the CCR Escrow Amount into the CCR Escrow, for eventual disbursement to CCR if, when, and to the extent the CCR Claim is Allowed pursuant to a Final Order in the CCR Allowance Proceeding. If the CCR Escrow becomes applicable, the Reorganized Debtors' First Payment To Asbestos Trust shall be computed as $220,000,000 minus the CCR Escrow Amount, and CCR's sole recourse for payment of the CCR Claim shall be against the CCR Escrow. Any balance remaining in the CCR Escrow after the CCR Claim is paid or disallowed shall be distributed as follows: (i) If the CCR Claim is disallowed by Final Order, Reorganized G-I shall receive $5 million plus an allocable pro rata share of any CCR Escrow Earnings, and the Asbestos Trust shall receive all remaining proceeds of the CCR Escrow, including all remaining CCR Escrow Earnings; (ii) if the CCR Claim is Allowed by Final Order and the resulting CCR Payment Amount is $10 million or less, Reorganized G-I shall receive the difference between $5 million and 50% of the CCR Payment Amount, plus a pro rata share of any CCR Escrow Earnings, and the Asbestos Trust shall receive the entire remaining balance of the CCR Escrow plus all remaining CCR Escrow Earnings; and (iii) if the CCR Claim is allowed by Final Order and the resulting CCR Payment Amount is more than $10 million, the Asbestos Trust shall receive the entire remaining balance of the CCR Escrow plus all CCR Escrow Earnings.

(Plan § 4.4.(c)(i).)  Based on this provision, the parties at the Confirmation Hearing often referred to the figure of $215 million in reference to the approximate amount of cash that will be a first payment to the Asbestos Trust, and to the figure $220 million in reference to the approximate total amount of cash that will be paid by the Reorganized Debtors upon on the Effective date under the Plan.

Solicitation Procedures Order p. 4 (D.N. 8606)).  The Disclosure Statement and Solicitation

Procedures Order also approved EPIQ Bankruptcy Solutions, LLC ("Epiq") as Voting Agent,

approved the solicitation package, and established procedures for the solicitation and tabulation

of votes to accept or reject the Second Amended Plan, which provided for a fair and equitable

voting process and are consistent with section 1126 of the Bankruptcy Code.  (Disclosure

Statement & Solicitation Procedures Order p. 8.)  Pursuant to Disclosure Statement and

Solicitation Procedures Order, only Class 3A (G-1 Unsecured Claims), Class 5 (Other

Environmental Claims), Class 6 (Asbestos Claims), Class 7 (Asbestos Property Damage Claims

and Asbestos Property Damage Contribution Claims) and Class 8 (CCR Claim) (all together, the

"Voting Classes") were to be sent ballots under the plan.  (Disclosure Statement & Solicitation

Procedures Order pp. 7-8; Second Amended Plan Art. III.)

On or about December 4, 2008, the Plan and Disclosure Statement were submitted to the

Voting Classes, which were allowed to vote to accept or reject the Plan pursuant to 11 U.S.C. §

1126.  The other classes received a Notice of Non-Voting Status.[12]  The Voting Procedures

Order also established the approved form of a notice to be published in *The Wall Street Journal*,

*USA Today*, and *The New York Times* advising of the entry of the Voting Procedures Order and

---

[12] Specifically, the Bankruptcy Court ordered that that Ballots need not be provided to the holders of Claims and Equity Interests in Class 1A (G-I Priority Non-Tax Claims), Class 1B (ACI Priority Non- Tax Claims), Class 2A G-I Secured Claims, Class 2B (ACI Secured Claims), Class 3B (ACI Unsecured Claims), Class 4 (Environmental Claims for Remedial Relief), Class 8 (CCR Claim, if the CCR settlement is approved before Voting Deadline), Class 9 (Bonded Class), and Class 10B (ACI Affiliate Claims), because they are unimpaired under the Plan and, therefore, are conclusively presumed to accept the Plan, pursuant to 11 U.S.C. § 1126(f).  Holders of Claims in such Classes were sent, instead of a Ballot, the Notice of Non-Voting Status (Unimpaired Class).  *Id*. at 8.  Ballots were not provided to the holders of Claims in Class 5 (Other Environmental Claims), Class 10A (G-I Affiliate Classes), Class 12A (G-I Equity Interests) and Class 12B (ACI Equity Interests), because they were deemed to reject the Plan.  *Id*. at 7.

the January 23, 2009[13] deadline (the "Voting Deadline") for the receipt of ballots by the Voting

Agent.  (Disclosure Statement & Solicitation Procedures Order, 10.)

On September 29, 2009, the Debtors filed the Declaration of James Katchadurian of Epiq

Bankruptcy Solutions, LLC Regarding the Tabulation of and Results of Voting with Respect to

the Second Amended Joint Plan of Reorganization of G-I Holdings Inc. and ACI Inc. Pursuant to

Chapter 11 of the Bankruptcy Code (the "Voting Declaration"), certifying the tabulation of and

results of voting with respect to the Second Amended Plan.  The Voting Declaration set forth

that the votes were solicited and tabulated "in accordance with the Disclosure Statement Order,"

and certified that 249,099 Class 6 Claimants totaling $3,360,633,295.00 in Claims cast ballots

accepting the Second Amended Plan, while just 395 Class 6 Claimants totaling $7,245,885.00 in

Claims cast ballots rejecting the Second Amended Plan.   (*See* Voting Declaration ¶ 7-9.)

Therefore, at least one non-insider Class of impaired Claims (the Asbestos Claims in Class 6)

voted to accept the Second Amended Plan.  (*See* Voting Declaration ¶ 7-9.)  At the conclusion of

the solicitation process, the Debtors received sufficient votes in favor of the Plan to support their

request for an order confirming the Plan.  Of the Classes entitled to vote, Class 6 voted in favor

of the Plan and Class 3A and Class 7 voted in opposition to the Plan.  Pursuant to the Plan,

Classes 1A, 1B, 2A, 2B, 3B, 3C, 4, 5A, 8, 9 and 10B were not entitled to vote and were deemed

to accept the Plan. Classes 5, 10A, 11, 12A and 12B were not entitled to vote and were deemed

to reject the Plan.

### E.  Poor Economic Climate Leads to Delay in Confirmation Hearing

Debtors subsequently informed the Bankruptcy Court that, due to lack of available credit

in the market at the time, it was unlikely that they would be able to obtain the Letter of Credit

---

[13] Ballots were to be received by the Voting Agent no later at 4 p.m. (Eastern Time), regardless of when they are postmarked

that was integral to the funding of the Asbestos Trust and therefore the confirmation of Second Amended Plan.  As a result, the Bankruptcy Court delayed the confirmation hearing and asked the Debtors to keep the Bankruptcy Court apprised of further developments via monthly status conferences.

In June 2009, the Debtors informed the Bankruptcy Court that it would be possible for the Debtors to secure the Letter of Credit necessary for the funding of the proposed Asbestos Trust; therefore, the confirmation process could resume.  After consultation with the parties, the Bankruptcy Court entered the Amended Plan Confirmation Scheduling Order ("Amended Scheduling Order") on July 1, 2009.  Per the Amended Scheduling Order, the Bankruptcy Court established September 4, 2009 as the deadline for parties in interest to file Objections to Confirmation, and established that the Confirmation Hearing would commence on September 30, 2009.  (*See* Amended Scheduling Order (D.N. 9278).)

### F.  <u>Modifications Lead to an Eighth Amended Plan of Reorganization</u>

Following entry of the Amended Scheduling Order, the Debtors filed several amendments to the Second Amended Plan, which was the version for which the Disclosure Statement was approved and votes were solicited. Specifically, the Debtors filed a Third Amended Plan on July 2, 2009, a Fourth Amended Plan on July 28, 2009, a Fifth Amended Plan on August 19, 2009, a Sixth Amended Plan on September 9, 2009, a Seventh Amended Plan on September 30, 2009 and an Eighth Amended Plan on October 5, 2009.  It is the Eighth Amended Plan that was ultimately the subject of the Confirmation hearing.

Most of the cumulative amendments made to the Plan between the Second Amended Plan for which solicitations and voting had occurred and the Eighth Amended Plan are in the nature of technical, non-substantive changes.  With respect to changes to the Plan that may be considered

substantive, those proposed modifications did not adversely change the treatment of the claim of any impaired creditor who previously approved the plan.

Several modifications to the Plan were made the result of settlements approved by the Bankruptcy Court between Debtors and certain Claim holders, which in turn resolved previously asserted objections to confirmation.  For example, a new Class 5A was added to the Plan to provide for treatment of the US Environmental Claim and Vermont Environmental Claim pursuant to the terms of the Consent Decree and Settlement Agreement, which memorializes a global settlement between G-I and its Affiliates, on the one hand, and the United States and the State of Vermont, on the other, to resolve litigation underlying such Claims. (Plan § 3.10.) Pursuant to the terms of the Consent Decree and Settlement Agreement, the Class 5A Claims are impaired under the Plan and their agreement constitutes the Claim holders' vote to accept the Plan.  Similarly, a settlement was reached with the Center for Claims Resolution, Inc. ("CCR") and the CCR Settlement Agreement[14] was approved by the Bankruptcy Court, and those Claim holders are now deemed to accept the plan.  (Plan § 3.13.)[15]

To resolve objections by holders of Class 7 Claims (Asbestos Property Damage Claims and Asbestos Property Damage Contribution Claims), the Plan was also amended to provide that Class 7 claimants would receive the same treatment as other Unsecured Claims, rather than be limited to a pro rata share of available insurance. Therefore, holders of Class 7 Claims are now receiving improved treatment of their Claims compared to the earlier proposed chapter 11 plans. To address the concerns of the United States Trustee, clarifying language was added with respect

---

[14] The CCR Settlement Agreement is defined in the Plan as an agreement to be entered into between and among the Debtors, the Asbestos Claimants Committee, the Legal Representative and CCR, and submitted for approval to the Bankruptcy Court, which will implement the letter of understanding with CCR dated June 30, 2008, and provide for a compromise and settlement governing the allowance and treatment of the CCR Claim under the Plan.  (Plan § 1.1.41.)

[15] *See* Order Pursuant to Bankruptcy Rule 9019 Approving Settlement and Compromise of Certain Claims Pursuant to the CCR Settlement Agreement (D.N. 9595).  Note that Former CCR Member Claims, to the extent that they are Allowed, if any, will join Class 3A (G-1 Unsecured Claims).  (Plan §§ 1.1.35, 1.1.72.)

to the payment of post-confirmation statutory fees.  (*See* Plan § 13.7.)  Other modifications

adjust the interest rate payable on certain unimpaired IRS Priority tax claims (*see* Plan § 2.4),

create a new class of claims to render the IRS non-priority tax penalty claims unimpaired,[16] or

clarify that the terms of the Plan are consistent with the terms of a preexisting contractual

relationship between Debtors and the IRS.[17]

###    G.  Objections to Confirmation

Per the Amended Scheduling Order dated July 1, 2009, the Bankruptcy Court established

September 4, 2009 as the deadline for filing objections to the Plan.  On July 17, 2009, Owens

Illinois and the Novak each filed a notice of intent to file an objection to the Plan.  In each case,

as of the September 4, 2009 deadline, no such objection was filed.

On January 12, 2009, the NYCHA filed an objection to confirmation arguing that the

Plan should not be confirmed because it does not "meaningfully address" NYCHA's claim for

property damage.  On July 17, 2009, LAUSD and ILL each filed objections to the Plan based on

the proposed treatment of their property damage claims, which would have been tied to

insurance proceeds.[18]  The Plan has been modified to remove the tie to insurance proceeds

and provide that Allowed Asbestos Property Damage and Allowed Asbestos Property

Damage Contribution Claims "shall receive Cash in an amount equal to 8.6% of such Allowed

Claim."  Plan § 3.12(b).  The objections of NYCHA, LAUSD and the ILL are satisfied by the

aforementioned modification to the Plan.

On September 3, 2009, USG filed an Objection to the Plan on the grounds that its

property damage claim was improperly classified as a Class 8 CCR Claim.  (*See* US Gypsum

---

[16] Class 3C:  G-1 Non Priority Tax Penalty Claims.  (*See* Plan § 3.7.)

[17] *See* Tolling Agreement (*See Infra* § II.I, defining Tolling Agreement); Plan § 2.4.

[18] The provision in the third amended Plan providing that Class 7 Asbestos Property Damage and Asbestos Property Damage Contribution Claims were to be paid 8.6% of their Allowed Claims, solely from PD Existing Insurance. (*See* Third Amended Plan § 3.12(b).)

Objection ¶ 9 (D.N. 9453).)  Similarly, on September 4, 2009, Quigley and Pfizer each filed objections to the Plan on the ground that the Plan improperly classifies their claims as Class 8 CCR Claims, rather than Class 3A (G-I Unsecured Claims).  (*See* Quigley Objection ¶ 24 (D.N. 9459); Pfizer Objection ¶ 3 (D.N. 9456).)  The Plan has been modified to reclassify the aforementioned claims ("Former CCR Member Claims") as Class 3A G-1 Unsecured Claims to the extent that they become allowed.  (Plan § 3.5(a).)[19]  The objections of USG, Quigley and Pfizer are satisfied by the aforementioned modification to the Plan.

On September 4, 2009, Continental filed an objection to the Plan, alleging that it is not insurance neutral.  (*See* Continental Objection ¶¶ 11, 12 (D.N. 9469).)  Also on September 4, 2009, Century filed an objection to the Plan on similar grounds, but withdrew its objection on all grounds other than insurance neutrality pursuant to settlement agreement approved by Order of the Bankruptcy Court on September 25, 2009.  (*See* Order Approving Settlement Agreement With Century Indemnity Company And Authorizing The Sale of Rights Under Insurance Policies Free and Clear of Liens, Claims, Interests and Other Encumbrances (D.N. 9598).)  The Debtors argued that the language of section 6.5 of the Plan is modeled on language approved by the United States Court of Appeals for the Third Circuit in the seminal case on insurance neutrality.  *See In re Combustion Eng'g*, 391 F.3d 190 (3d Cir. 2004).  Neither Continental nor Century presented any evidence in support of its objection as at the Confirmation hearing.  A modification was later made to the Plan to clarify a provision with respect to insurance neutrality.  (Confirmation Hearing Transcript 15-17, Sept. 30, 2009.)  These objections were withdrawn on the record at the start of the Confirmation Hearing, as a result of a mutually agreed upon plan modification.  (*See* Conf. Hr'g Tr. 15-17, Sept. 30, 2009.)

---

[19] "To The extent that Former CCR Member Claims become Allowed Former CCR Member Claims, such Claims shall be entitled to the treatment provided for Allowed Claims in Class 3A." (Plan § 3.5(a).)

The United States Trustee had filed a preliminary objection to the Third Amended Plan, but it was resolved before the Confirmation Hearing based upon language that was incorporated into updated version of the Plan. The United States Trustee never filed a formal objection to the current Plan, and Mitchell Hausman appeared at the Confirmation Hearing on behalf of the United States Trustee to explain that they were in fact withdrawing their preliminary objection to Plan Confirmation.

### H.  Withdrawal of the Reference

By Order dated September 29, 2009, pursuant to 28 U.S.C. § 157(d), on motion of the Debtors and with the support of the ACC and the Legal Representative, the District Court partially withdrew the reference of the Confirmation Hearing to enable the Bankruptcy Court and the District Court to preside jointly over confirmation.[20]

### I.  Discussion of Facts Related to IRS's Objections

In 1990, ACI and GAF were involved in business transaction that allegedly resulted in the formation of a partnership. In 1994, GAF settled certain outstanding disputes relating to GAF's interest in the partnership. Under the terms of the settlement agreement, GAF agreed to terminate pending litigation and received a partnership distribution of a portion of its interest in the partnership of approximately $25.5 million. The settlement resulted in pre-tax income of $23 million. The settlement also provided that GAF would receive fixed monthly distributions until 1999 as well as a fixed final distribution in 1999. On September 15, 2997, G-I received a notice from the IRS of a deficiency in the amount of $84.4 million in connection with the formation of the partnership. The Debtors filed petitions in the United States Tax Court challenging the IRS's notice of deficiency. The filing of the Debtors' bankruptcy petitions automatically stayed

---

[20] The Plan is dependent on an injunction issued pursuant to 11 U.S.C. § 524(g) that may not be revoked or modified except as provided in 11 U.S.C. § 524(g)(3)(A), which subsection requires that the District Court issue or affirm the Confirmation Order.

proceedings in the Tax Court, and the IRS thereafter filed proofs of claim in the Bankruptcy

Court. The Debtors objected to the amounts and validity of the IRS's proofs of claims, and these

objections are the subject of separate legal proceedings currently pending before the Honorable

Stanley R. Chesler of the United States District Court for the District of New Jersey. *See United

States v. G-I Holdings, Inc.*, Case No. 02-03082 (D.N.J.).[21]

At all times relevant to the IRS claims against the Debtors, the Debtors and their non-

debtor affiliates (and their predecessors), including but not limited to BMCA and International

Specialty Products, Inc. ("ISP"), filed consolidated federal income tax returns. As a

consequence, the Debtors' non-debtor affiliates are severally liable for any and all federal

income taxes, including interest and penalties on delinquent taxes, that are owed by the Debtors.

*See* 26 U.S.C. § 1502; 26 C.F.R. § 1.1502-6(a). On November 30, 2001, the IRS, G-I and G-I's

affiliated non-debtors entered into the "Agreement to be Bound, Waiver, and Agreement to

Defer Assessment" (the "Tolling Agreement") (Conf. Hr'g Ex. 399), regarding "tax liability" (as

defined therein) for this affiliated group of taxpayers for the taxable years ended December 31,

1985 through December 31, 1999. Pursuant to the Tolling Agreement, G-I (referred to as the

"Taxpayer") agreed that for each taxable year in which its non-debtor affiliates filed consolidated

tax returns with G-I as their designated agent, G-I would be liable for the tax liabilities of the

consolidated group. G-I further agreed that for each taxable year, the statute of limitations for

the non-debtor affiliates would not expire before the tax liability may be assessed against the

Taxpayer, G-I. The IRS agreed that the tax liability of the nonbankrupt parties to the Tolling

Agreement would be the amount of liability that is ultimately determined by a court of

competent jurisdiction against G-I, and that it would not assess against G-I's affiliates "before

---

[21] The District Court withdrew the reference from the Bankruptcy Court regarding the Debtors' objection to the
IRS's proofs of claim on May 13, 2003. *In re G-I Holdings Inc.*, Case No. 02-03082 (D.N. 10, 11).

such time as [the IRS] may assess the same against the Taxpayer."  Lastly, the IRS agreed to "not assess any amount against the nonbankrupt corporations with respect to said tax liability that is greater than the amount of the liability that [the IRS] may assess against the Taxpayer." Albert H. Turkus, a partner in the tax controversy group of Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates who was involved in discussions leading to the Tolling Agreement, filed an affidavit with the Court, in which Turkus stated that the first draft of the Tolling Agreement was drafted by the IRS, and that the IRS revised the draft agreement before the final version was executed.

The IRS has asserted two sets of alternative tax claims against the Debtors in this bankruptcy case.  First, the IRS has asserted priority tax claims approximating $315 million, plus unsecured non-priority claims of roughly $68 million for penalties, arising from the disputed character of the alleged partnership transaction executed by the Debtors in 1990.  In the alternative, the IRS has asserted priority tax claims approximating $131 million, plus unsecured non-priority claims of roughly $26 million for penalties, arising from the termination of the Debtors' alleged partnership transaction in 1999.

The Plan refers to the IRS's alternative priority tax claims as the "Priority Tax Claim" and its alternative unsecured non-priority tax claims as the "G-I Non-Priority Tax Penalty Claim."  (Plan §§ 1.1.78, 1.1.100.)  Pursuant to the Plan, the IRS would receive "full and complete satisfaction of" its Priority Tax Claims.[22]  Payment to the IRS may be (i) in cash, (ii)

---

[22] The Plan treats the IRS's Priority Tax Claims as follows:

each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the applicable Reorganized Debtor and in full and complete satisfaction of any and all liability attributable to such Priority Tax Claim on the latest of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law, or as soon thereafter as is reasonably practicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim, (b) a transferable

under a transferable, interest-bearing, six-year note, or (iii) via a combination of cash and a note, and the Debtors may prepay any note without penalty.  (Plan § 2.4.)  The six-year note provides for a fixed interest rate based on the London Interbank Offered Rate ("LIBOR") plus 1%, and is back-end amortized, with full payment of the note coming at the end of six years.  (Plan § 2.4.) Any payment, by note, cash or a combination thereof, will be provided on the later of the effective date of the Plan, the date the IRS's priority tax claim becomes an Allowed Priority Tax Claim, or on the date the IRS's Priority Tax Claim is payable under applicable non-bankruptcy law.  (Plan § 2.4.)

The Plan also provides for treatment of the IRS' G-I Non-Priority Tax Penalty Claim.   In the initial versions of the Plan, the Debtors classified the IRS's potential claims for tax penalties in Class 3A (G-I Unsecured Claims), which is an impaired class.  Because the District Court had not yet ruled on the applicability of the IRS's claim for tax penalties, the IRS filed its Vote Allowance Motion before the Bankruptcy Court on July 13, 2009, for an order pursuant to

---

note in the principal amount equal to such Allowed Priority Tax Claim, together with interest at a rate per annum equal to LIBOR in effect on the Confirmation Date plus 1%, payable in Cash on the sixth (6th) anniversary from the date of the final determination of the assessment of such Allowed Priority Tax Claim (for purposes of this section 2.4, such date means the date upon which the Allowed Priority Tax Claim is determined by a Final Order), or (c) any combination of Cash and a note, on the terms provided in subsections (a) and (b) hereof, in an aggregate Cash and principal amount equal to such Allowed Priority Tax Claim; *provided*, that the Debtors reserve the right to prepay any such note in part or in whole at any time without premium or penalty; and provided*, further*, that no holder of an Allowed Priority Tax Claim shall be entitled to any payments on account of any pre-Effective Date interest accrued on or penalty arising after the Commencement Date with respect to or in connection with such Allowed Priority Tax Claim; and *provided further*, that any assessment of a tax liability made against any entity the payment of which would give rise to a claim for indemnification by such entity against the Reorganized Debtors shall (i) not exceed the amount of any Allowed Priority Tax Claim, (ii) for purposes of this Section 2.4, be deemed to be an assessment of an Allowed Priority Tax Claim, and (iii) be subject to the timing and payment terms set forth herein, such that any such assessment may be satisfied in full upon such entity's delivering a note issued by G-I having the same terms as described in (b) hereof.

(Plan § 2.4.)

Federal Rule of Bankruptcy Procedure 3018(a) temporarily allowing its unsecured non-priority

tax claim in the amount of $26,144,269 for the purposes of voting its Class 3A Claim for or

against confirmation of the Plan.  In response, on July 28, 2009, the Plan Proponents filed the

Fourth Amended Joint Plan or Reorganization, which added a new class entitled *Class 3C: G-I

Non-Priority Tax Penalty Claim*.  The term "G-I Non-Priority Tax Penalty Claim" is defined in

the Plan as "any Unsecured Claim of the Internal Revenue Service under the Tax Code against

the Debtors or their estates for penalties (including interest thereon) that is not a Priority Tax

Claim."  (Plan § 1.1.78.)  Pursuant to the Plan, the IRS will receive a cash payment for its G-I

Non-Priority Tax Penalty Claim in an amount equal to 100% of such claim.[23]  The IRS will

receive such payment when its claim becomes allowed: effectively, upon the resolution of the

pending tax litigation.  The Plan also provides for the payment of any interest on such claims,

however, it does not define the rate of interest.  The cash necessary to make these payments shall

be provided by ISP, an affiliate of the Debtors.  (Plan § 4.4(e).)  The Plan treats Class 3C as an

unimpaired class that is not entitled to vote for or against confirmation of the Plan.

During the Confirmation Hearing, the Debtors introduced the Eighth Amended Plan,

which inserted a provision in section 2.4 of the Plan that addresses the tax liabilities of G-I's

non-debtor affiliates.  This provision provides that G-I's non-debtor affiliates, including BMCA,

---

[23] The Plan treats Class 3C, the G-I Non-Priority Tax Penalty Claims, as follows:

> on the later of (i) the Effective Date and (ii) the date on which a G-I Non-Priority Tax Penalty
> Claim becomes an Allowed G-I Non-Priority Tax Penalty Claim, or as soon thereafter as is
> reasonably practicable, each holder of an Allowed G-I Non-Priority Tax Penalty Claim shall
> receive Cash in an amount equal to 100% of such Allowed Claim; provided, however, that if
> necessary to render any such Class 3C Claim unimpaired, each holder of an Allowed G-I Non-
> Priority Tax Penalty Claim shall also receive Cash in an amount sufficient for payment in full of
> postpetition interest on any such Class 3C Claim, to the extent accrued under applicable non-
> bankruptcy law.

(Plan § 3.7(b).)

may satisfy an assessment by the IRS by delivering a note in the same amount and including the same payment terms as those that apply to G-I's repayment of the Priority Tax Claims.[24]  The Debtors amended the Plan to include this provision because BMCA is G-I's primary source of income to fund its obligations under the Plan.  Also, on January 31, 1994, GAF, G-I Holdings Inc. and BMCA entered into a Tax Sharing Agreement, which requires G-I to indemnify BMCA for any payments it makes to the IRS.  The specific indemnity provision of the Tax Sharing Agreement provides as follows:

> GAF and each signatory to this Agreement (other than the members of the BMC Group) agrees, jointly and severally, to indemnify the BMC Group for the amount of any tax paid by the BMC Group, whether by application of Treas. Reg. Sec .1.1502-6 or similar provision of state or local law, in excess of the amount otherwise payable by the BMC Group under this Agreement.

(Tax Sharing Agreement, Conf. Hr'g Ex. 385, p. 12, § 8(b).)  Thus, as the Debtors argue, if the IRS were able to assert additional tax liability against BMCA after confirmation of the Plan, G-I would ultimately be liable for those additional amounts pursuant to the Tax Sharing Agreement, which would hamper G-I's ability to reorganize.

## J.  **IRS's Objections**

The IRS first argues that the Plan is not confirmable because it fails to comport with the requirement set forth in 11 U.S.C. § 1129(a)(9)(C) that priority tax creditors receive "deferred cash payments."  Specifically, the IRS contends that to comply with the statute's six-year

---

[24] Section 2.4 of the Plan presently provides, in relevant part, that

> [a]ny assessment of a tax liability made against any entity the payment of which would give rise to a claim for indemnification by such entity against the Reorganized Debtors shall (i) not exceed the amount of any Allowed Priority Tax Claim, (ii) for purposes of this Section 2.4, be deemed to be an assessment of an Allowed Priority Tax Claim, and (iii) be subject to the timing and payment terms set forth herein, such that any such assessment may be satisfied in full upon such entity's delivering a note issued by G-I having the same terms as described in (b) hereof.

(Plan § 2.4.)

payment requirement, it should be entitled to assess against the Debtors upon confirmation of the Plan, thereby triggering issuance of the note, rather than upon the final determination of the pending District Court litigation.  Also, it argues that the language of § 1129(a)(9)(C) requires its Priority Tax Claim to be satisfied by payment in cash, rather than by issuance of a note, and that the note's single balloon payment in six years after an allowed assessment violates the Code's requirement that payments be "deferred" for six years.  Moreover, the IRS takes issue with the proposed rate of interest for the note.  In order to comply with the language of § 1129(a)(9)(C) that the Plan pay the "value" of the Priority Tax Claim, the IRS argues that the Plan should establish an interest rate for the note in accordance with one of the following methods: (1) the rate that an efficient market would produce when pricing the Debtors' debt, which the IRS argues lies somewhere between 8.2%  and 12.6%, *see Till*, 541 U.S. at 477 n.14; (2) the formula approach adopted in *Till*, using the prime rate of 3.25% for commercial borrowers,[25] not the LIBOR rate, plus a 3% risk premium; or (3) the statutory rate mandated by Congress for unpaid federal tax debts, which is approximately 6%.  *See* 26 U.S.C. § 6621.

The IRS argues that the Plan unlawfully attempts to discharge non-debtor affiliates from their liability for post-petition interest and penalties due on the Debtors' unpaid federal tax debts. While the IRS acknowledges that it may not seek to collect from the Debtors any more than the Plan provides, it asserts that it is entitled to collect the remainder from the Debtors' non-debtor affiliates, in particular, BMCA.  Because the non-debtors are members of a consolidated group, are severally liable for taxes, interest and penalties as per federal law, and do not enjoy the same protections that the Bankruptcy Code affords the Debtors, the IRS declares that it may collect additional monies from the non-debtors after the District Court litigation regarding its claims has

---

[25] The IRS argued that the prime rate was 3.25% when it filed its Second, Amended Objection to Confirmation in September 2009.

become *res judicata*.  The additional monies sought by the IRS include any post-petition, pre-confirmation interest ("Gap Interest") on taxes owed by the Debtors, and any post-confirmation taxes, interest, and penalties on terms different than those set out in the Plan for the Debtors' Priority Tax Claim ("Post Confirmation Obligations").[26]  This particular objection of the IRS relates specifically to the language in Plan section 2.4.  The IRS asserts multiple legal arguments in support of its position.

First, the IRS argues that this Court lacks jurisdiction to determine the liabilities of non-debtors.  It asserts that the court does not have "related to" jurisdiction under 28 U.S.C. 1334, because the Debtors' liability is not affected at all by the liability of the non-debtors.  *See In re Combustion Eng'g, Inc.*, 391 F.3d at 226.  To support this assertion, the IRS explains that it cannot collect from the Debtors that which it would be seeking to collect from the non-debtors, and it states that the Debtors have not provided sufficient evidence to demonstrate that collection efforts against non-debtors would indirectly affect the Debtors' estates pursuant to the Tax Sharing Agreement.  Moreover, the IRS argues that the Court cannot rule on the non-debtor's liability because there is no existing case or controversy as required by Article III of the United States Constitution.  The IRS has neither made an assessment nor attempted to collect from the non-debtors, and even if it were to take such steps, only the non-debtors would then have standing to object.

Second, the IRS argues that the Court is barred from absolving the non-debtors of tax liability by the Anti-Injunction Act, 26 U.S.C. § 7421(a).  This statute provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court

---

[26] The IRS concedes that it would not be entitled to Post-Confirmation Obligations if this Court finds that the issuance of a note satisfies the requirement of § 1129(a)(9)(C) that deferred payments be made in "cash."

by any person, whether or not such person is the person against whom such tax was assessed." *Id.* The IRS cites to *In re Becker's Motor Transp., Inc.*, 632 F.2d 242 (3d Cir. 1980), and *Pazzo Pazzo, Inc. v. New Jersey*, No. 07-CV-1558(WJM), 2007 WL 4166017 (D.N.J. Nov. 20, 2007), to support its proposition that the Anti-Injunction Act bars the Court from enjoining the United States from collecting tax debts from non-debtors. Also, while recognizing that 11 U.S.C. § 106(a) operates as a general waiver of the federal government's sovereign immunity in the bankruptcy context, the IRS notes that this waiver is subject to the Anti-Injunction Act as appropriate nonbankruptcy law under 11 U.S.C. § 106(a)(4). Alternatively, the IRS asserts that even if the Anti-Injunction Act does not apply, the Debtors would still fail the standard analysis that courts use in determining whether to impose an injunction. *See In re Campbell Enters., Inc.*, 66 B.R. 200 (Bankr. D.N.J. 1986) (Gambardella, J.). Also, the IRS argues that the Court's use of 11 U.S.C. § 105 to impose an injunction on non-debtors is improper.

Third, the IRS argues that the Plan's release of non-debtors from tax liability violates 11 U.S.C. § 524(e). This section provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." *Id.* The IRS argues that this section imposes an unequivocal bar on all third-party releases, and accordingly, a discharge granted to the Debtors would not affect the liability of any non-debtor with respect to the debts owed to the IRS. Because the United States Court of Appeals for the Third Circuit has not ruled directly on this issue, the IRS urges this Court to follow the United States Courts of Appeals for the Fifth, Ninth and Tenth Circuits, which prohibit non-debtor releases. *See In re Lowenschuss*, 67 F.3d 194, 1401-02 (9th Cir. 1995); *In re Zale Corp.*, 62 F.3d 746, 759-62 (5th Cir. 1995); *In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 601-02 (10th Cir. 1990), *modified by, Abel v. West*, 932 F.2d 898 (10th Cir. 1991).

The IRS posits that the Third Circuit has, however, adopted an alternative analysis in determining whether to approve non-consensual releases that would require this Court to analyze certain hallmarks such as "fairness, necessity to the reorganization, and specific factual findings to support these conclusions." *See In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000). According to the IRS, the Debtors have not demonstrated the necessary showing under *In re Continental Airlines*. For instance, the releases are not necessary to the Debtors' reorganization because the Debtors' own projections show that there is ample cash available to pay the additional liabilities of the non-debtors. Moreover, to allow the Debtors to argue that the releases are necessary to ensure feasibility of the Plan would erroneously imply that the legal obligations of any non-debtor would be absolved simply because the non-debtor has agreed to fund a plan. Also, opines the IRS, the Debtors cannot argue that the release of BMCA from tax liability is necessary to absolve G-I from indemnification liability under the Tax Sharing Agreement, because under bankruptcy law G-I can either reject that agreement, or as the sole shareholder of BMCA it can renegotiate the agreement. Furthermore, the money that G-I would pay to indemnify BMCA under the Tax Sharing Agreement would ultimately come from BMCA, which has ample cash to pay such indemnification according to the Debtors' own projections, eliminating the necessity of a release. Finally, states the IRS, although the Debtors assert that Plan Sponsor will revoke his offer if the releases are not obtained, the Debtors have failed to demonstrate that the Plan Sponsor's offer is necessary to reorganization since the Debtors' eight years of exclusivity has prevented open bidding or proposals.

Finally, the IRS argues that there is nothing in either the language or the intent of the Tolling Agreement that absolves the non-debtors from their liability for all the taxes of the consolidated group, including Gap Interest. Its argument centers on the use of the term "assess."

It claims that once the tax litigation is resolved, it will be able to assess the full tax liability, including Gap Interest, against G-I without violating the Bankruptcy Code's automatic stay and discharge provisions.  *See* 11 U.S.C. §§ 362(b)(9) & 524(a)(2).  It explains that "[w]hile 11 U.S.C. § 502(b) prevents Gap Interest from being claimed in the bankruptcy case (as to the Debtors), nothing prevents its *accrual* under nonbankruptcy law, even though the interest may ultimately be **uncollectible** from the Debtors after the bankruptcy case if the Debtors receive a discharge."  (IRS Response, p. 21) (emphasis in original).  Thus, the IRS posits, although it may not collect against G-I, it may legally assess the full value of its claim, including accrued Gap-Interest, against G-I and the non-debtors, and then collect against the non-debtors.

The IRS objects to confirmation of the Plan on two additional grounds.  First, the IRS argues that the Plan violates the absolute priority rule under 11 U.S.C. § 1129(b)(2)(B), because no opportunities have existed for other parties to bid on the assets or to propose an alternative plan.  *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 North LaSalle P'shp*, 526 U.S. 434, 443 (1999) (hereafter "*LaSalle*").  This is a result, notes the IRS, of the lack of any public or private auction for the company, and also because the Debtors retained the exclusive right to propose a plan throughout the entire bankruptcy case, thereby preventing the introduction of any competing plans.  Additionally, the IRS asserts that Plan Sponsor is receiving value on account of his ownership interest in the Debtors and that his contribution to the Plan fails to meet the new value exception to the absolute priority rule.

To demonstrate that it has standing to make the above objections, the IRS claims that it is an impaired creditor due to the Plan's treatment of its G-I Non-Priority Tax Penalty Claim in Class 3C.  The IRS argues that it is impaired because the Court has no jurisdiction over ISP, a non-debtor, to order the cash payment that the Plan requires, and because the Debtors have not

established that ISP has the funds to make such a payment.  Moreover, it is impaired because the

Plan does not specify the interest rate at which its penalty claim will be repaid.  Finally, the IRS

claims that it is impaired because the Plan prohibits it from foreclosing on its penalty claim once

that claim is assessed.

As a second additional objection to the Plan, the IRS argues that the Plan fails to comply

with the requirement of 11 U.S.C. § 1129(a)(3) because it is not proposed in good faith.

Specifically, the IRS argues again that Plan Sponsor is obtaining new equity in the Debtors in

violation of the absolute priority rule.   Additionally, the IRS argues that the Debtors have

provided no sound business justification for delaying payment for six years on the its Priority

Tax Claims, and that the delayed payment to the IRS is not reasonably necessary to the

reorganization of the Debtors.  Thus, according to the IRS, the Plan unnecessarily risks non-

payment to the IRS on its priority claims.

### K.  Debtors Response to the IRS's Objections

Regarding the IRS's objections to the Plan's treatment of its Priority Tax Claims under

11 U.S.C. § 1129(a)(9)(C), the Debtors note that the Plan complies with the statutory time

requirements because the six year note is issued, and begins to run, from the moment that the

IRS makes their assessment.  However, the Debtors contend that the IRS may not make an

assessment while the tax dispute is still pending exclusively in U.S. District Court, and that the

IRS must wait for a final unappealable judgment.  *See* 26 U.S.C. § 6213.  The Debtors opine that

the IRS would not be harmed by any delay because the Plan provides that interest will accrue on

its Priority Tax Claim between the effective date of the Plan and the date of a final unappealable

judgment.  Moreover, the Debtors assert, nothing in the language of the Bankruptcy Code or in

the cases that interpret its text requires the Debtors to make periodic payments of principal and

interest rather than one single payment at the end of the six year period.  Besides, argue the

Debtors, the purpose of the statute is to delay payments so that the Debtors can successfully

reorganize, a principle that the ACC clearly understood when agreeing to delay payments to it

under the Plan and that the Supreme Court espoused in *United States v. Energy Resources Co.,*

*Inc.*, 495 U.S. 545 (1990) (hereafter "*Energy Resources*").

The Debtors also address the IRS's objections to the proposed rate of interest for the note.

The Debtors assert that the proposed rate of interest of LIBOR plus 1% comports with the

formula approach adopted by the Supreme Court in *Till v. SCS Credit Corp.*, 541 U.S. at 480.

The Debtors argue that, under *Till*, cram down interest rates are not designed to make each

individual creditor whole, rather, they are designed simply to ensure that the debtor's payments

have the required present value.  The Debtors note that there is a very low probability of plan

failure and the IRS itself has not challenged the feasibility of the Plan.  Furthermore, the Debtors

claim that the appropriate reference rate is LIBOR rather than the "irrelevant" and

"anachronistic" prime rate, and that the 1% risk premium is ample given the remote possibility of

default.  Additionally, the Debtors argue that the IRS has presented no evidence of an "efficient

market" in the bankruptcy context and thus no basis exists for this Court to assume the existence

of such a market.

In response to the IRS's arguments against the "non-debtor release," the Debtors argue

that the Court has subject matter jurisdiction over BMCA's tax liability under 28 U.S.C. § 1334

and under 11 U.S.C. § 505(a)(1).  They assert that the Court has jurisdiction because the matter

arises under title 11 in a case under title 11.  Moreover, the Debtors state, the tax liability of

BMCA is "related to" these bankruptcy cases in accordance with 28 U.S.C. § 1334 and *Pacor,*

*Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), because collection acts by the IRS against BMCA

and other affiliates would effect the Debtors' estates by impairing the funding sources for the

Debtors' chapter 11 Plan, and because the Tax Sharing Agreement requires G-I to indemnify the

non-debtors for any amounts collected by the IRS. The Debtors counter the IRS's claims that

they could easily renegotiate the Tax Sharing Agreement to release their indemnity liability,

noting that such a strategy would require the consent of BMCA's creditors. Moreover, the case

or controversy requirement under Article III of the United States Constitution is satisfied because

the determination of BMCA's tax liability is central to G-I's prospects for reorganization under

this Plan.

The Debtors claim that the Bankruptcy Code and the Supreme Court provides this Court

with authority to confirm the Plan, including section 2.4 as amended. The Debtors rely on the

Supreme Court's ruling in *Energy Resources*, 495 U.S. 545, to illustrate this Court's broad grant

of authority to do whatever "'is necessary or appropriate to carry out the provisions' of the Code

and ensure the success of the Plan." The Debtors posit that they are seeking in section 2.4 of the

Plan significantly less relief against the IRS than the Supreme Court allowed in *Energy

Resources*. Additionally, the Debtors point to sources of authority for approving the Plan

amendment under Bankruptcy Code and Federal Rules of Bankruptcy Procedure, including Code

sections 1123(b)(6), 1142(b), 105(a), 106(a) and 505(a)(1), and Rule 3020(c)(1) and (d). Finally,

the Debtors assert that where necessary to effectuate a successful reorganization, courts in title

11 cases have asserted power to approve plans with provisions affecting claims against

nondebtors without running afoul of 11 U.S.C. § 524(e). *See In re Ingersoll, Inc.* 562 F.3d 856,

864 (7th Cir. 2009); *In re Airadigm Communs., Inc.*, 519 F.3d 640, 657 (7th Cir. 2008); *Class

Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 656-76

(6th Cir. 2002). Finally, the Debtors provide cases where courts have exercised jurisdiction,

despite 11 U.S.C. § 524(e), to address creditors' claims against non-debtors when the non-debtors have rights of indemnity against chapter 11 debtors.  *See Menard-Sanford v. Mabey (A.H. Robins Co. Inc.)*, 880 F.2d 694, 702 (4th Cir. 1989); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).

The Debtors oppose the IRS's reliance on the Anti-Injunction Act, explaining that in section 106 of the Bankruptcy Code, Congress specifically waived sovereign immunity so as to make clear that bankruptcy courts can approve Plan provisions and issue orders affecting the collection rights of the IRS.  Also, they argue that section 106(a)(4) of the Bankruptcy Code does not impact upon the waiver of sovereign immunity.  Moreover, they claim, in *Central Virginia Community College v. Katz*, 546 U.S. 356, 361 (2006), the Supreme Court ruled that even without the amendments that Congress made to section 106 specifically waiving sovereign immunity, the U.S. Constitution had abrogated sovereign immunity in the bankruptcy court.  The Debtors aver that the cases relied on by the IRS considered neither the amendment to section 106 of the Bankruptcy Code that waived the government's sovereign immunity nor the Supreme Court's decision in *Central Virginia Community College*.  As an alternative argument, the Debtors claim that they are not seeking an injunction from this Court.  Rather, they assert, they are seeking a substantive Plan term that will address the amount, timing and payment terms of BMCA's and G-I's tax liability, which would have binding, res judicata effect in any future proceeding brought by the IRS.  Should the Court find that the Debtors are seeking an injunction, they argue, the Court should not apply the general injunction standards, but instead should apply a modified standard unique to the bankruptcy context where a court may issue an injunction where such relief is simply necessary to the successful reorganization of a debtor.

Finally, the Debtors assert that under basic contract law, the plain language of the Tolling Agreement provide an additional and independent basis for confirming the Plan with amended section 2.4. The Debtors note that the Tolling Agreement bars the IRS from assessing any amount against BMCA that is greater than the amount it may assess against G-I. Since post-petition interest does not run against the Debtors by operation of bankruptcy law, making such interest uncollectable by the IRS, argue the Debtors, the IRS cannot seek to collect it from the non-debtor affiliates without violating the agreement. Moreover, the Debtors note that under tax law, an assessment against G-I automatically imposes a lien against all G-I's property. *See* 26 U.S.C. §§ 6321 & 6322. Thus, argue the Debtors, if the IRS assessed against G-I greater amounts than the bankruptcy law and Plan permit it to collect, it would automatically create a lien against the property of G-I and be in violation of the discharge injunction under 11 U.S.C. 524(a)(2).

In refuting the IRS's objection that the Plan violates the absolute priority rule under 11 U.S.C. § 1129(b), the Debtors posit that the Court need not even reach it, because the IRS is an unimpaired creditor and has no standing to invoke the absolute priority rule or object to an aspect of the plan that does not impact its pecuniary interest. It should be noted that the Debtors raised an identical argument in their Objection to the IRS's Vote Allowance Motion. In that Objection, the Debtors first argued that the IRS is barred from voting its potential claim because it failed to seek temporary allowance of it prior to the voting deadline. The Debtors also note that as a result of amendments to the Plan the IRS no longer holds claims in Class 3A, an impaired class. Rather, assert the Debtors, the IRS's unsecured claims are classified in Class 3C, an unimpaired class, thus, its request is moot because unimpaired claims are not entitled to vote for or against

the Plan.[27]   Moreover, because the IRS is unimpaired, it has no standing under either

constitutional or prudential grounds to object to confirmation under 11 U.S.C. § 1129(b) on

grounds of new value, because it faces no actual harm relating to those issues and those issues do

not affect its rights.[28]

According to the Debtors, the IRS has marshaled no authority to support its claim that the

Court's lack of jurisdiction over ISP is tantamount to impairment, and it ignores the Court's

jurisdictional authority based on Rule 7004(d).   Moreover, note the Debtors, ISP is willing to

sign a formal agreement binding it to the Court's jurisdiction.   Also, although the Debtors have

already provided financial documents from ISP to the IRS, the IRS neither objected nor sought

additional information, and it has not provided facts in support of its allegation that ISP has

insufficient funds.   Finally, the Debtors posit that the Plan does not delay, impair or alter the

IRS's rights in relation to its penalty claim, rather, it simply provides the terms of payment and

leaves the IRS the right to foreclose if necessary.   Thus, argues the Debtors, the IRS is

unimpaired and conclusively presumed to have accepted the Plan, and it has no legitimate reason

or standing to challenge the provisions allowing Plan Sponsor to acquire new equity under the

absolute priority rule.

Moreover, the Debtors assert that even if the IRS had standing to assert an absolute

priority objection, the objection would fail because the Plan fits within the new value exception.

The Debtors note that "the Plan is the result of nine years of litigation and two years of hard-

fought arm's-length negotiations between exceptionally well-advised and sophisticated

---

[27] The Debtors note that the IRS's Priority Tax Claims are treated separately by the Plan, and are being paid in full.
[28] The Debtors also assert that, given that Bankruptcy Code section 1126(a) only provides for allowed claims to vote, and Bankruptcy Rule 3018(a) enables unallowed claims to vote without the plan proponents' consent, Rule 3018(a) is ultra vires in this context because it is outside the rule-making authority of 28 U.S.C. § 2075.

adversaries" who were able to extract the maximum possible value from the estate and is congruent with the requirements of *LaSalle*, 526 U.S. 434. Additionally, the Debtors assert that Plan Sponsor's new capital contribution of approximately $220 million in cash and an amount of collateral sufficient to secure a $560 million note satisfies the new value exception to the absolute priority rule. Finally, the Debtors argue that, in contrast to *LaSalle*, the old equity interest holders here have not had an exclusive opportunity to value the reorganized debtors' business and propose a plan or reorganization. The Debtors explain that the ACC held a veto power over any plan, because only with its constituency's 75% vote could BMCA obtain a section 524(g) injunction. Thus, the Plan has been market tested because it is as much the creation of the non-debtor Committee as it is the Debtors.

Next, the Debtors refute the IRS's argument that the Plan was not proposed in good faith by first restating their argument that Plan Sponsor's contribution fits within the new value exception. Also, the Debtors argue that the Plan squarely provides for the treatment required by section 1129(a)(9)(C) and that good faith does not impose a duty on the Debtors to offer more to the IRS than the Bankruptcy Code requires. Moreover, the Debtors argue, the IRS can not justifiably complain that the Plan treats the Asbestos Claimants more favorably because the IRS receives full payment years before they receive their 8.6% payments.

### L.  Documentary Evidence  - Cooper Feasibility Study & Other Expert Reports

#### i.  *Cooper Feasibility Report*

The Expert Report of Stephen F. Cooper, ("Cooper Feasibility Report") dated August 6, 2009, was submitted to the Court. (Conf. Hr'g Ex. 702.) The report contains a feasibility analysis and conclusions regarding the feasibility of the Plan. The report explains the qualitative and quantitative data that was considered, the critical assumptions that underpin the study, and

the mechanics of the financial analysis that was performed.  The report expresses the opinion that

BMCA has a strong management team and a proven track record in support of the assertion that

the company will succeed going forward.  The report concludes that "the Plan, as presented, is

not likely to be followed by the liquidation, or the need for further financial reorganization, of

the Debtor."  (Cooper Feasibility Report, p. 7.)

### ii. Beaulne Valuation Report

The Expert Report of Daniel Beaulne (the "Beaulne Valuation Report") dated August 6,

2009, was submitted to the Court.  (Conf. Hr'g Ex. 701.)  The report contains his valuation

analysis and conclusions regarding the valuation of G-1 and BMCA, much of which Mr. Beaulne

testified to during the Confirmation Hearing.

### iii. Cooper Rebuttal Report

The Rebuttal Report of Steven F. Cooper and Zolfo Cooper LLC in the Form of

Comments on the Expert Report of Daniel Beaulne dated August 6, 2009 (the "Cooper Rebuttal

Report") was submitted to the Court.[29]  (Conf. Hr'g Ex. 703.)  The report contains a critique of

the valuation analysis and conclusions regarding the valuation of G-1 and BMCA contained in

the Beaulne Valuation Report.

### M. **The Confirmation Hearing**

At the start of the Confirmation Hearing, Debtor's counsel read a settlement into the

record that it had reached with two objectors to confirmation, Continental and Century.[30]  (Conf.

Hr'g Tr. 15, Sept. 30, 2009.)  The objections were based on the concerns regarding insurance

neutrality; Debtors agreed to include certain clarifying language into its proposed confirmation

---

[29] The Cooper Rebuttal Report itself is dated August 20, 2009.
[30] Century's objections were D.N. 9318 and D.N. 9466; Continental's objection was D.N. 9469.

order, and in exchange Continental and Century agreed to withdraw their objection. (Conf. Hr'g

Tr. 15, Sept. 30, 2009.) The provision was read in to the record as follows:

> Notwithstanding anything to the contrary in this confirmation order, the plan or any plan document, nothing in this confirmation order, the plan or any of the plan documents including any other provision that purports to be peremptory or supervening, shall in any way operate to or have the effect of impairing in any respect the legal, equitable or contractual rights, if any, of any entity that issued any insurance policies including but not limited to policies issued to GAF Corporation, the Ruberoid Company or any of the Debtors or their predecessors and the various agreements related to the policies together with the policies defined as the insurance agreements, under or in connection with such insurance agreements. Nothing in the plan or this confirmation order shall preclude any entity from asserting in any proceeding any and all claims, defenses, rights or causes of action that such entity has or may have under or in connection with any of the insurance agreements or otherwise. Nothing in the plan or this confirmation order shall be deemed to waive any claims, defenses, rights or causes of action that any entity has or may have under the provisions, terms, conditions, defenses and/or exclusions contained in the insurance agreements, including but not limited to any and all claims, defenses, rights or causes of action based upon or arising out of the claims that are liquidated, resolved, discharged, channeled or paid in connection with the plan.

(Conf. Hr'g Tr. 15-17, Sept. 30, 2009.) After the provision was read into the record, Counsel for

Continental and Century both confirmed that their objections should be considered withdrawn.

(Conf. Hr'g Tr. 17, Sept. 30, 2009.)

## N. **Voting**

At the Confirmation Hearing, Debtors' counsel, Mr. Martin Bienenstock, also

incorporated the Voting Declaration into the record, which certifies the outcome of the voting on

the plan. (Conf. Hr'g Tr. 18, Sept. 30, 2009.) Debtors' counsel noted that voting was not being

contested by any party at the hearing, and thereafter the Voting Declaration was admitted into

Evidence without objection. (Conf. Hr'g Tr. 18, Sept. 30, 2009.)

## O.  **Direct Testimony of Samuel J. Heyman**

### i.  *Testimony on the Business and the Current Financial Position of G-1 and its Affiliates*

At the confirmation hearing, Samuel J. Heyman, the Debtor's Chairman, testified before this Court.  Mr. Heyman testified that he is "Chairman of G-I and BMCA and . . . the owner of both G-I, BMCA and ISP."  (Conf. Hr'g Tr. 22, Sept. 30, 2009.)  Mr. Heyman described the business of the company as the "[c]hemicals business, which is under the name of ISP, and the roofing business which is BMCA and GAF."  (Conf. Hr'g Tr. 22, Sept. 30, 2009.)  With respect to the relationship between G-1 the Debtor and BMCA the non-debtor, Mr. Heyman testified that G-1 itself does not have any operating businesses, and that "BMCA is a wholly owned subsidiary of G-1, and BMCA is really where the profits are being derived from." (Conf. Hr'g Tr. 25, Sept. 30, 2009.)  When asked about the current state of the BMCA's roofing business, Mr. Heyman testified that it is "the leading company in the industry" and summarized the health of the business as follows: "I think it's a healthy business. We have … a very good management. I think, … there are risks, but there are some upsides, and I think it's going to be a fairly steady business over the near future."  (Conf. Hr'g Tr. 23-25, Sept. 30, 2009.)  In terms of assets and liabilities of G-1, Mr. Heyman testified that its key asset is the 100 percent interest in BMCA, and the principal liabilities of G-1 total approximately $2.5 billion.[31]  (Conf. Hr'g Tr. 34, Sept. 30, 2009.)

### ii. *Testimony on the Circumstances Leading Up to Bankruptcy Filing*

Mr. Heyman testified that at the time G-1 acquired GAF in 1983, "there were very few asbestos claims," (Conf. Hr'g Tr. 29, Sept. 30, 2009), but that the number asbestos claims

---

[31] The $2.5 billion figure is inclusive of approximately $775 million to make a cash payment and a note backed up by a Letter of Credit, which assumes that the Global Settlement is approved.  It also includes $350 million for the IRS claim, which Mr. Heyman actually testified "could be anywhere from zero to $350 million."  (Conf. Hr'g Tr. 34, Sept. 30, 2009.)

increased dramatically over time, growing to "hundreds and hundreds of thousands" prior to the filing of the Bankruptcy petition, (Conf. Hr'g Tr. 33-34, Sept. 30, 2009).  Mr. Heyman testified that the company made several efforts to try to resolve its asbestos liabilities on a global basis over the years, including joining with asbestos co-defendants to resolve these claims,[32] negotiating and accepting a proposed class action settlement,[33] lobbying Congress for a legislative solution,[34] and setting up their "own legal network throughout the country" (Conf. Hr'g Tr. 32, Sept. 30, 2009), but none of these efforts were successful in achieving a global solution. (Conf. Hr'g Tr. 30-32, Sept. 30, 2009.)    Mr. Heyman testified that prior to filing for Bankruptcy, G-1 paid out approximately $1.3 billion is asbestos claims.[35] (Conf. Hr'g Tr. 27, Sept. 30, 2009.)  Mr. Heyman testified that there was no way the company could pay the expenses associated with the rapidly accumulating claims, and filing a bankruptcy proceeding "was the only alternative." (Conf. Hr'g Tr. 27, Sept. 30, 2009.)

  iii. *Testimony on the Complexity of Litigation Resolved by the Global Settlement and the Plan and Timing Issues*

   Mr. Heyman testified that the principal issue to be resolved in the settlement was the estimation of the asbestos liabilities, which was a hotly contested, and which would have

---

[32] The Center for Claims Resolution (CCR). "We then entered into the CCR, the Center for Claims Resolution, with 20 other asbestos co-defendants on the theory that at least we would cut our defense costs by 95 percent by using one counsel."  (Conf. Hr'g Tr. 30, Sept. 30, 2009.)

[33] This refers to the *Georgine* settlement, which Mr. Heyman described as follows:

> In 1993 we entered into the *Georgine* settlement which was a class action settlement with all the major asbestos lawyers to put asbestos behind us, and we had every expectation that that settlement would hold and the importance of that settlement to us is it gave us a certain certainty. . . . [T]he Supreme Court reversed *Georgine* and they said that the federal class action law is not equipped to deal with such diverse class actions with such a diverse group of plaintiffs. And so this whole settlement that we worked on for three or four years was reversed . . . by the Court and the Court said this is a huge problem in America. We should go to the Congress, that Congress should fix the asbestos problem.

(Conf. Hr'g Tr. 30-31, Sept. 30, 2009.)

[34] "[T]hen we spent the next four years lobbying in the Congress on behalf of legislation which we thought was going to be very helpful in resolving it on a very fair basis. And we lost."  (Conf. Hr'g Tr. 30, Sept. 31, 2009.)

[35] Mr. Heyman estimated that half of the total was paid by G-1 itself, and was paid by half by insurance.  (Conf. Hr'g Tr. 27, Sept. 30, 2009.)

involved a lengthy discovery process, the examination of X-rays and other medical information for thousands of claimants, and the implementation of a claimant questionnaire and sampling protocol.  (Conf. Hr'g Tr. 34-36, Sept. 30, 2009.)  Mr. Heyman testified that the Court set aside two years for this discovery process, and that then given the length of the litigation and the appeals process, he knew that such an estimation proceeding would come at a substantial cost to the bankruptcy estate.  (Conf. Hr'g Tr. 36-37, Sept. 30, 2009.)  Mr. Heyman testified that the Global Settlement is the product of eight and a half years of settlement efforts.  (Conf. Hr'g Tr. 38, Sept. 30, 2009.)  Mr. Heyman stated that the Global Settlement not only resolves the litigation with respect to the value of the asbestos liabilities, but also brings resolution to two other separately litigated cases between these adverse parties.[36]  (Conf. Hr'g Tr. 39-42, Sept. 30, 2009.)  Mr. Heyman also testified that the terms of the settlement were integrated such that it would not be possible to pry apart any piece of the settlement while leaving the rest intact.  (Conf. Hr'g Tr. 54, Sept. 30, 2009.)  Mr. Heyman testified that given his experience, it was his business judgment that this plan or reorganization is in the best interests of the estate and its creditors.  (Conf. Hr'g Tr. 54, Sept. 30, 2009.)  Mr. Heyman also testified that time was of the essence in getting the company out of bankruptcy, noting that the volatility and risk of the credit markets might prevent consummation of the plan if it is not approved quickly.  (*See* Conf. Hr'g Tr. 73, Sept. 30, 2009.)

*iv. Testimony on Plan Sponsor's Contribution to the Plan*

Mr. Heyman testified that upon confirmation of the Plan, the Plan Sponsor will immediately be making a $220 million cash contribution.  (Conf. Hr'g Tr. 48, Sept. 30, 2009.)  He also stated that the Plan Sponsor will be providing collateralized Letters of Credit at

---

[36] Specifically, Mr. Heyman referred to an alleged fraudulent conveyance claim involving ISP, and an alleged RICO action.  (Conf. Hr'g Tr. 41-42, Sept. 30, 2009.)

significant expense.[37]  (Conf. Hr'g Tr. 48, Sept. 30, 2009.)  Mr. Heyman stated that he is taking a

significant risk because the Plan Sponsor is putting "an enormous amount of money at risk" and

they "may get an inadequate return."  (Conf. Hr'g Tr. 51, Sept. 30, 2009.)

> *v.  Testimony on Payment of the IRS Tax Claims under the Plan, the Tax Sharing Agreement and their effect on the Plan's Feasibility*

With respect to the treatment of the IRS priority tax claim under the Plan, Mr. Heyman

testified that they will receive "100 cents on the dollar, assuming they have a claim and they

establish it in the courts."  (Conf. Hr'g Tr. 56, Sept. 30, 2009.)  He stated that they will be paid

via a six-year note that will be issued when a final judgment is reached in the tax litigation.

(Conf. Hr'g Tr. 56, Sept. 30, 2009.)  Mr. Heyman testified that the priority tax liability, if any, is

the result of the partnership transaction that G-I entered into with the French chemicals company

Rhone Poulenc in 1990.[38]  (Conf. Hr'g Tr. 57, Sept. 30, 2009.)  Mr. Heyman stated that under

section 8(b) of the Tax Sharing Agreement, G-1 must indemnify its affiliate BMCA with respect

to any tax liability related to the Rhone-Poulenc transaction, and that litigation is pending to

determine such liability before Judge Chesler in the District Court.  (Conf. Hr'g Tr. 60-61, Sept.

30, 2009.)  Also, Heyman testified that the Tax Sharing Agreement is critical to the success of

the Plan, as the principal source of income that G-I will have upon reorganization are the

payments that are made from BMCA to G-I pursuant to the Tax Sharing Agreement.  (Conf.

Hr'g Tr. 70-71, Sept. 30, 2009.)  He testified that G-1 will use the payments that it receives

---

[37] "In my view, I look at this as if I'm essentially, I and my family entities are essentially paying the $775 million in cash to, to enable this deal to happen."  (Conf. Hr'g Tr. 49, Sept. 30, 2009.)

[38] With respect to the 1990 Rhone Poulenc transaction, Mr. Heyman stated:

> We put these assets into a partnership. We . . . treated this as a valid partnership, declared all the income as partners and so forth. And the Government has alleged that this was the equivalent of a disguised sale and that when we borrowed money against our partnership interest that was like getting sale proceeds from the sale. [T]he contentions are hotly contested.

(Conf. Hr'g Tr. 57, Sept. 30, 2009.)

under this agreement to pay the IRS note proposed by the Plan.[39]  (Conf. Hr'g Tr. 59-62, Sept. 30, 2009.)  Mr. Heyman testified that the proposed amortization schedule on the IRS note was one of the critical assumptions in the plan's feasibility analysis, and that it will help ensure the plan's success.[40] (Conf. Hr'g Tr. 68-69, Sept. 30, 2009.)

> *vi. Testimony about the Negotiation Process and Receiving Fair Market Value for the Estate*

Mr. Heyman testified that these were arm's-length negotiations that were hard fought between two sophisticated parties.[41] (Conf. Hr'g Tr. 45, Sept. 30, 2009.)  When asked how he was certain that the Plan was providing the fair market available value to the estate, Mr. Heyman pointed to the arm's length negotiation process and stated that over the eight and a half years that the negotiations took place "no one else showed up to express an interest in the company notwithstanding the fact that this has been a very public proceeding and everybody knew… about our bankruptcy." (Conf. Hr'g Tr. 64-65, Sept. 30, 2009.)  When asked why he didn't hold

---

[39] Heyman stated that he did not reject the Tax Sharing Agreement as an executory contract because it wouldn't be in the best interests of the estate:

> the tax sharing agreement is to G-I's overwhelming advantage because all the income, they get to share the income of G-I, is through tax sharing payments from BMCA up to G-I.  So that was a substantial benefit that G-I would lose if it rejected this contract.  Now the gain that it would have is that it would be free from the indemnity that G-I had given to its affiliates in connection with the Rhone-Poulenc tax liability, though we made the conclusion that the benefits far outweighed the burden to G-I and that would be against G-I's interests to reject that contract.

(Conf. Hr'g Tr. 70-71, Sept. 30, 2009.)

[40] Mr. Heyman stated

> the amortization schedule gives the company some breathing room, as I think was intended by the six-year statute . . . to build up its cash resources, build up its equity and provides, I think a needed cushion to run the business notwithstanding a huge amount of other debt that the company has.  And we certainly don't want to enter into a plan today that's gonna have us end up back in the Bankruptcy Court years later . . . . [W]e want to make sure that when we do this deal that we're gonna be, you know, reasonably or highly confident that we're gonna be able to meet all our obligations.

(Conf. Hr'g Tr. 68, Sept. 30, 2009.)

[41] "These were very difficult negotiations, very tough. … [T]he asbestos lawyers were very sophisticated, very tenacious, and we were not the easiest people to deal with as well, I'm sure . . . . I think both sides . . . started with very opposite views about the merits of the case, and, but it certainly was very arm's-length."  (Conf. Hr'g Tr. 45, Sept. 30, 2009.)

an auction for the company to ensure that fair market value was received, Mr. Heyman testified

that holding such an auction would be very harmful and could severely damage the value of the

company.[42]   (Conf. Hr'g Tr. 65-67, Sept. 30, 2009.)   He testified that he thought that "the

chances of getting a higher bid are slim to none."  (Conf. Hr'g Tr. 66, Sept. 30, 2009.)

> vii.    Testimony about the Tax Liability and the Tolling Agreement

Mr. Heyman testified that his understanding of the current IRS legal position was that they could

"disregard the plan, the six-year note, the interest rate, all these things that we've been

negotiating about, litigating about, and could assess against BMCA or other G-I affiliates where

the money would be due" immediately.  (Conf. Hr'g Tr. 40, Oct. 5, 2009.)  Mr. Heyman said that

if that were the case, it would put G-1 and BMCA in "an impossible position." (Conf. Hr'g Tr.

40, Oct. 5, 2009.)   Mr. Heyman testified that this was the concern that caused the Debtor to

propose an amendment to the language of Section 2.4 of the Seventh Amended Plan.   (Conf.

Hr'g Tr. 41, Oct. 5, 2009.)   After the Tolling Agreement was entered into evidence as Hearing

Exhibit 399, Mr. Heyman testified that this was an agreement "between G-1 Holdings, which is

denoted as a common agent of the affiliated group or corporations, and the IRS."  (Conf. Hr'g

Tr. 44, Oct. 5, 2009.)   Mr. Heyman testified that it was his understanding, in formulating the

Plan, that under the Tolling Agreement, the amount and timing of tax liability to be assessed

against the non-debtor would be no greater than that assessed against the debtor.  (Conf. Hr'g Tr.

49-50, Oct. 5, 2009.)  Mr. Heyman testified that he understood the agreement to mean that G-1

and the affiliates would be treated in the same manner with respect to the assessment amount and

timing.[43]  He stated that this was an assumption that formed the basis of his business decision to

---

[42] Specifically, Mr. Heyman noted potential harms related to damaged customer relationships and management
exodus, as well as the triggering of debt acceleration and golden parachutes after a change of control.
[43] Mr. Heyman stated that

act as Plan Sponsor.  (Conf. Hr'g Tr. 53, Oct. 5, 2009.)  Mr. Heyman testified that, according to

his recollection, the Tolling Agreement was drafted by the IRS.  (Conf. Hr'g Tr. 67, Oct. 5,

2009.)  When asked about the prospect of an immediate collection effort by the IRS against

BMCA of the entirety of its alleged tax liability, Mr. Heyman testified that it would be "an utter

disaster," because BMCA has about $1.5 billion in debt that must be refinanced in two or three

years.  (Conf. Hr'g Tr. 54, Oct. 5, 2009.)  He testified that the credit markets are already volatile,

and the additional risk of an immediate IRS assessment would make the prospects of refinancing

even riskier.  (Conf. Hr'g Tr. 54-55, Oct. 5, 2009.)

       *viii.    Cross Examination of Mr. Heyman*

Mr. Heyman was cross examined by Mr. Ari Kunofsky on behalf of the United States.

Mr. Heyman testified that neither BMCA nor ISP is a debtor in the bankruptcy case.  (Conf. Hr'g

Tr. 75, Sept. 30, 2009.)  With respect to the letter of credit required under the plan, Mr. Heyman

testified that he doesn't currently have a $560 million letter of credit secured, but it is the subject

of heavy negotiation and he believes that there is an understanding in place.  (Conf. Hr'g Tr. 76,

Sept. 30, 2009.)  With respect to the collateral being used to obtain the letter of credit, Mr.

Heyman testified that some of the collateral will come from Cash, and some of the collateral will

come from business assets, but he stated that he is unable to give a percentage breakdown

between the two.  (Conf. Hr'g Tr. 77, Sept. 30, 2009.)  Mr. Heyman testified that the business

assets used for collateral might come partially from BMCA and ISP.    (Conf. Hr'g Tr. 77-78,

Sept. 30, 2009.)

---

      We formulated a plan, you know, based upon the assumption that the affiliates would be treated in
the same manner as the, as G-I in terms of amount of liability, in terms of timing for assessment,
and so forth, so that we recognized that the IRS could proceed against G-I, BMCA, and so forth,
but it would be all on the same terms and conditions, and that we would have, the affiliates would
have no greater liability than the G-I parent . . . .  And the same time -- no greater liability and the
same timing for payment.

(Conf. Hr'g Tr. 52-53, Oct. 5, 2009.)

When asked about the fair market value of BMCA, Mr. Heyman testified that he thought $780 million was a fair market price for BMCA.[44]  (Conf. Hr'g Tr. 80, Sept. 30, 2009.)  When asked what efforts he had taken to try and sell the company during his eight years of bankruptcy, Mr. Heyman testified that he had made no active efforts to market the company or solicit bids from strategic buyers.  (Conf. Hr'g Tr. 81-82, Sept. 30, 2009.)  When asked about the proposed amortization schedule on the note that will satisfy the IRS Priority Tax Claim, Mr. Heyman testified that it called for payment in full six years after the date of final judgment of the tax claim.  (Conf. Hr'g Tr. 82, Sept. 30, 2009.)  When asked why the amortization schedule called for a six year delay as opposed to immediate or periodic payments, Mr. Heyman testified that he received legal advice that this treatment was available under the stature, and that this amortization schedule was an important assumption in the feasibility study[45] performed on the Plan.  (Conf. Hr'g Tr. 75, Sept. 30, 2009.)  Mr. Heyman testified that the note to be paid to the IRS would deliver payment six years after the final judgment date.  (Conf. Hr'g Tr. 60, Oct. 5, 2009.)  Mr. Heyman testified that there could be volatility in the market within the next three to five years.  (Conf. Hr'g Tr. 60, Oct. 5, 2009.)  Mr. Heyman testified that to his knowledge, the proposed IRS note was not necessarily a secured instrument in legal terms.  (Conf. Hr'g Tr. 60, Oct. 5, 2009.)

ix. *Finding of Credibility of Mr. Heyman*

The Court finds that the testimony of Mr. Samuel J. Heyman was credible.

**P.  Testimony of Elihu Inselbuch, Esq.**

i.        *Testimony on Professional Background and Role within the Asbestos Creditors Committee, the Global Settlement and the Development of the Plan*

---

[44] Mr. Heyman clarified that his opinion was that of a businessman, not a valuation expert.
[45] Mr. Heyman is referring to the Cooper Feasibility Report.  (Conf. Hr'g Ex. 702.)

At the confirmation hearing, Elihu Inselbuch, Esq., testified before this Court.   Mr.

Inselbuch testified that his firm, Caplin & Drysdale, "are lead counsel to the Asbestos Creditors

Committee, and I am kind of a lead lawyer on the team that represents the Committee in these

proceedings." (Conf. Hr'g Tr. 92-93, Sept. 30, 2009.)  Mr. Inselbuch testified that he played an

"active" role in the negotiations "and in many cases was the lead negotiator." (Conf. Hr'g Tr. 93,

Sept. 30, 2009.)  Mr. Inselbuch testified at length to his academic and legal background (Conf.

Hr'g Tr. 93-94, Sept. 30, 2009), and specifically to his many years of specialized experience

within asbestos bankruptcies in the role of advisor to asbestos creditor committees.[46]   When

asked about the lawyers for the individual ACC members, he described them as "the leading

asbestos personal injury lawyers around the country."  (Conf. Hr'g Tr. 102, Sept. 30, 2009.)  Mr.

Inselbuch testified that in this case, the ACC is a "Plan Proponent." (Conf. Hr'g Tr. 93, Sept. 30,

2009.)  *Testimony on the Complexity of Litigation Resolved by the Global Settlement, the Plan
and Timing Issues*

Mr. Inselbuch testified that the ACC did significant due diligence and hired a number of

experts to solidify the estimation of their claims against the Debtors.  (Conf. Hr'g Tr. 103-106,

Sept. 30, 2009.)  Mr. Inselbuch further testified that from the perspective of the ACC, there were

three economic subjects on the table in the settlement: the value to be extracted from Debtors

themselves in bankruptcy, the challenged conveyance with respect to ISP, and the issue of

---

[46] Mr. Inselbuch stated:

> Beginning in February of 2000 and continuing into 2001, there are a substantial number, probably
> well over a dozen substantial bankruptcies filed, that were wholly generated by asbestos liability.
> We were retained -- in each of those bankruptcies a committee representing the asbestos creditors
> was appointed by the U.S. Trustee and the Bankruptcy Court.  And we were retained in many of
> those as counsel to that Committee.

(Conf. Hr'g Tr. 100, Sept. 30, 2009.)

whether BMCA should be consolidated with the Debtors.[47]   Mr. Inselbuch testified that the

settlement was not negotiated by assigning a value to the different disputes, but rather as a

package.    (Conf. Hr'g Tr. 124, Sept. 30, 2009.)   Mr. Inselbuch testified that the ACC was

confident that their claims were so substantial that "at the end of the day [the committee was]

entitled to all of the Debtors' assets.  (Conf. Hr'g Tr. 107, Sept. 30, 2009.)  Mr. Inselbuch further

testified that although the ACC was confident that they could prevail in their litigation actions, it

would take a long time. (Conf. Hr'g Tr. 115, Sept. 30, 2009.)  Mr. Inselbuch testified that a

settlement was attractive because a speedy resolution to these issues was important to the

constituency that he and the Asbestos Creditors represent.[48]

> ii.    *Testimony about the Negotiation Process and Receiving Fair Market Value for the Estate*

Mr. Inselbuch testified that the negotiations went on for years and despite all of his

experience in similar cases, these negotiations were "at least as contentious as any of the

negotiations in which I was ever engaged." (Conf. Hr'g Tr. 121, Sept. 30, 2009.)  Mr. Inselbuch

testified that he was not previously acquainted with Legal Representative of Future Claimants, C.

---

[47] Mr. Inselbuch stated:

> there were three economic issues, or economic subjects.  One was the Debtor itself in this Chapter 11; the second was the, the conveyance that we challenged in the ISP case; and, the third was the, our argument that the court should consolidate BMCA with the Debtor, and the further argument that that would lead to setting aside the liens that had to be provided to certain of the banks' creditors of BMCA permitting them to have structured priority or actual priority over the, the unsecured creditors here and permitting them to be paid in full during the course of this bankruptcy.  With the concomitant, if we could get that far along of seeking to claw that money back from these banks.  Those were the three pots basically that we were looking at for recovery.

(Conf. Hr'g Tr. 106-07, Sept. 30, 2009.)

[48] Mr. Inselbuch stated:

> I might say also that waiting four or five years while that might be neutral to financial people in the sense that time value of money is measured by the interest rate, to our constituency where we have tens if not hundreds of thousands of people getting sick and dying waiting another four or five years for compensation was not the same as the bank waiting to get paid or even for that matter the IRS waiting to get paid.

(Conf. Hr'g Tr. 118, Sept. 30, 2009.)

Judson Hamlin, before the case started.  (Conf. Hr'g Tr. 124-25, Sept. 30, 2009.)  Mr. Inselbuch testified that in his experience from similar asbestos cases, it was not uncommon for third party investors to contact the ACC and express an interest in buying the Chapter 11 Debtors, but that this never happened in this case.  (Conf. Hr'g Tr. 122-23, Sept. 30, 2009.)  In summation, Mr Inselbuch said that he thought the results of the settlement embodied in the Plan were "fair."[49] (Conf. Hr'g Tr. 124, Sept. 30, 2009.)

### iii.     Cross Examination of Mr. Inselbuch

Mr. Inselbuch was cross examined by Mr. Jan Geht on behalf of the United States.  Mr. Inselbuch testified that the $215 million in cash and the $560 million note were at the core of the settlement discussion dating back to December 2006.  (*See* Conf. Hr'g Tr. 129, Sept. 30, 2009.)  Mr. Inselbuch testified that these numbers in the current Plan are consistent with the results of the negotiation of the Global Settlement.  (Conf. Hr'g Tr. 130-131, Sept. 30, 2009.)  When asked if he thought the value of BMCA and or G-1 had changed in the intervening time since the negotiations had been completed, Mr. Inselbuch stated that "I would have no reason to think so." (Conf. Hr'g Tr. 131, Sept. 30, 2009.)

### x. Finding of Credibility of Mr. Inselbuch

The Court finds that the testimony of Mr. Elihu Inselbuch was credible.

---

[49] Mr. Inselbuch stated:

> What's a fair price is what a willing buyer will give a willing -- or a willing seller will get from a willing buyer.  I think here nobody was particularly willing.  I think certainly the Committee would have liked more; I think certainly Mr. Heyman would have liked less; but, this is where we came down, and given the arm's-length nature of the debate  and the heat and fury around it, I would have to say that the result is fair.

(Conf. Hr'g Tr. 124, Sept. 30, 2009.)

### Q. **Testimony of CFO John Rebele**

> i.    *Testimony on Professional Background, the Business and the Current Financial Position of G-1 and its Affiliates*

At the confirmation hearing, John Rebele, testified before this Court.  Mr. Rebele testified that he is the Senior Vice President, Chief Financial Officer, and Chief Administrative Officer of BMCA.  (Conf. Hr'g Tr. 134, Sept. 30, 2009.)  Mr. Rebele testified that the focus of BMCA's business is in residential roofing and commercial roofing, and that aproximatelythree quarters of the sales are from residential roofing.  (Conf. Hr'g Tr. 135-36, Sept. 30, 2009.)  Mr. Rebele testified that BMCA is not a debtor in this chapter 11 proceeding. (Conf. Hr'g Tr. 135, Sept. 30, 2009.)   Mr. Rebele testified that the current credit rating of BMCA was below investment grade.  (Conf. Hr'g Tr. 135, Sept. 30, 2009.)  Mr. Rebele testified that BMCA made a significant acquisition in February of 1997 when it acquired Elk Corporation, and that since the acquisition BMCA has realized more than $120 million in synergies.  (Conf. Hr'g Tr. 138-39, Sept. 30, 2009.)   Mr. Rebele testified that unit demand for BMCA products was down by approximately twenty percent in the first half of 2009 (Conf. Hr'g Tr. 140, Sept. 30, 2009), but that earnings were high because the company was enjoying increased margins starting "in the back half" of 2008 and continuing forward (*See* Conf. Hr'g Tr. 142-43, Sept. 30, 2009.)  Mr. Rebele testified that he would describe these high margins as "an aberration" and that he believed that they would "adjust and moderate" over time.  (Conf. Hr'g Tr. 143, Sept. 30, 2009.)

> ii.    *Testimony on the Restrictions on BMCA imposed by the Tax Sharing Agreement and Debt Covenants*

Mr. Rebele testified that BMCA is currently able make its dividend payments to its parent, G-1[50] (Conf. Hr'g Tr. 153, Sept. 30, 2009), and that BMCA is limited in the amount of

---

[50] As required under the Tax Sharing Agreement.

dividend that BMCA can pay up to G-1 within a given year (*see* Conf. Hr'g Tr. 156, Sept. 30, 2009).  With respect to the financing package for BMCA, Mr. Rebele testified that BMCA has approximately $1.55 billion of outstanding debt.  (Conf. Hr'g Tr. 153, Sept. 30, 2009.)  Mr. Rebele testified that these debt agreements have change of control provisions.  (Conf. Hr'g Tr. 156, Sept. 30, 2009.)  Mr. Rebele testified that a change of control could constitute an event of default, which would cause the majority of that debt to be accelerated.  (Conf. Hr'g Tr. 157-59, Sept. 30, 2009.)  Mr. Rebele testified that a change in control could also have a negative financial impact on BMCA in that certain employee contract provisions would be triggered, which would be expensive for the company.  (Conf. Hr'g Tr. 161, Sept. 30, 2009.)  Mr. Rebele testified that LIBOR is the predominant reference point for debt instruments.  (Conf. Hr'g Tr. 164, Sept. 30, 2009.)

      iii.     *Testimony on the Feasibility Generally, Financial Projections, Payment of the IRS Tax Claims under the Plan, the Tax Sharing Agreement, and their effect on the Plan's Feasibility*

Mr. Rebele testified that, based on his thirty years of experience with the company, he is reasonably comfortable that the company can meet its obligations under the Plan and that the Plan is feasible.  (Conf. Hr'g Tr. 152, Sept. 30, 2009.)  Mr. Rebele testified that he prepared a set of projections[51] specifically for this bankruptcy case (Conf. Hr'g Tr. 144, Sept. 30, 2009), and that he provided these projections to Mr. Stephen Cooper, the Debtors' Feasibility Expert, to be used as a basis for the determination of whether the Plan is feasible.[52] (Conf. Hr'g Tr. 152, Sept. 30, 2009.)  Mr. Rebele testified that although there are risks that the company might not meet projections, he was comfortable based on his experience that these projections were reasonable.  (Conf. Hr'g Tr. 150, Sept. 30, 2009.)  Mr. Rebele testified that he was comfortable with the data

---

[51] Mr. Rebele testified that he prepared both a "base case" projection (Conf. Hr'g Tr. 144, Sept. 30, 2009) and a "downside case" (Conf. Hr'g Tr. 150, Sept. 30, 2009).
[52] The analysis referred to here is documented in the Cooper Feasibility Report, Conf. Hr'g Ex. 702.

that Mr. Cooper relied on in developing his feasibility analysis [in the Cooper Feasibility Report]. (Conf. Hr'g Tr. 152, Sept. 30, 2009.) Mr. Rebele testified that if the IRS were to assess $500 million of tax liability against BMCA within 150 days of the confirmation of the Plan, that would be "very difficult." (Conf. Hr'g Tr. 35, Oct. 5, 2009.)

             *iv.*      *Cross Examination of Mr. Rebele*

Mr. Rebele was cross examined by Jan Geht on behalf of the United States. Mr. Rebele testified at length with respect to his financial projections, and testified repeatedly that he thought these projections were reasonable (Conf. Hr'g Tr. 38, Oct. 5, 2009.) When asked if it might be possible, given the cashflow in the projections, for BMCA to pay the IRS on a more accelerated schedule than is proposed in the plan, Mr. Rebele testified that it might be possible. (Conf. Hr'g Tr. 17-19, Oct. 5, 2009.) Mr. Rebele testified that his best estimate of the amount of BMCA collateral that is going to be used to obtain the $560 million letter of credit contemplated under the Plan is $200 million. (Conf. Hr'g Tr. 24, Oct. 5, 2009.) Mr. Rebele testified about the various interest rates on its outstanding debt, each of which were based on LIBOR plus a certain percentage. (Conf. Hr'g Tr. 26, Oct. 5, 2009.) Mr. Rebele testified that BMCA has a $600 million credit revolver, and that it is not drawn down, but has approximately $40 million in letters of credit against it. (Conf. Hr'g Tr. 31-32, Oct. 5, 2009.) Mr. Rebele criticized the interest rate used in the Valuation Report of Daniel Beaulne because "that rate is premised on BMCA having an investment grade rating" and Mr. Rebele thinks that is "flawed." (Conf. Hr'g Tr. 25, Oct. 5, 2009.) When asked if the IRS were to assess $500 million of tax liability against BMCA within 150 days of the confirmation of the Plan, whether that would cause the Plan to no longer be feasible, Mr. Rebele said that he couldn't answer. (Conf. Hr'g Tr. 39, Oct. 5, 2009.)

   *v.*  *Finding of Credibility of Mr. Rebele*

The Court finds that the testimony of Mr. John Rebele was credible.

  *R.* **Testimony of the IRS's Valuation Expert – Daniel Beaulne**

   *i.*  *Testimony on his Valuation Opinion*

At the confirmation hearing Daniel Beaulne, the IRS's valuation expert, testified before

this Court.  Mr. Beaulne testified that he holds the designations of "Chartered Business

Evaluator," "Chartered Accountant" and "Chartered Financial Analyst," and that he has

previously testified as an expert in the field of business valuation.  (Conf. Hr'g Tr. 73-76, Oct. 5,

2009.)  The United States submitted Mr. Beaulne as an expert in the field of business valuation

in this case without objection of any party.  (Conf. Hr'g Tr. 76, Oct. 5, 2009.)  Mr. Beaulne

testified that he was hired by the United States to value G-1 Holdings, and as part of that

assignment, to value BMCA.  (Conf. Hr'g Tr. 78, Oct. 5, 2009.)  Mr. Beaulne testified that the

standard of valuation that he used was "fair market value," which he described as "a price

between a willing buyer and a willing seller acting at arm's-length."  (Conf. Hr'g Tr. 79, Oct. 5,

2009.)  Mr. Beaulne described at length the mechanics of his valuation process, the results of

which are documented exhaustively in the Beaulne Valuation Report, which was offered into

evidence.  (Beaulne Valuation Report. Conf. Hr'g Ex. 701.)  Mr. Beaulne testified that his

valuation analysis "resulted in an enterprise value of approximately $3.6 billion" for BMCA.

(Conf. Hr'g Tr. 91, Oct. 5, 2009.)  Mr. Beaulne testified that the value that he calculated  for

BMCA under "the income approach is $3.466 billion" and under "the market approach was

$3.585 [billion], and the average of those two approaches was $3.526 billion."  (Conf. Hr'g Tr.

113, Oct. 5, 2009.)  Mr. Beaulne testified at length about responses to technical criticisms of his

analyses that were contained in the Cooper Rebuttal Report.  (Conf. Hr'g Ex. 703.)  Mr. Beaulne

presented various technical criticisms of the analyses performed by Mr. Cooper in the Cooper

Rebuttal Report.  (Conf. Hr'g Tr. 6-28, 33-35, Oct. 6, 2009.)

>    ii.    *Cross Examination of IRS Valuation Expert – Daniel Beaulne*

Mr. Beaulne was cross examined by Mr. Andrew Rossman on behalf of the Debtors and

by Mr. Trevor Swett on behalf of the ACC.  Mr. Beaulne testified that he doesn't dispute the

assertion that the IRS has now admitted that the Plan is feasible.  (Conf. Hr'g Tr. 127, Oct. 5,

2009.)  Mr. Beaulne testified that he was hired to perform a valuation analysis, not a feasibility

analysis.  (Conf. Hr'g Tr. 127, Oct. 5, 2009.)  Mr. Beaulne testified that as part of his analysis, he

never took a site visit or interviewed any of the company management.  (Conf. Hr'g Tr. 128, Oct.

5, 2009.)  Mr. Beaulne testified that he was aware that a change of control would constitute an

event of default under BMCA's loan agreements, but explained that theoretically a would-be

purchaser would likely contact the lenders prior to proceeding with the transaction and would

choose not to pursue it unless the lenders waived the event of default.  (*See* Conf. Hr'g Tr. 151,

Oct. 5, 2009.)  Mr. Beaulne testified at length about certain implicit assumptions within his

analyses, why he thought his assumptions were appropriate in these circumstances, and how

those assumptions could impact the valuation.  When asked about the analysis in the Cooper

Rebuttal Report, which resulted in a valuation for BMCA at $2.195 billion, Mr. Beaulne testified

that he did not disagree with the math, but that he had a strong disagreement with the result

because Mr. Cooper "did not follow . . . appropriate appraisal practices."  (Conf. Hr'g Tr. 175,

Oct. 5, 2009.)

>    iii.    *Finding of Credibility of Mr. Beaulne*

The Court finds that the testimony of Mr. Daniel Beaulne was credible.

### S. **Appearance from United States Trustee Mitchell Hausman**

Mitchell Hausman appeared at the Confirmation Hearing on behalf of the United States Trustee.  Mr. Hausman stated that the parties resolved the preliminary objection filed by the UST based on language that was incorporated into the Seventh Amended Plan.  (Conf. Hr'g Tr. 82, Oct. 6, 2009.)  Mr. Hausman clarified that this is why the UST did not file a formal objection, and stated that they were in fact withdrawing their preliminary objection to Plan Confirmation. (Conf. Hr'g Tr. 82, Oct. 6, 2009.)

### T. **Other Declarations in Evidence, Death of Mr. Heyman**

#### *i. Declaration of C. Judson Hamlin*

Robert Sanker appeared on behalf of the Legal Representative and submitted the Declaration of C. Judson Hamlin in Support of Confirmation of Debtors' [Third] Amended Joint Plan of Reorganization ("Decl. of Hamlin").  (Conf. Hr'g Ex. 400.)  In the Declaration, Mr. Hamlin describes his extensive legal background and his due diligence in this case, which dates back to October 2001, and includes the retention of various professionals and advisors.  (Decl. of Hamlin ¶ 1-13.)  Mr. Hamlin declares that the Plan is "the result of years of extensive and contentious negotiations." (Decl. of Hamlin ¶ 14.)  Mr. Hamlin declares that he "believe[s] this global settlement, and the resulting Plan, is reasonable as well as fair and equitable to Demand holders and is in the best interests of the Debtors' estates." (Decl. of Hamlin ¶ 15.)  Mr. Hamlin declares that the Asbestos Permanent Channeling Injunction, together with the Asbestos Trust Agreement, is an integral part of the Plan.  (Decl. of Hamlin ¶ 20.)  Mr. Hamlin declares that after consultation with G-1, Marina Coredemus, Alan B. Rich, and Stephen M. Snyder have been nominated to serve as the Asbestos Trustees for the Asbestos Trust.  (Decl. of Hamlin ¶ 26.)  Mr. Hamlin declares that, "based upon my experience, my due diligence, the extensive negotiations

in this Chapter 11 Case, and the advice provided to me by the professionals that I have retained, I believe the overall treatment provided under the Plan is fair and equitable to holders of Demands." (Decl. of Hamlin ¶ 30.)    Finally, Mr. Hamlin declares that he is "further satisfied that the terms that the terms of the Asbestos Permanent Channeling Injunction are fair and equitable to holders of Demands."  (Decl. of Hamlin ¶ 31.)

> ### ii. Declaration of Michael Tanenbaum

The Debtors submitted the Declaration of Michael Tanenbaum, Esq., of Sedgwick, Detert, Moran, & Arnold LLP ("Decl. of Tanenbaum"), into evidence at the Confirmation Hearing.  (Hr'g Ex. 382.)  Mr. Tanenbaum declares that he is an attorney with more than 25 years of experience in managing complex product liability litigation, and he formally represented G-1 or its predecessor GAF since December 1999 in connection with the prosecution and settlement of various asbestos claims.  (Decl. of Tanenbaum ¶ 3-5.)  Mr. Tanenbaum declares that by October 1, 2000, prior to the filing of a chapter 11 petition, GAF Corporation faced approximately 148,800 asbestos-related personal injury claims.  (Decl. of Tanenbaum ¶ 11.)  Mr. Tanenbaum declares that absent a channeling injunction, G-1 and its affiliates would continue to be subject to significant future asbestos personal injury claims and substantial future demands for payment.  (Decl. of Tanenbaum ¶ 13.)  Mr. Tanenbaum declares that it is not possible to predict with certainty the exact amounts, numbers, and timing of the future Demands.  (Decl. of Tanenbaum ¶ 13.)  Mr. Tanenbaum declares that absent a channeling injunction, there is a risk that not all demands will be treated equitably.  (Decl. of Tanenbaum ¶ 14.)  Mr. Tanenbaum declares that the establishment of a trust and a channeling injunction would allow for the fair, efficient, and cost effective liquidation of all present and future asbestos personal injury claims

against G-1 without imperiling the viability of the reorganized debtor in the future.  (Decl. of

Tanenbaum ¶ 15.)

> iii. Death of Mr. Heyman

As discussed above, Mr. Heyman died on November 7, 2009.  In responding to the

impact that Mr. Heyman's death has this Court's confirmation of the Plan, the Plan Proponents

filed a Joint Declaration of All Plan Proponents, in which each Plan Proponent reaffirmed that

they are prepared to proceed to closing the Plan on the same timetable as the Debtors previously

advised.  (Joint Declaration of All Plan Proponents ¶¶ 3-5 (D.N. 9781).)  Additionally, in the

Joint Declaration, the Debtors declared that the financing necessary to consummate the plan has

been arranged, despite Mr. Heyman's death.  (*Id.* ¶ 3.)  On November 10, 2009, the Court held a

status conference, in which multiple interested parties participated.  At that status conference,

Mark A. Belnick, Esq., appearing on behalf of the Estate of Mr. Heyman and the Heyman

family, represented that Ronnie Feuerstein Heyman, Mr. Heyman's wife, has been formally

given by the appropriate corporate resolutions and board activities all of the same signatory

powers as Mr. Heyman, and that she was committed to the Plan.  Additionally, Mr. Belnick

represented that the financial institutions are aware of Ronnie Heyman's control, and are

standing behind their commitments to the Plan.

## III.  <u>DISCUSSION</u>

### A.  <u>The IRS has Limited Standing to Assert Objections to Plan Confirmation</u>

As a threshold matter, the Court finds that under the Plan, the IRS does not hold any

impaired claims against the Debtors' estates.  Pursuant to the Bankruptcy Code, a claim is

deemed "impaired" under a plan of reorganization unless the plan "leaves unaltered the legal,

equitable, and contractual rights to which such claim . . .  entitles the holder of such claim."  11

U.S.C. § 1124(1).  As will be discussed below, the Plan comports with the requirements of 11

U.S.C. § 1129(a)(9) regarding the treatment of the IRS's Priority Tax Claim.  Moreover, while

the IRS asserts that its claim in Class 3C: G-I Non-Priority Tax Penalty Claims is impaired by

the Plan, should the IRS succeed in the Tax Litigation, the Plan provides that the IRS "shall

receive Cash in an amount equal to 100% of such Allowed Claim . . . [and] shall also receive

Cash in an amount sufficient for payment in full of postpetition interest."  (Plan § 3.7(b).)  The

Plan provides that ISP will make the necessary cash payments if and when the IRS's tax penalty

claim is deemed allowed by final resolution of the tax litigation.  (Plan §§ 4.4(e), 3.7(b).)  The

Court is satisfied from the evidence and testimony that the IRS's legal right to payment for its

tax penalty claim, should it arise, will be satisfied in full under the Plan.  Because its claims are

unimpaired, the IRS is conclusively presumed to have accepted the Plan, and is not entitled to

vote to accept or reject the Plan.  *See* 11 U.S.C. § 1126(f).  Thus, the Court denies the IRS's Vote

Allowance Motion.[53]

In the context of bankruptcy plan confirmation hearings, "creditors have standing only to

challenge those parts of a reorganization plan that affect their direct interests."

*In re E.S. Bankest, L.C.*, 321 B.R. 590, 595 (Bankr. S.D. Fla. 2005) (*citing In re Orlando

Investors, L.P.*, 103 B.R. 593, 597 (Bankr. E.D. Pa. 1989)).  As an unimpaired creditor, the

provisions of the plan relating to § 1129(b) have no effect on the interests of the IRS.  Thus, the

IRS has no standing to object to confirmation on grounds that the Plan fails to satisfy the "new

value" exception to the absolute priority rule under § 1129(b).  Accordingly, the Court will not

---

[53] As an additional basis for denying the IRS's Vote Allowance Motion, the Court notes that the IRS is barred from voting its tax penalty claim because it failed to timely file its Vote Allowance Motion.  *See Jacksonville Airport, Inc. v. Michkeldel Inc.*, 434 F.3d 729, 732 (4th Cir. 2006); *In re Miami Trucolor Offset Svc. Co.*, 187 B.R. 767, 769 (Bankr. S.D. Fl. 1995).  The deadline for voting on the Plan expired on January 23, 2009.  Although the tax litigation had been pending for years, the IRS did not file its Vote Allowance Motion until July 13, 2009, roughly six months after the voting deadline had passed.  In addition, the IRS's Vote Allowance Motion sought permission to vote its claim in Class 3A, yet, after the Plan was amended to create a new class 3C, the IRS no longer holds any existing claim in Class 3A.

consider the particular testimony and evidence provided by the IRS that challenges the Plan's

satisfaction of the requirements under § 1129(b) in making its determinations.

**B.    The Post Balloting Plan Modifications Do Not Require a Re-solicitation of Votes**

With respect to modification of a plan before confirmation, section 1127(a) of the

Bankruptcy Code provides:

> The proponent of a plan may modify such plan at any time before confirmation,
> but may not modify such plan so that such plan as modified fails to meet the
> requirements of sections 1122 and 1123 of this title. After the proponent of a plan
> files a modification of such plan with the court, the plan as modified becomes the
> plan.

11 U.S.C § 1127(a).  Rule 3019(a) of the Federal Rules of Bankruptcy Procedure further clarifies

plan modification before confirmation as follows:

> In a chapter 9 or chapter 11 case, after a plan has been accepted and before its
> confirmation, the proponent may file a modification of the plan.  If the court finds
> after hearing on notice to the trustee, any committee appointed under the Code,
> and any other entity designated by the court that the proposed modification does
> not adversely change the treatment of the claim of any creditor or the interest of
> any equity security holder who has not accepted in writing the modification, it
> shall be deemed accepted by all creditors and equity security holders who have
> previously accepted the plan.

Fed. R. Bankr. P. 3019.  If the amendments are material and adversely affect the way

creditors are treated, § 1127 requires a new disclosure statement and balloting of the

amended plan.  *In re New Power Co.*, 438 F.3d 1113 (11th Cir. 2006).  Whether an

amendment is material is a mixed question of law and fact.  *Id.* at 1117.  "The best test is

whether the modification so affects any creditor or interest holder who accepted the plan

that such entity, if it knew of the modification, would be likely to reconsider its

acceptance."  9 COLLIER ON BANKRUPTCY ¶ 3019.01 (15th ed. rev. 2009).

In the instant case, the modifications to the Plan after the balloting have not adversely

affected the treatment of any creditor that previously voted to accept the Plan.  The only party

that has objected to a post-balloting modification is the IRS.  Given that the IRS's claims are deemed unimpaired after the modifications, re-solicitation would not cause any party who previously voted to accept the Plan to reconsider their vote.  The Court concludes that the modifications do not adversely affect creditors, and the Court will consider the Plan as modified without the need for further balloting.

### C.  The Global Settlement is Fair and Equitable and Meets the Standard for Approval Under *Martin*

At the heart of the Plan before the Court is the Global Settlement; absent the approval of this settlement, the Plan could not go forward.  Therefore, as a threshold matter, the Court will consider whether the Global Settlement should be approved.  Under section 1123(b)(3)(A) of the Bankruptcy Code, a plan shall provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." *Id.* Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." *Id.*  Here, the Plan by its terms is a motion for approval of the Global Settlement.  *See In re Texaco*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988) ("Compromises may be effected separately during reorganization proceedings or in the body of the reorganization plan itself.")

Courts may approve settlements if they are "fair and equitable." *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, (1968); *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006).  Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them.  *In re Nutraquest, Inc.*, 434 F.3d at 644.   In evaluating a proposed settlement, the Court is not supposed to have a "mini-trial" on the merits, but rather examine the settlement and determine whether it falls "'below the lowest point in the

range of reasonableness.'" *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (*quoting*

*Newman v. Stein*, 464 F. 2d 689, 693 (2d Cir. 1972)); *In re Jasmine, Ltd.*, 258 B.R. 119,

123 (D.N.J. 2000).

Courts generally consider the following four criteria when considering whether to

approve a proposed settlement: "(1) the probability of success in litigation; (2) the likely

difficulties in collection; (3) the complexity of the litigation involved, and the expense,

inconvenience and delay necessarily attending it; and (4) the paramount interest of the

creditors." *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (*citing TMT Trailer Ferry*, 390

U.S. at 424-5; *In re Nutraquest, Inc.*, 434 F.3d at 644-645).

In the present case, the fact that the Global Settlement is the product of over eight

years of arms-length bargaining by highly sophisticated parties is strong evidence that the

agreement is not below the lowest point in a range of reasonableness.  After reviewing the

Plan, the records of the Covered Matters including briefs and decisions setting forth the

main facts and legal issues in the Covered Matters,[54] and based upon the testimony and

other documentary evidence submitted at the Confirmation Hearing, the Court concludes

that the Plan Proponents have demonstrated that the Global Settlement embodied in the

Plan is fair and equitable.

---

[54] "Covered Matters" (as defined in the Plan), include: (i) proceedings pending or formerly pending before the
Bankruptcy Court, the United States District Court for the District of New Jersey and/or the United States Court of
Appeals for the Third Circuit relating to the estimation of the asbestos personal injury claims and demands asserted
against the Debtors; (ii) proceedings pending or formerly pending before Bankruptcy Court and/or the United States
District Court for the District of New Jersey concerning BMCA, including (a) proceedings regarding whether
BMCA is liable for asbestos liabilities as a successor to G-I, (b) whether BMCA should be substantively
consolidated with G-I's Chapter 11 Case, (c) whether asbestos personal injury claims asserted against BMCA should
be stayed, and (d) whether the Asbestos Claimants Committee could prosecute alleged avoidance actions of the G-I
estate against BMCA; (iii) the fraudulent transfer action pending before the United States District Court for the
Southern District of New York challenging the 1997 transaction whereby International Specialty Products Inc.
("ISP") ceased to be a subsidiary of G-I's predecessor, GAF Corporation; and (iv) G-I's RICO action pending
before the United States Court of Appeals for the Second Circuit, seeking recovery of damages from attorneys and
law firms alleged to have engaged in a scheme to inundate the judicial system with hundreds of thousands of
asbestos cases without regard to their merit.

Our consideration of the four *Martin* factors also supports the conclusion that the Global Settlement should be approved.  First, with respect to the probability of success in litigation, the court records and testimony at the Confirmation Hearing show that the multiple litigation actions being resolved here are hotly contested and have been in the courts for many years; it is very difficult to predict how these complex litigation actions would be resolved in the courts.  Second, with respect to the potential collection efforts absent a settlement, several of the matters resolved by the Global Settlement have been appealed and remain at the appellate level, delaying and potentially forestalling any potential for recoveries; the appellate proceedings present a substantial obstacle to the collection of any eventual award in the various litigation actions.  Third, given the testimony of Mr. Heyman and Mr. Inselbuch about the complexity of the issues being litigated and the great expense and lengthy delay that would be involved with ongoing litigation, there is strong evidence that the Global Settlement provides a more efficient solution.  Fourth, the Global Settlement is fully endorsed by the key creditor constituencies in this case—the ACC and the Legal Representative.  Without their support, a Plan with an irrevocable § 524(g) injunction could not be confirmed in these Chapter 11 Cases.  Additionally, as supported by the testimony of Mr. Heyman and Mr. Inselbuch and the Declaration of C. Judson Hamlin, the interests of all Creditors are best served by implementation of the Global Settlement because it makes assets available to other unsecured Creditors that would have been depleted or unavailable by the continuing the costly litigation over the Asbestos Claims.  In consideration of all of the factors above, the Global Settlement is approved.

**D.  The Plan Complies with Requirements for Confirmation under Sections 1129, 1122, & 1123 of the Bankruptcy Code**

Having concluded that the Global Settlement should be approved, the Court will determine whether the requirements for confirmation found in section 1129 of the Bankruptcy Code are met.  Section 1129(a)(1) provides that "[t]he court shall confirm a plan only if . . . (1) The plan complies with the applicable provisions of [the Bankruptcy Code]."  *Id.*  The Court will now determine whether the Plan complies with other applicable provisions of § 1129(a)(1), including §§ 1122 and 1123.  Section 1122, which governs the classification of claims or interests, states:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
>
> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122(a)-(b).  Section 1122 requires that all claims which are together be substantially similar, which "insures that large claims of differing legal natures do not dictate other claims within a class."  *In re Resorts Int'l, Inc.*, 145 B.R. 412, 447 (Bankr. D.N.J. 1990) (citations omitted).  In the instant case, Article IV of the Plan designates nineteen classes of Claims and Equity Interests as follows:

> Class 1A: G-I Priority Non-Tax Claims
> Class 1B: ACI Priority Non-Tax Claims
> Class 2A: G-I Secured Claims
> Class 2B: ACI Secured Claims
> Class 3A: G-I Unsecured Claims
> Class 3B: ACI Unsecured Claims
> Class 3C: G-I Non-Priority Tax Penalty Claims
> Class 4: Environmental Claims for Remedial Relief
> Class 5: Other Environmental Claims
> Class 5A: US Environmental Claim and Vermont Environmental Claim
> Class 6: Asbestos Claims
> Class 7: Asbestos Property Damage Claims and Asbestos Property Damage

Contribution Claims
Class 8: CCR Claim
Class 9: Bonded Claims
Class 10A: G-I Affiliate Claims
Class 10B: ACI Affiliate Claims
Class 11: G-I Equity Interest Redemption Claims
Class 12A: G-I Equity Interests
Class 12B: ACI Equity Interests

(Plan, Art. IV.)   The Court concludes that under the Plan, the claims of each class are substantially similar to meet the requirements of § 1122(a).   The Court notes that no objections have been filed alleging otherwise.   Further, "[i]t is also clear that even though some class members may have stronger claims, or stronger defenses than others, they may be classified together so long as their claims are substantially similar and their treatment is approximately equal." *In re Resorts Int'l, Inc.*, 145 B.R. at 448.   The Court notes that because the Plan does not designate a separate class of Unsecured Claims for administrative convenience purposes, the provision of § 1122(b) is inapplicable here.

Section 1123(a) of the Bankruptcy Code governs the contents of a reorganization plan, and provides that notwithstanding any otherwise applicable nonbankruptcy law, a plan shall:

(1) designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(12), 507(a)(23), or 507(a)(8) of this title, and classes of interests;

(2) specify any class of claims or interests that is not impaired under the plan;

(3) specify the treatment of any class of claims or interests that is impaired under the plan;

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

(5) provide adequate means for the plan's implementation, such as--

(A) retention by the debtor of all or any part of the property of the estate;

(B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

(C) merger or consolidation of the debtor with one or more persons;

(D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

(E) satisfaction or modification of any lien;

(F) cancellation or modification of any indenture or similar instrument;

(G) curing or waiving of any default;

(H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;

(I) amendment of the debtor's charter; or

(J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;

(6) provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends; and

(7) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee;

11 U.S.C. § 1123(a).

Concerning sections 1123(a)(1)-(3), Article III of the Plan provides that Class 1A: G-I Priority Non-Tax Claims, Class 1B: ACI Priority Non-Tax Claims, Class 2A: G-I Secured Claims, Class 2B: ACI Secured Claims, Class 3B: ACI Unsecured Claims, Class 3C: G-I Non-Priority Tax Penalty Claims, Class 4: Environmental Claims for Remedial Relief, Class 9: Bonded Claims, and Class 10B: ACI Affiliate Claims are unimpaired under the Plan and, therefore, are deemed to have accepted the Plan.  Pursuant to the CCR Settlement Agreement, Class 8: CCR Claim is unimpaired, and therefore is deemed to have accepted the Plan.  Pursuant to the Consent Decree and Settlement Agreement, Class 5A: US Environmental Claim and

Vermont Environmental Claim is impaired but is deemed to have voted to accept the Plan.  Class 3A: G-I Unsecured Claims, Class 5: Other Environmental Claims, Class 6: Asbestos Claims, Class 7: Asbestos Property Damage Claims and Asbestos Property Damage Contribution Claims, Class 10A: G-I Affiliate Claims, Class 11: G-I Equity Interest Redemption Claims, Class 12A: G-I Equity Interests, and Class 12B: ACI Equity Interests are impaired under the Plan.  The Plan specifies the treatment for any class of claims or interests that is impaired under the plan.  (Plan, Art. III.)   Therefore, the Court concludes that under this Plan the claims of each class are substantially similar to meet the requirements of § 1123(a)(1)-(3).

Concerning § 1123(a)(4), Article IV of the Plan provides that the treatment of each Claim or Equity Interest within a Class is to be the same as the treatment of each other Claim or Equity Interest in such Class unless the holder of a Claim or Equity Interest has agreed to or subsequently agrees to less favorable treatment on account of its Claim or Equity Interest.

Concerning § 1123(a)(5), the Plan, including Article IV of the Plan, provides adequate means for its implementation.   Specifically, Article IV creates the Asbestos Trust that will assume all liability and responsibility to satisfy all Trust Claims.  From and after the Effective Date, all Trust Claims will be subject to the Permanent Channeling Injunction pursuant to section 524(g) of the Bankruptcy Code.  The Protected Parties shall have no obligation to pay any liability of any nature or description arising out of an Asbestos Claim or Demand.  Additionally, to generally carry out and fund the Plan, the Reorganized Debtors, in their sole discretion, may use (a) cash flow from BMCA, a wholly owned subsidiary of G-I, (b) dividends from any direct or indirect subsidiary of the Reorganized Debtors, (c) contributions to capital of the Reorganized Debtors from the Plan Sponsor (as defined in the Plan), (d) sales of Equity Interests in, or assets of, the Reorganized Debtors or any of their direct or indirect subsidiaries or (e) borrowings by

Reorganized Debtors. (Plan § 4.4(e).)  Non-debtor ISP will contribute the Cash necessary to pay the holder of the Allowed G-I Non-Priority Tax Penalty Claim, if any.

Concerning § 1123(a)(6), pursuant to Section 8.3 of the Plan, The Reorganized Debtors' bylaws and charters provides that the Reorganized Debtors' certificates of incorporation shall be deemed to contain provisions prohibiting the issuance of nonvoting equity securities and provide for the appropriate distribution of voting power among all classes of equity securities authorized for issuance.  (Plan § 8.3.)  The Court concludes that the Plan complies with this requirement.

Concerning § 1123(a)(7), sections 8.1 and 8.2 of the Plan and the Reorganized Debtors' charters, bylaws and similar constituent documents regarding the manner of selection of officers and directors of the Reorganized Debtors are consistent with the interests of creditors and equity security holders and with public policy.  (*See* Plan § 8.1-8.2; Schedule 8.2 of the Plan Supplement.)  The Court concludes that the Plan complies with this requirement.

Section 1123(b) of the Bankruptcy Code, which also governs the contents of a reorganization plan, provides that a plan may

>(1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;
>(2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;
>(3) provide for--
>>(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or
>>(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;
>(4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;
>(5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal

residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

(6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

11 U.S.C. § 1123(b).

Concerning § 1123(b)(1), Article III of the Plan provides that the following classes are impaired: Class 3A: G-I Unsecured Claims, Class 5: Other Environmental Claims, Class 5A: US Environmental Claim and Vermont Environmental Claim, Class 6: Asbestos Claims, Class 7: Asbestos Property Damage Claims and Asbestos Property Damage Contribution Claims, Class 10A: G-I Affiliate Claims, Class 11: G-I Equity Interest Redemption Claims, Class 12A: G-I Equity Interests, and Class 12B: ACI Equity Interests. Class 8: CCR Claim, is Unimpaired if the CCR Settlement Agreement is reached before the Voting Deadline, otherwise it is impaired. Classes 1A: G-I Priority Non-Tax Claims, 1B: ACI Priority Non-Tax Claims, 2A: G-I Secured Claims, 2B: ACI Secured Claims, 3B: ACI Unsecured Claims, 3C: G-I Non-Priority Tax Penalties Claims, 4: Environmental Claims for Remedial Relief, 9: Bonded Claims, and 10B: ACI Affiliate Claims are unimpaired. The Plan therefore modifies the rights of the holders of certain Claims and interests and leaves the rights of others unaffected.

Concerning § 1123(b)(2), Article VII of the Plan provides for the assumption or rejection of all of Debtors' executory contracts and unexpired leases of the Debtors not previously assumed or rejected (or subject to pending requests for assumption or rejection) under section 365 of the Bankruptcy Code. Therefore, the plan complies with § 1123(b)(2).

Concerning § 1123(b)(3), Section 4.4 of the Plan provides for the assignment of the Trust Causes of Action to the Asbestos Trust. It also provides for the release of certain claims in Section 9.4 of the Plan and provides for the settlement of claims in Class 5A and Class 8. Accordingly, the Plan complies with § 1123(b)(3).

Concerning § 1123(b)(5), Article III of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of each class of Claims and interests.  (Plan Article III.)

Concerning § 1123(b)(6), the Plan includes additional appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code, including: (i) the provisions of Article V of the Plan governing distributions under the Plan; (iii) the provisions of Article VI of the Plan establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved; and (iii) the provisions of Article XI of the Plan regarding retention of jurisdiction by the Bankruptcy Court and District Court over certain matters after the Effective Date.

Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."  11 U.S.C. § 1123(d).  Section 7.3 of the Plan and the Confirmation Order provides for the satisfaction of cure amounts associated with each executory contract and unexpired lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code.  Accordingly, the Plan is consistent with § 1123(d).

Accordingly, the Court concludes that all of the requirements of § 1129(a)(1) have been satisfied by the Plan.

Section 1129(a)(2) requires that "the proponent of the plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2).  *See also In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000). In conducting this inquiry, the Court will give consideration to whether the Plan complies with section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.  Section 1125 of the Bankruptcy Code provides, in relevant part, that:

(b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary or the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information . . . .

(c) The same disclosure statement shall be transmitted to each holder of a claim or interest of a particular class, but there may be transmitted different disclosure statements, differing in amount, detail, of kind of information, as between Classes.

11 U.S.C. § 1125.  In the instant case, on December 5, 2008, pursuant to the Disclosure Statement and Solicitation Procedures Order, after notice and a hearing, the Bankruptcy Court approved the Disclosure Statement and the associated solicitation procedures for its pursuant to § 1125.  (See D.N. 8606.)  The Disclosure Statement and the procedures by which the Ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with §§ 1125 and 1126, Bankruptcy Rules 3017 and 3018 and the Disclosure Statement and Solicitations Procedures Order. Votes with respect to the Plan were solicited in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement and Solicitation Procedures Order, as evidenced by the Voting Declaration. Therefore, the Debtors, the Reorganized Debtors, the ACC and the Legal Representative have acted in good faith within the meaning of §1125(e).

With respect to section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan. 11 U.S.C. § 1126(a), (f) and (g).  In the present case, the Plan Proponents solicited acceptances or rejections of the Plan from the holders of all Allowed Claims in each impaired class that are to receive distributions under the Plan.  The voting requirements for acceptance are laid out in sections 1126(c) and 1126(d) of the Bankruptcy Code as follows:

(c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more-than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected the plan.

(d) A class of interests has accepted the plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c)-(d).   In the present case, the Plan requires an irrevocable Asbestos Permanent Channeling Injunction under § 524(g).   To obtain an irrevocable channeling injunction under § 524(g), the separate class of asbestos claimants that are to receive their distributions from a § 524(g) asbestos trust must accept the plan by at least 75 percent of those voting in such class vote.   11 U.S.C. § 524(g)(2)(B)(ii)(IV).   In the present case, as evidenced by the Voting Declaration, the requisite votes required under sections 1126 and 524(g) of the Bankruptcy Code were obtained to confirm the Plan.   Thus, the Plan Proponents complied with sections 524(g) and 1126 of the Bankruptcy Code.   Accordingly, the Court concludes that the requirements of 11 U.S.C. § 1129(a)(2) have been satisfied.

Section 1129(a)(3) requires that "The plan has been proposed in good faith and not by any means forbidden by law."   11 U.S.C. § 1129(a)(3).   The Third Circuit has stated that "[f]or purposes of determining good faith under section 1123(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."   *In re Combustion Eng'g, Inc.*, 391 F.3d at 247 (citations omitted).   *See also In re PWS Holding Corp.*, 228 F.3d at 242.   The Supreme Court has recognized that "[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984).

Based on the evidence presented at the Confirmation Hearing and from the terms of the

Plan itself, the Court finds and concludes that the Plan has been proposed with the legitimate

purpose of reorganizing the affairs of each of the Debtors and maximizing the returns available

to creditors.  Consistent with the objectives and purposes of the Bankruptcy Code, the Plan is

designed to allow each of the Debtors to reorganize by resolving certain pending disputes and

proceedings and providing the Reorganized Debtors with a capital structure that will allow them

to satisfy their obligations with sufficient liquidity and capital resources and to fund necessary

capital expenditure and otherwise conduct their businesses.  In particular, and without limitation,

the Plan achieves a global resolution of Asbestos Claims and Demands through the assumption

of such Claims and Demands by the Asbestos Trust, subject to the terms of the Plan.  As to the

IRS's objection regarding good faith, the Plan squarely provides for the treatment of the IRS's

Priority Tax Claim as required by § 1129(a)(9)(C) and the IRS's Class 3C: Non-Priority Tax

Penalty Claim.  The good faith standard does not impose a duty on the Debtors to offer more to

the IRS than the Bankruptcy Code requires.   The Court hereby concludes that the Plan

Proponents have proposed the Plan in good faith and not by any means forbidden by law.

Accordingly, the requirements of § 1129(a)(3) have been satisfied.

Section 1129(a)(4) of the Bankruptcy Code provides that:

> Any payment made or to be made by the proponent, by the debtor, or by a person
> issuing securities or acquiring property under the plan, for services or for costs
> and expenses in or in connection with the case, or in connection with the plan and
> incident to the case, has been approved by, or is subject to the approval of, the
> court as reasonable.

11 U.S.C. § 1129(a)(4).  In the present case, in accordance with Section 1129(a)(4) of the

Bankruptcy Code, no payment for services or costs and expenses in or in connection with

the Chapter 11 Cases, or in connection with the Plan and incidental to the Chapter 11

Cases, including Claims for professional fees, has been or will be made other than

payments that have been authorized by order of the Bankruptcy Court.  Thus, the

requirements of § 1129(a)(4) have been satisfied.

Section 1129(a)(5) provides that:

(A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

11 U.S.C. §§ 1129(a)(5)(A)-(B).  Section 101(31)(B) of the Bankruptcy Code defines "insider"

in the case of a corporate debtor to include a "(i) director of the debtor; (ii) officer of the debtor;

(iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner;

general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in

control of the debtor."  *Id.*

Concerning 11 U.S.C. § 1129(a)(5), the Debtors have disclosed the identity and

affiliations of each individual proposed to serve, after confirmation of the Plan, as a director

and/or officer of the Debtors and the appointment to or continuation in such office by such

individual is consistent with the interests of creditors and equity security holders and with public

policy.  The Debtors have also disclosed the identity of each insider that will be employed or

retained by the Reorganized Debtors and the nature of the compensation to such insider.

Accordingly, the requirements of § 1129(a)(5) have been satisfied.

Section 1129(a)(6) of the Bankruptcy Code requires that "[a]ny governmental regulatory

commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has

approved any rate change provided for in the plan, or such rate change is expressly conditioned

on such approval." 11 U.S.C. § 1129(a)(6).  In the instant case, because the Debtors' businesses

do not involve rates over which any regulatory commission has or will have jurisdiction after

confirmation, § 1129(a)(6) is inapplicable.

Section 1129(a)(7) establishes the following requirements for each class of impaired

claims or interests:

> (A) each holder of a claim or interest of such class—
>> (i) has accepted the plan; or
>> (ii) will receive or retain under the plan on account of such claim or interest
>> property of a value, as of the effective date of the plan, that is not less than
>> the amount that such holder would so receive or retain if the debtor were
>> liquidated under chapter 7 of this title on such date; or
> (B) if section 1111(b)(2) of this title applies to the claims of such class, each
> holder of a claim of such class will receive or retain under the plan on account of
> such claim property of a value, as of the effective date of the plan, that is not less
> than the value of such holder's interest in the estate's interest in the property that
> secures such claims."

11 U.S.C. § 1129(a)(7)(A).  This section is often referred to as the "best interests" test.  *See In re*

*Resorts Int'l, Inc.*, 145 B.R. at 477 (*citing In re Toy & Sports*, 37 B.R. at 150).  The best interests

test focuses on individual dissenting creditors rather than classes of claims.  *Id.*  Under the best

interests test, the Court "must find that each [non-accepting] creditor will receive or retain value

that is not less than the amount he would receive if the debtor were liquidated." *LaSalle*, 526

U.S. at 440; *United States v. Reorganized CF&J Fabricators, Inc.*, 518 U.S. 213, 228 (1996).

Considering the liquidation analyses attached as Exhibit E to the Disclosure Statement

and other evidence submitted at the Confirmation Hearing, and because the § 524(g) injunction

is necessary to enable the Reorganized Debtors to function as going concerns and the injunction

is unavailable in chapter 7, each holder of an impaired Claim or interest that has not accepted the

Plan will on account of such Claim or interest receive or retain property under the Plan having a

value, as of the Effective Date, that is not less than the amount that such holder would so receive

or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective

Date.  Accordingly, the requirements of § 1129(a)(7) have been satisfied.

Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or

interests has either accepted the Plan or is not impaired under the Plan, subject to the exceptions

identified in § 1129(b).  11 U.S.C. § 1129(a)(8).  The evidence presented at the Confirmation

Hearing, including the Voting Declaration, established that one impaired Class was entitled to

vote, Class 6: Asbestos Claims, accepted the Plan.[55]  Although impaired Classes 3A and 7 have

voted to reject the Plan, and other Classes were deemed to reject the Plan, as set forth below,

because the Plan does not discriminate unfairly against, and is fair and equitable with respect to,

such rejecting impaired Classes pursuant to § 1129(b), the Plan may be confirmed

notwithstanding that two voting Classes of Claims rejected the Plan.

Section 1129(a)(9) of the Bankruptcy Code requires that holders of claims entitled to

priority treatment under section 507(a) of the Bankruptcy Code receive specified payments under

the Plan.  Specifically, unless the holder of a particular claim agrees to a different treatment with

respect to such claim, § 1129(a)(9) requires the Plan to provide as follows:

> (A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of
> this title, on the effective date of the plan, the holder of such claim will receive on
> account of such claim cash equal to the allowed amount of such claim;
> (B) with respect to a class of claims of a kind specified in section 507(a)(3),
> 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of
> such class will receive—
>> (i) if such class has accepted the plan, deferred cash payments of a value, as of
>> the effective date of the plan, equal to the allowed amount of such claim; or
>> (ii) if such class has not accepted the plan, cash on the effective date of the
>> plan equal to the allowed amount of such claim; and
> (C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the
> holder of such claim will receive on account of such claim deferred cash
> payments, over a period not exceeding six years after the date of assessment of

---

[55] Of those voting in Class 6, the Asbestos Claims, 99.78% by amount and 99.84% by number voted in favor of the
Plan.

such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

11 U.S.C. § 1129.  Here, the Court finds that the Plan satisfies the requirements of § 1129(a)(9) in its treatment of all priority claims.

With respect to the IRS's objection to the Plan's treatment of its priority claims, the Court concludes that the Plan properly provides for deferred cash payments to the IRS within six years of assessment, as required under § 1129(a)(9)(C).  As discussed above, Section 2.4 of the Plan provides several options for payment of the IRS's alleged priority tax claims.  Under one option, the Debtors may issue a note to the IRS, payable upon six years after issuance.  If the Debtors choose to issue the note, they must do so "on the latest of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law." (Plan § 2.4.)  The Court finds that the IRS's Priority Tax Claim will be allowed when the U.S. District Court issues a final, unappealable judgment in the Tax Litigation.  At that time, the IRS will be legally entitled to make an assessment against the Debtors, whereby the claim would become payable under applicable non-bankruptcy law.  This would then trigger the Debtors' obligation to issue the note.  Additionally, the Court concludes that the proposed payment schedule for the note— *i.e.*, a single, lump-sum payment upon maturity at six years after the note's issuance—is proper under the Bankruptcy Code, because "nothing in the statutory language [of § 1129(a)(9)(C)] prohibits a single payment of principal and interest at the end of the six year time period."  *In re Gregory Boat Co.*, 144 B.R. 361, 364 (Bankr. E.D. Mich. 1992).

Moreover, regarding the proposed rate of interest for the note, the Court concludes that the interest provided for in the Plan is adequate to provide the IRS with the full value of its Allowed Priority Tax Claim.  Section 1129(a)(9)(C) requires that  payment of priority tax claims

shall be made in the full amount as of the Effective Date of the Plan. The Plan's proposed rate of interest for the note of LIBOR plus one percent per annum comports with the standard adopted by the Supreme Court in *Till*, 541 U.S. 465. The Court is satisfied that the testimony demonstrated that no efficient market for credit exists under these circumstances. Thus, the Court concludes that the "formula approach" that was adopted by the Court in *Till* should be used to determine the proper rate of interest for the treatment of the IRS's Priority Tax Claim. As such, the Court is satisfied from the evidence and testimony that LIBOR is an appropriate reference rate to use. Additionally, the Court is satisfied from the record that a risk adjustment to the LIBOR rate of one percent is proper under these facts. Accordingly, the requirements of § 1129(a)(9) have been satisfied.

Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). *See In re Resorts Int'l, Inc.,* 145 B.R. at 477 (where four classes of impaired creditors accepted the plan, exclusive of insiders, requirements of § 1129(a)(10) were  satisfied). As indicated in the Voting Declaration and as reflected in the record of the Confirmation Hearing, Class 6: Asbestos Claims is impaired under the Plan and voted to accept the Plan. The acceptance of Class 6 is exclusive of insiders.. Accordingly, the Plan complies with § 1129(a)(10).

Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition precedent to confirmation, courts determine that the Plan is feasible. Specifically, a court must determine that "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). The feasibility

test set forth in section 1129(a)(11) requires courts to determine whether the Plan is feasible and

has a reasonable likelihood of success. *See In re American Family Enters.*, 256 B.R. 377, 404

(D.N.J. 2000); *In re The Leslie Fay Cos.*, 207 B.R. 764, 788 (Bankr. S.D.N.Y. 1997); *In re*

*Woodmere Investors Ltd. P'ship*, 178 B.R. 346, 361 (Bankr. S.D.N.Y. 1995); *In re Drexel*

*Burnham*, 138 B.R. at 762; *In re Johns-Manville Corp.*, 68 B.R. at 635.  In assessing feasibility,

the Court is guided by the standard that "[s]uccess need not be guaranteed." *Johns-Manville*

*Corp.*, 843 F.2d at 649.  *See also In re Sound Radio, Inc.*, 93 B.R. 849, 856 (Bankr. D.N.J. 1988)

("Under § 1129(a)(11), all that is required is a 'reasonable' prospect for financial stability.")

(citations omitted).  The purpose of the feasibility test is to protect against visionary or

speculative plans.  Therefore, the key element of feasibility is whether there is a reasonable

probability the provisions of the Plan can be performed.  *See In re U.S. Truck Co.*, 47 B.R. 932,

944 (E.D. Mich. 1985.)

In the instant case, the feasibility of the Plan is not being challenged by any interested

party.[56]  Based on the testimony of Mr. Heyman and Mr. Rebele, and on the Cooper Feasibility

Study, the Court is satisfied that Confirmation of the Plan is not likely to be followed by the

liquidation, or the need for further financial reorganization, of the Debtors or the Reorganized

Debtors.  Accordingly, the requirements of § 1129(a)(11) have been satisfied.

Section 1129(a)(12) of the Bankruptcy Code requires that "All fees payable under section

1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been

paid or the plan provides for the payment of all such fees on the effective date of the plan."  *Id.*

Concerning § 1129(a)(12), Section 13.7 of the Plan provides that all fees payable pursuant to

Section 1930 of title 28 of the United States Code shall be paid by the Debtors and the

---

[56] The IRS has conceded that the Plan is feasible.  (*See* IRS Response to Debtors' Request For Admission No. 4 submitted on or about October 15, 2009 as a supplemental exhibit in support of the Plan.)

Reorganized Debtors as and when due.  Accordingly, the requirements of § 1129(a)(12) have

been satisfied.

Section 1129(a)(13) of the Bankruptcy Code requires that:

The plan provides for the continuation after its effective date of payment of all
retiree benefits, as that term is defined in section 1114 of this title, at the level
established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at
any time prior to confirmation of the plan, for the duration of the period the debtor
has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13).  According to the plain terms of Sections 7.6 and 7.7 of the Plan, the

Plan does provide for retiree benefits at levels established pursuant to section 1114 of the

Bankruptcy Code.  Accordingly, the requirements of § 1129(a)(13) have been satisfied.

Section 1129(b)(1) of the Bankruptcy Code provides that, if certain requirements are

satisfied, a plan shall be confirmed notwithstanding that § 1129(a)(8) is not satisfied with respect

to one or more classes—

if all of the applicable requirements of subsection (a) of this section other than
paragraph (8) are met with respect to a plan, the court, on request of the
proponent of the plan, shall confirm the plan notwithstanding the requirements of
such paragraph if the plan does not discriminate unfairly, and is fair and
equitable, with respect to each class of claims or interests that is impaired under,
and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).  Thus, to confirm a plan that has not been accepted by all impaired

Classes, the plan proponent must show that the plan "does not discriminate unfairly" and is "fair

and equitable" with respect to the non-accepting impaired class.  *See In re Zenith Elecs. Corp.*,

241 B.R. 92, 105 (Bankr. D. Del. 1999).

Pursuant to section 1129(b)(1) of the Bankruptcy Code, the Plan does not discriminate

unfairly against the Claims in Classes 5, 10A, 11, 12A and 12B that are impaired and deemed to

have rejected the Plan pursuant to § 1126(g), and the Claims in Classes 3A and 7 that are

impaired and voted to reject the Plan.  As set forth in detail in the findings recited above, the

76

Plan does not discriminate unfairly with respect to such rejecting Classes because the Plan
provides treatment to such Classes of Claims that is equivalent to the treatment afforded to other,
similarly situated Claims.

Under the "fair and equitable" test of § 1129(b)(1), a plan may be found to be "fair and
equitable" with respect to a dissenting class of impaired unsecured creditors only if the allowed
value of the claim is to be paid in full, or, in the alternative, if "the holder of any claim or interest
that is junior to the claims of such class will not receive or retain under the plan on account of
such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). *See also Lasalle*, 526
U.S. at 442. The requirement in § 1129(b)(2)(B)(ii) is termed the "absolute priority rule." *See
Lasalle*, 526 U.S. at 442. Certain courts have recognized exceptions to the absolute priority rule,
as "there are some cases in which property can transfer to junior interests not 'on account of'
those interests but for other reasons." *In re PWS Holding Corp.*, 228 F.3d at 238. *See also In re
Sea Garden Motel & Apts.*, 195 B.R. 294, 301 (D.N.J. 1996) (stating that "most courts have
recognized a so-called 'new value exception' to the absolute priority rule"). To invoke the new
value exception to the absolute priority rule, the "qualifying new value contribution must be (1)
necessary to the reorganization; (2) in the form of money or money's worth; and (3) reasonably
equivalent to the interest retained . . . [4] substantial and [5] proferred by the debtor at the outset,
*i.e.*, 'up front.'" *In re Sea Garden Motel & Apts.*, 195 B.R. at 301 (*quoting In re Capital Center
Equities*, 144 Bankr. 262, 268 (Bankr. E.D. Pa. 1992)). *See also In re Torgro Atlantic City, LLC*,
No. 08-13458, 2009 WL 1288367, at *14 (Bankr. D.N.J. May 7, 2009) (unpublished).

Here, based on the facts, the Court is satisfied that the Plan Sponsor's contribution
satisfies each of these requirements. The Plan Sponsor's contributions to the Plan's funding are
substantial and necessary for the successful reorganization of the Debtors. Without these

contributions, the Global Settlement could not be achieved, thereby stifling any attempt by the Debtors to reorganize.    The evidence also demonstrates that without the Plan Sponsor's contributions, the value of the equity in the Reorganized Debtors would be essentially worthless due to their significant asbestos liability.    Thus, the Plan Sponsor's cash contributions satisfy the requirement that it be reasonably equivalent to the value of the interest retained.

The record at the Confirmation Hearing also established that the old equity did not enjoy exclusivity in proposing a plan that allowed it to obtain the new equity in the Reorganized Debtors on account of its interest and for a lesser value. *See In re PWS Holding Corp.*, 228 F.3d at 238-39; *LaSalle*, 526 U.S. at 456.    In these Chapter 11 Cases, the constituency represented by the ACC effectively held a veto power over any chapter 11 plan because the votes of 75% of its constituency were necessary for the irrevocable § 524(g) injunction.    An irrevocable § 524(g) injunction is vital to the Debtors' successful reorganization because it provides a solution to G-I's asbestos liabilities.    The Supreme Court's suggestion that a plan proposed by a non-debtor may provide a market test of the reasonableness of the new value contribution is evidenced here where the non-debtor is the ACC whose constituency has the power to prevent confirmation of any going concern plan. *LaSalle*, 526 U.S. at 458.    The ACC and the Legal Representative co-proposed the Plan after arm's-length negotiations.    As a result, the prepetition equity holders lacked an exclusive opportunity to obtain equity interests in the Reorganized Debtors via a plan that contained a § 524(g) injunction, which is critical to a successful reorganization.    The Debtors could only propound a plan with the consent of the ACC and Legal Representative, whose motivation is obtaining top dollar for the Debtors' estates.    Thus, the policy behind the absolute priority rule of preventing the debtor from using its exclusivity to prevent creditors from

bargaining for a fair and equitable outcome is adhered to here where creditors with co-equal bargaining power stand as joint plan proponents.

This Court concludes that based on the record, the Plan is fair and equitable with respect to the impaired rejecting Classes.[57]  The Court finds that the holders of the Interests in Classes junior to such rejecting Classes are not receiving the equity in the Reorganized Debtors on account of their old equity interests.  Rather, the junior interest holders (Classes 12A and 12B) are receiving new equity in the reorganized debtors in exchange for the new value being contributed by the Plan Sponsor.  Accordingly, the Plan satisfies the absolute priority rule and may be confirmed over the rejection of impaired classes of claims.

Section 1129(d) of the Bankruptcy Code provides that "on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."  In accordance with § 1129(d), the principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of section 5 of the Securities Act of 1933.

The Court concludes that the Plan complies in all respects with the applicable requirements of section 1129 of the Bankruptcy Code.

### E.  The Asbestos Trust  and Asbestos Permanent Channeling Injunction Comply with Section 524(g) of the Bankruptcy Code

The Plan calls for the creation and establishment of an Asbestos Trust, on the Effective Date, pursuant to the Asbestos Trust Agreement.[58]  (Plan § 4.2.)  On the Effective Date, the Trust will assume and succeeded to all liability and responsibility to satisfy all Asbestos Claims against the Protected Parties.   (Plan §  4.4(f).)   Additionally, from and after the Effective Date, all Asbestos Claims will be subject to a Asbestos Permanent Channeling Injunction pursuant to

---

[57] As discussed above, the IRS has no standing to raise an objection under 11 U.S.C. § 1129(b)(2).
[58] The Asbestos Trust Agreement is Exhibit 1.1.17 to the Plan.

sections 524(g) and 1141 of the Bankruptcy Code and the provisions of this Plan and the

Confirmation Order, and those entities defined as Protected Parties shall have no obligation to

pay any liability of any nature or description arising out of Asbestos Claims.  (Plan § 4.4(f).)

The Bankruptcy Code authorizes a court to enter an injunction, in connection with an

order confirming a plan of reorganization and to supplement the injunctive effect of a chapter 11

discharge, to enjoin entities from taking legal action for the purpose of directly or indirectly

collecting, recovering, or receiving payment or recovery with respect to asbestos-related claims

or demands if the plan establishes a trust to resolve and pay such claims that complies with the

requirements set forth in 11 U.S.C. § 524(g)(1).  Section 524(g) therefore "provides a special

form of supplemental injunctive relief for an insolvent debtor facing the unique problems and

complexities associated with asbestos liabilities." *In re Combustion Eng'g*, 391 F.3d at 234.

The purpose of § 524(g) is to channel asbestos-related claims to a trust, which relieves the debtor

of the uncertainty of future asbestos liabilities and helps achieve the purposes of chapter 11 by

facilitating the reorganization and rehabilitation of the debtor as an economically viable entity

while providing for an equitable resolution of asbestos-related claims. *See Combustion Eng'g*,

391 F.3d at 234.

Section 524(g)(2)(B)(i) of the Bankruptcy Code provides as follows:

(i) the injunction is to be implemented in connection with a  trust that, pursuant to
the plan of reorganization—

(I) is to assume the liabilities of a debtor which at the time of entry of the
order   for relief has been named as a defendant in personal injury, wrongful
death, or property-damage actions seeking recovery for damages allegedly
caused by the presence of, or exposure to, asbestos or asbestos-containing
products;

(II) is to be funded in whole or in part by the securities of 1 or more debtors
involved in such plan and by the obligation of such debtor or debtors to make
future payments, including dividends;

(III) is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of—

(aa) each such debtor;

(bb) the parent corporation of each such debtor; or

(cc) a subsidiary of each such debtor that is also a debtor; and

(IV) is to use its assets or income to pay claims and demands;

*Id.* § 524(g)(2)(B)(i).   In the present case, all of the Code requirements have been met, as described more specifically below.

With respect to § 524(g)(2)(B)(i)(I), the Code requires that a trust assume the liabilities of a debtor that has been named as a defendant in actions to recover damages for asbestos-related claims as of the petition date.   *Id.*   In the instant case, the terms and provisions of the Plan and the evidence established at the Confirmation Hearing in these Chapter 11 Cases establish that, as of the Commencement Date of G-I's Chapter 11 Case, G-I had been named as a defendant in personal injury, wrongful death, and property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.[59] Therefore, the requirements of § 524(g)(2)(B)(i) are satisfied.

With respect to § 524(g)(2)(B)(i)(II), an asbestos trust must be funded by the securities of an involved debtor and by the obligation of such debtor to pay dividends.   *Id.*   Here, the delivery of the Trust Note on the Effective Date by Reorganized G-I satisfies the statutory requirement that the Asbestos Trust be funded in whole or in part by the securities of one or more debtors involved in a plan.   By funding the Asbestos Trust with the Trust Note, Reorganized G-I has undertaken the obligation to make future payments to the Asbestos Trust, given that, pursuant to the terms of Trust Note, Reorganized G-I is obligated to pay quarterly interest and annual principal payments of $10 million in December 2012 and $63.75 million annually thereafter each

---

[59] *See*, *e.g.,* Mr. Heyman's testimony that G-1 was the subject of hundreds of thousands of such asbestos related claims prior to the companies decision to file for Bankruptcy.  (Conf. Hr'g Tr. 27, Sept. 30, 2009.)

December for the years 2013 through and including 2018. (*See* Plan Ex. 1.1.112.) The entire unpaid principal amount of the Trust Note, together with accrued and unpaid interest thereon shall be due and payable on the Maturity Date (as defined therein). (*See* Plan Ex. 1.1.112.) Therefore, the requirements of § 524(g)(2)(B)(i)(II) are satisfied.

With respect to § 524(g)(2)(B)(i)(III), the Code requires that an asbestos trust must own, or be entitled to own, the majority of the voting shares of the debtor[60] if certain specified contingencies occur. *See Id.* Here, the Asbestos Trust will own, or by the exercise of rights granted under the Plan, would be entitled to own, if specified contingencies occur, a majority of the voting shares of G-I. Specifically, the Plan provides that the Trust Note will be secured by the Capital Stock Lien, which is, pursuant to the terms of the Holdings Pledge Agreement, a lien granted by Holdings to the Asbestos Trust on 100% of Reorganized G-I's voting common stock (as defined in the Plan, the G-I Class B Shares). (Plan §§ 1.1.74, 4.4(c)(ii) & 4.7.) Subject to section 4.4(c)(iii) of the Plan, as of the Effective Date, the Capital Stock Lien shall attach to the G-I Class B Shares and the Collateral Agent shall thereby possess a valid and enforceable security interest in such shares, upon performance of delivery requirements specified in the Holdings Pledge Agreement with respect to such pledged collateral. Thus, as of the Effective Date and upon a specified contingency occurring (a default by reorganized G-I under the Trust Note), the Asbestos Trust will have a right to own all the controlling stock of Reorganized G-I. (*See* Plan §§ 1.1.31, 4.4(c)(ii), 4.7 & 4.9.) Therefore, the requirements of § 524(g)(2)(B)(i)(III) are satisfied.

With respect to § 524(g)(2)(B)(i)(IV), the asbestos trust is required "to use its assets or income to pay claims and demands." *Id.* Here, the Asbestos Trust will assume and succeed to, on the Effective Date, all liability and responsibility for the Asbestos Claims (*see* Plan § 4.4(f)),

---

[60] Or of the parent company of the debtor, or of each debtor subsidiary.

and will "preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Asbestos Claims." (Plan § 4.2.) The Asbestos Trust Agreement provides that its purpose is to assume all liabilities and responsibility for the Debtors' Asbestos Claims and Demands and to liquidate and pay those Asbestos Claims and Demands in accordance with the Asbestos Trust Distribution Procedures. (Trust Agreement at 1.2.) Accordingly, the requirements of § 524(g)(2)(B)(i)(IV) are satisfied. Therefore, all of the requirements of § 524(g)(2)(B)(i) are satisfied.

Section 524(g)(2)(B)(ii) of the Bankruptcy Code requires the following factual determinations before an asbestos channeling injunction may be issued. Specifically, it requires in relevant part:

> (I) the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction;

> (II) the actual amounts, numbers, and timing of such future demands cannot be determined;

> (III) pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands;

> (IV) as part of the process of seeking confirmation of such plan—

>> (aa) the terms of the injunction proposed to be issued under paragraph (1)(A), including any provisions barring actions against third parties pursuant to paragraph (4)(A), are set out in such plan and in any disclosure statement supporting the plan; and

>> (bb) a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan; and

> (V) subject to subsection (h), pursuant to court orders or otherwise, the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

*Id.* § 524(g)(2)(B)(ii).  In the present case, the Court has determined that there is a sufficient factual basis for the issuance of an asbestos channeling injunction, as described more specifically below.

Based on the substantial number of asbestos personal injury claims that had been asserted against the Debtors prior to the Petition Date and the substantial number of such claims that remained unresolved on the Petition Date, the Court finds that the Debtors would likely be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the asbestos personal injury claims that were pending against the Debtors on the Petition Date.[61]

In light of (i) the long latency period of asbestos-related diseases, (ii) the inherent uncertainties regarding asbestos-related claims and demands, and (iii) the substantial number and amounts of asbestos-related personal injury and wrongful death claims asserted against the Debtors prior to the Petition Date, the Court finds that the actual number and amounts of future Demands, to which the Debtors would be subject, and the timing of assertion of such Demands, cannot be determined.[62]

The Court concludes that the Demands outside of the procedures prescribed by the Plan would likely threaten the Plan's purpose to deal equitably with Claims and future Demands by resulting in the consumption of the Debtors' assets by those claimants who filed first, potentially leaving nothing for future Demand holders.  If the holders of asbestos-related Demands are able to pursue such Demands outside of the Asbestos Trust and the Asbestos Trust Distribution Procedures, then the holders of such Demands would likely have to pursue their claims in the tort system on an individual basis, which, because of the vagaries inherent in litigation, could

---

[61] This factual finding is sufficient to meet the requirements of § 524(g)(2)(B)(ii)(I).
[62] This factual finding is sufficient to meet the requirements of § 524(g)(2)(B)(ii)(II).

produce inconsistent results.  Further, a substantial amount of the Debtors' asbestos personal injury liability relates to Demands, and estimates of the predicted liability for such Demands encompasses an extraordinarily wide range of values.  There is a risk that, at some point in the future, such Demands would go unsatisfied if holders of Asbestos Claims and Demands were permitted to pursue their Claims and Demands outside the Asbestos Trust and Asbestos Trust Distribution Procedures.[63]

The Court concludes that the Plan Proponents incorporated the terms of the Asbestos Permanent Channeling Injunction, including provisions therein barring actions against any Protected Party, as set forth in both the Plan and the Disclosure Statement.  (*See* Plan §§ 1.1.12 & 1.1.101; Disclosure Statement § VI.E.)  The Plan also designates a separate class—Class 6 under the Plan—for all Asbestos Claims to be addressed under the Plan (*see* Plan § 3.11), and the Claim holders in Class 6 voted overwhelmingly in favor of confirmation of the Plan (99.78% by amount and 99.84% by number). (*See* Voting Declaration.)[64]

The Court concludes that the Plan provides for the operation of the Asbestos Trust in accordance with the Asbestos Trust Distribution Procedures.  (*See* Plan § 1.1.18 and Ex. 1.1.18; Disclosure Statement § VI.H annexed to the Plan.)  Those procedures contain mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Claims and Demands, or other comparable mechanisms, that provide reasonable assurance that the Asbestos Trust will liquidate, and be in a financial position to pay, Asbestos Claims and Demands that involve similar Claims in substantially the same manner.[65]

---

[63] These factual findings are sufficient to meet the requirements of § 524(g)(2)(B)(ii)(III).

[64] These factual findings are sufficient to meet the requirements of § 524(g)(2)(B)(ii)(IV).

[65] These factual findings are sufficient to meet the requirements of § 524(g)(2)(B)(ii)(V).

The Court concludes that the Plan comports with the Bankruptcy Code's requirements for the issuance of a channeling injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in respect to Trust Claims against the Reorganized Debtors or their property.

The terms of the Asbestos Permanent Channeling Injunction, including its provisions barring actions against the Protected Parties pursuant to § 524(g)(4)(A) are set out in the Plan and the Disclosure Statement.   The Asbestos Permanent Channeling Injunction is extended to certain third parties[66] in a matter consistent with the Code, as described in more detail below.

Sections 524(g)(3)(A) and 524(g)(4)(A)(ii) of the Bankruptcy Code designate certain entities that shall be or may be protected by a channeling injunction entered pursuant to § 524(g)(1)(A).   In the first instance, § 524(g)(3)(A) specifically provides:

> (A) If the requirements of paragraph (2)(B) are met and the order confirming the plan of reorganization was issued or affirmed by the district court that has jurisdiction over the reorganization case, then after the time for appeal of the order that issues or affirms the plan--
>> (i) the injunction shall be valid and enforceable and may not be revoked or modified by any court except through appeal in accordance with paragraph (6);
>> (ii) no entity that pursuant to such plan or thereafter becomes a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction shall be liable with respect to any claim or demand made against such entity by reason of its becoming such a transferee or successor; and
>> (iii) no entity that pursuant to such plan or thereafter makes a loan to such a debtor or trust or to such a successor or transferee shall, by reason of making the loan, be liable with respect to any claim or demand made against such entity, nor shall any pledge of assets made in connection with such a loan be upset or impaired for that reason;

*Id.* § 524(g)(3)(A).   Here, the Plan provides that the Asbestos Permanent Channeling Injunction will be extended to protect the following parties:

---

[66] Specifically, those third parties that are defined as "Protected Parties" under the Plan.  (Plan § 1.1.101.)

any Entity that, pursuant to the Plan or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any assets of the Debtors, the Reorganized Debtors, or the Asbestos Trust, but solely to the extent that an Asbestos Claim is asserted against such Entity by reason of its becoming such a transferee or successor (Plan § 1.1.101(d)); and any Entity that, pursuant to the Plan or after the Effective Date, makes a loan to the Reorganized Debtors, any Protected Party, or the Asbestos Trust or to a successor to, or transferee of, any assets of the Debtors, the Reorganized Debtors, or the Asbestos Trust, but solely to the extent that an Asbestos Claim is asserted against such Entity by reason of its making such loan or to the extent that any pledge of assets made in connection with such a loan is sought to be upset or impaired.

(Plan § 1.1.101(e).)   Accordingly, the Plan satisfies the mandatory entity requirements of §

524(g)(3)(A).

In the second instance, pursuant to § 524(g)(4)(A)(ii), the Plan further provides that the

channeling injunction entered pursuant to § 524(g)(1)(A):

may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of –

(I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

(II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

(III) the third party's provision of insurance to the debtor or a related party; or

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to–

(aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

(bb) acquiring or selling a financial interest in an entity as part of such a transaction.

*Id.* § 524(g)(4)(A)(ii).  Here, as required by § 524(g)(4)(A)(ii), each Protected Party under the

Plan is either identifiable by name from the terms of the injunction (the Debtors, the Reorganized

Debtors and Affiliates) or is a member of an identifiable group.  (*See* Plan § 1.1.101; Plan Ex.

1.1.101(c).)  With respect to the latter, the Plan defines Protected Party to include those parties that fit within the precise statutory groups listed in § 524(g)(4)(A).  (*See* Plan § 1.1.101(f).)  With respect to the former, the Affiliate entities that are Protected Parties under the Plan are listed in Exhibit 1.1.101(c) of the Plan.  The entities and persons listed as Affiliates in Exhibit 1.1.101(c) of the Plan as Protected Parties comply with the statutory requirements.  The Asbestos Permanent Channeling Injunction proposed in the Plan bars any action directed against such Protected Parties to the extent they are alleged to be directly or indirectly liable for the conduct of, claims against, or demands on G-I, to the extent such alleged liability of such Protected Parties arises by reason of one or more of the grounds for derivative liability set forth in § 524(g)(4)(A)(ii)(I)-(IV).

Section 524(g)(4)(B)(i) of the Bankruptcy Code provides that an asbestos channeling injunction shall be effective to enjoin future asbestos-related demands against the parties protected thereby if a court determines that "as part of the proceedings leading to the issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands of the kind."  *Id.* § 524(g)(4)(B)(i).  Here, the Legal Representative, C. Judson Hamlin, was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Asbestos Permanent Channeling Injunction for the purpose of protecting the rights of persons that might subsequently assert unknown Asbestos Claims and Demands of the kind that are addressed in the Asbestos Permanent Channeling Injunction and channeled to and assumed by the Asbestos Trust.  The Court finds that The Legal Representative has in all respects fulfilled his fiduciary duties, responsibilities, and obligations as the future representative in accordance with § 524(g).

Section 524(g)(4)(B)(ii) requires a court to determine that entry of the channeling injunction, and the protection from liability that is afforded to the parties named therein "is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party." *Id.* § 524(g)(4)(B)(ii). Here, the Reorganized Debtors, the Plan Sponsor, and certain non-debtors in the G-I corporate group, on their own behalf and on behalf of all Protected Parties, are contributing substantial assets to the Asbestos Trust. (*See* Plan § 4.4(c).) Specifically, on the Effective Date, to fund the present and future payment of Asbestos Claims and Demands, the Plan Sponsor will pay $215 million of his own funds in cash to partially fund the Asbestos Trust and Reorganized G-I will issue the ten (10) year $560 million Trust Note to the Asbestos Trust, which will be secured on the Effective Date by the Capital Stock Lien and will provide regular dividends of substantial quarterly interest payments and principal payments beginning in 2012 and annually thereafter to fund the payment of asbestos-related Demands until the final principal is paid under the Trust Note in December 2019. (*See* Plan § 4.4(c)(i)-(ii).) To further secure repayment on the Trust Note, on the Effective Date, Reorganized G-I or the Plan Sponsor will deliver or cause to be delivered the Letter of Credit, which will provide greater assurance that the Reorganized G-I's obligations under the Trust Note will be satisfied, even if a default were to occur. (*See* Plan § 4.4(c)(iii).)

The Court finds that in light of all of these substantial contributions provided, or to be provided, to the Asbestos Trust by or on behalf of all the Protected Parties, the entry of the Asbestos Permanent Channeling Injunction, and the protections provided to each Protected Party thereunder, are fair and equitable with respect to persons that might subsequently assert Demands against each such Protected Party.

**F.**    **Limitation on the IRS's Ability to Collect Gap Interest**

28 U.S.C. § 1334(b) provides in relevant part that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).  The bankruptcy courts, in turn, obtain jurisdiction pursuant to 28 U.S.C. § 157, "which allows the district courts to refer, to the bankruptcy courts, cases over which the district courts have jurisdiction pursuant to section 1334."  *In re Kaplan*, 104 F.3d 589, 594 (3d Cir. 1997).  In cases involving non-debtors, "the bankruptcy court's jurisdiction is to be determined solely by 28 U.S.C. § 1334(b)."  *Id.* (*citing Quattrone Accountants, Inc. v. Internal Revenue Service*, 895 F.2d 921, 926 (3d Cir. 1990)).   In determining whether a civil proceeding is "related to" a bankruptcy proceeding, the court must assess "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."  *Id.* at 594 (*quoting Pacor, Inc. v. Higgins* 743 F.2d at 994).  Thus, a bankruptcy court properly obtains jurisdiction over a civil matter if the outcome could conceivably "alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."  *Id.* at 595 (*quoting Pacor*, 743 F.2d at 994).

Here, the Court has subject matter jurisdiction over the IRS's tax claims against the non-debtor affiliates pursuant to 28 U.S.C. § 1334, because the tax claims are "related to" the G-I bankruptcy proceedings.  Pursuant to the Tax Sharing Agreement, G-I is obligated to indemnify certain affiliates for any amounts paid by the affiliates to the IRS.  Moreover, G-I is dependent upon cash from BMCA to meet its obligations to creditors.  Because collection acts by the IRS against BMCA and other affiliates would impair the very funding sources for the Debtors' chapter 11 Plan, and because G-I would be required to indemnify the affiliates for any amounts

90

paid to the IRS, the tax liabilities of the consolidated tax group could "conceivably" affect the administration of the estates.  Because the District Court has joined in presiding over this confirmation proceeding and partially withdrawn the reference, both core and non-core related proceedings under 28 U.S.C. § 157 are properly before this Court.

Principles of bankruptcy law, tax law, and the plain language of the Tolling Agreement provide this Court with a basis for confirming the Plan with amended section 2.4.  In the Tolling Agreement, the parties agreed that the IRS will be entitled to assess against G-I's non-debtor affiliates upon final determination by U.S. District Court Judge Chesler of the IRS's tax claims, however, the IRS agrees that it may "not assess any amount against the nonbankrupt corporations with respect to said tax liability that is greater than the amount of the liability that he may assess against the Taxpayer."  The IRS claims that, despite the Bankruptcy Code's prohibition on the collection of Gap Interest from G-I, the Code does not prohibit the *assessment* of Gap Interest against G-I.  Pursuant to the Tolling Agreement, in order to collect the Gap Interest from G-I's affiliates, the IRS must be able to assess the Gap Interest against G-I.  While the Plan contemplates that the IRS will assess against G-I, it only does so to the extent that the IRS's claim is allowed.[67]  The Plan also expressly bars the IRS from collecting Gap Interest from G-I.[68]  The Plan's treatment in this regard is consistent with the Bankruptcy Code's disallowance of post-petition interest.  *See* 11 U.S.C. § 502(b)(2).  Thus, under the Plan and the Bankruptcy Code, the IRS cannot collect from G-I more than the amount of its allowed claim against G-I.

---

[67] Upon final determination of the District Court tax litigation, the IRS will be entitled to payment in the form of cash or a note for its Allowed Priority Tax Claim only when its allowed claim is "payable under applicable non-bankruptcy law," *i.e.*, when the IRS assesses G-I for its Allowed Priority Tax Claim.  (*See* Plan § 2.4.)  After a final determination, the IRS will be entitled to assess against G-I, a Debtor, pursuant to 11 U.S.C. § 505(c).  *See also In re Conston, Inc.*, 181 B.R. 769, 776 (D. Del. 1995).  However, its right to assess will be "subject to any otherwise applicable law."  The "applicable law" in this situation would be § 502(b)(2).

[68] Section 2.4 of the Plan provides that "no holder of an Allowed Priority Tax Claim shall be entitled to any payments on account of any pre-Effective Date interest accrued on or penalty arising after the Commencement Date with respect to or in connection with such Allowed Priority Tax Claim."  (Plan § 2.4.)

The IRS's argument ignores the effect that an "assessment" would have on the bankruptcy estate, as that term is used in the Internal Revenue Code. The tax assessment statute provides that the amount of any unpaid taxes, including interest, "shall be a lien in favor of the United States upon all property and rights to property . . . belonging to such person." 26 U.S.C § 6321. Moreover, the lien imposed by the foregoing statute arises automatically at the time the assessment is made. *Id.* § 6322. Thus, were the IRS to assess against G-I for an amount greater than its allowed claim, it would automatically impose a lien on the property of G-I, thereby commencing an act to collect unallowable post-petition interest in violation of the discharge injunction. *See* 11 U.S.C. § 524(a)(2).

It follows that under the Tolling Agreement, the IRS contractually agreed to limit itself to assessing against, and collecting from, G-I's affiliates, no more than its allowed Priority Tax Claim against G-I. Thus, this Court finds that were the IRS to seek to collect from G-I's non-debtor affiliates more than it could collect from G-I, it would violate the terms of the Tolling Agreement. Section 2.4 of the Plan incorporates this limitation for reasons discussed below. Contrary to the IRS's objection, this Court's order approving section 2.4 does not impose an injunction against the IRS. Rather, it establishes the amount, timing and payment terms of G-I's non-debtor affiliates' tax liability under the Bankruptcy Code and the Tolling Agreement, which the IRS may choose to litigate at some future point.

This Court's authority to confirm a Plan that incorporates those limitations lies within the confines of the Bankruptcy Code itself. Section 1123(b)(6) of the Bankruptcy Code provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). Additionally, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title." *Id.* § 105(a).  The Supreme Court of the United States has already addressed sections 105(a) and 1123(b)(6) of the Bankruptcy Code in the context of a reorganization plan's modification of non-debtor obligations. *Energy Resources*, 495 U.S. at 547-48.

In *Energy Resources*, the Court consolidated two bankruptcy proceedings that each addressed whether a bankruptcy court may order the IRS to allocate payments made by a chapter 11 debtor under a reorganization plan to the debtor's trust fund tax liabilities, which were guaranteed by a third-party, before the debtor's nontrust fund tax liabilities. *Id.* at 547-48.  The Court recognized that nothing in the Bankruptcy Code explicitly authorized the bankruptcy court's approval of a reorganization plan that designated the allocation of tax payments as either trust fund or nontrust fund. *Id.*  Nevertheless, the Court found that authority existed under Code sections 1123(b)(6) (former section 1123(b)(5)) and 105(a), explaining that "[t]hese statutory directives are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *Id.* at 549.  The Court held that "a bankruptcy court has the authority to order the IRS to apply the payments to trust fund liabilities if the bankruptcy court determines that this designation is necessary to the success of a reorganization plan." *Id.* at 549.  In so holding, the Court relied solely on sections 105(a) and 1123(b)(6) as sources of substantive power to issue a tax allocation order.

Consistent with the Supreme Court's ruling in *Energy Resources*, this Court finds that sections 105(a) and 1123(b)(6) of the Bankruptcy Code grant it authority to confirm a provision of the Plan that incorporates the limitations imposed upon the IRS by the Tolling Agreement. The facts and testimony demonstrate that if the IRS attempted to collect additional tax liabilities from BMCA on terms different from the terms set forth in the Plan, it would jeopardize the

Debtors' ability to successfully reorganize.  The principal source of income to fund the Debtors'

reorganization comes from payments made from BMCA to G-I pursuant to the Tax Sharing

Agreement.    Under the Tax Sharing Agreement, G-I must indemnify BMCA for any tax

payments BMCA makes to the IRS, thus, an assessment against BMCA would in effect be an

assessment against G-I.    Testimony revealed that the Tax Sharing Agreement results in an

overall benefit to the estates, thus, its rejection by the Debtors would be impractical.  Moreover,

the facts indicate that G-I could not simply renegotiate the Tax Sharing Agreement with BMCA

without triggering defaults under various credit agreements between G-I and third parties.

Accordingly, this court finds that section 2.4 of the Plan, which addresses the amount, timing an

payment terms of BMCA's and G-I's tax liability under the Bankruptcy Code and the Tolling

Agreement, is "necessary [and] appropriate to carry out the provisions" of the Bankruptcy Code

and to ensure the Plan's success.  By issuing an order that confirms section 2.4 of the Plan, this

Court is not preventing the IRS from assessing against BMCA, or other non-debtor affiliates.

Rather, it is issuing a substantive ruling on BMCA's liability to the IRS by addressing the self-

imposed limitations of the IRS's claim against BMCA, and specifying that BMCA shall satisfy

any such IRS assessment against BMCA in the same manner that G-I would satisfy an IRS

assessment against G-I.

Even if this Court's order were to comprise an injunction barring the IRS from collecting

against non-debtor affiliates, such an injunction is a proper exercise of authority granted to this

Court by the Bankruptcy Code and the United States Supreme Court's decision in *Energy*

*Resources*.  As discussed above, sections 105(a) and 1123(b)(6) of the Bankruptcy Code provide

this Court with authority to issue orders "necessary to the success of a reorganization plan," even

when that authority is not specifically designated by the Bankruptcy Code.  *Energy Resources*,

495 U.S. at 549.  Because the Debtors have demonstrated that is critical to the Debtors'

reorganization efforts that the IRS not seek to collect more from BMCA or ISP than it is entitled

to under the Plan and Tolling Agreement, the Court may appropriately issue an order to enjoin

the IRS from collecting those additional amounts from the non-debtor affiliates.  *See In re*

*Airadigm Communs., Inc.*, 519 F.3d at 657 (holding that "this 'residual authority' permits the

bankruptcy court to release third parties from liability to participating creditors if the release is

'appropriate' and not inconsistent with any provision of the bankruptcy code").  Because the IRS

is unimpaired under the Plan, and the facts demonstrate that the release of BMCA from

additional tax liability (of which G-I would be indirectly liable pursuant to its obligation to

indemnify BMCA under the Tax Sharing Agreement) is critical to a successful reorganization,

the Court's approval of amended section 2.4 of the Plan satisfies "the hallmarks of permissible

non-consensual releases—fairness, necessity to the reorganization, and specific factual findings

to support these conclusions."  *In re Continental Airlines*, 203 F.3d at 214.  Finally, any such

injunction issued by this Court would only be provisional, as it would be dependent upon the

satisfaction by the Debtors of their obligations to the IRS under the Plan.

To enjoin the IRS, however, the Court would have to determine that its authority is not

limited by the Anti-Injunction Act.  26 U.S.C. § 7421(a).  The Anti-Injunction Act provides that

"no suit for the purpose of restraining the assessment or collection of any tax shall be maintained

in any court by any person, whether or not such person is the person against whom such tax was

assessed."  *Id.*  This Court is obliged to give particular attention to *In re Becker's Motor*

*Transportation, Inc.*, as it is a decision of the Third Circuit Court of Appeals which is binding on

us.  632 F.2d 242.  The circuit court in *In re Becker's Motor* held that the Anti-Injunction Act

prohibits a bankruptcy court from enjoining IRS collection efforts against a debtor.  *Id.* at 246.

Thus, the holding in *In re Becker's Motor* would seem to foreclose any effort by this Court to enjoin the IRS from collecting against G-I's non-debtor affiliates.

Yet a tension exists between the Anti-Injunction Act and the Bankruptcy Code.  On the one hand, the Anti-Injunction Act functions as an application of sovereign immunity, which bars courts from restraining the assessment or collection by the government of any tax.  *See Randell v. United States*, 64 F.3d 101, 106 (2d Cir. 1995) (noting that "[i]n the context of tax assessments and collections the government's sovereign immunity has been codified by the Anti-Injunction Act").  On the other hand, Congress explicitly waived governmental sovereign immunity in the bankruptcy context with respect to certain Bankruptcy Code sections, including sections 105 and 505.  *See* 11 U.S.C. § 106(a).[69]  Because the waiver of governmental sovereign immunity in the bankruptcy court arises from the Constitution itself, s*ee Central Va. Cmty. Coll v. Katz*, 546 U.S. at 379, this Court finds that the Anti-Injunction Act does not impede its authority to issue an order that provisionally limits the IRS from seeking to collect additional amounts from BMCA than those provided for in the Plan.

The circuit court's decision in *In re Becker's Motor Transp., Inc.*, 632 F.2d 242, and the district court's decision in *Pazzo Pazzo, Inc. v. New Jersey*, 2007 WL 4166017 are distinguishable, because neither contemplated section 106 of the Bankruptcy Code nor the Supreme Court's decision in *Central Virginia Community College*.  Moreover, subsequent decisions rendered by the United States Supreme Court have undermined the core reasoning behind the Third Circuit's decision in *In re Becker's Motor*.  *See South Carolina v. Regan*, 465 U.S. 367 (1984); *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1 (1962).  *See also In*

---

[69] Additionally, when a governmental unit files a proof of claim in a bankruptcy case, it "is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose." 11 U.S.C. § 106(b).  Here, the IRS has filed a proof of claim in the G-I bankruptcy case, thus, it is deemed to have waived sovereign immunity.

*re Campbell Enterprises, Inc.*, 66 B.R. at 207 (noting that "[t]he *Becker's* decision was premised upon the finding that only Congress, not the judiciary, has the power to create exceptions to the Anti-Injunction Act.  The *Regan* decision, which was rendered by the Supreme Court of the United States subsequent to the *Becker's* decision, however, demonstrates that judicial exceptions to the Anti-Injunction Act may be created.").  In sum, the Anti-Injunction Act does not prevent this Court from issuing an order that provisionally limits the IRS from seeking to collect additional amounts from non-debtor BMCA.

The Court finds that the Debtors have satisfied the standard for issuance of an injunction. To obtain a preliminary injunction in the bankruptcy context, the party seeking the injunction must demonstrate (1) a reasonable likelihood of a successful plan of reorganization; (2) irreparable harm to the Debtors' ability to reorganize without the requested relief; (3) the relative balance of the harms to the adverse parties in determining whether or not to issue an injunction; and (4) whether granting relief would serve the public interest.  *See In re Phila. Newspapers, LLC*, 407 B.R. 606, 617 (E.D. Pa. 2009) (*citing Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)).  Here, the testimony demonstrates that the Plan is feasible. The facts demonstrate that the Plan was formulated by the Joint Proponents under the assumption that the Tolling Agreement limits the IRS's ability to collect from BMCA.  As discussed above, this Court has already addressed the issue of BMCA's tax liability to the IRS, and has concluded that BMCA would not be liable to be assessed for an additional amount of taxes than G-I as a result of the Tolling Agreement.  It is apparent from the testimony that without the inclusion of amended section 2.4 of the Plan, the risk of a failed reorganization attempt increases dramatically.  This is a harm that the Court is unwilling to permit, especially at the request of a creditor that is unimpaired under the Plan.

As a final matter, section 524(e) of the Bankruptcy Code does not prevent the Court from issuing an order approving section 2.4 of the Plan, as § 524(e) does not establish a per se rule barring a reorganization plan from limiting the liability of non-debtors. *In re PWS Holding Corp.*, 228 F.3d at 247. *See also In re Airadigm Communs., Inc.*, 519 F.3d at 657 (noting that "§ 524(e) does not bar a non-consensual third-party release from liability"). This Court agrees with the reasoning of the court in *In re Airadigm Communs., Inc.*, which stated:

> § 524(e) does not purport to limit the bankruptcy court's powers to release a non-debtor from a creditor's claims. If Congress meant to include such a limit, it would have used the mandatory terms "shall" or "will" rather than the definitional term "does." And it would have omitted the prepositional phrase "on, or . . . for, such debt," ensuring that the "discharge of a debt of the debtor shall not affect the liability of another entity"--whether related to a debt or not.

*Id.* at 656. For these reasons, § 524(e) would not automatically bar the Court from enjoining the IRS from seeking to collect additional amounts from BMCA.

## G. Good Faith Negotiation, Implementation, and Consummation

As evidenced by the Plan, the Plan Documents, and the testimony given at the Confirmation Hearing, the Court finds that the Debtors, ACC, and the Legal Representative participated in good faith in negotiating, at arm's-length, the Plan and all plan-related documents necessary to implement, effectuate and consummate the Plan, including: (a) all contracts, instruments, agreements and documents to be executed and delivered in connection with the Plan; (b) the new or amended certificates of incorporation and bylaws or comparable constituent documents of the Reorganized Debtors; (c) the Trust Note and Letter of Credit; (d) all agreements and documents to be executed and delivered in connection with the Asbestos Trust and all other contracts, instruments, agreements and documents to be executed and delivered by any Debtor or Reorganized Debtors in connection therewith. In making this finding, the Court has examined, among other things, the totality of the circumstances

surrounding the filing of the Chapter 11 Cases, the record of this proceeding and the Plan and all

related pleadings, exhibits, statements and comments regarding confirmation.

The Court finds that each of the conditions precedent set forth in Section 10.1 of the Plan

has been satisfied or duly waived pursuant to Section 10.2.

## H.  <u>Approval of Discharges, Releases, Injunctions, Indemnifications and Exculpations</u>

Each of the discharges, releases, injunctions, indemnifications and exculpations provided

under the Plan, including those set forth in Article IX and Section 7.5 of the Plan, among other

Sections, is (1) integral to the terms, conditions and settlements contained in the Plan, (2)

appropriate in connection with the reorganization of the Debtors and/or (3) supported by

reasonable consideration.  In light of all of the circumstances and the record in these Chapter 11

Cases, each of the discharges, releases, injunctions, indemnifications and exculpations provided

for under the Plan is fair and reasonable to all parties in interest.  *See In re Continental Airlines*,

203 F.3d at 214 (denying the requested releases but explaining that nondebtor releases are proper

in the correct circumstances); *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 980-81 (1st

Cir. 1995) (permanent injunctions allowed in "extraordinary circumstances" to protect

nondebtors who contribute to plan).  The Court finds that each of the discharge, release,

injunctive, indemnification and exculpation provisions set forth in the Plan and the Confirmation

Order is: (i) within the jurisdiction of the Bankruptcy Court under 28 U.S.C. §§ 1334(a), 1334(b)

and 1334(d); (ii) an essential means of implementing the Plan pursuant to section 1123(a)(6) of

the Bankruptcy Code; (iii) an integral element of the transactions incorporated into the Plan; (iv)

beneficial to, and in the best interests of, the Debtors, their estates and their creditors; (v) critical

to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-

interest in the Chapter 11 Cases with respect to each of the Debtors; and (vi) consistent with

sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

## I.    <u>Stay Pending Appeal & Ten-Day Stay Period</u>

Federal Rule of Bankruptcy Procedure 8005 provides that a bankruptcy judge may

"suspend or order the continuation of the proceedings in the case . . . or make any other

appropriate order during the pendency of an appeal . . . as will protect the rights of all parties in

interest."  Fed. R. Bankr. P. 8005.  *See also* Rule 8017.  A motion for a stay of the judgment or

order "must ordinarily be presented to the bankruptcy judge in the first instance."  *Id.*  The Court

maintains the sound discretion to grant or deny stay relief.  *In re Blackwell*, 162 B.R. 117, 119

(E.D. Pa. 1993) (*citing In re Dial Industries, Inc.*, 137 B.R. 247, 249 (Bankr. N.D. Ohio 1992).

In addition, the moving party bears the burden of demonstrating that the court should grant the

stay.  *Dial*, 137 B.R. at 249 (*citing In re Hamilton*, 95 B.R. 564, 565 (N.D. Ill. 1989)).

In determining whether a stay pending appeal motion should be granted, courts have

applied the standard as set forth in *Family Kingdom Inc. v. IMEF New Jersey Limited*

*Partnership*, 225 B.R. 65 (D.N.J. 1998).  In *Family Kingdom*, the district court stated:

> In order to determine whether to grant a stay pending appeal, [the] court considers
> the following factors: (1) whether the appellant is likely to succeed on the merits
> of the appeal; (2) whether the appellant will suffer irreparable injury if the stay is
> not granted; (3) whether a stay would substantially harm other parties in the
> litigation; [and] (4) whether a stay is in the public interest.

*Id.* at 69.  While other decisions relax the likelihood of success on the merits prong when the

moving party satisfies the remaining factors, the *Family Kingdom* court noted that this was not

the rule in the Third Circuit for stays of bankruptcy court orders pending appeal.  *Id.* at n.6.

Thus, the court may grant a motion seeking a stay pending appeal when the moving party

satisfies all four factors.

Here, IRS requested in its pleadings and during oral argument that should this Court overrule all of the Untied States' objections, it nevertheless stay the effective date of the Plan pending resolution of any appeal to avoid the invocation of the doctrine of mootness by the reviewing courts, citing *In re Zenith Elecs. Corp.*, 241 B.R. at 105. Additionally, and apart from its request for a stay pending appeal, the IRS filed a letter with this Court on November 9, 2009, requesting that the Court preserve in any order that it issues the ten-day stay period provided by Rules 3020(e), 7062(a), 8005 and 8017 of the Federal Rules of Bankruptcy Procedure. The IRS reiterated its arguments during the status conference on November 10, 2009.

The Court finds that the IRS has not established the necessary showing required to issue a stay pending appeal. As discussed above, the IRS will suffer no injury as a result of this Court's order confirming the Plan because it is an unimpaired creditor. Moreover, testimony demonstrated that only now do the Debtors have an opportunity to obtain financing that would allow them to successfully reorganize, and that any further delay would seriously jeopardize the agreements that were reached to make this reorganization feasible. By granting a stay pending appeal, this Court would risk the failure of a reorganization effort that is the result of hard-fought negotiation among a myriad of interested parties and that fulfills the fundamental purposes of chapter 11. The Court will not grant a stay pending appeal and exacerbate the present risk of failure for a creditor that is being paid in full under the Plan. Regarding the ten-day stay period provided by Bankruptcy Rules 3020(e), 7062(a), 8005 and 8017, the Court finds that sufficient cause exists to shorten the ten-day stay period. Thus, this Court's order of confirmation is stayed until Monday, November 16, 2009 at 5 P.M. Eastern Standard Time, and thereafter shall be effective.

## IV.  <u>CONCLUSION</u>

The Court denies the motion of the United States to Temporarily Allow its Unsecured, Non-priority Claims for Purposes of Voting on Confirmation.[70]  The IRS Motion for a Stay Pending Appeal is denied.  All objections to the Plan are overruled.  The Court will enter an order confirming the Plan.  This Confirmation Order shall be stayed until Monday, November 16, 2009, at 5 p.m. Eastern Standard Time, and shall take effect immediately thereafter.


Dated: November 12, 2009          /s/ Rosemary Gambardella
                                  The Honorable Rosemary Gambardella
                                  UNITED STATES BANKRUPTCY JUDGE


Dated: November 12, 2009          /s/ Garrett E. Brown, Jr.,
                                  The Honorable Garrett E. Brown, Jr.
                                  CHIEF UNITED STATES DISTRICT JUDGE

---

[70] The Motion of the United States to Unseal its Second, Amended Objection to Confirmation was settled prior to the Confirmation Hearing.